# EXHIBIT "C"

## JOINT INTENTIONS AND COMMITMENTS

Enhanced student achievement based upon high standards and expectations must be the driving force behind every activity of New York City public schools.  To accomplish this, we must reinvent schools so that decision making is shared by those closest to students, including parents, teachers, administrators and other stakeholders.  Layers of bureaucratic impediments must be peeled away so that flexibility, creativity, entrepreneurship, trust and risk-taking become the new reality of our schools.  The factory model schools of the 1900s must make way for the child-centered schools of this century.

To this end, the Union and the Board mutually agree to join together with other partners in the redesign and improvement of our schools, including closing those that have failed and supporting their restructuring.  We must challenge ourselves each day to improve student learning, based upon academic rigor, newfound flexibility, meaningful assessments and true accountability.  Roles and responsibilities of parents, staff and other partners must be defined.  The standards to which we hold our students must never be lower than those we hold for our own children.  To accomplish this, we must focus on both the depth and breadth of each proposed instructional and operational change, each designed to support the children and their teachers, whom we expect to meet these rigorous standards.

Change must be service-oriented, supportive and sufficiently flexible so that each school's educational vision can become a reality.  It must be practical, possible, efficient and timely.  Respect for each other and for every student must be unconditional if we are to accomplish what we must.

To reach these goals, we commit to working together along with other stakeholders to develop specific recommendations in areas requiring immediate attention.  These will include, but not be limited to:
- School Based Budgeting
- Early Intervention and Prevention of Inappropriate Referrals to Special Education
- Professional Development
- Parent Outreach and Support
- Workload Standards.

This commitment is our pledge to the children of the City of New York, not just to a promise but to a reality of educational excellence.

AGREEMENT MADE AND ENTERED INTO on the 1st day of May, 2014, by and between THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK (hereinafter referred to as the "Board") and UNITED FEDERATION OF TEACHERS, Local 2, American Federation of Teachers, AFL-CIO (hereinafter referred to as the "Union" or "UFT").

WHEREAS, the Board has voluntarily endorsed the practices and procedures of collective bargaining as a peaceful, fair and orderly way of conducting its relations with its employees insofar as such practices and procedures are appropriate to the special functions and obligations of the Board, are permitted by law and are consonant with the paramount interests of the school children, the school system and the public; and

1

WHEREAS, in a special referendum conducted among the professional educational personnel, over seventy percent of those who participated favored collective bargaining as a way of conducting their relations with the Board; and

WHEREAS, the Union has demonstrated in a secret ballot election that it represents a majority of those assigned as classroom teachers in the regular day school instructional program and has shown by other satisfactory evidence that it represents a majority of those employed as per session teachers, a majority of those assigned as WNYE teachers, a majority of teachers employed in WIN, a majority of teachers and counselors employed in WEP, a majority of employees employed by MDTP, a majority of teachers assigned to central headquarters and district offices, and, in accordance with Board policy, is therefore the exclusive collective bargaining representative for all such employees; and

WHEREAS, pursuant to the Arbitration Award in AAA Case No. 1339-0416-80 certain education administrators were accreted to the bargaining unit; and

WHEREAS, pursuant to the operation of Article One of this Agreement, certain education officers, education analysts, associate education officers and associate education analysts, other than managerial or confidential employees, are accreted to the bargaining unit; and

WHEREAS, other than occasional per diem substitutes were accreted to the bargaining unit pursuant to a determination by the Public Employment Relations Board; and

WHEREAS, the Union has shown by satisfactory evidence that a majority of substitute vocational assistants wish to be represented by the Union for purposes of collective bargaining, and the Union was designated as the exclusive collective bargaining representative for all such employees; and

WHEREAS, the Union has shown by satisfactory evidence that a majority of teacher's assistants wish to be represented by the Union for purposes of collective bargaining, and the Union was designated as the exclusive collective bargaining representative for all such employees; and

WHEREAS, the parties entered into an Agreement effective October 13, 2007 until October 31, 2009; and

WHEREAS, the parties entered into a Memorandum of Agreement on May 1, 2014 effective from November 1, 2009 through November 30, 2018 (the "May 1st MOA"); and

WHEREAS, the Board and its designated representatives have met with representatives of the Union and fully considered and discussed with them, on behalf of the employees in the bargaining unit, changes in salary schedules, improvements in working conditions, and machinery for the presentation and adjustment of certain types of complaints, it is agreed as follows:

## ARTICLE ONE
## UNION RECOGNITION

The Board recognizes the Union as the exclusive bargaining representative of all those assigned as teachers in the regular day school instructional program; all those employed as per session teachers; all those assigned as teachers at WNYE; all primary and non-primary adult education employees; teachers assigned to headquarters or district offices (except supervisors and occasional per diem substitutes); certain education

administrators; certain education officers, education analysts, associate education officers and associate education analysts; substitute vocational assistants; and teacher's assistants.

The term "teachers in the regular day school instructional program" (herein referred to as "day school teachers" or "teachers" or "employees") comprises the following teacher categories:

Teachers of early childhood classes; teachers in the elementary schools; teachers in intermediate schools; teachers in junior high schools; teachers in day academic and day vocational high schools; teachers of health conservation classes; teachers of homebound children; teachers of visually handicapped children; teachers of children with retarded mental development; teachers of speech improvement; teachers in schools for the deaf; teachers in special day schools, day treatment centers or institutional settings; teachers in adult education appointed to fulltime service under licenses issued pursuant to Section 401 of the Board of Education by-laws; teachers in occupational training centers; and all other teachers employed by the Board including all those employed in non-public schools.

The term "certain education administrators" (herein referred to as "education administrators") comprises all non-supervisory education administrators at Level I.

The term "certain education officers, education analysts, associate education officers and associate education analysts" (herein referred to as "education officers and education analysts") comprises employees in the titles Education Officer, Education Analyst, Associate Education Officer, and Associate Education Analyst except those serving in the Offices of the Chancellor, Deputy Chancellors, Labor Relations and Collective Bargaining, and Legal Services; those serving in the Division of Budget Operations and Review and in the Division of Human Resources, except employees who are neither managerial nor confidential as defined in Section 201.7 of Article 14 of the CSL; and those serving elsewhere in the Board of Education who are managerial or confidential as defined in Section 201.7 of Article 14 of the CSL.

During the term of this Agreement should the Board employ a new title or category of employees having a community of interest with employees in the existing bargaining unit described herein, employees in such new title or category shall be included within the existing bargaining unit, and upon request of the Union the parties shall negotiate the terms and conditions of employment for such new title or category of employees; but nothing contained herein shall be construed to require re-negotiation of terms and conditions of employment applicable to employees in the existing bargaining unit as a result of the Board's re-designation of the title or category of employees in the unit.

Nothing contained herein shall be construed to prevent any Board official from meeting with any employee organization representing employees in the bargaining unit for the purpose of hearing the views and proposals of its members, except that, as to matters presented by such organizations which are proper subjects of collective bargaining, the Union shall be informed of the meeting and, as to those matters, any changes or modifications shall be made only through negotiations with the Union.

It is understood that all collective bargaining is to be conducted at Board headquarters level.  There shall be no negotiation with the Union chapter or with any other employee group or organization at the school level.  It is further understood that there shall not be established or continued in any school a Staff Relations Committee as described in the Staff Relations Plan issued by the Board on October 23, 1956.

Nothing contained herein shall be construed to prevent any individual employee from informally discussing a complaint with his/her immediate supervisor.

Nothing contained herein shall be construed to deny to any employee his/her rights under Section 15 of the New York Civil Rights Law or under the State Education Law or under applicable civil service laws and regulations.

## ARTICLE TWO
## FAIR PRACTICES

The Union agrees to maintain its eligibility to represent all teachers by continuing to admit persons to membership without discrimination on the basis of race, creed, color, national origin, sex, marital status, sexual orientation, handicapping condition or age and to represent equally all employees without regard to membership or participation in, or association with the activities of, any employee organization.

The Board agrees to continue its policy of not discriminating against any employee on the basis of race, creed, color, national origin, sex, marital status, sexual orientation, handicapping condition, age or membership or participation in, or association with the activities of, any employee organization.

The Board agrees that it will not require any teacher to complete an oath or affirmation of loyalty unless such requirement is established by law.

The Board of Education agrees that, as a result of the strike and its related activities, it will not dismiss, demote, discipline, or otherwise act against any staff member because of his or her participation in said strike or related activities.  Specifically excluded from the foregoing are any and all provisions of the Taylor Law (New York Civil Service Law, Section 200 et seq.), none of which are waived hereby.

Any records of court proceedings or other memoranda relating to job action or strike shall not be put in a staff member's permanent file, except as required by law.

## ARTICLE THREE
## SALARIES AND BENEFITS OF
## DAY SCHOOL TEACHERS

**A. Salaries and Differentials**

The salaries and differentials of day school teachers and the eligibility requirements therefor are set forth in pertinent part in Appendix A which is attached to and made a part of this Agreement.

**B. Staff Development Rate**

The hourly rate for paid attendance at training sessions shall be:

Effective May 19, 2008…………………………………$19.12
Effective May 1, 2013………………………………….$19.31
Effective May 1, 2014………………………………….$19.50
Effective May 1, 2015………………………………….$20.09
Effective May 1, 2016………………………………….$20.79
Effective May 1, 2017………………………………….$21.74
Effective May 1, 2018………………………………….$22.17
Effective June 16, 2018.………………………………..$22.84

**C. Salary Credit**

   **1. Regular Substitute Service**

An appointee as a regular teacher who has performed prior satisfactory service as a regular substitute teacher for a period of one or more terms shall be placed in the appropriate salary schedule as though all such regular substitute teaching service had been performed in the capacity of a regular teacher; and such appointee shall be given salary credit for each term of such regular substitute teaching preceding appointment.

   **2. Per Diem Substitute Service**

An appointee as a regular teacher shall be granted one year of salary credit for each 170 days of prior satisfactory substitute service in the day public schools of the City of New York.

An appointee as a regular teacher who has had 85 or more days of such substitute service, but fewer than 170 days, or who has 85 or more days in excess of 170 days, or multiple thereof, shall receive one term of salary credit.

Effective June 26, 2002, newly appointed persons shall enter at a salary step not higher than step 8B and shall receive salary credit for each term up to 20 of prior regular substitute service and prior per diem substitute service. Appointed incumbents' salary steps shall be adjusted effective June 26, 2002.

   **3. Industrial Experience**

An appointee as a teacher of shop subject-trades shall be granted salary credit for appropriate industrial experience beyond that required for satisfying the eligibility requirements prescribed in Chancellor's Regulation C-389 on a year by year basis up to a maximum of ten (10) years.

Effective February 1, 1985 a teacher of shop subject-trades shall be granted salary credit for appropriate industrial experience gained within the ten (10) years immediately preceding date of appointment for appointees or date of original license or certificate for substitutes, on a year for year basis, as prescribed in Chancellor's Regulations C-500 and C-535.

   **4. Nursing Experience**

An appointee as a teacher of nursing in day high school shall be granted salary credit for appropriate nursing experience as a registered nurse beyond that required for satisfying the eligibility requirements prescribed in Chancellor's Regulation C-386 on a year by year basis up to a maximum of ten (10) years.

Effective February 1, 1985, a teacher of nursing in day high school shall be granted salary credit for appropriate nursing experience as a registered nurse gained within the ten (10) years immediately preceding date of appointment for appointees or date of original license/certificate for substitutes, on a year for year basis, as prescribed in Chancellor's Regulations C-500 and C-535.

**D. College Credits for Differentials**

All college credits creditable toward college work in excess of the number required for the baccalaureate, whether earned before or after graduation, shall be applicable for differential purposes, except as otherwise provided herein.

Effective for courses commenced after September 8, 1980 correspondence courses will no longer be acceptable for salary differentials or advancement on the increment schedule.

**E.  Application for Certain Salary Differentials**

Effective July 1, 1964, teachers who, at the time of appointment, were not required to hold a baccalaureate degree as an exclusive prerequisite to qualify for the teaching license may apply under either of the following methods for the salary differential provided in Salary Schedule C2 or C6 of Appendix A hereof:

They may submit evidence of having completed the required number of semester hours of approved study, or

They may be credited with 26 semester hours of approved study by reason of having reached the maximum step of Salary Schedule C1 or C2.  In addition, they shall submit evidence of the completion of the required additional number of semester hours of approved study, which additional hours must have been completed prior to the date of appointment or subsequent to the date of placement on the maximum step of the salary schedule.

**F.  Vacation Pay**

**1.  Summer Vacation Pay**

Summer vacation pay shall be prorated for the school year in which teachers are appointed and for the school year in which their service ceases on the following basis: Teachers who are appointed after the start of the school year and teachers who are terminated, laid off, resign or retire on/or before the end of the school year shall receive vacation pay for the summer following their appointment or cessation of service as follows: one-tenth of the amount of the vacation pay which would be payable for a full school year's service shall be paid for each month of service or major fraction thereof during the school year in which they are appointed or cease service except that service of less than a major fraction during the first month of appointment shall be credited for summer vacation pay.  The pro-rating of summer vacation pay for the year in which teachers are appointed and for the year in which their service ceases in accordance with this provision shall not diminish the teacher's entitlement to any other benefit including health insurance and welfare coverage he/she would have received under the prior method of payment.

An employee who serves as a regular or per diem substitute and is appointed after the beginning of the school year shall be entitled to the additional vacation pay of a regular or per diem substitute for the year in which he/she is appointed on the basis of his/her substitute service prior to his/her appointment.

**2.  Vacation Pay Credit and Service Credit**

a.  The estate of a teacher who dies during the school year shall receive a pro-rata amount, based on the length of his/her employment during the school year, of the vacation pay he/she would have received had he/she been employed during the entire school year.  This section shall not apply to those teachers who are presumed to have retired on the day immediately preceding their death pursuant to Section B 20-410 of the Administrative Code of the City of New York, as amended.

b.  A regularly appointed teacher who has rendered actual service during any school year covered in part by leave of absence for maternity and child care shall be given credit for salary increment purposes for any pro-rata vacation pay received for such service.

6

### G.  Health Insurance and Welfare Fund Benefits
#### 1.   Choice of Health Plans

The Board agrees to arrange for, and make available to each day school teacher, a choice of health and hospital insurance coverage from among designated plans and the Board agrees to pay the full cost of such coverage.

Regularly appointed teachers who are laid off and who are covered by a health and hospital insurance plan at the time they are laid off shall continue to be so covered for ninety days from the day on which they are laid off, and the Board will pay the full cost of such coverage.

The Board, the Union and the City of New York ("City") continue to discuss, on an ongoing basis the Citywide health benefits program covering employees represented by the Union and employees separated from service.  Any program-wide changes to the existing basic health coverage will be expressly incorporated into and made a part of this Agreement.  The provisions of Appendix E (Health Insurance) shall apply as modified herein.

The parties acknowledge that collective bargaining regarding health benefits is within the purview of negotiations between the Municipal Labor Committee and the City.  Cost-containment initiatives and program modifications in the City Health Benefits Program shall be discussed with the Municipal Labor Committee.

#### 2.   Supplemental Welfare Fund Benefits

a.   The Board will provide funds at the rate of $1,720 ($1,745 effective July 1, 2014, $1,770 effective July 1, 2015, $1,795 effective July 1, 2016, $1,820 effective July 1, 2017) per year on a pro-rata basis per month on behalf of each day school teacher, for the purpose of making available for each day school teacher supplemental welfare benefits and for the purpose of making available college scholarships for children from low income families graduating from the City's public high schools under a plan devised and established jointly by representatives of the Union and of the Board.  The Board will continue to make payments for supplemental benefits at the rates per year set forth herein on a pro-rata basis per month for ninety days from the day of layoff on behalf of each regularly appointed teacher who is laid off.

b.  Domestic partners of covered employees will be provided with welfare fund benefits in the same manner in which covered employees who are married receive such benefits for their spouses.

c.   The Union has established a supplemental welfare benefits fund program for employees represented by the Union who have separated from service subsequent to June 30, 1970, who were eligible to receive supplemental welfare benefits and who were covered by a welfare fund at the time of such separation pursuant to a separate agreement between the Board of Education and the certified Union representing such employees, who remain primary beneficiaries of the New York City Health Insurance Program and are entitled to benefits paid for by the City through such program.

The Board of Education shall contribute the following annual amount on a pro-rata monthly basis for each eligible individual for remittance to the Union to such supplemental benefits fund pursuant to the terms of the supplemental agreement:

(1) Eligible employees separated from service from July 1, 1970 through September 8, 1982:

Effective November 1, 2009...................$1,160

Effective July 1, 2014.............................$1,185
Effective July 1, 2015.............................$1,210
Effective July 1, 2016.............................$1,235
Effective July 1, 2017 ............................$1,260

(2) Eligible employees separated from service after September 8, 1982:
Effective November 1, 2009...................$1,600
Effective July 1, 2014.............................$1,625
Effective July 1, 2015.............................$1,650
Effective July 1, 2016.............................$1,675
Effective July 1, 2017.............................$1,700

d.  Employees who are separated from service and thereafter return to active service will be entitled to the same Welfare Fund benefits as other active employees.  For the period of their active employment, such employees will not also receive retiree benefits.  Accordingly, the Union Welfare Fund will receive only one contribution on behalf of each such employee, which shall be at the applicable contribution rate for active employees.

e.  The 2009 Health Benefits Agreement, dated July 2, 2009 between the City Commissioner of Labor Relations James F. Hanley and Municipal Labor Committee Chair Harry Nespoli, is deemed to be part of this Agreement.  The Letters of Agreement regarding Welfare Fund Contributions, dated May 5, 2014 and August 14, 2014, between the City Commissioner of Labor Relations Robert W. Linn, and Municipal Labor Committee Chair Harry Nespoli, are deemed to be part of this Agreement.  The side letter agreement between the City Commissioner of Labor Relations James F. Hanley and UFT President Randi Weingarten, dated October 21, 2004, is deemed to be part of this Agreement.  Pursuant to those Agreements, the parties have agreed to a series of payments to the Welfare Fund.

f.  Pursuant to the Municipal Labor Coalition Benefits Agreement, the Union Welfare Fund shall provide Welfare Fund benefits equal to the benefits provided on behalf of an active Welfare Fund-covered employee to widow(ers), domestic partners and/or children of any active Welfare Fund-covered employee who dies in the line of duty as that term is referenced in Section 12-126(b)(2) of the New York City Administrative Code.  The cost of providing this benefit shall be funded by the Stabilization Fund.

**3.  Health Care Flexible Spending Account**

a.  A flexible health care spending account has been established pursuant to Section 125 of the Internal Revenue Code.  Those employees covered by this Agreement are eligible to participate on the same basis as they are eligible to participate in the Citywide health benefits program.  Participating employees shall contribute at least $260 per year up to a maximum of $5,000 per year.  The labor-management health committee which includes Union and City representatives may modify these contribution levels, based on experience of the plan.

b.  Expenses covered by the account shall include but not be limited to deductibles, co-insurance, co-payments, excess expenses beyond plan limits, physical exams and health related transportation costs for vision, dental, medical and prescription drug plans where the employee and dependents are covered.  In no case will any of the above

expenses include those non-deductible expenses defined as non-deductible in IRS Publication 502.

c.  An administrative annual fee of $48.00 shall be charged for participation in the program.  Pursuant to Section 125 of the Internal Revenue Code, an employee's participation in the account is irrevocable during any plan year and any excess funds in an employee's account at the close of any plan year is retained by the plan and not refundable to the employee.

**4.  Dependent Care Assistance Program**

a.  A dependent care assistance program has been established pursuant to Section 125 of the Internal Revenue Code.  Those employees covered by this Agreement are eligible to participate on the same basis as they are eligible to participate in the Citywide health benefits program.  Participating employees shall contribute at least $500 per year up to a maximum of $5,000 per year.  The labor-management health committee which includes Union and City representatives may modify these contribution levels, based on experience of the plan.

b.  An annual administrative fee of $48.00 shall be charged for participation in the program.  Pursuant to Section 125 of the Internal Revenue Code, an employee's participation in the account is irrevocable during any plan year and any excess funds in an employee's account at the close of any plan year is retained by the plan and not refundable to the employee.

**5.  Retiree Health Insurance Coverage**

The parties shall jointly take whatever action is necessary, including joint support of legislation, to modify retiree eligibility for health insurance coverage so that vested retirement and service retirement retirees with less than fifteen (15) years of credited service as a member of such retirement or pension system shall no longer be eligible for health insurance and welfare benefit coverage, although they may remain vested for pension purposes after ten (10) years of credited service.

The above shall apply to UFT-represented employees in TRS and BERS hired after the legislation is enacted.

**H.  Reimbursement for Medical Expenses**

Teachers shall be reimbursed by the Board for reasonable medical expenses, not exceeding $750, incurred because of injuries in the line of duty, to the extent that such expenses are not covered by insurance.

In accordance with existing regulations, as they may be modified by the parties, this limit is waived for employees injured as a result of an unprovoked assault while on duty or while on school premises.

**I.  Damage or Destruction of Property**

1.  Teachers shall not be held responsible for loss within the school of school property or children's property when such loss is not the fault of the teacher.

This does not exonerate the teacher from responsibility for school property in his/her charge.

2.  The Board of Education will reimburse teachers, in an amount not to exceed a total of $100 in any school year, for loss or damage or destruction, while on duty in the school or while on duty on a field trip, of personal property of a kind normally worn to or brought into school, or on a field trip, when the teacher has not been negligent, to the extent that such loss is not covered by insurance.

The term "personal property" shall not include cash.  The terms "loss," "damage" and "destruction" shall not cover the effects of normal wear and tear and use.

3.  Teachers of the homebound shall be reimbursed for loss or damage or destruction, while on official duty on field assignments, of personal property of a kind normally worn or carried on duty when such loss results from force or violence reported to the police.  Reimbursement will be limited to a total of $100 in any school year; will be made when the teacher of the homebound has not been negligent; and will be granted to the extent that such loss is not covered by insurance.  The term "personal property" shall not include cash.  The terms "loss," "damage" and "destruction" shall not cover the effects of normal wear and tear and use.

**J.  Reimbursement for Telephone Calls**

Teachers of the homebound shall be reimbursed for all business telephone calls.

**K.  Transportation Benefits**

**1.  Reimbursement for Use of Cars**

a.  Teachers of the homebound, except for those who work principally in mid-town Manhattan, will be given authorization to use their personal cars on official business in accordance with criteria, procedures and other requirements of generally applicable rules and regulations issued by the Chancellor.  Employees who are authorized to use their personal cars on official business shall be reimbursed in accordance with the allowance established by the City Comptroller.

It is understood that this provision is subject to the continuing budgetary authority of the Board to permit use of personal cars on official business.

b.  Teachers of nursing may be authorized by their supervisor to use their personal cars to travel between the school and clinic on official business in accordance with criteria, procedures and other requirements of generally applicable rules and regulations issued by the Chancellor.  Employees who are authorized to use their personal cars on official business shall be reimbursed in accordance with the allowance established by the City Comptroller.

**2.  Transportation Benefit Program**

Employees are eligible to participate in the NYC Transit Chek program.

The parties agree that the City will expand the current Transit Chek program to offer to eligible employees the ability to purchase a Transit Debit Card through payroll deductions in accordance with IRC Section 132.  In addition to the current MTA Surface and Subway lines, the Transit Debit Card may be used to purchase tickets for mass transit commutation only (i.e., LIRR, LI MTA Buses, MetroNorth).  The administrative fee for this benefit will be borne by the participants and will be deducted on a prorated basis from the participating employee's paycheck.  After one year of experience with this benefit, the City will examine the level of participation and the associated costs of providing this benefit to determine whether or not the administrative fee requires adjustment.

The parties further agree to examine the possible expansion of this benefit to include other regional mass transit carriers.

**L.  Salary Payment**

1.  The parties agree that a biweekly payroll gives employees a date certain for receipt of their pay.  Therefore, the Board will convert the pedagogical payroll to a biweekly payroll from the existing semi-monthly payroll as soon as practicable.  The

parties will make whatever contractual changes are technically necessary to accomplish this goal.

2.  On the last day of the school year, employees shall receive five (5) paychecks which are not to be cashed until the date appearing on the paychecks dated on or about June 30, July 15, July 30, August 15 and August 31.

The Board and the Union agree that any employee who attempts to cash or cashes any of these five paychecks prior to the date on the paycheck(s) shall thereafter reimburse the Board and/or the City of New York for any costs resulting from such action by deduction of such costs from the payments due to said employee.

The early distribution of these five paychecks shall end if five (5) percent of the paychecks in any one summer are prematurely cashed and the practice in existence prior to this Agreement shall resume.

3.  The Board will recommend to the Comptroller of the City of New York that he/she itemize more fully employee pay checks and that he/she provide accompanying explanations when lump sum payments are made.

4.  The Board has in place an electronic funds transfer ("EFT") program without resort to a payroll lag for those bargaining unit members who are regularly scheduled employees in titles paid on the Q Bank and who elect the receipt of their paychecks by electronic funds transfer.  Annual enrollments will take place each March.

5.  As of school year 2007-2008, all newly-hired employees of the Board of Education shall have their wages paid through direct deposit.

**M. Performance Incentives Committee**

A committee co-chaired by the Chancellor, the President of the UFT and the New York City Commissioner of Labor Relations, or his or her high-ranking designee, shall be established to investigate the viability and desirability of merit pay and to address other compensation issues such as comparability, skills and responsibility, shortage and hard to staff areas and potential career ladder opportunities.

**N.  Ratification Bonus**

1.  A lump sum cash payment in the amount of $1,000, pro-rated for other than full time employees, shall be payable as soon as practicable upon ratification of the May 1st MOA to those employees who are on payroll as of the day of ratification.  This lump sum is pensionable, consistent with applicable law, and shall not be part of the Employee's basic salary rate.

2.  Any disputes arising under this section N shall be determined by Martin F. Scheinman.  The parties shall share the costs of his services.

**O.  Structured Retiree Claims Settlement Fund**

1.  Upon ratification, the City shall establish a Structured Retiree Claims Settlement Fund in the total amount of $180 million, as modified by the decision of Arbitrator Martin F. Scheinman dated November 17, 2014, to settle all claims by retirees who have retired between November 1, 2009 through June 30, 2014 concerning wage increases arising out of the 2009-2011 round of bargaining.  The Fund will be distributed based upon an agreed upon formula.

2.  Any disputes arising under this section O shall be determined by Martin F. Scheinman.  The parties shall share the costs of his services.

**P.  Lump Sum Payments Stemming From the 2009-2011 Round of Bargaining**

1.  Schedule for actives for those continuously employed as of the day of payout:

      i.   10/1/15 – 12.5%
     ii.   10/1/17 – 12.5%
   iii.   10/1/18 – 25%
   iv.   10/1/19 – 25%
    v.   10/1/20 – 25%

2.  Employees who retire after June 30, 2014 shall receive lump sum payments based on the same schedule as actives as set forth in this section P.

3.  Any disputes arising under this section P shall be determined by Martin F. Scheinman.  The parties shall share the costs of his services.

**Q.  Healthcare Savings**

1.  The UFT and the City/DOE agree the UFT will exercise its best efforts to have the MLC agree to the following:

a.  for fiscal year 2015 (July 1, 2014-June 30, 2015), there shall be $400 million in savings on a citywide basis in health care costs in the NYC health care program.

b.  for fiscal year 2016 (July 1, 2015-June 30, 2016), there shall be $700 million in savings on a citywide basis in health care costs in the NYC health care program.

c.  for fiscal year 2017 (July 1, 2016-June 30, 2017), there shall be $1 billion in savings on a citywide basis in health care costs in the NYC health care program.

d.  for fiscal year 2018 (July 1, 2017-June 30, 2018), there shall be $1.3 billion in savings on a citywide basis in health care costs in the NYC health care program.

e.  for every fiscal year thereafter, the savings on a citywide basis in health care costs shall continue on a recurring basis.

f.  The parties agree that the above savings to be achieved on a Citywide basis are a material term of this agreement.

g,  In the event the MLC does not agree to the above citywide targets, the arbitrator shall determine the UFT's proportional share of the savings target and, absent an agreement by these parties, shall implement the process for the satisfaction of these savings targets.

h.  Stabilization Fund: (1) Effective July 1, 2014, the Stabilization Fund shall convey $1 billion to the City of New York to be used in support of the pro rata funding of this agreement. (2) Commencing on July 1, 2014, $200 million from the Stabilization Fund shall be made available per year to pay for ongoing programs (such as $65 welfare fund contribution, PICA payments, budget relief).  In the event the MLC does not agree to provide the funds specified in this paragraph, the arbitrator shall determine the UFT's proportional share of the Stabilization Fund monies required to be paid under this paragraph.

2.  Dispute resolution regarding this section Q

a.  In the event of any dispute, the parties shall meet and confer in an attempt to resolve the dispute.  If the parties cannot resolve the dispute, such dispute shall be referred to Arbitrator Martin F. Scheinman for resolution.

b.  Such dispute shall be resolved within ninety (90) days.

c.  The arbitrator shall have the authority to impose interim relief that is consistent with the parties' intent.

d.  The arbitrator shall have the authority to meet with the parties at such times as the arbitrator determines is appropriate to enforce the terms of this agreement.

e.   The parties shall meet and confer to select and retain an impartial health care actuary.  If the parties are unable to agree, the arbitrator shall select the impartial health care actuary to be retained by the parties.

f.   The parties shall share the costs for the arbitrator and the actuary the arbitrator selects.

**R.  Parking**

Provisions with respect to parking placards are contained in the letter agreement set forth in Appendix M.

## ARTICLE FOUR
## PENSION AND RETIREMENT
## PROGRAM

**A.  Annuity Fund**

The Board shall contribute at the rate of $400 per year to the Teachers' Retirement System to be credited monthly to the annuity account of each teacher who is at the maximum step of his/her salary schedule.

The Board will seek such legislation as may be necessary to provide for these annuity contributions.  In the event that necessary enabling legislation is not enacted, the Board will pay monthly to each teacher covered in the preceding paragraph at the rate specified above.

**B.  Support for Program**

With respect to pensions and retirement, the Board hereby affirms its support of the following program:

1.   One year of pension credit shall be granted for each 170 days of substitute service.

2.   Teachers shall be entitled to credit for all teaching service in New York City or elsewhere rendered before entry into the Teachers' Retirement System of the City of New York.

3.   The Teachers' Retirement Board should be adequately staffed to provide prompt and efficient service.

4.   Teacher members of the Retirement Board shall be free from their teaching duties during their terms of office to be available for the education of teachers regarding their pension rights.

**C.  Pension Legislation**

The parties have agreed to jointly support pension legislation as set forth in the letter attached as Appendix K.

**D.  Tax Deferred Annuity Plan**

The parties agree to enroll newly-hired employees who do not enroll in a retirement or pension system maintained by the City of New York in the Board's 403(b) Annuity Plan at the time the employee is hired.  It is further agreed that such employees will be provided with the option to withdraw from enrollment in the Board's 403(b) Annuity Plan.

**E.  Pension Benefits Agreement and Deferred Compensation Plan**

1.   The Pension Benefits Agreement dated June 6, 2000, is deemed to be a part of this Agreement.

2.   The Board and the City shall promptly make available to the employees covered by this Agreement an eligible deferred compensation plan under Section 457 of the Internal Revenue Code in accordance with all applicable laws, rules and regulations.

**ARTICLE FIVE**
**LICENSURE, ASSIGNMENT**
**AND APPOINTMENT**

**A.  Substitute Teacher Position**

It is the policy of the Board to provide for the gradual elimination of the position of substitute teacher in the following manner:

1.   No examination for substitute teacher of common branches will be conducted at any time after September 1, 1968, and no license will be issued after February 1, 1969.

2.   No examination for any other substitute teaching license will be conducted at any time after February 1. 1969, and no license will be issued after June 30, 1969.

The Board agrees that, in the event that the steps described in 1 and 2 above are not taken, it will pay to regular substitute teachers an additional sum calculated on the basis of the percentage of their annual salary which is equal to the percentage paid by the City of New York as increased take-home pay for its provisional employees but not to exceed the percentage paid to regular teachers.  The Board will also treat regular substitute teachers for salary schedule placement and increment purposes in the same way as teachers who are appointed as regular teachers.

**B.  Regularized Licensure**

The Board of Education shall provide for the regular licensure of classroom teaching personnel consistent with the needs of the instructional program and subject to applicable law and the by-laws of the Board of Education.  The Board will take the following actions:

The Board has established regular licenses valid for classroom teaching service under regular appointment, or for day-to-day per diem service, or for full-term assignment, or for other teaching service, including bi-lingual teaching.  All teaching positions will be filled by persons holding such regular licenses except under the following circumstances:

1.   Where a position must be filled to cover a class for which no person holding such regular license is immediately available after all efforts have been made to fill the position by a person holding such regular license;

2.   Where the position covers a subject not normally taught in the public schools and is temporary in nature.

**C.  Provisional Teachers**

1.   A Certified Provisional Teacher ("CPT") is a person who has not yet been appointed, who holds a New York State provisional or permanent certificate, a New York City regular license or a New York City substitute license issued on or before June 30, 1969. CPT's do not require annual renomination.

2.   A Preparatory Provisional Teacher ("PPT") is a person who has not yet completed all the requirements for New York State provisional certification, but who holds a New York State temporary license.  Pursuant to Commissioner's regulations, a PPT will be eligible for annual renomination for a state temporary license for a period of three years provided that for each year of service the PPT has been rated satisfactory and has shown

progress toward state provisional certification. For any PPT who satisfies these conditions the Chancellor will seek state renomination.

3.  Appointments and assignments to teaching positions shall be made in accordance with State Education Law, Commissioner's regulations and applicable Board of Education regulations and provisions of this Agreement. Appointments shall be made from eligible lists of persons holding regular licenses. After all available persons with regular licenses have been appointed and where positions still remain vacant or arise during the course of the school term, certified provisional teachers shall have priority for any assignment. Where no certified provisional teacher is available for assignment, preparatory provisional teachers will be eligible for such assignment.

Except in cases of emergency, any CPT or PPT employed to fill a full term or balance of term assignment will be retained for at least the duration of that term.

**D.  Assignment During First Fifteen Days**

A teacher who is assigned during the first fifteen (15) days of the school term to a position which is expected to be vacant for that term shall serve under the terms and conditions of this Agreement which would be applicable if a regular substitute teacher were serving in that position.

**E.  Withdrawal of Resignation and Subsequent Reappointment**

1.  Requests for withdrawal of resignation on the part of teachers who attained permanent tenure prior to their resignation shall be effectuated, subject only to medical examination and the approval of the Chancellor, provided that application for such withdrawal of resignation is made on or before the opening of school in September next following five years after the effective date of resignation. In all other cases of withdrawal of resignation, the requirements of former Section 255 of the Board of Education by-laws shall continue in effect.

2.  Teachers who resign and subsequently are reappointed shall be placed in the salary step at which they were at the time of resignation and shall be given the sick leave "bank" and sabbatical leave rights which they held at the time of resignation.

**F.  Absence Without Notice**

Teachers who are absent for 20 consecutive school days without notice shall be deemed to have resigned unless they have reasonable cause for failure to notify. The issue of the reasonableness of the cause and the penalty, if any, shall be subject to the grievance procedure, including binding arbitration, set forth in Article Twenty-Two.

**G.  Return to Former License of Appointment**

To open more opportunities to serve in the New York City public schools, and to encourage the use of shortage area licenses, the parties have agreed to the following system for license reversion, which supplements the existing procedure. This new system requires application and approval to revert to a former license and appointment. Except in unusual cases, approval will not be given to change from a shortage to a non-shortage license area. However, pedagogues serving in agreed-upon shortage areas may apply under Section 248 of the Chancellor's Regulations to revert to a former license and appointment.

Except for pedagogues serving in agreed-upon shortage areas, pedagogues who have been previously appointed under different license(s) may apply to serve under any such license(s) according to the following guidelines:

1. The former license was validated by serving one year satisfactorily under that license and is still valid, and

2. The most recent three years of active service have been rated satisfactory, and

3. A vacancy in the school, district or city exists in the former license.

A pedagogue whose application to return to a former license is approved will be placed at the next reorganization in a vacant position in the same school or program in which he/she is serving. If no such vacancy exists he/she will be placed in a vacancy in the same community school district or superintendency. If no vacancy exists in the community school district or superintendency, the Division of Human Resources will place the pedagogue in a vacancy in the City.

For the purpose of this provision, a vacancy is defined as an unencumbered position, an anticipated vacancy, or a position currently held by a substitute.

A pedagogue who returns to a former license must serve a minimum of two school years in the license before being eligible to apply again under this provision.

A pedagogue who reverts to a license in an agreed-upon shortage area pursuant to this provision has the right to return to the license from which he/she reverted after at least two years of service in the shortage area.

**H. New Arts Licenses**

In consequence of the creation of pre-kindergarten - grade 12 licenses for art, dance, vocal music and orchestral music ("the new arts licenses") the following is agreed upon with respect to contractual implementation for teachers impacted by the new arts licenses:

1. Teachers who have completed probation in any license and are also state certified in a specific arts area and have taught for three years satisfactorily in the specific arts area will be grandfathered into the new license for all contractual purposes; however, for completion of probation in the new arts licenses, a teacher must serve one year under the new arts license.

2. Appointed teachers who have taught satisfactorily for three years in a specific arts area but who do not currently hold state certification in the specific arts area and who commit to an education plan to achieve state certification by September 1, 2005 will be considered for seniority purposes with licensed probationary teachers in the specific arts area. However, for completion of probation in the new arts licenses, the teacher must serve one year under the new arts license.

3. Teachers serving under any of the four new arts licenses may transfer pursuant to Article 18A only within the level (elementary, middle/junior high school or high school) in which they completed probation in the new arts license.

4. Upon their request, Article 17C (Appointment to New Program, License or Title) shall apply to teachers who are displaced by the establishment of the new licenses.


**ARTICLE SIX**
**HOURS**

**A. School Day**

1. The following shall apply except as set forth in Article 6B below:

a. The school day for teachers serving in the schools shall be six hours and 20 minutes and such additional time as provided for below and in the by-laws. The gross

annual salary of employees covered by this Agreement will be increased in accordance with the salary schedules herein.

b.   The parties agreed, effective February, 2006**,** to extend the teacher work day in "non Extended Time Schools" by an additional 37 ½ minutes per day, Monday through Thursday following student dismissal.  Friday's work schedule is 6 hours and 20 minutes. The 37 ½ minutes of the extended four (4) days per week shall be used for tutorials, test preparation and/or small group instruction and will have a teacher to student ratio of no more than one to ten. In single session schools, the day will start no earlier than 8:00 a.m. and end no later than 3:45 p.m.

c.   Multi-session schools that cannot utilize the additional time in this manner due to space or scheduling limitations will have a 6 hour 50 minute day.

d.   In District 75 buildings and District 75 self-contained classes in other school sites, the school day will be 6 hours and 50 minutes unless the principal and chapter leader agree to schedule the time as set forth in paragraph 2 above; however, in this event the teacher to student ratio will be no more than 1 to 5.  Non-District 75 self contained classrooms shall have either a (a) 6 hour and 50 minute day; (b) a 6 hour and 57 ½ minute day Monday through Thursday and 6 hour and 20 minute day on Friday; or (c) if the time is utilized as set forth in paragraph 2 above the teacher to student ratio should be no more than five.

e.   Existing faculty and grade conference time should be used for professional development.

f.   On professional development days, the school day shall be 6 hours and 50 minutes.

2.   Expedited Appeal Regarding Group Size

In order to ensure that the maximum number of students is not exceeded there will be an expedited arbitration procedure to allow the UFT to seek both a cease and desist order as well as monetary penalties for exceeding the small group instruction size limit.  The procedure is set forth in Article 22B6 and 22G.

**B.  Pilot Workday**

1.   Detailed below are the terms for a two (2) year pilot to occur during the 2014-2015 and 2015-2016 school years only.  Should the parties wish to continue this model, they must agree in writing to do so by May 15, 2016.  If no such agreement is reached, the workday shall automatically revert to the provisions of Article 6A.

**a.  Default Workday Configuration for Teachers:**

Unless modified through a School-Based Option ("SBO") pursuant to Article 8B, the following shall apply to Teachers in Single Session Schools:

(1)  The school day shall be 6 hours and 20 minutes Monday through Friday.

(2)  On Mondays and Tuesdays, the day shall start no earlier than 8:00 a.m. and end no later than 4:00 p.m. The parties have agreed to repurpose the one hundred fifty (150) minutes per week of extended time and all faculty and grade conference time be used instead as follows:

(a)  On Mondays when school is in session there will be an 80-minute block of Professional Development immediately following the conclusion of the school day. Professional Development shall be collaboratively developed by a school based committee as set forth below in section b of this section B(1).  If less than the entire 80-

minute period is taken up by Professional Development activities, then the time will be utilized for Other Professional Work as set forth below.

(b) On Tuesdays when school is in session there will be a 75-minute block immediately following the conclusion of the school day that consists of 40-minutes for Parent Engagement activities as set forth below in section c of this section B(1), immediately followed by a 35 minute block of time for Other Professional Work as set forth section d of this section B(1). If less than the entire 40-minute block of time is taken up by Parent Engagement activities, then the time will be utilized for Other Professional Work as set forth Section D of this Article.

(c) On Wednesday through Friday, the day shall begin no earlier than 8:00 a.m. and end no later than 3:45 p.m.

(d) On citywide professional development days the workday shall be 6 hours and 50 minutes.

**b. Professional Development:**

Each school (and program functioning as a school) shall form a School-Based Staff Development Committee ("SDC"). Such committee will include the Chapter Leader and consist of equal number of members selected by the Chapter Leader and the Principal, respectively. The SDC shall collaboratively review, consider and develop the school-based professional development that is offered during the Professional Development block to be relevant to all participating staff-members, supportive of pedagogical practices and programs at the school and reasonable to prepare and complete during the Professional Development block. The Principal shall review the SDC's work but shall have final approval of Professional Development.

School and District and Functional Chapter Based Staff Development Committees, as described below and in corresponding agreements, shall each meet during the last clerical half day scheduled in June and/or a portion of the time during the workdays prior to the start of the instructional year when students are not in attendance, to begin their work regarding the following school year's professional development. In addition, each may choose to also meet to continue their work during times when Other Professional Work, as defined herein, is appropriate.

It is recognized by the parties that some Professional Development activities will be appropriate for all staff and some will be most relevant to certain groups of staff members. Accordingly, schools are encouraged, where appropriate, to include differentiated professional development activities for groups or titles, including functional chapters, that is aligned to the groups' or titles' roles.

**c. Parent Engagement:**

Appropriate activities for the 40-minute Parent Engagement block are: face-to face meetings (individual or group) with parents or guardians; telephone conversations with parents or guardians; written correspondence including email with parents or guardians; creating newsletters; creating content for school/class websites and/or answering machines; preparing student report cards; preparing student progress reports; Meetings with parents of English Language Learners (as per Commissioner's Regulations part 154); and preparing for any of the Parent Engagement activities listed herein. Teachers shall select from the activities listed to engage in during these blocks of time unless otherwise directed by the principal to another activity specified herein.

**d.  Other Professional Work:**

Appropriate Other Professional Work for any period of time, during these specified blocks, during which Parent Engagement and/or Professional Development activities are not taking place are: collaborative planning; Lesson Study; Inquiry and review of student work; Measures of Student Learning ("MOSL") related work; IEP related work (excluding IEP meetings); work with or related to computer systems/data entry; preparing and grading student assessments; mentoring; as well as responsibilities related to teacher leader duties for all individuals in Teacher Leadership Positions.  Teachers can choose from the listed activities over the course of the year.  Principals can direct teachers to an activity on the list "on as needed basis" to improve class instruction and meet the needs of the school as outlined by the Comprehensive Education Plan.  In addition to the activities listed here, a teacher or a group of teachers may propose additional activities that may include working with a student or students for any portion of the school year, which requires approval by the principal.  In addition, as provided for in section b of this section B(1), an SDC may choose to also meet to continue its work during times when Other Professional Work is appropriate.

There will be one (1) or two (2) periods of time during the school year, based upon a school's MOSL selections, one in the Fall and one in the Spring, each of which shall be a minimum of six (6) weeks in duration, that will be designated as "MOSL windows" for the entire school district by the DOE. The six (6) week time periods need not be consecutive weeks. During these "MOSL windows" teachers shall be permitted to devote as much time as necessary during the entire Parent Engagement periods of time to perform MOSL related work. Should teachers not have the need to do MOSL related work during the MOSL window, they shall engage in either Parent Engagement or Other Professional Work as set forth herein.

**e.  Evening Parent-Teacher Conferences:**

(1) The two (2) existing afternoon Parent-Teacher Conferences shall be unchanged.

(2) The two (2) existing evening Parent-Teacher Conferences shall be unchanged except that they shall each be three (3) hours long.

(3) There shall be two (2) additional evening Parent-Teacher Conferences.  Each additional conference shall be three (3) hours long.  Such conference time, together with a portion of the Tuesday activities block, shall replace all existing faculty and grade/department conferences as designated in the By-Laws and collective bargaining agreement.

(4) The four (4) evening Parent-Teacher Conferences shall be held in September, November, March and May, respectively on dates to be determined by the Board (DOE). All conferences shall begin no earlier than 4:30 p.m. and end no later than 8:00 p.m.

(5) The September conference shall not be a traditional Parent-Teacher Conference but rather used for an alternative event using one of the following formats as determined by the school Principal and Chapter Leader in consultation with the School Leadership Team ("SLT"):  Curriculum Night; Meet the Staff Night; Common Core or other training for Parents Night, or another non-traditional format mutually agreed upon by the Principal and Chapter Leader in consultation with the SLT.  Should the principal and Chapter Leader not agree on a format, the default format for the September Conference shall be "Meet the Staff" night. It is understood that in schools which had previously

exchanged faculty conference time for an evening event, those events are subsumed within the four (4) evening Parent-Teacher Conferences.

(6) All existing rules, regulations and procedures regarding Parent Teacher Conferences continue to apply unless specifically modified herein.

**f.  School-Based Options ("SBO"):**

In addition to the above described default schedule, the following configurations of the workday shall be approved by the President of the UFT and Chancellor if the other requirements of the SBO process as set forth in Article 8B of this Agreement. The start and end time of the work day shall be specified in each of the SBOs.

**(1) 100/55 Option:**

(a) The school day shall be 6 hours and 20 minutes.

(b) On Monday, the day shall begin no earlier than 8:00 a.m. and end no later than 4:00 p.m. On Tuesday through Friday the day shall begin no earlier than 8 a.m. and end no later than 3:45 p.m.

(c) On Monday there shall be a 100-minute Professional Development period immediately following the end of the school day.  If less than the entire 100-minute period is taken up for Professional Development, the time shall be utilized for Other Professional Work.

(d) On Tuesday there shall be a 55-minute block for Parent Engagement. If less than the entire 55-minute period is taken up by Parent Engagement Activities, then the time shall be utilized for Other Professional Work.

**(2) 80/40/35 Option:**

(a) The school day shall be 6 hours and 20 minutes.

(b) On Monday, the day shall begin no earlier than 8:00 a.m. and end no later than 4:00 p.m. On Tuesday through Friday the day shall begin no earlier than 8:00 a.m. and end no later than 3:45 p.m.

(c) On Monday there shall be an 80-minute Professional Development period immediately following the end of the school day. If less than the entire 80-minute period is taken up for Professional Development, the time shall be utilized for Other Professional Work.

(d) On Tuesday there shall be a 40-minute block for Parent Engagement immediately following the end of the school day. If less than the entire 40-minute period is taken up by Parent Engagement Activities, then the time shall be utilized for Other Professional Work.

(e) On Thursday immediately following the end of the school day, there shall be 35-minute period to be used for Other Professional Work.

Consistent with the contractual requirements, other SBO configurations voted on by schools shall be considered.

2.  The following shall apply to multi-session, District 75 and District 79 Schools only, for the duration of the pilot and, if continued, thereafter:

a.  The parties both understand and agree that staff in multi-session and Districts 75 and 79 schools need and deserve support and professional development and that such schools would also benefit from additional parent engagement opportunities.  Each school should have an opportunity to address those needs within its unique scheduling and programmatic structures.  Accordingly, the default workday and workday configuration, including faculty and grade/department conferences, for multi-session and

20

Districts 75 and 79 Schools remains as set forth in the 2007-2009 collective bargaining agreements.

b.   Each multi-session school and each District 75 and 79 school shall form a School-Based Staff Development Committee ("SDC"), in accordance with the parameters outlined for such Committees in the Single Session Schools section above.  In addition to the duties of a SDC in a single session school, multi-session and District 75 and 79 SDCs shall discuss potential SBOs for the configuration of time appropriate to the scheduling needs of those schools so as to provide for appropriate blocks of time to be used for Professional Development, Parent Engagement, and Other Professional Work. The UFT and the DOE agree to consider any such proposed SBO in light of the individual school's scheduling and programmatic needs.

c.   There shall also be Central District 75 and District 79 SDCs consisting of an equal number of members selected by the applicable UFT District Representative and the District Superintendent, which shall address specific professional development and scheduling needs in District 75 and 79, respectively.

d.   The parties agree to discuss and develop mutually agreeable SBO options for multi-session, District 75 and District 79 schools.

**C.  Work Year**

1.   All teachers shall report to their schools to begin work on the Tuesday following Labor Day, and will have a professional day on Brooklyn-Queens Day.  The Tuesday following Labor Day may be an instructional day.  Teachers shall be in attendance on duty thereafter on all days of the school year except for the last two weekdays of the month of June.  The official school year calendar shall provide a one week February mid-winter recess which includes Washington's Birthday, without reducing the number of instructional days for students.  In no event, however, shall the number of days worked in any school year under this work calendar be fewer than the number of days teachers would have worked had they reported, as before, on the Friday after Labor Day and worked through the last weekday in June.

2.   Emergency Closings

a.   The Board of Education ("DOE") and UFT recognize that due to emergency conditions (including, but not limited to snow closings) there may be situations where the DOE may fall short of the minimum number of instructional days required annually by the Education Law.

b.   Prior to opening of each school year, the DOE and UFT agree to jointly determine those vacation days during designated recess periods which shall be used in the event that there is a need to make up days in order to meet the statutory minimum and the order in which such days would be used.

c.   In no event shall the number of make-up days exceed the number needed to meet the minimum required by the Education Law.

**ARTICLE SEVEN**
**PROGRAMS, ASSIGNMENTS AND**
**TEACHING CONDITIONS**
**IN SCHOOLS AND PROGRAMS**

**A.  High Schools**

  **1.  Program Preference**

No later than 60 days before the end of the term, program preference sheets should be distributed to all teachers.  Where advisable and feasible, preferences with respect to subparagraphs a through g below will be honored to the extent consistent with the provisions of this Agreement relating to rotation and programming.

No later than 10 school days prior to the end of the term, teachers should be notified of the following matters concerning their programs for the following term:

  a.  Subjects to be taught;

  b.  Grades of the subjects to be taught;

  c.  Any special or unusual classes that teachers will be required to teach;

  d.  The grade level and special nature, if any, of the official class;

  e.  The session to which a teacher will be assigned if the school operates on more than one session;

  f.  The particular special education program designation (e.g. staffing ratio, collaborative team teaching, Special Education Teacher Support Services (SETSS), etc.);

  g.  The age range of special education classes;

  h.  The professional activity assigned pursuant to Article 7A6 (Professional Activity Options) and Article 7U (Professional Activity Assignment Procedures).

No later than the end of the next to the last school day of the term, teachers should receive their building programs for the following term, including the periods and rooms where their teaching assignments occur.

It is understood that all information detailed above is to be considered subject to change if necessary because of changes in subject enrollments, staff changes, and programming exigencies.

  **2.  Program Guidelines**

Wherever administratively possible, teacher programs should follow these guidelines:

  a.  There should be no more than three consecutive teaching assignments and no more than four consecutive working assignments (including professional activities)

  b.  The number of different rooms in which assignments occur should be held to the absolute minimum administratively possible.

  c.  The number of lesson preparations should be kept at the minimum consistent with the nature of the subject, the size of the department, the special offerings of the department, and special requests of teachers.  Honor classes and modified classes should be considered as separate preparations.  Within a department, teachers with a full teaching program should be given preference in the assignment of the number of preparations.

  d.  All shops should be programmed by single grade level, or in the case of special education classes by functional level.

  e.  All classes in physical education should be homogeneous as to grade level, or in the case of special education classes by functional level.

### 3. Rotation

a.  In the matters of teaching, special, honor, and modified classes the policy of rotation of qualified persons should be followed insofar as possible.

It is understood, however, that requests by teachers of industrial arts/technology education, home economics/home and career skills, and trade subjects to retain their shop subjects and rooms should be honored when not inconsistent with the needs of the school. The following procedures will apply to shop openings:

(1) Teachers of industrial arts/technology education, home economics/home and career skills and trade subjects should be given an opportunity to apply for a particular shop which becomes vacant.

(2)  The teacher with the highest seniority in the school from among those who apply shall be given preference if not inconsistent with the needs of the school.

b.  In the matters of sessions, annex assignments, and proctoring assignments the policy of rotation should be followed except for unusual circumstances.  It is understood, however, that, upon his/her request, a teacher may retain a particular session if no other qualified teacher desires such session and the needs of the school will be served thereby.

c.  Each spring the principal and UFT chapter committee shall meet to review the compensatory time positions in the school with the goal of agreeing upon the number of, responsibilities, qualifications, basis for selection and term for compensatory time positions in their school.  If no agreement is reached at the school level, the UFT district representative and superintendent shall assist the principal and chapter committee in their goal of reaching such an agreement.

When an agreement is reached and ratified by the chapter, the principal shall establish and fill the positions in accordance with the agreement.   Only the chapter, not individuals, shall have the right to grieve an alleged violation or misapplication of the ratified agreement.

If no agreement is reached and ratified, the selection process shall be governed by the following:

(1)  A list of vacancies for all such non-teaching assignments shall be made available to all teachers in the school in sufficient time to permit written applications for such assignments.

(2)  Except for compensatory time positions filled as set forth in paragraph (3) or (4) below, seniority in the school shall be the basis for selection among applicants.

(3)  Those compensatory time positions which require job-related qualifications shall be filled on the basis of seniority in the school from among applicants who meet the posted job-related qualifications.

(4)  The position of programmer shall be filled from among applicants who meet the job-related qualifications for that position, promulgated by the Board after consultation with the Union.

(5) The term of years for the duration of each non-teaching assignment shall not exceed six years.

(6)  A teacher who has not had a non-teaching assignment for which there is a list of applicants shall have priority over any other teacher who had such assignment, except that the programmer position in the school is exempt from all contractual rotation requirements.  In the case of applicants for positions covered by paragraphs (3) and (4) the job-related qualifications must be met by the applicant.

(7)  The term of a non-teaching assignment which is made to fill a vacancy occurring before the end of the school year will be considered as beginning as of the first day of the next school year.

(8)  A teacher may relinquish any non-teaching assignment after a minimum period of one year.

(9)  A seniority list of the faculty shall be made available for inspection by teachers who wish to make application for a non-teaching assignment.

(10)  An applicant for an assignment who does not receive the desired assignment, shall, upon request, be given the reasons for not having been selected.

**4.  Teaching Periods**

a.  Teachers shall have a maximum teaching load of 25 periods per week except where they are programmed for an average of 25 periods.

b.  Shop teachers in vocational, comprehensive and academic high schools shall not be programmed for more than five periods a day.

c.  Teachers in vocational high schools shall be programmed for an eight-period day, one of which shall be a lunch period.

**5.  Relief from Non-Teaching Chores**

a.  Teachers will be relieved of study hall service, and work on a school-wide basis related to the handling, distribution, storing and inventory of books, supplies and equipment, and duplicating of teaching materials.

b.  Teachers will be relieved of the duty of scoring Citywide standardized achievement tests and of preparing absentee post cards and truant slips.

c.  Teachers in the high schools will be relieved of the duty of preparing transcripts for college applicants.

d.  Teachers who are relieved of administrative assignments shall not be assigned to teaching duties in lieu of such administrative assignments.

e.  Special education teachers shall not be programmed to help children with disabilities on and off buses except as permitted in Article 7A6 below.  However, this shall not prevent their assignment for that purpose in cases of emergency.

f.  Teachers in vocational, comprehensive and academic high schools shall not be required to do any other than minor maintenance and repair work on equipment.

**6.  Professional Activity Options**

a.  Teachers at all levels must select a professional or administrative activity in accordance with this section and the provisions of Article 7U (Professional Activity Assignment Procedures).  Except as described in paragraph (d) below, this provision shall not create an additional teaching period, as that term is defined in the Collective Bargaining Agreement.

The menu of activities to be offered to each teacher shall be from among the following:

(1) Small group instruction (not to exceed 10 students)
(2) One to one tutoring
(3) Advise student activities such as clubs, teams or publications
(4) Perform student assessment activities (including portfolios, performance tests, IEPs, ECLAS, etc.)
(5) Professional development/prepare staff development workshops and demonstration lessons

    (6) Common planning time
    (7) Conflict resolution for students
    (8) Cafeteria duty
    (9) Schoolyard duty
    (10) Hallway duty
    (11) AM bus duty
    (12) PM bus duty
    (13) Homeroom
    (14) Provide inter-disciplinary articulation
    (15) Develop multi-cultural curriculum
    (16) Develop programs to integrate technology into the daily life of the classroom

Teachers performing homeroom fulfill the requirement of the professional period. Teachers selecting AM or PM bus duty will use their professional activity period as a preparation period.

Any teacher who wishes to participate in a professional activity not listed on the above menu may, upon approval of the principal, select such an activity.

b. If the UFT chapter and the principal deem it necessary, then an organizational period will be permitted but limited to a few days at the beginning and end of the school term/year, as well as rare occasional meetings during the school term/year, in lieu of homeroom.

c. Such compensatory time positions as dean, programmer and grade advisor may be recreated. All contractual provisions dealing with compensatory time shall remain in place.

d. Provided that these periods are used to supplement, not supplant the current school program, and subject to the specific provisions regarding it, secondary teachers may use this time for a sixth teaching period compensated in accordance with Article 70 of the Agreement (Shortage License Areas). The chapter's concurrence to ensure that this is truly supplemental is necessary.

e. To strengthen school tone and to ensure student safety and discipline, the Union and Board agree that the following compensatory time positions may be established:

(1) In each school the principal shall have the discretion to establish and fill one compensatory time position of lunchroom coordinator to supervise school aides in each lunchroom for each lunch period;

(2) At the secondary level, principals shall have the discretion to establish and fill the compensatory time position of dean, the number of which shall be based upon student enrollment, i.e., up to 1,000 students, one dean; over 1,000 students, two deans; and

(3) In high schools, principals shall have the discretion to establish and fill one compensatory time position of programmer.

The above compensatory time positions shall be established and filled without following the procedural requirements that are applicable to other compensatory time positions, such as consultation, approval or voting. Contractual provisions regarding notification and selection of applicants for compensatory time positions shall be followed. This provision shall not result in any teacher being required to work beyond the maximum number of teaching periods provided for in this Agreement. No teacher shall be involuntarily assigned to any of the above compensatory time positions.

Resources available to the school shall be maintained at the same level which would be required if the proposal were not in effect.

### 7. Alternative High School Programs

#### a. Site Retention Rights

Teachers serving in alternative high school programs shall have retention rights at their sites subject to the following:

(1) If staffing needs within an alternative high school program ("Program") requires contracting the staff at one site and expanding staff at another site, the Board will first seek volunteers who wish to transfer from the contracting site to the expanding site. The senior qualified volunteer, based on excessing seniority, shall be selected. If no qualified volunteer exists, the Board will transfer the junior teacher, based on excessing seniority, who qualifies for the position. The teacher so transferred is entitled to return to his/her former site at the next reorganization in accordance with his/her excessing seniority.

(2) If demonstrated needs require the Board to transfer a teacher to another site, the Board will inform the teacher of the reason for the transfer. The teacher may grieve to determine whether the transfer was based on justifiable reasons.

(3) The Board will place the teacher reassigned pursuant to (1) or (2) above in an appropriate vacancy within the same Program in the same borough. If it is necessary to reassign the teacher outside the same Program in the same borough, the preferences of the teacher shall be taken into consideration.

(4) This provision does not apply to the Outreach Program.

#### b. Site Vacancies

For alternative high school programs, except the Outreach Program no later than sixty (60) days before the end of the term, a list of potential vacancies for the following term will be posted at the administrative office of each program, including vacancies anticipated through sabbatical leave, retirements and the opening of new sites. Regularly appointed teachers may file preference requests for reassignments to such sites with the principal and will be considered for such reassignments.

#### c. District 79 Reorganization

The Memorandum of Agreement controlling the rights of employees regarding the 2007 reorganization of District 79 is contained in Appendix I.

### 8. Teachers of Library

a. Teachers of library shall not be given any administrative assignments.

b. Per diem substitutes employed for library teaching shall be assigned to the library.

c. Teachers of library will not be required to serve in more than one school.

### 9. School Program

The school program will be posted in September in an area accessible to the entire faculty.

## B. Intermediate and Junior High Schools

### 1. Program Preference

By May 1, teachers should be given an opportunity to fill out program preference sheets. Preferences referred to in sub-paragraph a through g below will be honored to the extent consistent with the provisions of this Agreement relating to rotation, seniority and programming.

No later than 10 school days prior to the end of the school year, teachers should be notified of the following:

a.  Subjects to be taught;

b.  Grades of the subjects to be taught;

c.  Any special or unusual classes to be taught;

d.  The grade level and special nature, if any, of the official class;

e.  The session to which a teacher will be assigned if the school operates on more than one session;

f.  The particular special education program designation (e.g. staffing ratio, collaborative team teaching, SETSS, etc.);

g.  The age group of special education classes;

h.  The professional activity assigned pursuant to Article 7B8 (Professional Activity Options) and Article 7U (Professional Activity Assignment Procedures).

Teacher programs for the following year should be given out no later than five school days before the end of the school year.

It is understood that all information detailed above is to be considered subject to change if necessary because of changes in subject enrollments, staff changes, and programming exigencies.

**2.  Program Guidelines**

Wherever administratively possible, teacher programs should follow these guidelines:

a.  Teachers should have at least one unassigned period each day.

b.  There should be no more than three consecutive teaching assignments, except for teachers of subjects normally programmed for double periods.

c.  There should be no more than four consecutive working assignments (including professional activities).

d.  The number of different rooms in which assignments occur should be held to the absolute minimum administratively possible.

e.  The number of lesson preparations should be kept at the minimum consistent with the nature of the subject, the size of the department, the special offerings of the department, and special requests of teachers.  Classes for gifted, bright, average and difficult pupils should be considered as separate preparations.  Within a department, teachers with a full teaching program should be given preference in the assignment of the number of preparations.

f.  Only one class per period should be programmed for the library.

**3.  Rotation**

a.  In the matters of types of gifted, bright, average and difficult subject classes, the policy of rotation of qualified persons should be followed insofar as possible.  It is understood, however, that requests by teachers of industrial arts/technology education and home economics/home and career skills to retain their shop subjects and rooms should be honored when not inconsistent with the needs of the school.  The following procedures will apply to shop openings: (1) Teachers of industrial arts/technology education and home economics/home and career skills shall be given an opportunity to apply for a particular shop which becomes vacant. (2) The teacher with the highest seniority in the school from among those who apply shall be given preference if not inconsistent with the needs of the school.

b.  In the matter of sessions the policy of rotation should be followed except for unusual circumstances.

c.  Each spring the principal and UFT chapter committee shall meet to review the compensatory time positions in the school with the goal of agreeing upon the number of, responsibilities, qualifications, basis for selection and term for compensatory time positions in their school.  If no agreement is reached at the school level, the UFT district representative and superintendent shall assist the principal and chapter committee in their goal of reaching such an agreement.

When agreement is reached and ratified by the chapter, the principal shall establish and fill the positions in accordance with the agreement.   Only the chapter, not individuals, shall have the right to grieve an alleged violation or misapplication of the ratified agreement.

If no agreement is reached and ratified, the selection process shall be governed by the following:

(1) A list of vacancies for all such non-teaching assignments shall be made available to all teachers in the school in sufficient time to permit written application for such assignments.

(2) Except for compensatory time positions filled as set forth in paragraph (3) or (4) below, seniority in the school shall be the basis for selection among applicants.

(3) Those compensatory time positions which require job-related qualifications shall be filled on the basis of seniority in the school from among applicants who meet the posted job-related qualifications.

(4) The position of programmer shall be filled from among applicants who meet the job-related qualifications for that position, promulgated by the Board after consultation with the Union.

(5) The term of years for the duration of each non-teaching assignment shall not exceed six years.

(6) A teacher who has not had a non-teaching assignment for which there is a list of applicants shall have priority over any other teacher who had such assignment, except that the programmer position in the school is exempt from all contractual rotation requirements.  In the case of applicants for positions covered by paragraphs (3) and (4) the job-related qualifications must be met by the applicant.

(7) The term of a non-teaching assignment which is made to fill a vacancy occurring before the end of the school year will be considered as beginning as of the first day of the next school year.

(8) A teacher may relinquish any non-teaching assignment after a minimum period of one year.

(9) A seniority list of the faculty shall be made available for inspection by teachers who wish to make application for a non-teaching assignment.

(10)  An applicant for an assignment who does not receive the desired assignment shall, upon request, be given the reasons for not having been selected.

**4.  Teacher Programs**

a.  A basic maximum of 25 teaching periods, five preparation periods, and five professional activity periods for teachers shall be established before any other type of program for administrative purposes in which teachers teach less than 25 periods is arranged.

b.  In Title I intermediate and junior high schools, the program of 22 teaching periods, eight preparation periods and five professional activity periods will continue as

follows: The number of these programs will be fixed in each particular school at a percentage equal to the number of currently contractually eligible teachers or the number of homerooms that existed during the 1996-97 school year, whichever is less compared to the total number of teacher programs.  Until such time that there are no longer teachers serving in the school who are eligible for this program and the program ends, a rotation policy shall be in effect for those who are contractually eligible.

In non-Title I schools the same proportion of teaching and preparation time to total scheduled teaching time as presently exists in that school will continue, with a rotation policy established.

In accordance with the LOBA determination and award in Case No. IA-1-85, all Title I junior high school teachers in the following categories shall have no more than five preparation periods a week:

(1) Full-time per annum teachers hired on or after July 1, 1985.

(2) Teachers assigned to a school which after the 1985-86 school year loses its Title I designation, notwithstanding possible re-designation at a later date.

(3) Teachers assigned to a school which was not designated Title I for the 1985-86 school year and is subsequently designated as a Title I school.

(4) Teachers who on or after September 1, 1985 transfer from one school to another, except for those teachers transferring from one Title I school to another Title I school.

c.  Teachers in Title I intermediate and junior high schools shall have a maximum teaching load of 25 periods per week.  Teachers in non-Title I intermediate and junior high schools shall have a maximum teaching load of 26 periods per week.

d.  Teachers assigned to music and health education classes as additional teachers will be programmed for a regular teaching period.

e.  "Teaching periods" are those periods in which the teacher is actively involved with the pupil in the act of teaching, either as an individual or as a member of a teaching team, and has participated in the planning of the instruction to be conducted.

f.  "Homeroom classes" are those in which children assemble for administrative purposes.  The time involved is usually a short period and is known as the "homeroom period".

g.  "Preparation periods" are those periods during which the teacher is not assigned to a regularly programmed responsibility.  Teachers are expected to utilize their professional preparation time in such manner as to enable them to further their professional work for the purpose of their greater classroom effectiveness.

**5.  Programs of Teachers of Home Economics/Home and Career Skills and Industrial Arts/Technology Education**

a.  Home economics/home and career skills and industrial arts/technology education teachers in Title I schools shall teach an average of 23 teaching periods, seven preparation and five professional activity periods.  Such teachers will continue to have their classes programmed for double periods whenever practicable.

In accordance with the LOBA determination and award in Case No. IA-1-85, such teachers in the following categories shall teach an average of 25 teaching periods, five preparation and five professional activity periods a week:

(1) Full-time per annum teachers hired on or after July 1, 1985.

(2) Teachers assigned to a school which after the 1985-86 school year loses its Title I designation, notwithstanding possible re-designation at a later date.

(3) Teachers assigned to a school which was not designated Title I for the 1985-86 school year and is subsequently designated as a Title I school.

(4) Teachers who on or after September 1, 1985 transfer from one school to another, except for those teachers transferring from one Title I school to another Title I school.

b.   Home economics/home and career skills and industrial arts/technology education teachers in regular junior high schools shall have 26 teaching periods, four professional activity periods, and five preparation periods per week during the school year.   Such teachers will continue to have their classes programmed for double periods wherever practicable.

c.   Wherever practicable, the following policies should be adopted in the intermediate and junior high schools:

(1) Industrial arts/technology education teachers should teach only in their licensed area.

(2) Industrial arts/technology education teachers should not be assigned to professional activity periods when other shops are in operation.

(3) All shops should be in operation at the same time.

(4) Maximum opportunity for exploration should be accorded all shop pupils.

(5) All shops should be programmed by grade levels and homogeneously.

**6.   Duty-Free Lunch Period**

Teachers will be given a full duty-free period for lunch.

**7.   Relief from Non-Teaching Chores**

a.   Teachers will be relieved of study hall service, and work on a school-wide basis related to the handling, distribution, storing, and inventorying of books, supplies and equipment, and duplicating of teaching materials.

b.   Teachers will be relieved of the duty of scoring Citywide standardized achievement tests and of preparing absentee post cards and truant slips.

c.   Teachers who are relieved of administrative assignments shall not be assigned to teaching duties in lieu of such administrative assignments.

d.   Special education teachers shall not be programmed to help children with disabilities on and off buses except as permitted in Article 7B8.   However, this shall not prevent their assignment for that purpose in cases of emergency.

**8.   Professional Activity Options**

a.   Teachers at all levels must select a professional or administrative activity in accordance with this section and the provisions of Article 7U (Professional Activity Assignment Procedures).   Except as described in paragraph d below, this provision shall not create an additional teaching period, as that term is defined in the Collective Bargaining Agreement.

The menu of activities to be offered to each teacher shall be from among the following:

(1) Small group instruction (not to exceed 10 students)

(2) One to one tutoring

(3) Advise student activities such as clubs, teams or publications

(4) Perform student assessment activities (including portfolios, performance tests, IEPs, ECLAS, etc.)

(5) Professional development/prepare staff development workshops and demonstration lessons

(6) Common planning time
(7) Conflict resolution for students
(8) Cafeteria duty
(9) Schoolyard duty
(10)  Hallway duty
(11)  AM bus duty
(12)  PM bus duty
(13)  Homeroom
(14)  Provide inter-disciplinary articulation
(15)  Develop multi-cultural curriculum
(16)  Develop programs to integrate technology into the daily life of the classroom

Teachers performing homeroom fulfill the requirement of the professional period. Teachers selecting AM or PM bus duty will use their professional activity period as a preparation period.

Any teacher who wishes to participate in a professional activity not listed on the above menu may, upon approval of the principal, select such an activity.

b.  If the UFT chapter and the principal deem it necessary, then an organizational period will be permitted but limited to a few days at the beginning and end of the school term/year, as well as rare occasional meetings during the school term/year, in lieu of homeroom, or in junior high and intermediate schools, such homerooms, if deemed necessary, may be regularly programmed.

c.  Such compensatory time positions as dean, programmer and grade advisor may be recreated.  All contractual provisions dealing with compensatory time shall remain in place.

d.  Provided that these periods are used to supplement, not supplant the current school program, and subject to the specific provisions regarding it, secondary teachers may use this time for a sixth teaching period compensated in accordance with Article 7O of the Agreement (Shortage License Areas).  The chapter's concurrence to ensure that this is truly supplemental is necessary.

e.  To strengthen school tone and to ensure student safety and discipline, the Union and Board agree that the following compensatory time positions may be established:

(1) In each school the principal shall have the discretion to establish and fill one compensatory time position of lunchroom coordinator to supervise school aides in each lunchroom for each lunch period.

(2) At the secondary level, principals shall have the discretion to establish and fill the compensatory time position of dean, the number of which shall be based upon student enrollment, i.e., up to 1,000 students, one dean; over 1,000 students, two deans.

The above compensatory time positions shall be established and filled without following the procedural requirements that are applicable to other compensatory time positions, such as consultation, approval or voting.  Contractual provisions regarding notification and selection of applicants for compensatory time positions shall be followed.  This provision shall not result in any teacher being required to work beyond the maximum number of teaching periods provided for in this Agreement.  No teacher shall be involuntarily assigned to any of the above compensatory time positions. Resources available to the school shall be maintained at the same level which would be required if the position(s) were not in effect.

**9. Teachers of Library**

a.  Teachers of library shall not be given any administrative assignments.

b.  Per diem substitutes employed for library teaching shall be assigned to the library.

**10. School Program**

The school program will be posted in September in an area accessible to the entire faculty.

**C. Elementary Schools**

**1. Teacher Assignments**

a.  Early in the spring, time should be devoted at a faculty conference to a discussion of the procedures to be used in making assignments for the coming year.  Plans, goals and personnel needs for special programs should also be discussed.

b.  At that time, teachers should be given an opportunity to fill out "preference sheets" indicating three preferences in order of priority of grade level and type of class on that level or, in the case of special education teachers, the age range of special education classes and education program designation (e.g. staffing ratio, collaborative team teaching, SETSS, etc.) with the understanding that, where advisable and possible, such preferences will be honored.  Teachers should be given an opportunity to discuss their assignment requests with their principal.

c.  Teachers in schools with eight period days shall indicate their professional activity preferences pursuant to Article 7C4g (Professional Activity Options) and Article 7U (Professional Activity Assignment Procedures).

d.  With regard to requests as to grade level or special assignment (such as IGC), or, in the case of special education teachers, requests as to age range of special education classes, teachers with the highest seniority in the school should be given preference if qualifications for the position are the same.

e.  Grievances hereunder may be lodged if:

(1) In any year an elementary school teacher fails to be granted one of his/her stated program preferences; or

(2) For two years in succession the elementary school teacher has been denied his/her first priority of program preference.

Any assignment that is grievable shall be reviewed in accordance with the standards applicable to Articles 7C1b and c.

f.  Vacancies in special teaching assignments occurring at any time during the year which will extend through the year shall be filled in the same way as vacancies occurring at the beginning of the year, except that this provision shall not apply to vacancies occurring one month before the end of the school year.

g.  The Board will prepare and make available in every school, in time for teachers to apply for assignments, an official circular setting forth the uniform system-wide qualifications required for assignment as a teacher of an IGC class.

h.  In order to make certain that teachers are not frozen into positions which are relatively easy or difficult, the following procedures should be adopted in making class assignments (other than special assignments, such as IGC) on a particular grade level:

(1) On each grade level, classes should be divided into two categories, difficult and less difficult, in terms of reading achievement.  In general, a teacher who has been assigned to a class in the one category for a period of one year should be assigned to the

other category for the next year.  Teachers who have served in a school for one year or longer should receive assignments for the next school year before June 15.

(2) In the case of IGC classes the policy of rotation every three years of qualified teachers should be followed.

(3) The policy of rotation within the grade should be followed in the assignment of teachers to portable classrooms, annexes, and other out-of-building facilities except for unusual circumstances.

i.   A continuous record of teacher assignments should be kept at the school and be made available to chapter leaders.

**2.   Assignment as OTP**

Each spring the principal and UFT chapter committee shall meet to review the types and numbers of OTP positions in the school with the goal of agreeing upon the responsibilities, qualifications, basis for selection and term.  If no agreement is reached at the school level, the UFT district representatives and the superintendent shall assist the principal and chapter committee in their goal of reaching such an agreement.

When agreement is reached and ratified by the chapter, the principal shall establish and fill the positions in accordance with the agreement.   Only the chapter, not individuals, shall have the right to grieve an alleged violation or misapplication of the ratified agreement.

If no agreement is reached and ratified, the selection process shall be governed by the following:

a.   Each year a list of vacancies and the job-related qualifications required for OTP assignments shall be made available to all teachers in the school in sufficient time to permit written application for such assignments.

b.   The selection of OTPs will be made from among qualified applicants within the school.  Where applicants within the school are equally qualified, the selection will be made on the basis of seniority in the school.

c.   Where no applicants within a school are qualified, the selection will be made from among qualified applicants outside the school.  Where applicants from outside the school are equally qualified, the selection will be made on the basis of the number of years of teaching service on regular appointment in the school system.

**3.   New Positions**

In selecting teachers for new positions created at or before the beginning of the school year, preference shall be given to members of the staff before applicants outside the school are considered for such positions.

**4.   Teacher Programs**

**a.   Duty-Free Lunch Period**

Every elementary school teacher is to have a duty-free lunch period of 50 minutes.

**b.   Preparation Periods**

(1) All teachers in elementary schools will have five preparation periods per week.

(2) The term "teachers" as used above shall also include teachers of special education classes.

(3) Reading Teachers and Teachers of English as a Second Language shall have the same number of preparation periods as all other teachers in the school.

(4) Preparation periods shall be used for unassigned professional work.  Teachers are expected to utilize their professional preparation time in such manner as to enable them to

further their professional work for the purpose of their greater classroom effectiveness. Preparation periods shall be used for professional, job-related work which may include but is not limited to preparation for classes, preparation of teaching material, presentation of or attendance at demonstration lessons, participation in teacher training, and conferences with the principal, with other teachers, with guidance counselors or with parents.

**c.  Relief from Non-Teaching Chores**

(1) Teachers will be relieved of the following chores:  work on a school-wide basis related to the handling, distribution, storing, and inventorying of books, supplies and equipment, including audiovisual equipment, the duplicating of teaching materials, the collection of money for purposes such as milk and lunch and for school banking, and assisting in the accessioning of library books.

(2) Teachers will be relieved of the duty of scoring Citywide standardized achievement tests and of preparing absentee post cards and truant slips.

(3) Special education teachers shall not be programmed to help children with disabilities on and off buses except as permitted in Article 7C4g.  However, this shall not prevent their assignment for that purpose in cases of emergency.

**d.  Cluster Teacher Program**

(1) The term "cluster teacher" refers to teaching personnel in the elementary schools who are specially assigned to the teaching of classes in music, art, science, health education, other subjects or the fundamental skills and who are not assigned to a homeroom class.

(2) The cluster teacher's program shall include twenty 45-minute teaching periods per week.

(3) Where a music teacher participates for a major portion of the period in a teaching capacity during assemblies, the assembly period shall be deemed a teaching period.

(4) The cluster teacher shall have the same number of preparation periods and professional activity periods per week as all other teachers in the school.

(5) The other periods in the cluster teacher's program shall be devoted to professional activities to be assigned by the principal.

**e.  Teacher of Library Program**

(1) The program of the teacher of library shall include twenty 45-minute teaching periods per week.

(2) The teacher of library shall have the same number of preparation periods and professional activity periods per week as all other teachers in the school.

(3) The other periods in the program of the teacher of library shall be devoted to professional activities related to the library program.

**f.  Teachers Serving in Special Education Programs**

In elementary schools, within the workday set forth in Article 6A of this Agreement, all time in the special education teacher's program not programmed for teaching periods, preparation periods, professional activity periods, and duty-free lunch periods shall be devoted to appropriate professional activities to be assigned by the principal.

**g.  Professional Activity Options**

(1) Teachers in eight period per day schools must select a professional or administrative activity in accordance with the provisions of this section and Article 7U (Professional Activity Assignment Procedures).  This provision shall not create an

additional teaching period, as that term is defined in the Collective Bargaining Agreement.

The menu of activities to be offered to each teacher shall be from among the following:

(a) Small group instruction (not to exceed 10 students)
(b) One to one tutoring
(c) Advise student activities such as clubs, teams or publications
(d) Perform student assessment activities (including portfolios, performance tests, IEPs, ECLAS, etc.)
(e) Professional development/prepare staff development workshops and demonstration lessons
(f) Common planning time
(g) Conflict resolution for students
(h) Cafeteria duty
(i) Schoolyard duty
(j) Hallway duty
(k) AM bus duty
(l) PM bus duty
(m) Homeroom
(n) Provide inter-disciplinary articulation
(o) Develop multi-cultural curriculum
(p) Develop programs to integrate technology into the daily life of the classroom

Teachers performing homeroom fulfill the requirement of the professional period. Teachers selecting AM or PM bus duty will use their professional activity period as a preparation period.

Any teacher who wishes to participate in a professional activity not listed on the above menu may, upon approval of the principal, select such an activity.

(2) Such compensatory time positions as dean, programmer and grade advisor may be recreated.

(3) To strengthen school tone and to ensure student safety and discipline, the Union and Board agree that in each school the principal shall have the discretion to establish and fill one compensatory time position of lunchroom coordinator to supervise school aides in each lunchroom for each lunch period;

The above compensatory time position shall be established and filled without following the procedural requirements that are applicable to other compensatory time positions, such as consultation, approval or voting. Contractual provisions regarding notification and selection of applicants for compensatory time positions shall be followed. This provision shall not result in any teacher being required to work beyond the maximum number of teaching periods provided for in this Agreement. No teacher shall be involuntarily assigned to any of the above compensatory time positions. Resources available to the school shall be maintained at the same level which would be required if the proposal were not in effect.

**D. K-8 Schools**

K-6 teachers in K-8 schools shall have the same teaching schedule as that of elementary school teachers in the K-6 schools.

Seventh and eighth grade teachers in K-8 schools shall have the same program as teachers in the junior high schools.

**E.  Programs which Serve Students from More than One School**

Selection for teaching assignments in programs which serve students from more than one school shall be made from among qualified applicants after posting the job description and qualifications for the position.  Such posting shall be in each school in the district for programs serving students in the district.  If the program serves students from more than one district, the posting shall be in all schools in the system.  Upon completing service in the program, the teacher shall be returned to his/her school and shall take his/her place on the seniority lists.

**F.  Special Education Positions and Assignments**

    **1.  Resource Room and SETSS Positions**

a.  Vacancies in Resource Room and SETSS positions in high schools, junior high schools, intermediate schools and elementary schools will be advertised within the school.  If there are no qualified regularly appointed applicants, the position will be advertised in the high school superintendency or community school district.  If no regularly appointed qualified teachers apply for the position, it will be offered to a qualified substitute in the school who applies before filling the position with a qualified substitute from outside the school.

b.  A resource room teacher or SETSS teacher who returns from a leave of absence within one year of commencing the leave will be placed in a resource room or SETSS position in the school in accordance with his/her seniority as determined pursuant to Rule 3-D of Article 17B.

c.  If and when a resource room position is eliminated, the incumbent resource room teacher will be given the opportunity to become a SETSS teacher.  If the resource room teacher opts for a SETSS position, that teacher will be placed in seniority order with all other SETSS teachers in the school.

If no SETSS vacancy exists in the school, that teacher will be given the opportunity to be placed in a SETSS vacancy in the district/superintendency.  If the teacher chooses not to accept a SETSS vacancy in the school or district/superintendency or if no vacancy exists, the teacher will be placed in a position in license in the school in accordance with the teacher's seniority.

SETSS vacancies not filled in the manner above are to be posted in accordance with Article 7F1a.

    **2.  IEP/Special Education Teachers**

a.  IEP/special education teachers shall be programmed for a specific number of periods (minimum of 5 per week) for (i) preparing for and attending the IEP meetings of children initially referred to special education, and (ii) coverage of other special education teachers' classes so that they may attend the IEP meetings for their students for requested reevaluations and triennial evaluations.  The number of periods per week for the tasks described in (i) and (ii) shall be based upon a workload allocation created by the Department, prior to the beginning of each school year.  The Board will consult with the Union by May 15 of any school year if it plans to change the workload allocation or the number of schools for the following school year.

b.  In the event that the activities described in 2(a)(i) and (ii), above, are not sufficient, in a given week, to fill the periods programmed for such activities, the

principal may assign the teacher to one or more of the tasks described in paragraph 2(c)(i)-(v), below.

c.   The balance of the teacher's schedule not programmed for the tasks described in 2(a)(i) and (ii), above, will be programmed, in the discretion of the principal, for (i) instruction of students with disabilities (e.g., SETSS, Collaborative Team Teaching or part-time special education classes), (ii) individual and group instruction for identified special education or identified general education students at risk of academic failure; (iii) participating in Pupil Personnel Team/Instructional Support Committee meetings; (iv) providing interventions recommended by the Pupil Personnel Team/Instructional Support Committee; and (v) administration of curriculum-based assessments for "at-risk" general education students.  The teacher filling this assignment will not be used as a substitute or be part of the regular coverage pool unless s/he volunteers for such duty.  In the event that an uncovered class exists, the teacher filling this position will only be assigned to the class if those teachers in the regular coverage pool (teachers on preparation period or professional period) have been assigned for that period.

d.   Teachers filling this assignment will have scheduled prep, lunch and professional activity periods as provided in this Agreement.

e.   The assignment described in subparagraphs (a)-(d) above will be assigned in the same manner as other regular teaching assignments pursuant to existing contractual rules. Special education teachers will have the opportunity to declare a preference for this assignment.

f.   Notwithstanding (e) above, special education teachers who served as education evaluators during the 2002-2003 school year (or were on leave or sabbatical during that year) will have a preference for this assignment in each year that it exists, in whatever form that it exists, as more fully set forth in the Memorandum of Agreement between the parties dated October 28, 2003, which is incorporated herein by reference.  In the event such education evaluator does not exercise such right, or exercises such right but later gives up this assignment, s/he will have the same rights as any other special education teacher to apply for the assignment

**3.   Other Special Education Assignments**

Except as otherwise provided in this Agreement, selection for special teaching assignments, including but not limited to Special Education Teacher Support Services vacancies, collaborative team teaching and part-time special classes or combinations thereof, and for non-teaching assignments in special education programs shall be made from among qualified applicants after posting the job description and qualifications for the position.  Collaborative team teaching positions shall be posted for both the general education teachers and the special education teachers.  Such posting shall be in such places as will provide a fair opportunity for qualified teachers to apply for the assignments.

**4.   Teachers Serving in the School for the Deaf**

The weekly programs of teachers in the School for the Deaf shall consist of the following, as may be applicable:

(a) Teachers of pre-kindergarten and elementary levels in the School for the Deaf will have five preparation periods per week.

(b) Teachers of the junior high school level in the School for the Deaf will have a weekly program of 25 teaching periods, five preparation periods and five professional activity periods.

(c) Teachers in the School for the Deaf will be entitled to a duty-free lunch period of 50 minutes.

(d) In the event of a reduction in staff in junior high school classes in schools for the deaf, teachers serving out of license shall be the first to be reassigned to elementary school classes.  Teachers out of license with the least seniority in the school shall be the first to be so reassigned.

**G.  Non-Public Schools Program Teachers**

In June, teachers serving in the Non-Public Schools Program shall be informed of the new or vacant full positions in the Program and the qualifications therefor, and their timely application for assignment to such positions shall be considered and granted on the basis of their seniority in the Program, provided they meet the qualifications.

**H.  Split Assignments**

Upon request, a teacher serving in a split assignment shall be reassigned in accordance with his/her layoff seniority to a full position in the district or superintendency or program before a newly hired employee.  Such reassignment shall be effectuated at the next reorganization.

**I.  Interim Acting Supervisory Positions**

Notice of vacancies for interim acting supervisory positions shall be posted in each school.  The notice will include the requirements for the position, or, if this is not possible, a clear indication of the place where the requirements may be obtained.  Applicants who meet the requirements for the position shall be entitled to be interviewed for the position.

**J.  City Hall Academy**

1.  Visiting teachers' preparation periods will be scheduled at the end of the school day.  Visiting teachers may, at their option, travel to and from CHA with their students on Board-provided buses.

2.  Resident teachers can be returned, at the end of each school year, to their prior schools at the option of either the employee or the Board.  Mid-year transfers will not be permitted without the consent of the Board.

3.  The Board shall provide for substitute teacher coverage for the resident teachers and intends that such coverage will be provided by part-time teachers regularly staffed to CHA.

4.  The UFT Chapter Leader for CHA will conduct Union business during his or her scheduled professional activity periods.

**K.  Citywide Special Education (District 75)**

**1.  Program Preference**

**a.  Junior High Schools and Intermediate Schools**

By May 1, teachers should be given an opportunity to fill out program preference sheets.  Preferences referenced in sub-paragraphs (1) and (2) will be honored to the extent consistent with the provisions of this Agreement applicable to special education teachers.

No later than ten (10) school days prior to the end of the school year, teachers should be notified of the following:

(1) The particular special education program designation (e.g. staffing ratio, collaborative team teaching, SETSS, etc.);

(2) The age range of special education classes;

(3) The professional activity assigned pursuant to Article 7K3 (Relief from Non-Teaching Chores and Professional Activity Options) and Article 7U (Professional Activity Assignment Procedures).

Teacher programs for the following year should be given out no later than five (5) school days before the end of the school year.

It is understood that all information detailed above is to be considered subject to change if necessary because of changes in subject enrollments, staff changes, and programming exigencies.

**b. Elementary Schools**

Early in the spring, time should be devoted at a faculty conference to a discussion of the procedures to be used in making assignments for the coming year. Plans, goals and personnel needs for special programs should also be discussed.

At that time, teachers should be given an opportunity to fill out preference sheets indicating three preferences in order of priority of:

(1) The age range of special education classes;

(2) The particular special education program designation (e.g. staffing ratio, collaborative team teaching, SETSS, etc.);

(3) For 8-period schools, the professional activity selected pursuant to Article 7K3d.

With regard to requests as to age range of special education classes, teachers with the highest excessing seniority as calculated in Article Seventeen should be given preference if qualifications for the position are the same.

Where advisable and possible preferences pursuant to (2) above will be honored and teachers should be given an opportunity to discuss these assignment requests with their principal or supervisor, as appropriate.

Preferences pursuant to (3) above will be assigned in accordance with Article 7U below.

**c. Separate Special Education Settings**

Teachers in separate special education settings (except as otherwise provided) shall be entitled to exercise program preferences in accordance with the contractual provisions applicable to special education teachers in elementary, junior high school, intermediate school, or high school special education departments who teach pupils of the same level.

**d. HES and VES Programs**

Early in the spring, HES and VES teachers and HES and VES related service providers should be given an opportunity to express a preference for borough, special education program and level with the understanding that where advisable and possible such preferences will be honored.

For HES teachers, the special education programs are currently HES itinerant/related service providers, SETSS and staffing ratios.

For VES teachers, the special education programs are currently VES itinerant/related service providers, SETSS and staffing ratios.

With regard to requests as to special education program HES and VES teachers and HES and VES related service providers with the highest excessing seniority as calculated in Article 17 should be given preference if qualifications for the position are the same.

**2.  Teacher Programs**

**a.  Teachers Serving in Schools Together with Non-Special Education Teachers**

(1) All teachers in elementary schools will have five preparation periods per week.

(2) A basic maximum of 25 teaching periods, five preparation periods, and five professional activity periods for teachers shall be established before any other type of program for administrative purposes in which teachers teach less than 25 periods is arranged.

In Title I intermediate and junior high schools the program of 22 teaching periods, eight (8) preparation periods, and five (5) professional activity periods will continue as follows: The number of these programs will be fixed in each particular school at a percentage equal to the number of currently contractually eligible teachers or the number of homerooms that existed during the 1996-97 school year, whichever is less compared to the total number of teacher programs.  Until such time that there are no longer teachers serving in the school who are eligible for this program and the program ends, a rotation policy shall be in effect for those who are contractually eligible.

In accordance with the LOBA determination and award in Case No. IA-1-85, all Title I junior high school teachers in the following categories shall have no more than five preparation periods a week:

(a) Full-time per annum teachers hired on or after July 1, 1985.

(b) Teachers assigned to a school which after the 1985-86 school year loses its Title I designation, notwithstanding possible re-designation at a later date.

(c) Teachers assigned to a school which was not designated Title I for the 1985-86 school year and is subsequently designated as a Title I school.

(d) Teachers who on or after September 1, 1985 transfer from one school to another, except for those teachers transferring from one Title I school to another Title I school.

Special education teachers serving in Title I intermediate or junior high schools together with non-special education teachers shall have a maximum teaching load of 25 periods per week.

Special education teachers serving in non-Title I intermediate or junior high schools together with non-special education teachers shall have a maximum teaching load of 26 periods per week.

(3) Where special education teachers work in a high school, they will have five preparation periods per week.

(4) Special education teachers serving in schools together with non-special education teachers will have daily, a duty-free lunch period of 50 minutes in elementary schools or equal in length to the period of time provided for all other teachers in the school in intermediate, junior high and high schools.  Such lunch periods shall be scheduled to begin no earlier than 11 a.m. and to end no later than 1:30 p.m.

(5) Where special education teachers teach pupils of junior high school or high school level, the special education teachers' programs shall include five professional activity periods per week.

(6) In elementary schools, within the work day set forth in Article 6A of this Agreement, all time in the special education teachers' programs not programmed for teaching periods, preparation periods, professional activity and duty-free lunch periods shall be devoted to appropriate professional activities to be assigned by the principal.

**b.  Teachers Not Serving in Schools Together with Non-Special Education Teachers**

**(1)  Teachers Serving in Separate Special Education Settings**

Except as otherwise provided herein, all teachers who serve in separate special education settings will have five preparation periods per week and a daily duty-free lunch period of 50 minutes.

**(2)  Teachers Serving in Certain Special Education Programs (Formerly   Special Day Schools, Day Treatment Centers, or Institutional Settings)**

(a) The following shall apply to those teachers serving severely emotionally handicapped students in all self-contained special education schools, buildings, annexes or sites (which would formerly have been designated day schools or day treatment centers) or in institutional or agency settings for the severely emotionally handicapped:

(1) Their weekly program shall consist of 22 teaching periods, eight preparation periods and five professional activity periods.

(2) They will have a daily duty-free lunch period equal in time to a period in the school.

(3) Teachers will be relieved of routine school-wide clerical duties, of the duties of assisting in the distribution, collection and inventorying of textbooks and supplies, and of related duties not involving children in the normal program of the school.  This provision shall apply to institutional schools, where feasible.

(4) Such teachers who escort pupils to a public conveyance at the end of the school day shall not be required to return to the school building except for scheduled conferences.

(5) No class shall exceed 15 pupils except as specified in Article 7M3.

(6) The provisions of Article 7B1 shall apply except in institutional settings.

(b) When a vacancy exists in a center cluster or school cluster, announcement of such vacancy shall be made.  Applicants will apply to the head of the school for assignment to the position.  The selection will be made from among qualified applicants.  When applicants are equally qualified, the selection will be made on the basis of seniority in the school.

**c.  Teachers of the Homebound**

The weekly programs for teachers of the homebound shall be defined as follows:

(1) Such teachers shall work a seven-hour day and the maximum number of pupils assigned to teachers of the homebound shall be six, to the extent permitted by the budget. They shall report the Thursday and Friday before Labor Day and Brooklyn-Queens Day for professional development.

(2) Teachers of the homebound shall be allowed 45 minutes for duty-free lunch daily, exclusive of travel time.

(3) There shall be a policy of consultation with teachers of the homebound concerning their assignments and there shall be a policy of rotation of such assignments.

**d.  Resource Teachers or Itinerant Teachers**

(1) Resource teachers and itinerant teachers will have preparation periods in the same number as for all other teachers in the setting where they serve the majority of their time.

(2) Resource teachers and itinerant teachers will be given daily, a duty-free lunch period of 50 minutes, or of such time as is equal to a period in the setting where they

work, to be determined by the lunch period in the setting where the teacher serves on the particular day.

**3.   Relief from Non-Teaching Chores and Professional Activity Options**

a.   The same relief from non-teaching chores provided in this Agreement for other teachers will be applicable to all special education teachers who teach pupils of the same level.

b.   Special education teachers shall not be programmed to help children with disabilities on and off buses except as permitted by subparagraph d below.  However, this shall not prevent their assignment for that purpose in cases of emergency.

c.   Special education teachers shall have the same number of professional activity periods during the year as all other teachers who work on the same level in the school or in the special education setting.

d.   Teachers at all levels must select a professional or administrative activity in accordance with the provisions of this section and Article 7U (Professional Activity Assignment Procedures).  Except as described in subparagraph g below, this provision shall not create an additional teaching period, as that term is defined in the Collective Bargaining Agreement.

The menu of activities to be offered to each teacher shall be from among the following:

(1) Small group instruction (not to exceed 10 students)
(2) One to one tutoring
(3) Advise student activities such as clubs, teams or publications
(4) Perform student assessment activities (including portfolios, performance tests, IEPs, ECLAS, etc.)
(5) Professional development/prepare staff development workshops and demonstration lessons
(6) Common planning time
(7) Conflict resolution for students
(8) Cafeteria duty
(9) Schoolyard duty
(10)  Hallway duty
(11)  AM bus duty
(12)  PM bus duty
(13)  Homeroom
(14)  Provide inter-disciplinary articulation
(15)  Develop multi-cultural curriculum
(16)  Develop programs to integrate technology into the daily life of the classroom

Teachers performing homeroom fulfill the requirement of the professional period. Teachers selecting AM or PM bus duty will use their professional activity period as a preparation period.

Any teacher who wishes to participate in a professional activity not listed on the above menu may, upon approval of the principal, select such an activity.

e.   If the UFT chapter and the principal deem it necessary, then an organizational period will be permitted but limited to a few days at the beginning and end of the school term/year, as well as rare occasional meetings during the school term/year, in lieu of

homeroom, or in junior high and intermediate schools such homeroom if deemed necessary, may be regularly programmed.

f.   Such compensatory time positions as dean, programmer and grade advisor may be recreated.   All contractual provisions dealing with compensatory time shall remain in place.

g.   Provided that these periods are used to supplement, not supplant the current school program, and subject to the specific provisions regarding it, secondary teachers may use this time for a sixth teaching period compensated in accordance with article 7O of the Agreement (Shortage License Areas).  The chapter's concurrence to ensure that this is truly supplemental is necessary.

h.   To strengthen school tone and to ensure student safety and discipline, the Union and Board agree that the following compensatory time positions may be established:

(1) In each school the principal shall have the discretion to establish and fill one compensatory time position of lunchroom coordinator to supervise school aides in each lunchroom for each lunch period;

(2) At the secondary level, principals shall have the discretion to establish and fill the compensatory time position of dean, the number of which shall be based upon student enrollment, i.e., up to 1,000 students, one dean; over 1,000 students, two deans; and

(3) In high schools, principals shall have the discretion to establish and fill one compensatory time position of programmer.

The compensatory time positions listed in this subsection shall be established and filled without following the procedural requirements that are applicable to other compensatory time positions, such as consultation, approval or voting.   Contractual provisions regarding notification and selection of applicants for compensatory time positions shall be followed.  This provision shall not result in any teacher being required to work beyond the maximum number of teaching periods provided for in this Agreement.  No teacher shall be involuntarily assigned to any of the above compensatory time positions.  Resources available to the school shall be maintained at the same level which would be required if the proposal were not in effect.

**4.  Assignments**

a.   Except as otherwise provided in this Agreement, selection for special teaching assignments and for non-teaching assignments in special education programs shall be made from among qualified applicants after posting the job description and qualifications for the position.  Such posting shall be in such places as will provide a fair opportunity for qualified teachers to apply for the assignments.

b.   Teachers of the visually handicapped shall be informed of vacancies arising in the itinerant teaching program, and vacancies shall be filled by qualified applicants within the license.  Where applicants are equally qualified, the selection will be made on the basis of seniority in the license.

c.   In the event that a class in a hospital or other institution is closed, the teacher of the class shall be given a choice of existing appropriate vacancies within the school. Should no vacancies exist, the teacher should be assigned to the class of the teacher in excess.

d.   In the spring, time should be devoted at a faculty conference to a discussion of the procedures to be used in making assignments for the ensuing year.  Plans, goals and personnel needs for special programs should also be discussed.

e.  Where it is the practice in a school to dismiss pupils during schoolwide or Citywide examinations, teachers of special education classes shall also have their classes dismissed when special education examinations are scheduled at the same time as school-wide or Citywide examinations.

f.  Where HES teachers, HES related service providers, VES teachers, VES related service providers or homebound teachers are reassigned out of the borough of their current assignment due to a contraction which occurs at a reorganization, the teacher or related service provider with the least excessing seniority in the license will be reassigned out of the borough.  Where such contraction occurs at a time other than a reorganization the teacher with the least excessing seniority in the license will be reassigned out of the borough except where that would be disruptive to the educational program.

**5.  Cluster Schools**

Teachers serving in a cluster school shall have retention rights at their site, subject to the following:

a.  If staffing needs within the cluster school require contracting the staff at one site and expanding staff at another site, the Board will first seek volunteers who wish to transfer from the contracting site to the expanding site.

The senior qualified volunteer, based on excessing seniority, shall be selected.  If no qualified volunteer exists, the Board will transfer the junior teacher, based on excessing seniority, who qualifies for the position.

b.  If demonstrated needs require the Board to temporarily transfer a teacher to another site during the school year, the Board will inform the teacher of the reason for the temporary transfer.  The teacher so transferred is entitled to return to his/her former site at the next reorganization in accordance with his/her excessing seniority.

**L.  Speech Improvement Teachers**

**1.  Special Assignments**

Where feasible, newly created speech improvement teaching positions will be announced in sufficient time to permit written applications for such positions.  Such positions will be posted first in the community school district, District 75 program or high school superintendency, as appropriate.  If no qualified teacher applies, the position will be posted on a Citywide basis.  Criteria for assignment to the positions will be prepared.  Where qualifications of applicants for a position are the same, the selection will be made on a basis of seniority of applicants in the Speech Improvement license.

**2.  Certificate of Clinical Competence**

The Board and the Union established a task force to explore the feasibility of accommodating the needs of candidates for the certificate of clinical competence (CCC) to work with a holder of the CCC.  The task force reported its findings and recommendations which provide the basis for the Board's program.

**3.  Selection and Retention of Assignments**

a.  A list of anticipated school sites in the district with a description of the programs (e.g., staffing ratio, collaborative team teaching, SETSS, etc.) anticipated to be served at those sites shall be made available by April 15.  This should include full time equivalent positions (FTE) filled by contract agency personnel.  By May 1, speech improvement teachers should be given the opportunity to fill out "preference sheets" indicating three preferences in order of priority for the school sites.  Where advisable and possible, such preferences will be honored.  The speech improvement teacher's seniority should be one

of the factors considered in determining the assignment of the speech improvement teacher to a school site.  Program preferences are subordinate to the exercise of retention rights to an assignment in a school.

b.  A CPT or appointed speech improvement teacher's request to be retained in his/her school will not be unreasonably denied unless the appropriate Board of Education official can demonstrate there are compelling reasons for the denial.

Where there are more than two speech improvement teachers in a school, the senior teacher will be given preference unless the appropriate Board of Education official can demonstrate there are compelling reasons for the denial.  Teachers returning from sabbaticals or leaves of absence of less than two years will be returned to the schools where they were assigned in accordance with their seniority.  All reasons for denial of the teacher of speech improvement's preference will be done in writing.

c.  Unfilled positions, and positions filled by contract agency staff and uncertified teachers of speech improvement (PPTs) which are full time speech improvement teacher positions (whether the assignment is to a single school or more than one school) are to be advertised for transfer.  Although the number of vacancies and the anticipated locations shall be posted, and the speech improvement teacher may choose specific positions, the transfer is to the district, not to a particular position.

**M. Class Size Limitations**

**1. Pre-Kindergarten and Kindergarten**

a.  The size of pre-kindergarten classes shall be determined on the basis of a maximum absolute cap of 18 pupils with a teacher and paraprofessional.

b.  The size of kindergarten classes shall be determined on the basis of a maximum of 25 pupils for each teacher, except as specified in 3 below.

**2. Elementary, Junior High, and High Schools**

a.  No subject class in elementary school shall exceed 32 pupils, except as specified in 3 below.

b.  No subject class in a non-special service junior high school shall exceed 33 pupils, except as specified in 3 below.

c.  No subject class in a Title I junior high school shall exceed 30 pupils, except as specified in 3 below.

d.  No homeroom or official or subject class in senior high school shall exceed 34 pupils, except as specified in 3 below.  This shall not be accomplished by an increase in the size of classes for the non-college bound students.

e.  No class in trade shop subjects in the high schools shall exceed 28 pupils, except as specified in 3 below.

f.  The size of physical education classes in the junior and senior high schools shall be determined on the basis of a maximum of 50 pupils for each teacher, except as specified in 3 below.

g.  The size of required music classes in the high schools shall be determined on the basis of a maximum of 50 pupils for each teacher, except as specified in 3 below.

h.  The size of ninth grade classes in any high school where more than half of the pupils in the ninth grade have been admitted from reorganized junior high schools shall not exceed the maximum provided above for the junior high schools.

i.  Wherever administratively possible, teacher programs in high schools should follow these guidelines: In rooms with specific stations (e.g. typing rooms, shops and

laboratories) the number of pupils assigned to such rooms should not exceed the number of stations available.  In the programming of such classes, an extra number of pupils equal to the anticipated attrition rate may be included.

j.  In Title I schools in the junior high school division, classes in industrial arts/technology education and home economics/home and career skills should not exceed 22 students.  In regular schools in the junior high school division, classes in industrial arts/technology education and home economics/home and career skills should not exceed 24 students.

The class size limits set forth herein apply to classes conducted in shop or laboratory settings.

### 3.  Exceptions

An acceptable reason for exceeding the maximum class size limitations listed in paragraphs 1b through 2g above may be any of the following:

a.  There is no space available to permit scheduling of any additional class or classes in order to reduce class size.

b.  Conformity to the class size objective would result in placing additional classes on short time schedule.

c.  Conformity to the class size objective would result in the organization of half-classes.

d.  A class larger than the maximum is necessary or desirable in order to provide for specialized or experimental instruction, or for IGC instruction, or for placement of pupils in a subject class of which there is only one on a grade.

In the event that it is necessary to assign a teacher to a class which exceeds the maximum size listed above, the principal shall stipulate the reason in writing to the teacher and to the Chancellor.  Such statement of reasons may be available for examination by the Union in the Office of the Chancellor.

### 4.  Students with Disabilities in a General Education Class

There shall be no more than three emotionally disturbed or autistic students, out of the total number of students with IEPs, whose management needs are severe and chronic requiring intensive constant supervision, a significant degree of individualized attention, intervention and intensive behavior management, in a general education class with one teacher.

## N.  Coverage of Classes

1.  Teachers having an instructional program who are called for a full-day professional conference to the office of a Board official outside the school shall be relieved by a per diem substitute.

2.  Substitutes will be hired to allow an average of four teachers per school per year to visit other schools and to attend educational conferences.

3.  The Board and the Union agree that the classes of absent elementary school teachers should be covered by employment of per diem substitute teachers as a matter of first priority or by other appropriate coverage by teachers in the school if necessary.  The practice of breaking up classes of absent elementary school teachers and assigning the students to other classes in the school is strongly discouraged.  The Board and the Union will jointly monitor compliance with this provision.

4.  The unavailability of a teacher to cover a class constitutes an emergency.  It is recognized that, in such emergency, the principal has the responsibility to assign a

teacher in the school to the class without regard to the program of the teacher so assigned. Assignment of teachers to cover classes in such emergency shall be made on a rotation basis to the extent possible.

5.  Before involuntarily assigning any teacher, except a teacher who has had no coverage during the term, to cover a class, teachers will be assigned on an equitable basis from among all applicants who volunteer to cover the class during their preparation periods or professional activity periods.  Licensure shall be taken into consideration in making coverage assignments.  Implementation of this provision shall be in accordance with plans developed at the school level.

6.  In secondary schools teachers who are assigned to cover classes during their preparation period or their professional activity period will be paid for such time at the rate set forth in paragraph 10 below for each such period in excess of one in any term during the applicable school year.

To the extent possible, the assignment of teachers to cover subject classes during their preparation period or professional activity periods shall be made on a rotation basis among teachers in license.

In elementary schools preparation periods shall not be taken away from classroom teachers except when an emergency arises.  The unavailability of a teacher to cover a class constitutes an emergency.  Teachers who lose preparation periods because of emergency will be paid for such time at the rate set forth in paragraph 10 below for each such period in excess of one in any term during the applicable school year.

When the normal school schedule is changed for a parent-teacher conference day when the teacher's pupils are not in school, a clerical half-day, a staff development program mandated by the community school district or central board when the teacher's pupils are not in school, or a standardized testing day, a teacher who performs such duties during the time he/she is scheduled to have a preparation period shall lose his/her preparation period and no compensation shall be due him/her under this provision except that in elementary schools a preparation period which was lost due to administering a standardized test shall be rescheduled within five school days.

7.  Resource room teachers and speech improvement teachers will be treated equitably when involuntary assignments to emergency coverages are required to be made in the school.

8.  A per diem substitute who is hired to cover the class of an absent teacher will be assigned to teach such teacher's class.

9.  Any teacher removed from his/her professional assignment to cover a class will be entitled to be paid at the applicable coverage rate.

10. The coverage rate per period shall be:

Effective May 19, 2008…………………………....... $35.29
Effective May 1, 2013………………………………… $35.64
Effective May 1, 2014………………………………… $36.00
Effective May 1, 2015………………………………… $37.09
Effective May 1, 2016………………………………… $38.38
Effective May 1, 2017………………………………… $40.13
Effective May 1, 2018………………………………… $40.92
Effective June 16, 2018.……………………………… $42.15

**O.  Shortage License Areas**

The Board has informed the Union of the steps it has taken and is continuing to take to minimize or eliminate teacher shortages in particular license areas.  Notwithstanding these steps, the parties agree that Citywide shortages of regularly licensed teachers exist in particular licenses (shortage license areas).  Therefore, the parties have adopted the following provisions in a mutual effort to address shortages of teachers in shortage license areas:

1.  In accordance with applicable regulations, at each reorganization the Chancellor may authorize a particular school, where a vacancy exists in a shortage license area which the Division of Human Resources has been unable to fill, to fill the position pursuant to these provisions.

2.  If the school is so authorized to fill the position hereunder, teachers in the school who are regularly licensed and appointed in the shortage license area may apply for a program in which they teach up to five regularly scheduled periods per week beyond the applicable contractual maximum teaching load in lieu of preparation time to which they would otherwise be entitled.  For purposes of implementing these provisions, the "applicable contractual maximum" teaching loads shall be those specifically set forth in this Agreement.  The applications of such teachers shall be granted in order of their seniority.

3.  If, at any reorganization period, no teacher regularly licensed and appointed in the shortage license area applies to fill a position authorized hereunder, the position may be offered to other teachers in the school in the following order:

(1) Regularly appointed with certification in the license area;
(2) Provisional with certification in the license area;
(3) Regularly appointed with experience teaching in the license area;
(4) Provisional with experience teaching in the license area.

Within each category listed above, the applications of such teachers shall be granted in order of their seniority.

4.  At the next reorganization, the available assignments hereunder, if any, shall be rotated (within each category) by following the same procedure.  Accordingly, it is the intent of the parties that coverages will be equitably distributed over successive reorganizations and implementation of these provisions shall not modify any of the provisions of Article 7N.

5.  Teachers scheduled to teach in lieu of preparation time as set forth above shall be paid at the rates set forth below per semester as a "special per session payment" if they are scheduled to teach five periods per week in lieu of preparation time:

Effective May 19, 2008………………………………….. $5,660
Effective May 1, 2013…………………………………. $5,717
Effective May 1, 2014…………………………………. $5,774
Effective May 1, 2015………….....…………………… $5,948
Effective May 1, 2016……....…………………………. $6,156
Effective May 1, 2017………………………...………… $6,436
Effective May 1, 2018…..……………………………… $6,562
Effective June 16, 2018..………………………………. $6,759

Teachers who are scheduled to teach fewer than five periods per week in lieu of preparation time or who are scheduled to teach less than a full term shall receive a pro-rata "special per session payment" hereunder.

6.   These provisions shall not be implemented in any school where an excessing situation would be caused by their implementation.

7.   The decision of the Chancellor not to authorize implementation of these provisions in a shortage license area in a particular school shall be final and not subject to grievance.   However, all other aspects of these provisions shall be subject to the grievance and arbitration provisions of this Agreement.

8.   Should salary credit regulations be revised in order to recruit personnel in shortage license areas, incumbent employees will be treated equitably.

**P.  Regular Part-Time Assignments for Appointed Teachers**

1.   A limited number of regularly appointed teachers (including teachers on unpaid leaves) may be assigned to less than full-time positions where such an assignment meets a particular need of the school system, including, but not limited to, filling a vacancy where no full-time teacher is available, alleviating a shortage area, serving in the Mentor/Intern Program or sharing a full-time position with another teacher on unpaid leave.  The number of these positions in any school year will be decided jointly by the Board and the Union and awarded on the basis of agreed-upon criteria.

2.   Teachers in these positions will be entitled to full health and welfare benefits and pro rata salary (including vacation pay) and pro rata sick leave.

3.   Service performed in this program shall be considered for all seniority and salary credit consistent with current Board policy.

4.   The Board and the Union shall seek appropriate legislation, where necessary to secure pension rights.

5.   Teachers in these positions will be treated equitably in the assignment of preparation periods and other program requirements.

6.   The following provisions shall apply: Article One, Two, Three, Four, Five, Seven, Eight, Nine, Ten, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty, Thirty-One, and Thirty-Two.

**Q.  Conferences**

1.   School conferences held in September and June shall be held on school time.

2.   No more than one Citywide conference on school time for the entire faculty of teachers of the homebound will be held during the school year.

3.   In any one borough, no more than two borough-wide conferences for teachers of CRMD will be held after school hours during any school year.

4.   During any school year, no more than three borough-wide conferences for teachers of health conservation will be held after school hours in any borough.

5.   Regular monthly conferences of teachers of speech improvement will be held on school time in September and June. Other regular conferences will begin at 3:00 p.m.

6.   Faculty conference agendas shall be set in consultation with the UFT chapter committee.

**R.  Basic Instructional Supplies**
   **1.   Supplies and Books**
   The Board and the Union agree that schools should provide appropriate and sufficient basic instructional supplies and books to deliver an effective educational program.  Basic instructional supplies and books are those that must be provided for use by students without which classroom instruction will be impaired.

   In the event a member or members of the faculty believe that such supplies and books are not available to students and faculty, the chapter may request a meeting with the principal.  Upon the request of the chapter leader, the principal shall meet with the UFT chapter committee to resolve the issue.  If no resolution is achieved at the school level, the district representative and the appropriate superintendent will meet within five (5) school days to attempt to resolve it.  If they are unable to do so, the dispute will be forwarded by the Union to the Chancellor for his/her prompt review and response.

   **2.   Curriculum**
   The Board of Education (DOE) agrees to provide teachers with either a year-long or semester long Curriculum that is aligned with State Standards in all Core Subjects.

   Curriculum is defined as:
   a) a list of content and topics;
   b) scope and sequence; and
   c) a list of what students are expected to know and be able to do after studying each topic.

   Core Subjects are defined as follows: Math (including, but not limited to, Algebra and Geometry), Social Studies, English Language Arts, Science (including, but not limited to, General Science, Biology, Earth Science, Chemistry and Physics), Foreign Languages and other subject areas named by the DOE and shared with the UFT. It is understood that the DOE's obligation to provide curriculum shall extend to Core courses that may be electives.

   It is further understood by both parties that there are instances where teachers may want to participate in the development of curriculum.  Such instances include, but are not limited to, the creation of new themed schools or programs within a school, or where a teacher or group of teachers wishes to create or help create a set of lessons around a particular theme or subject, where approved by the principal.  Nothing in this agreement is intended to prohibit voluntary collaboration or work by teachers and other school staff on curriculum.

   However, if there is a specific request by the DOE or a school administrator for a teacher or teachers to write curriculum, then the teacher(s) must be given sufficient time during the work day to do so, in accordance with provisions of the collective bargaining agreement or given sufficient time after school, in accordance with the provisions of the collective bargaining agreement pertaining to Per Session.

   The failure to provide curriculum as defined above shall be subject to the grievance and arbitration procedures set forth in Article Twenty-Two of the collective bargaining agreement. However, such grievances shall be strictly limited to whether a curriculum, as defined above, was provided. The sufficiency and quality of the curriculum provided shall not be grievable.

**S.   Additional Facilities**
   1.   Adequate supplies will be made available in teacher washrooms in schools.

2. Pay telephone facilities in schools will be made available to teachers for their reasonable use.

3. In schools where continuous cafeteria service for teachers is not available, a vending machine for beverages shall be installed at the request of the particular school staff.

4. Teaching materials and workbooks shall be made available to teachers of the homebound at a central stock room on an emergency basis.

5. The Board shall issue parking display cards to identify automobiles of teachers of the homebound visiting homebound children. Additional provisions with respect to parking placards are contained in the letter agreement set forth in Appendix M.

6. The Board will make every effort to obtain parking privileges for special education teachers. Additional provisions with respect to parking placards are contained in the letter agreement set forth in Appendix M.

**T. Teleconferencing**

The required participation of special education teachers and/or related service providers in EPCs and CSE reviews may be accomplished via teleconferencing at the discretion of the appropriate Superintendent. If the teleconference occurs during a teacher's preparation period, or during an administrative period in which he or she is relieved, compensation will be paid at the coverage rate. If the teleconference occurs on other than school time, compensation at the applicable per session rate will be paid.

**U. Professional Activity Assignment Procedures**

1. The number of available positions for each professional activity and the qualifications and responsibilities required for each activity shall be set by the principal in consultation with the Chapter Leader. Each spring, but no later than April 15th, the principal shall meet to consult with the Chapter Leader on the number of positions for each menu item. Should the Union believe the number of positions for administrative activities set by the principal is inappropriate, or should a teacher believe a selection decision is in violation of the Agreement, the Union may appeal to the Chancellor. The Chancellor or his/her designee will consult with the Union President, or his/her designee, prior to issuing a decision on the appeal. The Union may appeal the decision of the Chancellor or his/her designee within 15 days to the NYC Office of Labor Relations, which will issue a final and binding decision.

2. Teachers shall select each spring (following the timeframe for program preferences listed under Articles 7A, 7B, 7C, and 7K in this Agreement) in priority order, three (3) activities from the menu they want to participate in for the following school year. The principal shall make assignments based on qualifications and availability of positions. If more teachers seek particular activities than positions are available, the principal shall select the most qualified teacher(s); and if the candidates are equally qualified the candidate with the most school seniority will be selected. To the extent possible each teacher shall receive one of the three (3) activities for the following school year. If this is not possible, the teacher will be given the opportunity to select three (3) additional choices, one of which will be granted, subject to qualifications, and unless sufficient teachers do not choose a particular activity. If sufficient teachers do not choose a particular activity with any of their six (6) choices, the Principal will assign teachers to these activities on a rotational basis in inverse seniority order with no teacher being involuntarily assigned to an administrative activity for consecutive years.

3.   Teachers new to the school system and those teachers in danger of receiving an unsatisfactory rating may be assigned by the principal to professional development or common planning as their professional activity, regardless of their preferences, to further enhance their teaching skills.  A teacher in danger of receiving an unsatisfactory rating who is assigned to AM or PM bus duty may be assigned by the principal to professional development or common planning as their professional activity in lieu of AM or PM bus duty. Teachers hired in the fall will be offered three choices by the principal from the menu.

4.   Each teacher shall be notified in writing by the principal prior to the end of the school year, pursuant to Articles 7A, 7B, 7C, and 7K of the activity they have been assigned for the following school year and it will be incorporated as part of his/her program.

5.   Teachers serving in compensatory time positions, pursuant to the SBO process (defined in Articles 7A, 7B, 7C and 7K and Circular 6) shall continue to do the work of their position during their professional periods (except to the extent the SBO specifically states otherwise) and must at the beginning of each term submit to the principal for approval a plan for the use of their professional periods.

6.   Teachers serving as athletic coaches, pursuant to Article 15 of this Agreement, and receiving per session pay for such activity, shall be permitted to use their professional periods to further the work of their activity, and must at the beginning of each term, submit to the principal for approval a plan for the use of their professional periods.

7.   Any teacher may grieve the failure to follow the terms of this provision pursuant to the regular grievance and arbitration provision of this Agreement.  However the assignment of particular activities hereunder shall not be grievable.  The Union may challenge the assignment of a particular activity by appealing, within 15 days, to the Chancellor/designee, who will consult with the Union prior to rendering a decision.  The Union may appeal the decision of the Chancellor/designee to the New York City Office of Labor Relations, which will issue a final and binding decision.

## V.  Regular Payroll Status for Per Diem Substitutes

1.   The Board ("Department") will pay on the regular payroll (i.e. Q payroll) any per diem substitute provided that he/she either:

(A)(i) was employed by the Department to replace a regularly appointed teacher who is in a Vacancy (as defined herein); (ii) commenced employment later than the fifteenth calendar day following the first day for the reporting of newly appointed teachers; and (iii) was employed for a minimum of two months; or

(B)(i) was employed by the Department to cover a Vacancy; and (ii) commenced employment during the first fifteen calendar days of the term.

2.   For purposes of this section, a Vacancy is a position that is filled by a substitute teacher under the following circumstances:

(A) there is no regular appointed teacher and the position is an unencumbered vacancy; or

(B) when the regularly appointed teacher is (a) on a sabbatical leave of absence for the full term or full school year; (b) on an unpaid leave of absence for the duration of the school year; (c) on an approved leave due to an injury in the line of duty ("ILOD") and the ILOD leave is for the duration of the school year; (d) reassigned for the duration of

the school year, however the substitute teacher shall not receive regular payroll status (i.e. Q payroll) for the first sixty (60) days of service in this assignment; (e) absent on paid status (i.e. using their Accumulated Absence Reserve (CAR), or borrowing up to 20 additional CAR days and/or utilizing the grace period) and whose status is subsequently adjusted to unpaid leave status for the duration of the school year; or (f) on an approved paid absence (i.e. using their CAR days and/or utilizing the grace period) for the duration of the school year.

3.   In the event a substitute does not work in the assignment for the duration of the school year (except in the case of a sabbatical for one term as described above in (3)(2)(a)), s/he shall not be entitled to regular payroll status (i.e. Q payroll).

4.   The foregoing shall supersede and replace Chancellor's Regulation C-525 with respect to the criteria necessary to attain regular payroll status (i.e. Q payroll).

5.   Pursuant to Chancellor's Regulation C-520, a substitute teacher shall be entitled to Z status if s/he replaces a particular absent employee for thirty (30) or more consecutive work days.  The terms of Chancellor's Regulation C-520 shall remain in effect with respect to Z status; to the extent C-520 addresses regular payroll status (i.e. Q payroll) and is inconsistent with this Stipulation, the terms of this Stipulation shall be determinative.


**ARTICLE EIGHT**
**EDUCATION REFORM**

**A.  School-Based Management/Shared Decision-Making (SBM/SDM)**

The Union and the Board agree that SBM/SDM is a process in which all members of the school community collaborate in identifying issues, defining goals, formulating policy and implementing programs.  The uniqueness of each school community requires that the SBM/SDM process and the organizational and instructional issues discussed are determined by the staff, parents, administration and students (where appropriate) at individual schools through the SBM/SDM team.  The Union and the Board agree that in order to achieve SBM/SDM at the school level significant restructuring of instruction must occur, and the parties agree to work cooperatively in an effort to bring about these changes.

**1.  Eligibility and Involvement**

a.  All schools are eligible to apply for participation in SBM/SDM.  School participation shall be voluntary and subject to approval by fifty-five (55) percent of the voting, non-supervisory school based staff (e.g., teachers, paraprofessionals, support staff and others) and agreement of the principal, the appropriate superintendent and parents. Similarly, schools involved in SBM/SDM may choose to opt out of the program at any time.  The decision to opt out shall be voluntary and subject to approval by at least fifty-five (55) percent of the voting, non-supervisory school based staff.

b.  All votes of non-supervisory school based staff concerning participating in SBM/SDM shall be conducted by the UFT chapter.

c.  Schools involved in SBM/SDM shall conduct ongoing self-evaluation and modify the program as needed.

## 2. SBM/SDM Teams

a.  Based upon a peer selection process, participating schools shall establish an SBM/SDM team.  For schools that come into the program after September 1993, the composition will be determined at the local level.  Any schools with a team in place as of September 1993 will have an opportunity each October to revisit the composition of its team.

b.  The UFT chapter leader shall be a member of the SBM/SDM team.

c.  Each SBM/SDM team shall determine the range of issues it will address and the decision-making process it will use.

## 3. Staff Development

The Board shall be responsible for making available appropriate staff development, technical assistance and support requested by schools involved in SBM/SDM, as well as schools expressing an interest in future involvement in the program.  The content and design of centrally offered staff development and technical assistance programs shall be developed in consultation with the Union.

## 4. Waivers

a.  Requests for waivers of existing provisions of this Agreement or Board regulations must be approved in accordance with the procedure set forth in Article Eight B (School-Based Options) of this Agreement i.e. approval of fifty-five (55) percent of those UFT chapter members voting and agreement of the school principal, UFT district representative, appropriate superintendent, the President of the Union and the Chancellor.

b.  Waivers or modifications of existing provisions of this Agreement or Board regulations applied for by schools participating in SBM/SDM are not limited to those areas set forth in Article Eight B (School-Based Options) of this Agreement.

c.  Existing provisions of this Agreement and Board regulations not specifically modified or waived, as provided above, shall continue in full force and effect in all SBM/SDM schools.

d.  In schools that vote to opt out of SBM/SDM, continuation of waivers shall be determined jointly by the President of the Union and the Chancellor.

e.  All School-Based Option votes covered by this Agreement, including those in Circular 6R, shall require an affirmative vote of fifty-five percent (55%) of those voting.

## B.  School-Based Options

The Union chapter in a school and the principal may agree to modify the existing provisions of this Agreement or Board regulations concerning class size, rotation of assignments/classes, teacher schedules and/or rotation of paid coverages for the entire school year.  By the May preceding the year in which the proposal will be in effect, the proposal will be submitted for ratification in the school in accordance with Union procedures which will require approval of fifty-five (55) percent of those voting.  Resources available to the school shall be maintained at the same level which would be required if the proposal were not in effect.  The Union District Representative, the President of the Union, the appropriate Superintendent and the Chancellor must approve the proposal and should be kept informed as the proposal is developed.  The proposal will be in effect for one school year.

Should problems arise in the implementation of the proposal and no resolution is achieved at the school level, the District Representative and the Superintendent will attempt to resolve the problem.  If they are unable to do so, it will be resolved by the

Chancellor and the Union President.  Issues arising under this provision are not subject to the grievance and arbitration procedures of the Agreement.

**C.  School Allocations**

Before the end of June and by the opening of school in September, to involve faculties and foster openness about the use of resources, the principal shall meet with the chapter leader and UFT chapter committee to discuss, explain and seek input on the use of the school allocations.  As soon as they are available, copies of the school allocations will be provided to the chapter leader and UFT chapter committee.

Any budgetary modifications regarding the use of the school allocations shall be discussed by the principal and chapter committee.

The Board shall utilize its best efforts to develop the capacity to include, in school allocations provided pursuant to this Article 8C, the specific extracurricular activities budgeted by each school.

The Board ("Department") shall provide to the Chapter Committee and Chapter Leader in school the School Leadership Team (SLT) view of the Galaxy Table of Organization.  This shall be supplied before the end of June each school year and again by the opening of school in September of each school year.

In addition, should there be any budget modification regarding the use of school allocations, these shall be discussed by the Principal and Chapter committee.  In order to facilitate such discussion, the modifications shall be provided to the Chapter Committee.

**D.  Students' Grades**

The teacher's judgment in grading students is to be respected; therefore if the principal changes a student's grade in any subject for a grading period, the principal shall notify the teacher of the reason for the change in writing.

**E.  Lesson Plan Format and Unit Planning**

The development of lesson plans by and for the use of the teacher is a professional responsibility vital to effective teaching.  The organization, format, notation and other physical aspects of the lesson plan are appropriately within the discretion of each teacher.  A principal or supervisor may suggest, but not require, a particular format or organization, except as part of a program to improve deficiencies of teachers who receive U-ratings or formal warnings.

A "Unit Plan," also known as a "Curriculum Unit," means a brief plan, by and for the use of the teacher, describing a related series of lesson plans and shall include: (1) the topic/theme/duration; (2) essential question(s); (3) standard(s); (4) key student learning objectives; (5) sequence of key learning activities; (6) text(s) and materials to be used; and (7) assessment(s).

Teachers that are provided with a Curriculum (as defined in this Agreement) have a professional responsibility to prepare Unit Plans.  No teacher shall be required to prepare a Unit Plan for each curriculum unit, other than the attached, brief, one-page form agreed upon by the UFT and DOE, including teachers of multiple subjects for the same group of students (e.g., elementary school teachers, teachers of self-contained classes), who will include each subject taught on the attached one page form.  Teachers shall not be required to prepare a Unit Plan in any format other than the form attached as Appendix P, agreed upon by the UFT and DOE.

A principal or supervisor may collect and/or copy a Teacher's Unit Plan provided that the principal/supervisor either (i) discusses the Unit Plan at the next professional

conference (*e.g.,* pre-observation or post-observation conference) pursuant to the observation cycle or as otherwise permitted by the parties' APPR plan, or (ii) uses the Unit Plan for professional learning (*e.g.*, non-evaluative conferencing with the principal or other administrators) within twenty (20) school days of the collection or copying, absent unforeseen and unusual circumstances.

**F.  Joint Efforts**

The Board of Education and the Union recognize that a sound educational program requires not only the efficient use of existing resources but also constant experimentation with new methods and organization.  The Union agrees that experimentation presupposes flexibility in assigning and programming pedagogical and other professional personnel. Hence, the Union will facilitate its members' voluntary participation in new ventures that may depart from usual procedures.  The Board agrees that educational experimentation will be consistent with the standards of working conditions prescribed in this Agreement. The Board and the Union will continue to participate in joint efforts to promote staff integration.

The parties will meet with a view toward drafting their collective bargaining agreements to reflect and embody provisions appropriate to the new and/or nontraditional school program organizational structures that have developed in the last several years, including as a result of this Agreement.

**G.  Professional Support for New Teachers**

The Union and the Board agree that all teachers new to the New York City Public Schools are entitled to collegial support as soon as they commence service.  The New Teacher Staff Development Program and Mentor Teacher-Intern Program provide this support, enabling new teachers to expand their range of instructional skills and strategies, and to become actively involved in the life of their school.

**1.  New Teacher Staff Development Program**

a.  For uncertified teachers without prior teaching experience there will be ten (10) mandatory days of staff development.  Five (5) of these days will take place in the summer prior to the new teacher's employment and the remaining five (5) will take place during the teacher's first year of service.

b.  For certified teachers without prior teaching experience there will be five (5) mandatory days of staff development.  Three (3) of these days will take place in the summer prior to the new teacher's employment and the remaining two (2) will take place during the first year of teaching.

c.  For teachers who have three (3) or more years of approved outside teaching experience there will be three (3) mandatory days of staff development in the summer prior to the new teacher's employment.

d.  Uncertified teachers without prior teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment and will be required to complete one (1) day for each remaining two (2) months of the school year.

e.  Certified teachers without prior teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment and will be required to complete one (1) day for each remaining two (2) months of the school year up to a maximum of two (2) days.

f. Teachers who have three (3) or more years of approved outside teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment.

g. The content and design of this professional development program for new teachers shall be developed collaboratively by the Union and the Board and will take into account varying needs of new teachers based upon their educational and professional backgrounds. As an additional option the Union and the Board agree to develop criteria for college courses that can be credited toward fulfillment of the first year professional development requirement in order to coordinate services and requirements for new teachers.

h. There shall be an expense stipend for each day of mandatory professional development for new teachers paid at the rate per day set forth below:

Effective May 19, 2008……………………………...... $40.20
Effective May 1, 2013………………………...…….. $40.60
Effective May 1, 2014……………………………… $41.01
Effective May 1, 2015……………………………… $42.25
Effective May 1, 2016……………………………… $43.72
Effective May 1, 2017……………………………… $45.71
Effective May 1, 2018……………………………… $46.61
Effective June 16, 2018..…………………………… $48.01

Provisions for payment of this stipend shall not apply to persons opting for the above mentioned college courses.

**2. Mentor Teacher Intern Program**

a. The Mentor Teacher Intern Program is designed to improve instruction for children in the New York City Public Schools by supporting the development of beginning teachers. At the core of the program is the relationship that develops between the skilled, experienced teacher (mentor) and the uncertified colleague (intern). This relationship provides a forum for the uncertified teacher to identify issues that form the basis of his or her professional development. For the mentor, it provides the opportunity to share years of accumulated skills and experience.

b. In accordance with state law and regulations: time will be provided for mentor-intern interaction; information shared between the mentor and the intern must remain confidential; and the building principal/supervisor does not rate teachers in their role as mentor or intern. Specific details will be jointly agreed upon by the Union and the Board.

c. All mentors are required to teach a minimum of one (1) period daily. Mentors are selected and matched to one (1) or more intern(s) by the Mentor Advisory Selection Committee. Full-time mentors serving in more than one building shall maintain seniority and the right of return to the site in which they previously served.

d. The Mentor Advisory Selection Committee is a 12 member committee with a majority of teachers who are selected by the Union. Its responsibilities include setting policy with regard to the Mentor Teacher-Intern Program, selecting mentors for recommendation to the appropriate superintendent, matching mentor-intern teams, requesting variances and coordinating district staff development for mentors and interns. The committee selects its chairperson through consensus. Operating procedures for the Mentor Advisory Selection Committee shall be jointly determined by the Union and the Board.

e.  The assignment of a mentor to an intern shall be made at the commencement of service but no later than the 20th day of service to the maximum extent possible. Exceptions will be made for those whose service commences after agreed upon dates, annually determined by the Union and the Board.

f.  All newly hired, uncertified teachers who do not possess the minimum number of education credits and student teaching/required experience necessary for a regular license shall participate in the Mentor Teacher-Intern Program for one (1) year.  This program shall be provided by a mentor.

The parties will jointly request on an annual basis a waiver of State Education Commissioner's Regulation 80.18 to offer in satisfaction of the State Mentoring requirement for uncertified teachers a cost effective, substantive, high quality, professional development program as provided in Special Circular No. 14, 1992-93 dated September 30, 1992.

g.  A mentor is a skilled, experienced colleague who has chosen to share his or her expertise by assisting the intern.  A mentor has five (5) or more years experience and possesses permanent certification in the same or related license area as the intern. Preference in selecting mentors may be given to teachers who have served three (3) of the last five (5) years in their present school.  Teachers who have transferred through the UFT Transfer Plan or teachers who have been excessed into the school may use previous school experience to qualify for three (3) years in the current school.

h.  The Union and the Board agree to collaboratively develop a professional development program for mentors.

### 3.  Professional Support Periods and Assignments

a.  Guidelines for the use of professional support periods for new teachers will be established.  Under the direction of the principal, their use will include but not be limited to activities supportive of upgrading instruction such as: observation of classes conducted by experienced teachers, consultation with others familiar with such areas as instructional strategies in the classroom, planning, curriculum and behavior management.

b.  During the first year of employment of a teacher who has not had previous professional employment as a teacher, two preparation periods per week shall be designated as professional support periods.

c.  For uncertified teachers being mentored during their second year of employment, two preparation periods per week shall continue to be designated as professional support periods exclusively for the purpose of mentoring.

d.  During the first year of employment, a new teacher will be exempt from the generally applicable policy of rotation of teaching assignments.  If the number of new teachers makes it impractical to apply this provision, an alternative to this approach may be implemented if jointly approved by the Board and the Union.  Guidelines for this purpose will be issued by the Chancellor after consultation with the Union.  New teachers may not volunteer or be assigned to coverages during their professional activity periods.

### H.  Professional Development and Second Differential

As one aspect of the parties' interest in professional development, a joint Board-Union committee comprised of three (3) designees of the UFT President and three (3) designees of the Chancellor was established to expand and professionalize available staff development opportunities.  As a priority, the joint committee focused on new professional development opportunities for teachers seeking their second differential, and

for other pedagogues seeking a comparable differential, and made its initial recommendations to the Chancellor. It is the intention of the parties to make such opportunities available to staff at no or modest cost, and with no additional cost to the employer. The Chancellor may establish limits on the number of these credits which can be earned per term toward the second differential via this professional development initiative (the P-credit program). It is understood that the Chancellor's decisions about all aspects of the Committee's recommendations, the design of the P-credit program and regulations for implementation of the P-credit program shall be final and binding on the parties and not subject to the grievance process. Any claim concerning the arbitrary, capricious and/or discriminatory application of such regulations to individuals will be grievable and arbitrable.

## I. Reduction of Paperwork

(1) A Central Paperwork Committee (the "Central Committee") will convene within thirty (30) days of the ratification of this agreement by the UFT. The Central Committee will be made up of an equal number of representatives appointed by the UFT President and the Chancellor. The representatives appointed by the Chancellor will include someone from the office of the Deputy Chancellor for Teaching and Learning. The Central Committee will meet at least monthly, on the first Wednesday of the month or at a mutually agreeable time, to review system-wide paperwork issues (whether paper or electronic), including, but not limited to, the requests for data in connection with the Quality Review process. The Central Committee will also establish, subject to agreement by the Chancellor and the UFT President, system-wide standards for the reduction and elimination of unnecessary paperwork ("System-wide Standards"). Should the Central Committee fail to establish System-wide Standards approved by the Chancellor within sixty (60) days of their first meeting, either the UFT or the Board (DOE) may request the assistance of a member of the Fact-Finding Panel of Martin F. Scheinman, Howard Edelman and Mark Grossman, or another mutually agreeable neutral, to help facilitate the Central Committee's discussions. Should the intervention of a neutral not result in an agreement by the Central Committee approved by the Chancellor within sixty (60) days of the neutral's involvement, the DOE and UFT will submit position statements to said neutral who will issue a binding decision. The neutral's decision setting the System-wide Standards shall be subject to Article 75 of the New York State Civil Practice Law and Rules.

(2) Once the System-wide Standards have been established they will be distributed to all schools and key stakeholders (including SLT Chairpersons, PA/PTA Presidents, UFT Chapter Leaders, UFT District Representatives, District Superintendents and CSA Representatives). Thereafter, District/High School Superintendency Paperwork Committees ("District Committees") shall be established in each community school district and high school superintendency. The District Committees shall meet monthly, at a regularly scheduled time, for the purpose of addressing paperwork issues (whether paper or electronic) at the school level and to ensure the System-wide Standards are being implemented properly in schools. These District Committees will be made up of an equal number of representatives appointed by the UFT President and the Chancellor. The representatives appointed by the Chancellor shall include the District/High School Superintendent or his/her designee.

(3) Employees (including those in functional chapters) may request that their Chapter Leader raise school-specific paperwork issues (whether paper or electronic) before the District Committee.  Subject to approval by the Chancellor, if a District Committee agrees on the resolution of the paperwork issue, the resolution shall be enforced by the District or High School Superintendent.  In the event that a District Committee cannot agree on the resolution of an issue raised by a Chapter Leader of an individual school, the District Committee shall refer the issue to the Central Committee for review. Subject to approval by the Chancellor, if the Central Committee agrees on the resolution of an issue raised by a Chapter Leader, the resolution shall be enforced by the District or High School Superintendent.

(4) For alleged violations of the System-wide Standards the UFT may file a grievance, in accordance with the grievance and arbitration procedures set forth in Article 22 of this Agreement. It is understood that, prior to a grievance being filed, the paperwork issues shall go through the committee process as described above. Such grievances shall be filed directly with the DOE's Office of Labor Relations ("OLR"), which may be scheduled for arbitration within twenty (20) days of notice to OLR. The parties shall negotiate pre-arbitration hearing procedures so that each party is aware of the allegations and defenses being raised at the arbitration. All arbitration days shall be part of the existing number of days as set forth in this Agreement.  An arbitrator may hear up to three (3) paperwork grievances on each arbitration date.  The arbitrator will issue a brief award that is final and binding upon the parties, within five (5) school days of the arbitration.

**J.  Evaluation and Observation System**

**1.  Teachers Not Subject to the APPR Plan Required By Education Law §3012-c**

a.  The UFT and the Board of Education are committed to attracting and retaining the most competent staff.  To this end the Union and the Board established a joint committee which undertook a study to develop and design a high quality prescriptive evaluation and professional growth system that would give each staff member choices and a role in his/her professional growth.

Following the study, the Union and the Board agreed upon such a system.  The parties' full agreement is embodied in the document entitled "Teaching for the 21st Century" and the attachments thereto, which is the definitive document regarding the evaluation/observation plan.  Under that plan, performance reviews are based on assessment/evaluation procedures which identify and recognize the range of abilities and experiences of teachers and link a teacher's performance, a school's educational goals and related professional development activities.  The reviews must be based on the agreed upon characteristics of good teaching, including consideration of positive student learning outcomes and parent involvement.

b.  The plan also provides the following:

(1) Where appropriate, the performance review must include clear and specific recommendations for professional growth.

(2) Annual performance reviews may be based on either of two models:

The first model, known as Annual Performance Options (Component A), offers an individual teacher, in consultation with his/her supervisor, the opportunity to set yearly goals and objectives and to choose the methods for demonstrating professional growth.

The annual performance options will be supported with appropriate follow-up professional development activities, as noted below.

The second model, known as Formal Observations (Component B), is the traditional classroom observation by a principal or supervisor which includes pre- and post-observation conferences and written feedback/comments.

(3) In an individual decision between the teacher and the supervisor, satisfactory, tenured teachers may choose either Component A or B or both as the basis for the annual performance review.  A process has been agreed upon to facilitate agreement in instances where a teacher and a supervisor have differences in professional judgment concerning the annual performance review option.

(4) New and probationary teachers who are new to a school, tenured teachers in danger of receiving an unsatisfactory rating, and tenured teachers who received an unsatisfactory rating the prior year must use Component B as the basis of their annual performance review, although, with the principal's concurrence, Component A may be utilized as a part of their performance review.

(5) Each component, or combination, should be implemented in a way that promotes the agreed upon characteristics of good teaching.

(6) The principal has final responsibility for rating a teacher's performance.

(7) The Board must inform parents of the agreed upon characteristics of good teaching and the principal must inform parents of the school's procedures for evaluation of teachers.

(8) Implementation of the plan has two phases.  Phase I introduced and defined the new performance review model to all teachers, supervisors, superintendents, parents and other members of the school community.  Phase II's focus is on specific professional development activities and opportunities for individual teachers as they identify specific goals and objectives and/or areas for improvement.  Any activities that require new and/or additional resources will be dependent on the Board and the Union jointly identifying, seeking and obtaining specific revenue sources.

(9) The President of the Union and the Chancellor may agree to make adjustments to the plan as necessary, but in any event the parties commit to a formal review of all aspects of this article.

c.  The provisions set forth in this Section I shall be subject to the grievance procedure and to arbitration only for the purpose of determining whether there has been a failure to comply with the procedural requirements contained in the plan.  In the event that a teacher appeals a rating, the appropriate forum for claiming a failure to comply with procedures is the rating appeal process and not the grievance/arbitration procedure.

**2.  APPR Plan Required By Education Law §3012-c**

The Board (DOE) and UFT agree that the following, subject to approval by the Commissioner of Education, represents the Parties APPR Plan as required by Education Law § 3012-c.

This Article replaces the Commissioner's June 1, 2013 APPR decision and subsequent clarification decisions dated September 5, 2013 and November 27, 2013 (collectively "the Commissioner's Decision").

Except as modified herein, the terms of the Commissioner's Decision are incorporated by reference and remain in full force and effect.  Except as stated herein, any dispute regarding this APPR Plan and the Commissioner's Decision shall be resolved

exclusively through negotiation between the parties or the grievance process set forth in Article 22 of the parties' collective bargaining agreement.  Any issue regarding the implementation of the APPR Plan with respect to the Measures of Student Learning and scoring that was not addressed in the Commissioner's Decision, shall be resolved through negotiations between the parties and, in the absence of an agreement, referred to the State Education Department for clarification.

The Parties agree to submit a draft APPR Plan to the State Education Department no later than May 15, 2014.

### a.  Teacher Practice Rubric

In order to simplify and focus the use of Danielson's *Framework for Teaching* (2013 Edition), and reduce unnecessary paperwork, only the following eight (8) components of the rubric shall be rated: 1(a), 1(e), 2(a), 2(d), 3(b), 3(c), 3(d), and 4(e). These eight (8) components shall be referred to herein as the "Danielson Rubric."  Any reference to Danielson or the Danielson Rubric in the Commissioner's Decision shall be deemed to refer only to these eight (8) components. In each observation, all components of the Danielson Rubric shall be rated for which there is observed evidence. The remaining components of the Danielson *Framework for Teaching* (2013 Edition) not described herein will continue to be used by the parties for formative purposes.

### b.  Observation Cycle

(1) Feedback following an observation must be provided to the teacher within fifteen (15) school days of the observation. Feedback must be evidence-based and aligned to the Danielson Rubric.

(2) Evaluator forms shall be provided to the teacher no later than forty-five (45) school days following the observation. From the time an observation (formal or informal, as defined by the Commissioner's Decision) is conducted until the time the teacher receives the evaluator form for that observation, only one (1) additional evaluative observation (formal or informal) may be conducted.

(3) The parties agree that Teacher Artifacts (as defined in the Commissioner's Decision) shall not be used in determining the Other Measures of Effectiveness ("Measures of Teaching Practice") subcomponent rating. Teachers are not required to submit Teacher Artifacts (as defined in the Commissioner's Decision) except principals have the discretion to collect evidence related to the Danielson Rubric in a manner consistent with the collective bargaining agreement and the Commissioner's Decision. The DOE and UFT shall jointly create guidance for evaluators on the collection of evidence for the Danielson Rubric. Whenever possible, the parties will jointly present this guidance to school communities.

(4) An evaluator shall provide a score on any component that is observed from the Danielson Rubric regardless of the observation option selected by the teacher and regardless of whether it is a formal or informal observation (as defined by the Commissioner's Decision).

(5) In addition to the two (2) observation options set forth in the Commissioner's Decision, the following shall apply:

(a) Teachers who have received "Highly Effective" as their final APPR rating in the previous year may choose Option 3. Option 3 consists of a minimum of three (3) informal observations that are used for evaluative purposes. Option 3 is subject to the same

procedures and scoring rules as Options 1 and 2 as provided for in the Commissioner's Decision as modified by this APPR Plan.

A teacher that chooses Option 3 shall make his/her classroom available for three (3) classroom visits by a colleague per school year. The classroom visits described herein shall not be used for any evaluative purpose. Any additional classroom visits by colleagues shall only be with the consent of the teacher selecting Option 3. The date and time of such visits shall be scheduled jointly by the teacher selecting Option 3 and the principal.

(b) Teachers who have received "Effective" as their final overall APPR rating in the previous year may choose Option 4.  Option 4 consists of a minimum of four (4) informal observations that are used for evaluative purposes.  Option 4 is subject to the same procedures and scoring rules as Options 1 and 2 as provided for in the Commissioner's Decision as modified by this APPR Plan.

(6) An evaluator may assess a teacher's preparation and professionalism only if the evaluator's conclusions are based on observable evidence pertaining to components 1(a), 1(e), and/or 4(e) of the Danielson Rubric during an observation or if the evaluator observes evidence for these components during the fifteen (15) school days immediately preceding a classroom observation.

(7) The parties agree to create an evaluator form that will allow evaluators to rate and delineate between all components observed during a classroom observation as well as (for components 1(a), 1(e), and 4(e) only) observed within fifteen (15) school days prior to the classroom observation as part of an assessment of a teacher's preparation and professionalism. Each evaluator form shall contain lesson-specific evidence for components observed during a classroom observation and teacher-specific evidence for components observed as part of an assessment of a teacher's preparation and professionalism.

(8)  An evaluator shall not include or consider evidence regarding the preparation and professionalism on an evaluator form if such evidence (or conduct) is also contained in a disciplinary letter to the teacher's file, unless the evidence was directly observed by the evaluator during a classroom observation (in which case the evidence may be on both an evaluator form and in a disciplinary letter).  Evidence not related to components 1(a), 1(e), and/or 4(e), or directly observed by the evaluator in the fifteen (15) school day period immediately preceding a classroom observation shall not be considered in a teacher's evaluation.

(9) Consistent with the Commissioner's Decision, there shall be Initial Planning Conferences ("IPC") and Summative End of Year Conferences (as defined therein). Teachers shall have the sole discretion of setting professional goals as part of the IPC. The DOE will explicitly state this in guidance for evaluators and educators for the 2014-15 school year and thereafter.

### c.  Videotaping and Photographing

(1) All observations shall be conducted in person. The teacher and evaluator may mutually consent to evaluators not being present when videotaping.

(2) A teacher may choose to have his/her observations videotaped.  If a teacher chooses to have his/her observations videotaped he/she shall select among the following options:

(a) the evaluator will choose what observations, if any, will be videotaped; or

(b) the evaluator shall videotape the observations in the following manner:

(i) if the teacher selected Option 1, the formal observation shall be videotaped;

(ii) if the teacher selected Option 2, two (2) of the informal observations shall be videotaped (at the evaluator's option);

(iii) if the teacher selected Option 3, one (1) of the informal observations shall be videotaped (at the evaluator's option);

(iv) if the teacher selected Option 4, one (1) of the informal observations shall be videotaped (at the evaluator's option).

(3) Evaluators who take photographs during observations relevant to the Danielson Rubric, should, to the extent practicable, be unobtrusive (for example, photographs may be taken at the end of the observation).

**d.  Covered Employees**

(1) The DOE and the UFT agree to jointly request that the State Education Department issue a determination as to whether teachers of programs for suspended students and teachers of programs of incarcerated students are subject to Education Law §3012-c (and therefore subject to this APPR Plan). Such decision shall be incorporated by reference into this APPR Plan.

(2) In order for a classroom teacher to be covered by this APPR Plan, the teacher must be teaching for at least six (6) cumulative calendar months in a school year.  If the teacher does not satisfy this requirement he/she shall not be covered by this APPR Plan and shall be subject to the evaluation system set forth in Article 8J of this Agreement and Teaching for the 21st Century.

(3) The following shall apply to teachers who are teaching for more than six (6) cumulative calendar months in a school year but less than the full year due to either (a) paid or unpaid leave of absence; (b) reassignment from teaching responsibilities; or (c) the teacher commenced, or separated from, employment mid-year:

(a) When a teacher is absent from the first day of school until the last Friday of October, the IPC (as defined in this APPR Plan) shall be conducted within ten (10) school days of his/her return to school.

(b) When a teacher is absent between the last Friday of April and the last Friday of June, and the absence was foreseen and the evaluator was aware that the teacher would not be present during this period (e.g., they are taking a maternity leave), the Summative Conference shall be held before the teacher leaves.

(c) When a teacher is absent between the last Friday of April and the last Friday of June and the absence was unforeseen (e.g., extended leave) and therefore the evaluator could not conduct the Summative Conference ahead of time, the Summative Conference shall be held no later than the last Friday of October in the following school year. Evaluators shall have the discretion to conduct the IPC and Summative Conference at the same time but must fulfill all the requirements of both conferences.

(d) When a teacher is unexpectedly absent for the remainder of the school year (e.g., extended leave), the teacher shall have a minimum of two (2) observations, which shall fulfill the observation requirements set forth herein.

(e) When a teacher is absent during the period when the baseline or post-test assessments are administered, and the teacher was assigned individual target populations for his/her State and/or Local Measures, the teacher will still receive Local and/or State Measures for individual target populations.

(f) When a teacher is absent during the period when the targets are set (for assessments with goal-setting), the teacher shall set targets and have their targets approved within the first month of his/her return to school.

The DOE shall explicitly state the rules described herein in guidance for educators for the 2014-15 school year and all school years thereafter.

### e.  Multiple Observers

For formative purposes (observations conducted entirely for non-evaluative purposes), no more than four (4) observers (either school-based or from outside of the school) may be present in a classroom. Additional observers may be present in the teacher's classroom with the teacher's consent. The visits described in this paragraph shall not be considered when scoring the Measures of Teacher Practice subcomponent.

For evaluative purposes, no more than one (1) evaluator (as defined by the Commissioner's Decision) and two (2) school-based observers (i.e., the Superintendent or Assistant Superintendent or trained administrator of the teacher's school) may be present during a formal or informal observation.   The evaluator shall be solely responsible for the observation report. The DOE and UFT shall jointly create guidance for evaluators on the role of multiple observers. Whenever possible, the parties will jointly present this guidance to school communities.

In extraordinary circumstances, only one (1) of the two (2) observers described herein may be an observer from outside of the school. The outside observer may only be either a Network Leader or Deputy Network Leader (or its functional equivalent).

### f.  Student Surveys

The DOE shall pilot student surveys during the 2013-2014 at mutually agreed upon schools and in all schools during the 2014-2015 school year. During the pilot, student surveys shall not be used for evaluative purposes.  At the conclusion of each pilot year, the DOE and UFT shall meet to discuss the results of the pilot and discuss the possibility of continuing/discontinuing the pilot and use of the surveys for evaluative purposes. If agreement is not reached at the conclusion of each pilot year, the student surveys shall be used for non-evaluative purposes in the 2014-2015 school year and evaluative purposes starting in the 2015-16 school year and thereafter. The implementation and scoring of the student surveys in 2015-16 and thereafter shall be consistent with the Commissioner's Decision.

### g.  Scoring

For all formal and informal observations (as defined by the Commissioner's Decision), all components of the Danielson Rubric shall be rated for which there is observed evidence. At the end of the school year, Overall Component Scores shall be created for each of the eight (8) components. The Overall Component Scores shall be the average of each rated component from the observations and/or assessments of a teacher's preparation and professionalism.

An Overall Rubric Score will then be calculated by taking the weighted average of the Overall Component Scores, using the following weightings: 1(a) (5%), 1(e) (5%), 2(a) (17%), 2(d) (17%), 3(b) (17%), 3(c) (17%), 3(d) (17%), 4(e) (5%).

Formal and informal observations (as defined by the Commissioner's Decision) shall not receive average observation ratings.

Formal and informal observations (as defined by the Commissioner's Decision) will no longer be afforded the weights as provided for in the Commissioner's Decision.

The Overall Rubric Score shall be the basis for the sixty (60) points of the Measures of Teaching Practice subcomponent, unless the student surveys are used for evaluative purposes. If student surveys are used for evaluative purposes, the Overall Rubric Score shall count for fifty-five (55) of the sixty (60) points of the Measures of Teaching Practice subcomponent score. The implementation and scoring of the student surveys in 2015-16 and thereafter shall be consistent with the Commissioner's Decision.

**h.  Courses That Are Not Annualized**

In the event that Measures of Student Learning (MOSL) assessment options do not include options for non-annualized courses: (1) in a school where each of the terms covers content where the second term builds on content from the first, the fall teacher shall administer the baseline and the spring teacher shall administer the post-test. Teachers from all terms will be held accountable for the students' results; or (2) in a school where the second term does not build on content from the first, these teachers shall be assigned Linked or Group Measures. Notwithstanding the foregoing, with respect to a teacher of a course leading to a January Regents, the post-test is the January Regents and a baseline shall be administered in the fall.

For Group and Linked Measures (as defined herein), if a student takes the same Regents exam in January and June, only the higher result will be used for State and Local Measures. For non-Group and Linked Measures, if a student takes the same Regents exam in January and June, and has the same teacher in the fall and spring, only the higher result will be used for State and Local Measures. If the student has different teachers in the fall and spring, the January Regents will be used for the fall teacher and the June Regents for the spring teacher.

Students will be equally weighted in a teacher's State and/or Local Measures subcomponent score if they are in a teacher's course for the same length of time (regardless of whether they take the January or June Regents).

For assessments that use growth models, the DOE will calculate scores following the rules outlined above. For assessments that use goal-setting, the teacher who administers the baseline will recommend targets for the students and the principal will approve. Fall term teachers shall set targets on the same timeline as other teachers. It is recommended that in the fall principals consult with subsequent term teachers about student targets if their assignments are known. Principals shall share these targets with subsequent term teachers within the first month of the start of the new term and provide these teachers with an opportunity to recommend any additional changes to student targets. Principals shall communicate any changes to targets to all affected teachers.

For assessments that use goal-setting, teachers of subsequent term courses who have students who have not previously had targets for them shall set and have their targets approved within the first month of the start of the new term.

State and Local Measures selections for teachers of non-annualized courses, including the application of the 50% rule, shall be determined based upon the teachers' entire school year schedule. As subsequent term selections may not be known in the fall, teachers shall administer all applicable assessments for the grades/subjects they are teaching in the fall.

**i.  Rules Regarding Measures of Student Learning**

For the 2014-2015 school year and thereafter the DOE shall issue guidance to the School MOSL Committee that sets forth and explains the rules described herein.

There is no limit on the number of Local Measures that a School MOSL Committee, as defined in this APPR Plan, can recommend for a particular grade or subject. If a School MOSL Committee selects the same assessment but different group for the Local Measures subcomponent, the following are allowable subgroups since the DOE is currently analyzing the performance of these groups of students: (1) English Language Learners; (2) students with disabilities; (3) the lowest-performing third of students; (4) over-age/under-credited students; or (5) Black/Latino males (consistent with New York City's Expanded Success Initiative).

School MOSL Committees shall consider, when selecting subgroups for Local Measures that the intent of having both Local and State Measures is to have two different measures of student learning. Using subgroups for Local Measures, by nature of the fact that they are a subset of the overall population, will in many instances mean that State and Local Measures are more similar to one another than if different assessments are used for State and Local Measures. Therefore, subgroups should not be selected for teachers in some schools if the subgroup selected reflects the entire population of students the teacher serves (*e.g.*, if a teacher only teaches English Language Learners, the Committee shall not select English Language Learners for their Local Measures and all of their students for the same assessment on their State Measures).

In the event that schools inadvertently select the same measures for State and Local Measures (after to the extent possible they have had an opportunity to correct), the lowest third performing students will be used for Local Measures and the entire populations of students used for State Measures.

The Central MOSL Committee will revisit the list of allowable subgroups annually, taking into account feedback from educators. If the Central MOSL Committee cannot agree on new/different subgroups, the current list of subgroups will be used.

Evaluators cannot choose to go above the 50% rule in selecting teachers' State Measures. The 50% rule will be followed for State Measures, per State Education Department guidance, such that teachers' State Measures must be determined as follows: for teachers of multiple courses, courses that result in a state growth score must always be used for a teacher's State Measures. If a teacher does not teach any courses that result in state growth scores, or state growth score courses cover less than 50% of a teacher's students, courses with the highest enrollment will be included next until 50% or more of students are included.

The 50% rule shall not apply to Local Measures. School MOSL Committees shall select the method that shall be used to determine which courses shall be included in a teacher's Local Measure. In the 2014-15 school year and thereafter, the DOE will (1) state this rule, provide guidance for teachers of multiple courses, and describe the benefits and considerations of not following the 50% rule for Local Measures; and (2) explain how to record and track Local Measures selections for individual teachers when the 50% rule is and is not used for Local Measures. The process for setting student targets for Local Measures is the same as the process for setting student targets for State Measures. The only exception is Group Measures (not including Linked Measures) for Local Measures. For Group Measures, the School MOSL Committees will have the option of recommending for Local Measures that student targets are set either (1) following the process used for State Measures; or (2) by the Committee. If the School MOSL Committee chooses to create the targets and the principal accepts the School

MOSL Committee's recommendation, the School MOSL Committee must create these targets no later than December 1.  Targets must be submitted using a format determined by the DOE.  In the event that the School MOSL Committee cannot agree on Group Measures targets for Local Measures, Group Measures targets will be determined following the process used for State Measures which requires that superintendents must finalize targets by January 15.

School MOSL Committees may recommend which baselines will be used for Local Measures from a menu of options created by the DOE. The only exceptions are instances where the same assessments are used for teachers in the same grades/subjects for State Measures. In these instances, the Principal shall select the baselines that will be used for State and Local Measures.

School MOSL Committees may recommend that Local Measures, Group Measures and Linked Measures may be used with state-approved 3rd party assessments. The DOE shall create guidance that will include a description of which 3rd party assessments it can use to create growth models.

School MOSL Committees may recommend that for Local Measures, Group Measures and Linked Measures may be used with NYC Performance Assessments. The DOE shall create guidance which will include a description of which NYC Performance Assessments it can use to create growth models, as well as the implications of selecting Group Measures with NYC Performance Assessments for scoring.

Regarding the Local Measures school-wide default, if a School MOSL Committee makes recommendations for Local Measures in only some grades/subjects, the principal may accept those recommendations and the Local Measures default would apply for the grades and subjects for which there is no recommendation.  Principals must choose to accept either all a School MOSL Committee's recommendations or none of the School MOSL Committee's recommendations. If the School MOSL Committee recommends the Local Measures default (or the principal does not accept the School MOSL Committee's recommendations and therefore the Local Measures default must be used), teachers must administer NYC Performance Assessments in grades 4-8 ELA and Math (if they are included in the DOE's menu of NYC Performance Assessments that are approved by the Commissioner annually).  In the foregoing scenario, the DOE growth models will be used to calculate a teacher's score on the NYC Performance Assessments in grades 4-8 ELA and Math.

**j.  Growth Model Conversion Charts**

For assessments where schools opt to use DOE-created growth models for State or Local Measures, including the Local Measures default, the DOE shall create scoring charts that convert growth model scores into 0-20 points, taking into account confidence intervals. These charts must be shared and discussed with the MOSL Central Committee (as defined herein) annually. In addition, analyses will be conducted and shared with the MOSL Central Committee regarding the comparability of Individual, Group, and Linked Measures.  If members of the MOSL Central Committee do not agree with any element of the growth model conversion charts and/or how they were created, the MOSL Central Committee members that are in disagreement may submit in writing to the Chancellor their reasons for disagreement.

The parties agree to convene a MOSL Technical Advisory Committee (the "MOSL TAC") consisting of one person designated by the DOE, one person designated by the

UFT, and a person mutually-selected by the parties. To ensure a meaningful and fair distribution of ratings, the MOSL TAC shall review the methodology and approach to the creation of growth models and their conversion charts and provide recommendations to the Chancellor. The Chancellor shall have final decision-making authority on the growth model conversion charts.

### k. Measures of Student Learning Options

(1) For the 2014-15 school year and thereafter the DOE shall create new measures (referred to as "Linked Measures") for Local and State Measures of Student Learning such that there is an option for each teacher to be evaluated based upon assessment results of students he/she teaches. Some or all assessments are not linked to courses the teacher teaches.

(2) For the 2013-14 school year, the following process for "procedural appeals" will only apply to "Group Measures" (*i.e.*, measures where teachers are evaluated based on the performance of some or all students they do not teach). For the 2014-15 and 2015-16 school years, the following process for "procedural appeals" will apply to Linked Measures and Group Measures. For the 2016-17 school year and thereafter the following process for "procedural appeals" will apply only to Group Measures. In all cases, teachers with 50% or more of their Local or State Measures based on Linked Measures/Group Measures shall be eligible for the procedural appeals process.

(3) If a teacher receives "Ineffective" ratings in both the State and Local Measures subcomponents and either is based on Linked Measures or Group Measures, and in that year the teacher receives either a "Highly Effective" or "Effective" rating on the Measures of Teaching Practice subcomponent, the teacher shall have a right to a "procedural appeal" of such rating to a representative of the DOE's Division of Teaching and Learning.

(a) If the teacher receives a "Highly Effective" rating on the Measures of Teaching Practice subcomponent, there shall be a presumption that the overall APPR rating shall be modified by the DOE such that the overall "Ineffective" rating becomes either an "Effective" rating (in the instance where *both* the State and Local Measures of Student Learning subcomponents are based on Linked Measures or Group Measures) or a "Developing" rating (in the instance where only one of the State or Local Measures of Student Learning subcomponents is based on Linked Measures or Group Measures);

(b) If the teacher receives an "Effective" subcomponent rating on the Measures of Teaching Practice, there shall be a presumption that the overall APPR rating shall be modified by the DOE such that the overall "Ineffective" rating becomes a "Developing" rating if both the State and Local Measures of Student Learning subcomponents are based on Linked Measures or Group Measures. If only one of the State or Local Measures of Student Learning subcomponents be based on Linked Measures or Group Measures, the rating shall be appealed to the principal, who shall have the discretion to increase the teacher's overall APPR rating. If the principal does not respond to the appeal, the teacher's overall APPR rating shall be modified to a "Developing" rating.

(c) The above-described procedural appeal process is separate and distinct from, and in addition to the appeal processes set forth in the Commissioner's Decision.

(4) In the event a teacher receives an "Highly Effective" rating in both the State and Local Measures of Student Learning, and neither is based on Linked Measures or Group Measures, and in that year the teacher is rated "Ineffective" on Measures of Teaching

Practice subcomponent, and this results in the teacher receiving an "Ineffective" overall APPR rating, the UFT may choose to appeal the rating to a three (3) member Panel consistent with the rules for Panel Appeals as described in Education Law §3012-c(5-a) and the Commissioner's Decision. However, these appeals shall not be counted towards the 13% of "Ineffective" ratings that may be appealed pursuant to Education Law §3012-c(5-a)(d) and the Commissioner's Decision.

(5) The parties agree to meet each fall to review and discuss other types of anomalies in scoring and determine appropriate actions.

(6) The DOE and UFT shall establish a Measures of Student Learning Central Committee consisting of an equal number of members selected by the DOE and the UFT (herein referred to as the "MOSL Central Committee"). The MOSL Central Committee shall convene within sixty (60) days after the ratification of this agreement by the UFT and each month thereafter. The MOSL Central Committee shall explore additional assessment options for the 2014-15 school year, which could include State-approved 3rd party assessments or existing assessments (*e.g.*, Fitnessgram, LOTE exams), and review and approval by the Chancellor, which would be offered as non-mandated options for State and Local Measures. The MOSL Central Committee shall also examine the current range of options and discuss expanded options for the State and Local Measures of Student Learning including, but not limited to, subject-based assessments, the use of portfolios, project-based learning, and/or semi-annualized/term course assessments. The MOSL Central Committee will also examine potential changes to the Local Measures default each school year. The MOSL Central Committee shall propose expanded options for the 2015-16 school year and thereafter. Expanded options proposed by the MOSL Central Committee shall be implemented for the 2015-2016 school year and thereafter subject to review and approval by the Chancellor. All MOSL options for the 2014-15 school year and thereafter shall be shared with the MOSL Central Committee. The MOSL Central Committee shall review all MOSL options to determine which options shall be proposed to the Chancellor for approval. If members of the MOSL Central Committee cannot agree which options should be proposed to the Chancellor, the MOSL Central Committee members that are in disagreement may submit in writing to the Chancellor their reasons for disagreement. The Chancellor shall have final decision-making authority.

(7) There will be no State Measures default. Principals must make decisions for State Measures for all applicable grades/subjects in their school by the deadline. For the 2014-15 school year, the Local Measures default for all schools shall be a school-wide measure of student growth based on all applicable assessments administered within the building which are limited to NYC Performance Assessments, if developed by August 1 prior to the start of the school year, and/or state-approved 3rd party assessments (Chancellor must select by August 1 prior to the start of the school year), and/or state assessments. The DOE and UFT shall annually review the Local Measures default and discuss the possibility of altering the default. If agreement is not reached at the conclusion of each year, the default will be the same as that used in the 2014-15 school year.

(8) All decisions of the School MOSL Committee (as defined in the Commissioner's Decision) must be recommended to the principal and the principal must (1) accept the recommendation (or opt for the Local Measures default); and (2) select the State Measures no later than ten (10) school days after the first day of school for students.

(9) In the event that a school uses the goal-setting option for State or Local Measures, teachers must submit their proposed goals to their building principal or designee no later than November 1 of each school year absent extraordinary circumstances.  The principal or designee must finalize teachers' goals no later than December 1 of each school year, absent extraordinary circumstances.

(10) Teachers whose MOSL scores would have been subject to chart 2.11 or 3.13 of the Commissioner's Decision shall now be assigned points such that 85%-100% of students must meet or exceed targets for a teacher to be rated "Highly Effective"; 55%-84% of students must meet or exceed targets for a teachers to be rated "Effective"; 30%-54% of students must meet or exceed targets for a teacher to be rated "Developing"; and 0%-29% of students must meet or exceed targets for a teacher to be rated "Ineffective."

**l.  Peer Validator**

(1) Except as modified herein, the Peer Validator shall replace the Independent Validator and fulfill all of the duties of and comply with the provisions applicable to the Independent Validator set forth in Education Law §3012-c(5-a) and the Commissioner's Decision.

(2) Term:  The Peer Validator program shall be two (2) school years (2014-15 and 2015-16). At the end of the two years, the parties must agree to extend the Peer Validator program and in the absence of an agreement the parties shall revert to the Independent Validator process as set forth in Education Law § 3012-c(5-a) and the Commissioner's Decision.

(3) Selection: A joint DOE-UFT committee composed of an equal number of members from the UFT and the DOE (the "Selection Committee") shall be established to determine selection criteria and screen and select qualified applicants to create a pool of eligible candidates.  The Deputy Chancellor of Teaching and Learning shall select all Peer Validators from the pool of all eligible candidates created by the Selection Committee.  To be eligible to become a Peer Validator an applicant must have at least five (5) years teaching experience; be tenured as a teacher; have received an overall APPR rating of "Highly Effective" or "Effective" (or "Satisfactory" rating where applicable) in the most recent school year; and either be a teacher, a teacher assigned, an assistant principal with reversion rights to a tenured teacher position, or an education administrator with reversion rights to a tenured teacher position.

(4) Duties:  The term for a Peer Validator shall be for two (2) years. All Peer Validators shall work under the title of Teacher Assigned A and shall have the same work year and work day as a Teacher Assigned A as defined in the collective bargaining agreement.  Peer Validators shall report to the Deputy Chancellor of Teaching and Learning or his/her designee.  Peer Validators shall conduct observations consistent with the Commissioner's Decision and shall not review any evidence other than what is observed during an observation by the Peer Validator.  All assignments are at the discretion of the DOE, however Peer Validators shall not be assigned to any school in which he/she previously worked. The parties agree to consult regarding Peer Validator assignments and workload. Peer Validators shall be reviewed and evaluated by the Deputy Chancellor of Teaching and Learning or his/her designee.  The review and evaluation of a Peer Validator shall not be based in any way on whether the Peer Validator agrees or disagrees with the principal's rating. A Peer Validator may be removed from the position at any point during the program provided that both the DOE

and UFT agree.  Teachers who become Peer Validators shall have the right to return to their prior school at the end of their term as a Peer Validator.

(5) Compensation:   Peer Validators shall receive additional compensation in the amount of fifteen thousand dollars ($15,000.00) per year for the term of this agreement above the applicable teacher compensation in accordance with the collective bargaining agreement. Referral of Students for Evaluations

**K.  Referral of Students for Evaluations**

Educators shall exercise proper discretion prior to referring students for evaluations, either for the provision of or decertification of special education services.  To that end, the Board will maintain a work environment free from reprisals based upon the proper and professional exercise of responsibilities related to the identification of students who have or are suspected of having disabilities.

**L.  Labor/Management Committee On Long Term Reforms**

With regard to the long term recommendations the 2005 Fact Finders made subject to adequate CFE funding, the parties shall establish a Labor Management Committee to discuss the following issues: a) bonuses, including housing bonuses, for shortage license areas; b) a pilot project for school-wide based performance bonuses for sustained growth in student achievement; c) salary differentials at the MA-5 through MA-7 levels; and d) a program for the reduction of class size in all grades and divisions.  If the parties agree on the terms of any or all of these issues, they may be implemented by the Board using whatever funds may be identified.

**M. Housing Support Program for Shortage Area Teachers**

The parties agree to the terms of the Housing Support Program for Shortage Area Teachers set forth in the program description attached hereto as Appendix H.

**N.  School Wide Bonus Program**

1.  As set forth in Article 8L the Board and the UFT jointly support, and pledge to work together to implement on a pilot basis, a school-wide based bonus program pursuant to which educators will be awarded substantial cash bonuses for student achievement gains.

2.  The program will be initiated immediately, with bonuses awarded for achievement gains in the 2007-2008 school year.  Subject to the successful solicitation of private funds, which the BOE and UFT commit to work together to raise as soon as practicable, approximately 15% of the City's highest need schools will be eligible to participate in the program this first year.  In consultation with the UFT, the BOE will identify approximately 200 of the highest-need schools in the City.  Each will be invited to participate in the program, and the BOE and UFT jointly pledge to work in good faith to encourage them to do so both this year and throughout the life of the program.

3.  In future years, if the school-wide bonus program continues, awards will be funded from public appropriations which supplement and do not supplant funds available for collective bargaining.

4.  In 2008-09 at least 30% of BOE schools will be eligible to participate in the program.  In consultation with the UFT, the BOE will identify approximately 400 of the highest-need schools in the City.

5.  Participation in the program will be at the option of each school as determined by a vote of fifty-five percent (55%) of the UFT-represented school staff and with the assent of the principal of the school.  The vote shall be conducted by the UFT Chapter in the

school, held within six weeks of the announcement of the program and shall be an up or down vote without conditions or restrictions on the terms of the program as set out herein. Each year the bonus program is available eligible schools shall exercise the option to participate ("Participant Schools") or not by the same voting procedure.

6. A school's agreement to participate in the bonus program shall be considered, along with other criteria, as a positive factor in determining whether the Participant School is to be phased out or given a year's moratorium on a possible phase-out. Nothing herein alters applicable law with regard to school closings.

7. Each Participant School will be eligible for a dollar award ("the pool"), which will be distributed to the school as a whole on the basis of the Progress Report or some other neutral criterion derived from the Progress Report.

8. In consultation with the UFT, the BOE will set the criteria for awarding funds to schools. The criteria will provide objective standards/benchmarks aligned with Progress Report factors and the specific details of those standards/benchmarks will be communicated to schools when the program is announced. All Participant Schools that achieve the announced standards/benchmarks shall receive the applicable money award. There shall be no cap or ceiling imposed on the number of Participant Schools receiving the award, provided the school meets the standards/benchmarks. Neither shall the relative standings of the Participant Schools affect their entitlement to the award once they have met the standards/benchmarks.

9. To account for variation in the size of schools, the size of the award each Participant School is eligible to receive will be determined by appropriate objective criteria.

10. The amount of the average per-person award should be sufficiently substantial to make a material difference to each awardee. As outlined below, each Participant School will determine the methodology for distributing any award it earns for school-wide performance. The size of each Participant School's total award for distribution in 2007-08 shall be the number of full-time UFT-represented employees on the school's table of organization times three thousand dollars ($3,000). In light of year-to-year appropriations uncertainties, nothing in this paragraph restricts the ability of the DOE to increase or decrease the total amount set annually for distribution pursuant to the program.

11. Each Participant School will form a compensation committee composed of the principal and a principal's designee (e.g., an assistant principal) and two UFT-represented staff members elected in a Chapter supervised election by the UFT-represented staff on an annual basis from among volunteers. The compensation committee will determine, by consensus, matters related to both eligibility for and the size of individual awards to UFT-represented staff members. However the compensation committee shall presume that all UFT-represented staff employed at a school that meets the targets for the bonus have contributed to the school's achievement to some extent and therefore should share in the bonus. If there is no consensus the pool of money will not be distributed to the school.

12. Among the topics each Participant School compensation committee may decide to consider, after receiving guidance from the BOE and UFT, are whether to make equal individual awards to all eligible UFT staff, equal awards to all those in the same title, or whether to make differential awards.

13. In making awards, a compensation committee shall not consider an awardee's length of service, provided however that it may make particular determinations for individuals who served at the school for less than a full academic year.

14. The school compensation committee shall make its decisions free of pressure from the BOE or UFT.

15. Funds will be awarded to schools as soon as practicable after the BOE's Office of Accountability has received and analyzed the information necessary to make the awards. To the extent such award is made after the beginning of the school year following the year that was the basis for the award, eligible staff who have left the school shall nevertheless share in the award for their contribution the prior year.

16. The pilot school-wide bonus program shall be comprehensively evaluated by a mutually agreed upon outside independent entity which shall provide the parties with a written report and analysis of all aspects of its operation together with associated recommendations for future years the program is in operation.

17. The Chancellor and the President of the UFT, or their designees, will constitute an Oversight Committee (OC) to review appeals of individual awards.  However if the awards made by the compensation committee are ratified by a simple majority of the UFT Chapter voting by secret ballot, no appeal may be taken to the OC.  The OC may modify a determination of a school compensation committee only if the OC, by consensus, finds that it was arbitrary, capricious or in clear violation of law or of the procedures and standards set out herein.

18. This Article 8N is contingent on the implementation and passage of the legislation referred to in Paragraph 6 of the October 2005 Memorandum of Agreement between the parties entitled "Pension and Retirement Program."

**O.  Hard to Staff Differential**

In order to promote teacher retention and recruitment to high need schools which have staffing challenges, teachers who work and remain at designated Hard to Staff schools will be eligible to receive a Hard to Staff school annual salary differential.  For each school year, the Chancellor shall have the sole discretion to determine the Hard to Staff schools that will be eligible and the amount of the differentiated compensation.  The Chancellor will consult with the UFT prior to designating schools and the differential amount.  The determinations as to the schools and amounts shall be final and not grievable.  All teachers serving in these Hard to Staff designated schools, including transfers and new hires, shall be eligible to receive the same annual salary differential except as delineated below.  The differential shall be paid in a lump sum by October 31 of the following school year.  To receive the differential, teachers must have earned a rating of "Highly Effective," "Effective," "Developing," or "Satisfactory" where applicable, and be in active service in, or be on an approved leave from, the designated Hard to Staff school at the time the lump sum payment is made in the fall of the following school year. Teachers who serve less than five (5) months of cumulative active service at the school are not eligible to receive the differential.  Teachers serving greater than five months but less than the full year shall receive a pro-rata share of the differential.

## ARTICLE NINE
## PROCEDURES FOR HANDLING SPECIAL
## BEHAVIOR PROBLEMS

The Board agrees that the procedures and policies concerning the problem of disruptive children, embodied in the Special Circular which is reproduced in Appendix B following this Agreement, will not be changed during the term of this Agreement, except that the Chancellor may modify the circular, provided that the Union finds such modification acceptable.

The provisions of the circular shall be subject to the grievance procedure and to arbitration only for the purpose of determining whether there has been a failure to comply with the procedural steps prescribed in the circular.

## ARTICLE TEN
## SAFETY AND HEALTH

**A.  Assistance in Assault Cases**

1.  The principal shall report as soon as possible but within 24 hours to the Office of Legal Services, to the Chief Executive of School Safety and Planning and to the Victim Support Program that an assault upon a teacher has been reported to him/her.   The principal shall investigate and file a complete report as soon as possible to the Office of Legal Services and to the Chief Executive of School Safety and Planning.  The full report shall be signed by the teacher to acknowledge that he/she has seen the report and he/she may append a statement to such report.

2.  The Office of Legal Services shall inform the teacher immediately of his/her rights under the law and shall provide such information in a written document.

3.  The Office of Legal Services shall notify the teacher of its readiness to assist the teacher.

This assistance is intended solely to apply to the criminal aspect of any case arising from such assault.

4.  Should the Office of Legal Services fail to provide an attorney to appear with the teacher in Family Court, the Board will reimburse the teacher if he/she retains his/her own attorney for only one such appearance in an amount up to $40.00.

5.  An assaulted employee who presses charges against his/her assailant shall have his/her days of court appearance designated as non-attendance days with pay.

6.  The provisions of the 1982-83 Chancellor's Memorandum entitled "Assistance to Staff in Matters Concerning Assaults" shall apply.

**B.  School Safety**

The principal is charged with the responsibility of maintaining security, safety and discipline in the school.  To meet this responsibility he/she shall develop in collaboration with the Union chapter committee and the parents association of the school a comprehensive safety plan, subject to the approval of the Chief Executive of School Safety and Planning.

The safety plan will be updated annually using the same collaborative process, and reports of any incidents shall be shared with the chapter leader.

A complaint by a teacher or the chapter leader that there has been a violation of the safety plan may be made to the principal as promptly as possible.  He/she will attempt to resolve the complaint within 24 hours, after receiving the complaint.  If the teacher or

chapter is not satisfied, an appeal may be made to the Chief Executive of School Safety and Planning who will arrange for a mediation session within 48 hours. If the teacher/chapter is not satisfied with the results of the mediation, an appeal may be made by an expedited arbitration process, to be developed by the parties.

**C.  Citywide Security and Discipline Committee**

1. The Union and the Board shall establish a joint committee which shall meet on a regular basis to discuss and consider appropriate means of resolving safety and discipline issues. Other city agencies will be invited to participate when the Union and Board deem it appropriate.

2. The joint committee or joint designees and any experts the Union and/or Board may designate will have access to all schools and other Board workplaces in which staff represented by the Union are assigned for the purpose of investigating and assessing allegedly unsafe working conditions. If possible, such visits shall be made on reasonable notice to the school, and in a manner that minimizes disruption to the school or other workplace.

3. The joint committee, from time to time, may establish sub-committees to deal with special safety/discipline issues. It shall establish a sub-committee to deal with the issues of safety and discipline in special education schools and programs.

**D.  Environmental Health and Safety Joint Committee**

1. The Union and the Board shall establish a joint committee which shall meet on a regular basis to discuss and consider appropriate means of resolving health and safety issues. The School Construction Authority will be invited to participate on issues raised by school capital modernization projects.

2. The joint committee or joint designees, and any experts the Union and/or the Board may designate, will have access to all schools and other Board workplaces in which staff represented by the UFT are assigned for the purpose of investigating and assessing allegedly hazardous working conditions. Such visits will be made upon reasonable notice to the Board's office of occupational safety and health and in a manner that minimizes disruption to the school or other workplace.

**E.  Safe Environment**

1. In recognition of the importance of employee safety and health, the Board agrees to provide the appropriate recognized standards of workplace sanitation, cleanliness, light, and noise control, adequate heating and ventilation. The Board of Education agrees to eliminate recognized hazards that are likely to cause serious physical harm.

2. If the Union believes a situation has arisen that is likely to cause serious physical harm, it may bring it to the attention of the Chancellor or designee who shall immediately assess the situation, including onsite inspection where appropriate, and take such action as the Chancellor deems appropriate. In the event the Union seeks to contest the Chancellor's determination, it may exercise its statutory rights under New York State Labor Law Section 27a (PESH) or other legal authority.

3. The Board will issue a circular advising staff of their rights under PESH and other applicable law and post the notices required by law.

**F.  Renovation and Modernization**

The Union and the Board believe that modernization and renovation projects are vital to enable children to receive the educational services to which they are entitled. However, in order to limit any educational disruption that a modernization project can

create, and to protect the health and safety of the staff and students that use a school setting undergoing modernization, the Board and Union have agreed to standard procedures to help to ensure that health, safety and educational standards are maintained during school capital modernization projects.  These standard procedures will be applied in school capital modernization projects undertaken by the School Construction Authority and will be posted and reviewed with all staff in any school undergoing modernization. Where conditions require it, the standard procedures may be modified after consultation with the Union.

**G.  Science Experiment Review Panel**

The Board and the Union have established a panel that considers disputes raised by staff members concerning the safety and efficacy of scientific experiments and procedures in schools.  The panel consists of three laboratory specialists and three science teachers selected by the Union and three science supervisors selected by the Board.  The chair will rotate annually between persons designated by the Board and the Union.

The panel will consider any dispute brought to its attention in writing and will expeditiously issue a written opinion as to whether and how the disputed experiment or procedure should be conducted.  Any use of the disputed experiment or procedure will be governed by the panel's opinion, and at least one supervisor, lab specialist and science teacher must concur before the issuance of any opinion.

The panel's opinions will be widely disseminated to appropriate divisions and schools, and will serve as guidelines for similar experiments or procedures. Administrative procedures governing the panel's operations will be issued by the Chancellor after consultation with the Union.

**H.  Identification Cards**

The Board will institute on an experimental basis in several high schools the use of identification cards for both staff and students to determine their value as a device for maintaining security in the school.

## ARTICLE ELEVEN
## RATES OF PAY AND WORKING CONDITIONS OF TEACHERS ASSIGNED, EDUCATION ADMINISTRATORS, EDUCATION ANALYSTS, EDUCATION OFFICERS, PROFESSIONAL DEVELOPMENT ASSIGNMENTS AND POSITIONS, AND TEACHER LEADERSHIP POSITIONS

### I. Teachers Assigned

**A.  Benefits and Working Conditions**

Teachers assigned shall be covered by the provisions of this Agreement except that:

1.  A teacher assigned who has been granted additional compensation by Board resolution shall continue to receive such additional compensation while in such assignment in accordance with the terms of the Board resolution.

2.  Only the following provisions of Article Five entitled "Licensure, Assignment, and Appointment'' shall apply: Section E, "Withdrawal of Resignation and Subsequent Reappointment"; Section F, "Absence Without Notice;" and Section G, "Return to Former License of Appointment."

3.   Only the following provisions of Article Seven entitled "Programs, Assignments and Teaching Conditions in Schools and Programs" shall apply: Section I, "Acting Supervisory Positions" to be applicable to district offices and central headquarters; Section P, "Regular Part-Time Assignments for Appointed Teachers'' (to the extent consistent with status as a teacher assigned) and Section S, "Additional Facilities."

4.   Only the following provisions of Article Eight entitled "Education Reform" shall apply: Section H, "Professional Development and Second Differential" Section I, "Reduction of Paperwork"; Section J, "Evaluation/Observation System;" and Section L, "Labor/Management Committee on Long Term Reforms."

5.   Only Part I of this Article Eleven shall apply.

6.   Only the following provisions of Article Seventeen entitled "Retention, Excessing and Layoff" shall apply: Section B, "Excessing Rules-Appointed Teachers"; Section D, "Layoff" and Section F, "Voluntary Severance for Personnel Who Have Been Excessed".

7.   Only the following provision of Article Eighteen entitled "Transfers" shall apply: Section A, "General Transfers".

8.   Only the following provision of Article Twenty-Three entitled "Special Complaints" shall apply: Section H, "Expansion of Special Complaint Procedure to Include Supervisors".

9.   Only the following provision of Article 24 entitled "Professional Conciliation" shall apply: Section B; "District Level."

10.   The following articles of this Agreement shall not apply: Article Six, "Hours"; Article Nine, "Procedures for Handling Special Behavior Problems"; Article Twelve, "Chapter 683 Program"; Article Thirteen, "Working Conditions of Per Diem Substitutes, Substitute Vocational Assistants, and Teacher's Assistants"; Article Fourteen, "Rates of Pay and Working Conditions of Adult Education Teachers"; Article Fifteen, "Rates of Pay and Working Conditions of Per Session Teachers"; Article Nineteen C, "Leaves of Absence for Union Officers"; Article Nineteen J "Information at the School"; Article Twenty, "Matters Not Covered" (third paragraph) and Article Twenty-Four, "Professional Conciliation."

**B.  Assignment as a Teacher Assigned**

1.   Notice of openings for positions as teachers assigned to district offices or central headquarters shall be posted.   The notice shall set forth the job description and qualifications for the positions.  Selection for the positions shall be from among qualified applicants who are regularly appointed teachers.   Such notices shall be posted in all schools in the district for a position in a district office; or in all schools in the system for a position at central headquarters.

2.   Assignment to a district office or central headquarters will be on a voluntary basis for a specified period of time or without limit of time.  At the end of the assignment the teacher shall have the right to return to the district from which he/she was assigned.  In the case of assignment from a high school or organizational unit the teacher shall have the right to return to his/her former school or to the organizational unit.

3.   A teacher assigned who requests a return to his/her former position within one year or, if his/her assignment terminates sooner, at the end of the assignment, shall be returned to his/her former school in accordance with his/her seniority.

4.   An appropriately selected teacher assigned who requests an opportunity to return to the position from which he/she was excessed shall be returned to that position if within

a year a vacancy should occur in that position.  If the teacher is serving in a school when the vacancy occurs, the return to position shall be effectuated at the next reorganization unless the school principal agrees to an earlier release.

5.   After at least one year as a teacher assigned, a teacher assigned who returns from any leave of absence with pay or from a leave without pay of one year or less shall be returned to the position from which he/she took the leave, in accordance with his/her seniority in that position, provided he/she meets the qualifications for the position as they then exist.

6.   After at least one year as a teacher assigned, a teacher assigned who returns from a leave of absence without pay of more than one year shall be returned to that position from which he/she took the leave provided a vacancy exists.  If no vacancy exists the teacher will be placed in excess and Paragraph 4 above shall apply.

**C.  Hours of Service**

The hours of service of a teacher assigned shall be thirty-seven and one-half hours per week exclusive of a daily thirty minute lunch period.  The daily schedule of work shall be 9 a.m. to 5 p.m. unless otherwise specified in the assignment.

**D.  Work Year**

1.   The work year of a teacher assigned whose work is preponderantly connected with school year instructional programs, their staff and/or students shall be the same work year as a day school teacher and in addition the teacher assigned may be required to serve a week during the Christmas recess, Easter recess or the summer vacation period.

2.   The work year for all other teachers assigned shall commence on September 1 of each year and end on the following August 31.  During each such work year the teacher assigned shall be granted 31 days vacation to be scheduled during the Christmas recess, Easter recess, summer vacation period and such other periods as can be mutually arranged with the head of the office or other organizational unit.

## II. Education Administrators

**A.  Applicability**

Education Administrators covered by this Agreement are all non-supervisory Education Administrators at Level I.

**B.  Salaries**

**1.  Salary Adjustments, Ranges and Longevities**

a.  During the term of this Agreement the salary range exclusive of longevities applicable to Education Administrators (Level I) in the unit shall be:

| Effective Date | Minimum | Maximum |
|---|---|---|
| May 19, 2008 | $82,726 | $102,955 |
| May 1, 2013 | $83,553 | $103,985 |
| May 1, 2014 | $84,389 | $105,025 |
| May 1, 2015 | $86,938 | $108,197 |
| May 1, 2016 | $89,972 | $111,974 |
| May 1, 2017 | $94,066 | $117,069 |
| May 1, 2018 | $95,910 | $119,364 |
| June 16, 2018 | $98,787 | $122,945 |

b.  Incumbent increases during the term of this Agreement shall be:

| Effective Date | Increase[1] |
|---|---|
| May 1, 2013 | 1% |
| May 1, 2014 | 1% |
| May 1, 2015 | 2% |
| May 1, 2015 | 1% |
| May 1, 2016 | 2% |
| May 1, 2016 | 1.5% |
| May 1, 2017 | 2% |
| May 1, 2017 | 2.5% |
| May 1, 2018 | 2% |
| June 16, 2018 | 3% |

c.  Appointed Education Administrators are eligible for annual longevity increments in the amount set forth below in accordance with Appendix A II C:

| Effective Date | After 5 Years | After 20 Years | After 22 Years |
|---|---|---|---|
| May 19, 2008 | $1,000 | $4,480 | $5,485 |
| May 1, 2013 | $1,010 | $4,525 | $5,540 |
| May 1, 2014 | $1,020 | $4,570 | $5,595 |
| May 1, 2015 | $1,051 | $4,708 | $5,764 |
| May 1, 2016 | $1,088 | $4,872 | $5,965 |
| May 1, 2017 | $1,138 | $5,094 | $6,236 |
| May 1, 2018 | $1,160 | $5,194 | $6,358 |
| June 16, 2018 | $1,195 | $5,350 | $6,549 |

**2.  Initial Appointment or Assignment**

Education Administrators newly assigned or appointed during the term of this Agreement shall be placed at the minimum of the applicable range except:

a.  E.A.'s whose service immediately prior to assignment or appointment as an E.A. was with the Board shall receive a 10% salary increase or the minimum salary of the range, whichever is greater.

b.  E.A.'s with service immediately prior to assignment or appointment as an E.A. in a non-Board position related to their E.A. position may receive up to 10% more than their salary in the related position.

c.  If, prior to appointment or assignment to a job, it is established that the scope of the duties and responsibilities of the job are substantially greater than the scope of the duties and responsibilities of related jobs at the minimum of the applicable salary range, a higher salary rate shall be set, consistent with the scope of the duties and responsibilities, following audit and review by the Division of Human Resources and after consultation with the Union and the approval by the Chancellor.  In case of disagreement as to the determination or the rate, the dispute may be submitted for a determination through the grievance and arbitration procedure.  Pending final determination of the dispute, the minimum of the applicable range shall be paid.  It is understood that the salary above the minimum is set for the specific job.

d.  Salary placement pursuant to paragraph a, b, or c above shall not exceed the maximum of the applicable range.

---

[1] These increases are compounded in accordance with the agreement of the Parties.

### C. Benefits and Working Conditions

Education Administrators shall be covered by the provisions of this Agreement except:

1. Only the following provisions of Article Three entitled "Salaries and Benefits of Day School Teachers" shall apply: Section G, "Health Insurance and Welfare Fund Benefits"; Section H, "Reimbursement for Medical Expenses"; Section I, "Damage or Destruction of Property"; Section K2 "Transportation Benefit Program"; Section L, "Salary Payment," (Paragraphs 1 and 3); Section M, "Performance Incentives Committee"; Section N, "Ratification Bonus"; Section O, "Structured Retiree Claims Settlement Fund"; Section P, "Lump Sum Payments Stemming From the 2009-2011 Round of Bargaining"; and Section Q, "Healthcare Savings".

2. Only the following provisions of Article Five entitled "Licensure, Assignment and Appointment" shall apply: Section E, "Withdrawal of Resignation and Subsequent Reappointment" subject to the procedures set forth in Chancellor's Regulation C-30; Section F, "Absence without Notice"; and Section G, "Return to Former License of Appointment."

3. Only the following provisions of Article Seven entitled "Programs, Assignments and Teaching Conditions in Schools and Programs" shall apply: Section I, "Interim Acting Supervisory Positions" to be applicable to district offices and central headquarters Section P, "Regular Part-Time Assignments for Appointed Teachers" (to the extent consistent with status as an Education Administrator) and Section S, "Additional Facilities."

4. Only the following provisions of Article Eight entitled "Education Reform" shall apply: Section I, "Reduction of Paperwork"; Section J, "Evaluation and Observation System" and Section L, "Labor/Management Committee On Long Term Reforms."

5. Only Part II of this Article Eleven shall apply.

6. Only the following provisions of Article Sixteen entitled "Leaves" shall apply: Section F, "Military Service Pay"; Section G, "Payment for Jury Duty" and Section I, "Discipline for Authorized Absences".

7. Only the following provisions of Article Seventeen entitled "Retention, Excessing and Layoff" shall apply: Section B, "Excessing Rules-Appointed Teachers"; Section C, "Appointment to New Program, License or Title"; Section D, "Layoff" and paragraph 1 of Section F, "Voluntary Severance for Personnel Who Have Been Excessed".

8. Only Section A, "General Transfers" and Section B, "Hardship Transfers," of Article Eighteen entitled "Transfers and Staffing" shall apply.

9. Article Nineteen, entitled "Union Activities, Privileges, and Responsibilities" shall apply except for Section B, "Time for Union Representatives" and Section C, "Leaves of Absence for Union Officers".

10. The following Articles shall not apply: Article Six entitled "Hours"; Article Nine entitled "Procedures for Handling Special Behavior Problems"; Article Twelve entitled "Chapter 683 Program"; Article Thirteen entitled "Working Conditions of Per Diem Substitutes, Substitute Vocational Assistants, and Teacher's Assistants"; Article Fourteen entitled "Rates of Pay and Working Conditions of Adult Education Teachers"; Article Fifteen entitled "Rates of Pay and Working Conditions of Per Session Teachers"; and Article Twenty-Four entitled "Professional Conciliation".

**D.  Work Week**

The hours of work for Education Administrators shall be thirty-seven and one-half hours per week, exclusive of a daily thirty minute lunch period.

**E.  Work Year**

Education Administrators shall have a workyear beginning September 1 and ending the following August 31.

Education Administrators will be paid for all Board of Education holidays and all other days on which their office is closed for special observance or emergency pursuant to action of the Chancellor or community superintendent.

**F.  Sick Leave**

1.  A sick leave allowance of one day per month of service shall be credited to Education Administrators and shall be used only for personal illness of the employee.

2.  Education Administrators may use two of the sick days allowed per year for the care of ill family members.

For the purpose of this provision, family member shall be defined as: spouse; natural, foster or step parent; child; brother or sister; father-in-law; mother-in-law; any relative residing in the household; and domestic partner, provided such domestic partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 et seq.

3.  Sick leave allowance is cumulative up to 200 days.

4.  Proof of illness may be required for absences of more than three consecutive workdays.

5.  The normal unit of charge against sick leave allowance is one-half day.  However, the Education Administrator's immediate supervisor may approve the use of units of one hour.

6.  In the calculation of sick leave allowance, a full month's credit shall be given to an Education Administrator who has been in full pay status for at least 15 calendar days during that month, provided that: (a) where an Education Administrator has been absent without pay for an accumulated total of more than 30 calendar days in the workyear, he/she shall lose the sick leave credits earnable in one month for each 30 days of such accumulated absence even though in full pay status for at least 15 days in each month during this period, and (b) if an Education Administrator loses sick leave allowance under this rule for several months in the workyear because he/she has been in full pay status for fewer than 15 days in each month, but accumulated during said months a total of 30 or more calendar days in full pay status, the Education Administrator shall be credited with the sick leave allowance earnable in one month for each 30 days of such full pay status.

7.  Where an Education Administrator is hospitalized on annual leave the period of such verified hospitalization shall be charged to sick leave and not to annual leave. Where an Education Administrator is seriously disabled but not hospitalized while on annual leave and providing the Education Administrator submits proof of such disability satisfactory to the Executive Director of Human Resources, written approval of the Executive Director may be given to charge such leave time to sick leave and not to annual leave at the employee's option.

8.  Sick leave allowances accumulated in another Board or City position shall be transferred to the employee's bank when he/she becomes an Education Administrator.

9.   At the discretion of the Executive Director of Human Resources and upon the recommendation of the appropriate superintendent:

(a) Education Administrators who have exhausted all earned sick leave balances may be permitted to use unearned sick leave allowance up to the amount earnable in one year of service, chargeable against future earned sick leave; and

(b) Education Administrators may also be granted sick leave with pay for three months after 10 years of City service, after all credits have been used.  In special instances, sick leave with pay may be further extended, with the approval of the Executive Director of Human Resources.  The Executive Director shall base the determination in this matter on the nature and extent of illness and the length and character of service. Such extension, if granted, may not exceed nine months.

**G.  Annual Leave**

1.  Except as otherwise provided in subsection 2 of this Section G, Education Administrators shall have an annual leave allowance as follows:

a.  The annual leave allowance for Education Administrators hired on or after September 9, 1985 shall accrue as follows:

| Years in Service | Monthly Accrual | Annual Leave Allowance |
|---|---|---|
| At the beginning of the employee's first year | One (1) day per month after the first two (2) months | 10 workdays |
| At the beginning of the employee's second year | One (1) day per month plus one (1) additional day at the end of the second year | 13 work days |
| At the beginning of the employee's third year | One (1) day per month plus one (1) additional day at the end of the third year | 13 work days |
| At the beginning of the employee's fourth year | 1¼ days per month | 15 work days |
| At the beginning of the employee's fifth year | 1 2/3 days per month | 20 work days |
| At the beginning of the employee's eighth year | Two (2) days per month plus one additional day at the end of the eighth through the fourteenth year | 25 work days |
| At the beginning of the employee's fifteenth year | 2¼ days per month | 27 work days |

b.  The annual leave allowance of Education Administrators hired before September 9, 1985 shall accrue as follows:

| Years of Continuous | Monthly Accrual Rate | Annual Leave Allowance |
|---|---|---|

**Board and/or City Service**

| Less than 8 Years | 1 2/3 days | 20 work days |
|---|---|---|
| 8 to 15 years | 2 days plus one additional day in December | 25 work days |
| 15 years or more | 2¼ days | 27 work days |

2.   Education Administrators entitled to 31 days annual leave prior to September 9, 1980 shall continue to earn annual leave at the rate of 31 days per year (based on a monthly accrual rate of two and one-half (2½) days per month, plus one additional day (3½ days) for the month of December).

3.   In calculating years of continuous service for purposes of annual leave allowance under subsection 1 of this Section G, credit shall be given for all active City service, including pedagogical and non-pedagogical service in the Board of Education and service in City agencies.  Continuity of service shall not be deemed to be interrupted except by separation from service for a continuous period of more than one year and one day.

4.   Up to two years' annual leave allowance may be accumulated by an Education Administrator and carried over from one work year to another.

5.   For good reason an Education Administrator may request and the appropriate superintendent may permit the use of up to ten days of annual leave allowance before it is earned.

6.   Use of accrued annual leave shall be scheduled by mutual agreement of the Education Administrator and his/her superior.  The employee's preference shall not be unreasonably denied.

If an Education Administrator's request to use annual leave is denied, he/she shall be entitled to carry over that portion of his/her annual leave allowance so denied for one additional work year notwithstanding that his/her accrual of annual leave may thereby exceed two years' entitlement.

7.   The minimum unit of charge against annual leave allowance shall be one hour.

8.   For the earning of annual leave allowance under subsection 1 of this Section G, a full month's allowance shall be earned by an employee who had been in full pay status for at least 15 calendar days during that month, provided that: (a) where an employee had been absent without pay for an accumulated total of more than 30 calendar days in the work year, the employee shall lose the annual leave allowance earnable in one month for each 30 days of such accumulated absence, even though in full pay status for at least 15 calendar days in each month during this period; and (b) if an employee loses annual leave under this rule for several months in the work year because the employee had been in full pay status for fewer than 15 days in each month, but accumulated during said months a total of 30 or more calendar days in full pay status, such employee shall be credited with annual leave earnable in one month for each 30 days of such full pay status.

**H.  Leaves Without Pay**

1.   Leaves of absence without pay may be granted to Education Administrators on application for a period of three years or less for the purpose of study, restoration of health, or for other satisfactory reasons on the same basis as apply to other pedagogical employees.

2.  No Education Administrator upon return to actual service shall be placed on a salary step or salary level lower than his/her salary step or salary level immediately prior to the initial date of the leave.

3.  Through at least July 31, 1995 the Board will implement a liberal policy concerning the granting of leaves of absence without pay to UFT bargaining unit members who meet the stated criteria for such leaves.  Bargaining unit members who are denied such a leave at the school or district level may appeal to the Executive Director of the Division of Human Resources for review and final determination.

**I.  Vested Benefits**

All annual leave, sick leave, sabbatical leave, compensatory and Cumulative Absence Reserve time balances to the credit of an Education Administrator as of March 31, 1979 shall remain to the employee's credit.  Such balances may be used in accordance with leave regulations and to the extent not used are applicable toward terminal leave, leave in lieu of sabbatical and/or separation or termination from employment.

## III. Education Officers and Education Analysts

**A.  Applicability**

Education Officers and Education Analysts covered by this Agreement are: employees in the titles Education Officer, Education Analyst, Associate Education Officer, and Associate Education Analyst except those serving in the Offices of the Chancellor, Deputy Chancellors, Labor Relations and Collective Bargaining, and Legal Services; those serving in the Office of Budget Operations and Review and in the Division of Human Resources, except employees who are neither managerial nor confidential as defined in Section 201.7 of Article 14 of the CSL; and those serving elsewhere in the Board of Education who are managerial or confidential as defined in Section 201.7 of Article 14 of the CSL.

**B.  Salaries**

**1.  Salary Adjustments, Ranges and Longevities**

a.  The salary ranges exclusive of longevities applicable to Education Officers and Education Analysts in the unit shall be:

### Education Analyst/Officer

| Effective Date | Annual | Hourly |
| --- | --- | --- |
| May 19, 2008 | $57,773-$74,711 | $29.52-$38.17 |
| May 1, 2013 | $58,351-$75,458 | $29.82-$38.55 |
| May 1, 2014 | $58,935-$76,213 | $30.12-$38.94 |
| May 1, 2015 | $60,715-$78,515 | $31.03-$40.12 |
| May 1, 2016 | $62,834-$81,255 | $32.11-$41.52 |
| May 1, 2017 | $65,693-$84,952 | $33.57-$43.41 |
| May 1, 2018 | $66,981-$86,617 | $34.23-$44.26 |
| June 16, 2018 | $68,990-$89,216 | $35.26-$45.59 |

### Associate Education Analyst/Officer

| Effective Date | Annual | Hourly |
|---|---|---|
| May 19, 2008 | $75,828-$98,180 | $38.75-$50.19 |
| May 1, 2013 | $76,586-$99,162 | $39.14-$50.69 |
| May 1, 2014 | $77,352-$100,154 | $39.53-$51.20 |
| May 1, 2015 | $79,688-$103,179 | $40.72-$52.75 |
| May 1, 2016 | $82,469-$106,780 | $42.14-$54.59 |
| May 1, 2017 | $86,221-$111,638 | $44.06-$57.07 |
| May 1, 2018 | $87,911-$113,827 | $44.92-$58.19 |
| June 16, 2018 | $90,548-$117,242 | $46.27-$59.94 |

b.      Incumbents will have the following salary adjustments:

| Effective Date | Increase[2] |
|---|---|
| May 1, 2013 | 1% |
| May 1, 2014 | 1% |
| May 1, 2015 | 2% |
| May 1, 2015 | 1% |
| May 1, 2016 | 2% |
| May 1 2016 | 1.5% |
| May 1, 2017 | 2% |
| May 1, 2017 | 2.5% |
| May 1, 2018 | 2% |
| June 16, 2018 | 3% |

c.   Longevities

Longevities for Education Analysts, Education Officers, Associate Education Analysts and Associate Education Officers are set forth below, and are received upon completion of the requisite service in the Board of Education and the City of New York:

| Effective Date | 5-Year | 10-Year | 15-Year | 20-Year |
|---|---|---|---|---|
| May 19, 2008 | $750 | $929 | $1,862 | $3,723 |
| May 1, 2013 | $758 | $938 | $1,881 | $3,760 |
| May 1, 2014 | $766 | $947 | $1,900 | $3,798 |
| May 1, 2015 | $789 | $976 | $1,957 | $3,913 |
| May 1, 2016 | $817 | $1,010 | $2,025 | $4,050 |
| May 1, 2017 | $854 | $1,056 | $2,117 | $4,234 |
| May 1, 2018 | $871 | $1,077 | $2,159 | $4,317 |
| June 16, 2018 | $897 | $1,109 | $2,224 | $4,447 |

**2.  Initial Appointment or Assignment**

Education Officers and Education Analysts newly assigned or appointed during the term of this Agreement shall be placed at the minimum of the applicable range except:

a.  Education Officers and Analysts whose service immediately prior to assignment or appointment as an Education Officer or Education Analyst was with the Board shall

---

[2] These increases are compounded in accordance with the agreement of the Parties.

receive a salary no less than they were receiving immediately prior to such assignment or appointment.

b.  Education Officers and Education Analysts whose service immediately prior to assignment or appointment as an Education Officer or Analyst was in a non-Board position related to their Education Officer or Analyst position shall receive a salary no less than their salary in the related position.

c.  If, prior to appointment or assignment to a job, it is established that the scope of the duties and responsibilities of the job are substantially greater than the scope of the duties and responsibilities of related jobs at the minimum of the applicable salary range, a higher salary rate shall be set, consistent with the scope of the duties and responsibilities, following audit and review by the Division of Human Resources and after consultation with the Union and approval of the Chancellor.  In case of disagreement as to the determination of the rate, the dispute may be submitted for a determination through the grievance and arbitration procedure.  Pending final determination of the dispute, the minimum of the applicable range shall be paid.  It is understood that the salary above the minimum is set for the specific job.

d.  Salary placement pursuant to paragraph a, b, or c above shall not exceed the maximum of the applicable range exclusive of longevities.

## C.  Benefits and Working Conditions

Education Officers and Analysts shall be covered by the provisions of this Agreement except:

1.  Only the following provisions of Article Three entitled "Salaries and Benefits of Day School Teachers" shall apply: Section H, "Reimbursement for Medical Expenses"; Section I, "Damage or Destruction of Property"; Section K2 "Transportation Benefit Program" Section L, "Salary Payment" (paragraph 3); Section M, "Performance Incentives Committee"; Section N, "Ratification Bonus"; Section O, "Structured Retiree Claims Settlement Fund"; Section P, "Lump Sum Payments Stemming From the 2009-2011 Round of Bargaining";  Section G, "Health Insurance and Welfare Fund Benefits" shall apply to employees assigned to work twenty hours or more per week.

2.  Only the following provisions of Article Four entitled "Pension and Retirement Program" shall apply: Section C, "Pension Legislation"; Section D, "Tax Deferred Annuity Plan", and Section E, "Pension Benefits Agreement and Deferred Compensation Plan".

3.  Only the following provision of Article Five entitled "Licensure, Assignment and Appointment" shall apply: Section F, "Absence without Notice".

4.  Only the following provision of Article Seven entitled "Programs, Assignments and Teaching Conditions in Schools and Programs" shall apply: Section S, "Additional Facilities".

5.  Only the following provisions of Article Eight entitled "Education Reform" shall apply: Section I, "Reduction of Paperwork" and Section L, "Labor/Management Committee on Long Term Reforms".

6.  Only the following provisions of Article Sixteen entitled "Leaves" shall apply: Section F, "Military Service Pay", Section G, "Payment for Jury Duty" and Section I, "Discipline for Authorized Absences".

7.  Only Section B, "Hardship Transfers", of Article Eighteen entitled "Transfers and Staffing" shall apply.

8.  Article Nineteen, entitled "Union Activities, Privileges, and Responsibilities" shall apply except for Section B, "Time for Union Representatives" and Section C. "Leaves of Absence for Union Officers."

9.  The following Articles shall not apply: Article Six entitled "Hours"; Article Nine entitled "Procedures for Handling Special Behavior Problems"; Article Twelve entitled "Chapter 683 Program"; Article Thirteen entitled "Working Conditions of Per Diem Substitutes, Substitute Vocational Assistants and Teacher's Assistants"; Article Fourteen entitled "Rates of Pay and Working Conditions of Adult Education Teachers"; Article Fifteen entitled "Rates of Pay and Working Conditions of Per Session Teachers"; Article Seventeen entitled "Retention, Excessing and Layoff"; and Article Twenty-Four entitled "Professional Conciliation".

**D.  Workweek**

The hours of work for full-time Education Officers and Analysts shall be thirty-seven and one-half hours per week exclusive of a daily thirty-minute lunch period.

**E.  Holidays**

Full-time Education Officers and Analysts will be paid for all Board of Education holidays and all other days on which their office is closed for special observance or emergency pursuant to action of the Chancellor or community superintendent.

**F.  Sick Leave**

1.  A sick leave allowance of one day per month of service shall be credited to full-time Education Officers and Analysts and shall be used only for personal illness of the employee.

2.  Education Officers and Analysts may use two of the sick days allowed per year for the care of ill family members.

For the purpose of this provision, family member shall be defined as: spouse; natural, foster or step parent; child; brother or sister; father-in-law; mother-in-law; any relative residing in the household; and domestic partner, provided such domestic partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 et seq.

3.  Sick leave allowance is cumulative up to 200 days.

4.  Proof of illness may be required for absences of more than three consecutive workdays.

5.  The normal unit of charge against sick leave allowance is one-half day.  However, the Education Officer's or Analyst's immediate supervisor may approve the use of units of one hour.

6.  In the calculation of sick leave allowance, a full month's credit shall be given to an Education Officer or Analyst who has been in full pay status for at least 15 calendar days during that month, provided that: (a) where an Education Officer or Analyst has been absent without pay for an accumulated total of more than 30 calendar days in the work-year, he/she shall lose the sick leave credits earnable in one month for each 30 days of such accumulated absence even though in full pay status for at least 15 days in each month during this period, and (b) if he/she loses sick leave allowance under this rule for several months in the work-year because he/she has been in full pay status for fewer than 15 days in each month, but accumulated during said months a total of 30 or more calendar days in full pay status, the Education Officer or Analyst shall be credited with the sick leave allowance earnable in one month for each 30 days of such full pay status.

7.   Where an Education Officer or Analyst is hospitalized on annual leave the period of such verified hospitalization shall be charged to sick leave and not to annual leave. Where he/she is seriously disabled but not hospitalized while on annual leave and providing the Education Officer or Analyst submits proof of such disability satisfactory to the Executive Director of Human Resources, written approval of the Executive Director may be given to charge such leave time to sick leave and not to annual leave at the employee's option.

8.   Sick leave allowances accumulated in another Board or City position shall be transferred to the employee's bank when he/she becomes an Education Officer or Education Analyst only if any break in service is thirty-one days or less.

9.   At the discretion of the Executive Director of Human Resources and upon the recommendation of the appropriate superintendent:

(a) Education Officers and Analysts who have exhausted all earned sick leave balances may be permitted to use unearned sick leave allowance up to the amount earnable in one year of service, chargeable against future earned sick leave; and

(b) Education Officers and Analysts may also be granted sick leave with pay for three months after 10 years of City service, after all credits have been used.  In special instances, sick leave with pay may be further extended, with the approval of the Executive Director of the Division of Human Resources.  The Executive Director shall base the determination in this matter on the nature and extent of illness and the length and character of service.  Such extension, if granted, may not exceed nine months.

## G.  Annual Leave

1.   Except as otherwise provided in subsection 2 of this Section G, full-time Education Officers and Analysts shall have an annual leave allowance as follows:

a.   The annual leave allowance for Education Officers and Analysts hired on or after September 9, 1985 shall accrue as follows:

| Years of Service | Monthly Accrual | Annual Leave Allowance |
| --- | --- | --- |
| At the beginning of the employee's first year | One (1) day per month after the first two (2) months | 10 workdays |
| At the beginning of the employee's second year | One (1) day per month plus one (1) additional day at the end of the second year | 13 work days |
| At the beginning of the employee's third year | One (1) day per month plus one (1) additional day at the end of the third year | 13 work days |
| At the beginning of the employee's fourth year | 1¼ days per month | 15 work days |
| At the beginning of the employee's fifth year | 1 2/3 days per month | 20 work days |
| At the beginning of the employee's eighth year | Two (2) days per month plus one additional day at | 25 work days |

|  | the end of the eighth through the fourteenth year | |
| --- | --- | --- |
| At the beginning of the employee's fifteenth year | 2¼ days per month | 27 work days |

b.  The annual leave allowance of Education Officers and Analysts hired before September 9, 1985 shall accrue as follows:

| Years of Continuous Board and/or City Service | Monthly Accrual Rate | Annual Leave Allowance |
| --- | --- | --- |
| Less than 8 Years | 1 2/3 days | 20 workdays |
| 8 to 15 years | 2 days plus one additional day in December | 25 workdays |
| 15 years or more | 2¼ days | 27 workdays |

2.  Education Officers and Analysts entitled to 31 days annual leave prior to September 9, 1980 shall continue to earn annual leave at the rate of 31 days per year (based on a monthly accrual rate of two and one-half (2½) days per month, plus one additional day (3½ days) for the month of December).

3.  In calculating years of continuous service for purposes of annual leave allowance under this provision, credit shall be given for all active City service, including pedagogical and non-pedagogical service in the Board of Education and service in City agencies.  Continuity of service shall not be deemed to be interrupted except by separation from service for a continuous period of more than thirty-one days.

4.  Up to two years' annual leave allowance may be accumulated by an Education Officer or Analyst and carried over from one workyear to another.

5.  For good reason, Education Officers and Analysts may request and the appropriate community or assistant superintendent may permit the use of up to ten days of annual leave allowance before it is earned.

6.  Use of accrued annual leave shall be scheduled by mutual agreement of the Education Officer or Analyst and his/her superior.  The employee's preference shall not be unreasonably denied.

If an Education Officer's or Analyst's request to use annual leave is denied, he/she shall be entitled to carry over that portion of his/her annual leave allowance so denied for one additional vacation year, notwithstanding that his/her accrual of annual leave may thereby exceed two years' entitlement.

7.  The minimum unit of charge against annual leave allowance shall be one hour.

8.  For the earning of annual leave allowance hereunder, a full month's allowance shall be earned by an employee who had been in full pay status for at least 15 calendar days during that month, provided that: (a) where an employee had been absent without pay for an accumulated total of more than 30 calendar days in the vacation year, the employee shall lose the annual leave allowance earnable in one month for each 30 days of such accumulated absence, even though in full pay status for at least 15 calendar days

in each month during this period; and (b) if an employee loses annual leave under this rule for several months in the vacation year because the employee had been in full pay status for fewer than 15 days in each month, but accumulated during said months a total of 30 or more calendar days in full pay status, such employee shall be credited with annual leave earnable in one month for each 30 days of such full pay status.

9.   The vacation year shall begin on May 1 and end the following April 30.

**H.  Leaves Without Pay**

1.   Leaves of absence without pay may be granted to Education Officers and Education Analysts on the same basis as apply to other administrative employees.

2.   No Education Officer or Analyst upon return to actual service shall be placed at a salary lower than his/her salary immediately prior to the initial date of the leave.

3.   Through at least July 31, 1995 the Board will implement a liberal policy concerning the granting of leaves of absence without pay to UFT bargaining unit members who meet the stated criteria for such leaves.  Bargaining unit members who are denied such a leave at the school or district level may appeal to the Executive Director of Human Resources for review and final determination.

**I.  Vested Benefits**

All annual leave, sick leave, sabbatical leave, compensatory and cumulative absence reserve time balances to the credit of an Education Officer or Analyst as of March 31, 1979 shall remain to the employee's credit.  Such balances may be used in accordance with leave regulations and to the extent not used are applicable toward terminal leave, leave in lieu of sabbatical and/or separation or termination from employment.

**J.  Posting Vacancies**

Vacancies in Education Officer and Education Analyst positions shall be posted in places accessible to employees, and incumbents shall be invited to apply before a new employee is hired.  Appointed employees shall have preference over provisionals.

**K.  Reduction of Positions**

If there is a reduction of positions in any office or other organizational unit, the junior Education Analyst or Education Officer, as appropriate shall be excessed to a vacancy or, if there is no vacancy, to the position held by a junior employee in the Board of Education.  Provisionals shall be excessed before probationers, and probationers shall be excessed before permanent employees.  Where a layoff situation exists in the Board of Education, the applicable provisions of law will be followed and those Education Officers or Education Analysts who are laid off without fault or delinquency will be placed on a preferred list for reinstatement to their positions.

**L.  Seniority**

Except where otherwise applicable for layoff or for benefit entitlements, the seniority of Education Analysts and Education Officers shall be computed as the length of service as an Education Analyst or an Education Officer in the Board of Education.

## IV. Professional Development Assignments and Positions

Lead Teachers, Mentors, Math and Literacy Coaches, and Lead Instructional Mentors are covered by all provisions of this Agreement not inconsistent with this Part IV of Article 11.[3]

## A. Lead Teachers

The CC9 Lead Teacher Pilot Program will be expanded as follows and continue until September 1, 2015, at which time the position of Lead Teacher shall be abolished.

1. The Chancellor will determine the number and location of lead teacher positions.

2. Lead teachers will receive $10,710 ($10,817 as of May 1, 2013, $10,925 as of May 1, 2014, and $11,255 as of May 1, 2015) per year as a salary differential in addition to the applicable salary otherwise provided in this Agreement. Such salary differential shall be included in the gross annual salary of teachers to whom it is paid.

3. In the elementary schools, each pair of lead teachers will have responsibility for one regular class. Each lead teacher will be programmed for a duty-free lunch period and a preparation period that will be scheduled at the same time as the preparation period of the lead teacher with whom they are sharing a class. Half of the remainder of the day will be spent teaching their class and half providing professional support to teaching staff.

Middle School and High School lead teachers will be programmed for a duty free lunch and a preparation period each day. Lead teachers will teach three regular classes per day and will provide professional support to teaching staff three periods per day.

4. Lead teachers will work as a group the five weekdays prior to the start of the work year for other teachers according to a plan set and approved by the applicable Superintendent. Lead teachers will work 4 hours per month outside of the normal workday, according to a schedule and plan set and approved by the applicable Superintendent at the start of the school year. Lead teachers shall not receive additional compensation for the work time specified in this paragraph.

5. Lead Teachers will be selected and assigned in the following manner. Positions will be advertised through a Citywide posting and assigned to individual schools. Selection will be done in a two-stage process: First, a Central Personnel Committee (the "Committee"), made up of four representatives of the Chancellor, two representatives of the UFT President and two parent representatives (selected by the BOE after consultation with the UFT) shall review all applications for the Lead Teacher Position Citywide and create a single Pool of qualified applicants according to criteria established by the Committee. Selections, to the extent possible, shall be made by consensus. The Committee shall ensure that all applications for the Lead Teacher position are collected and that all members of the Committee are provided access to all applications for review. Any applicant that is not qualified to be a Lead Teacher shall not be selected for the Pool. Second, each participating school will establish its own personnel committee, made up of the principal, administration representatives, staff representatives and parent representatives, with a majority of teachers, to make selections from the Pool created by the Committee. Selections, to the extent possible, shall be made by consensus and the principal shall have the ability to veto any selections of such school committee. Selections shall be made exclusively from the Pool created by the Committee. No teacher may serve as a Lead Teacher unless selected by the Committee.

---

[3] The parties disagree as to the applicability of Section 9 of the October 2005 MOA to Sections A6, B5(d), B5(e) and B5(f) and C5,6 and 7 of this Part IV of Article 11.

6.   Lead teachers leaving the assignment at the end of their first year as a lead teacher may return to a vacancy in the last school where they served before becoming a lead teacher and take their rightful place in seniority order, and if there is no vacancy in such school, to a vacancy in the district.  In the alternative, the lead teacher may choose to be placed in a vacancy in the district where they served as a lead teacher.

7.   If a lead teacher is involuntarily removed in the middle of the year by the principal, the lead teacher will be placed in a vacancy in the district s/he is working in as a lead teacher or in a vacancy in the district s/he worked in immediately prior to becoming a lead teacher (at the lead teacher's option).  If no such vacancies exist, the lead teacher will be placed in the substitute pool in the district s/he served in as a lead teacher.  At the end of the school year, the lead teacher shall be placed in a school pursuant to paragraph 6 above.

8.   Notwithstanding the foregoing, any lead teacher may be placed in a teaching vacancy in the school in which he or she is serving as lead teacher, with the consent of the lead teacher and such school's principal.

9.   A lead teacher's school seniority is determined in accordance with Article 29C of this Agreement.

10. Grievances regarding this provision, except the selection of lead teachers, shall be governed by Article 22B1 except that applicants rejected by the Committee may challenge the Committee's decision through the process set forth in Article 22E and if successful, will be included in the pool of applicants considered for selection.  The Union may challenge the selection of a lead teacher at the school level by appealing to the Chancellor/designee, who will consult with the Union prior to rendering a decision.  The Union may appeal the decision of the Chancellor/designee to the New York City Office of Labor Relations, which will issue a final and binding decision.

11. Individuals serving as Lead Teachers through the end of the 2014-2015 shall take their rightful place in seniority order as teachers on the table of organization of the school to which they were assigned as Lead Teachers, unless they find another position (including, but not limited to, Peer Collaborative Teacher) in accordance with this Agreement.

**B.  School Based Mentors**

**1.   New Teacher Induction Committee**

Each school will have a New Teacher Induction Committee (the "NTIC") comprised of a principal or designee; chapter leader or designee; teachers; and representatives of constituency groups.  A majority of the members of the NTIC shall be teachers.  NTIC will be responsible for working with the principal and SSO designee to devise and execute a plan for providing mentoring for new teachers.  The principal will make the final decision on the plan, provided that the plan must include in-classroom support and comport with the requirements below.

**2.   Mentor Selection Process**

a.   If the plan encompasses a model that includes release time for classroom teachers to mentor or per session for mentors, the NTIC will work with the principal to design a school-based posting.  The NTIC will interview applicants and recommend mentors. Once a roster of mentors is chosen, the committee will match mentors and new teachers. The final decision will be made by the principal.  Employees will have the right, pursuant

to Article 22, to grieve whether there was a reasonable basis for the denial of a position when a posting is used.

b.  If the NTIC decides on a model that includes hiring "F" status teachers, the same interview and selection process will be utilized. ("F" status teachers may only be used in instances where the school cannot provide appropriate internal mentor matches.)

c.  Preference will be given to full-time teachers currently employed.

**3.  Minimum Requirements for Mentors**

The minimum requirements for qualifying mentors are:

a.  5 years of teaching in the New York City public schools preferred;

b.  Demonstrated mastery of pedagogical and subject matter skills;

c.  Evidence of excellent interpersonal skills; and

d.  Commitment to participate in professional development.

**4.  Mentor Plan**

a.  Mentors will be matched by license and level when possible.

b.  Mentor/new teacher contact time during the school day will be equivalent to two (2) periods per week or more.

c.  If the plan includes a full time mentor position, the ratio of mentor to new teacher may not exceed 1-15.  This ratio shall not apply to Lead Instructional Mentors.

d.  If the plan includes mentoring to be performed by classroom teachers, it may require that he or she conduct mentoring activities during the mentor's professional period, but may not require the classroom teacher to perform mentoring activities during his or her lunch or preparation periods.  The plan may also include, without an SBO, a model pursuant to which mentors are provided release time for mentoring.

e.  Mentoring activities may include but not be limited to in-classroom support such as:

(1) providing demonstration lessons
(2) classroom inter-visitations
(3) co-teaching activities
(4) coaching conferences
(5) co-planning lessons
(6) collecting relevant classroom data

f.  Mentors and new teachers may (but will not be required to) meet before and/or after school for conferencing and planning activities with the approval of the principal. Both mentors and new teachers will be paid at the per session rate as per the collective bargaining agreement for this time.

g.  The BOE, in consultation with the UFT will work together to develop professional development for the school based mentors.  The BOE and UFT will meet as necessary to discuss the implementation and effectiveness of the school-based mentoring program.

**5.  The Mentor Position**

a.  The Mentor position shall be for one year with option to reapply.

b.  The Mentors will be teachers and their work day and year will be governed by Article 6 of this Agreement.  In addition to the time prescribed in Article 6, all Mentors will be required to work 18 hours after school during the school year.  First-year Mentors will be required to attend three days of professional development in the summer preceding the start of their first school year in the Mentor program.  For those unable to

attend the summer professional development session, a make-up session will be required during the month of September.

c   The Board will compensate the Mentors at the per session rate established by the Agreement for any hours or days worked pursuant to paragraph b that are outside of the regular teacher work day or year established by Article 6.  Such work will not count as a per session activity for purposes of any restrictions on a Mentor's ability to apply for other per session work.

d.   A mentor who leaves a mentoring assignment at the end of the first year of the assignment shall return to the last school where he or she served before becoming a mentor and take his or her rightful place in seniority order, unless he or she chooses to be placed in a vacancy in either the district(s) he or she served in as a mentor or the district he or she served in prior to becoming a mentor (if different), at his or her option (though the Board retains the right to determine the vacancy in which the mentor will be placed within the district chosen by the mentor).

e.   A mentor who leaves the assignment after the first year shall be returned to his or her former district in accordance with his or her seniority, unless he or she chooses to be placed in a vacancy in the school he or she served in prior to becoming a mentor or in a vacancy in the district(s) he or she served in as a mentor (if different), at his or her option (though the Board retains the right to determine the vacancy in which the mentor will be placed within the district chosen by the mentor).

f.   If a mentor is involuntarily removed in the middle of the year, the mentor may be placed (a) in a vacancy in the district(s) in which he or she is mentoring, (b) in a vacancy in the district he or she served in prior to becoming a mentor (if different) or, (c) in a vacancy in any other district, at the mentor's option (though the Board retains the right to determine the vacancy in which the mentor will be placed within the district chosen by the mentor).  If there is no vacancy, the mentor will be placed in the substitute pool in one of the districts in which he or she served as a mentor.  At the end of such school year, the mentor shall be placed in a school pursuant to either paragraph d or e above, as applicable.

g.   The Board agrees to fund 1 UFT Teacher Center position, who will serve as a liaison to the director of mentoring.  Such Teacher Center professional will report to both the Director of New Teacher Induction and the Director of the Teacher Center and will be rated by the Director of New Teacher Induction.  The Director of New Teacher Induction has final say over assignments.

h.   The Board agrees to evaluate whether it can limit the ratio of teachers to mentors and/or seek additional funding to supplement the support given to mentors, consistent with budgetary restraints.

**6.  Grievances**

Grievances regarding this Article 11 IV B, including selection of mentors, shall be governed by Article 22B1 of this Agreement.

**C.  Math and Literacy Coaches**

1.  Coaches will be selected for terms of one school year pursuant to annual Citywide postings and assigned to individual schools.  Coaches will serve the work day and year set forth in Article 6 of this Agreement.

2.   Should a coach selected in one year wish to serve another term as a coach in the same school the following year and should the principal agree, the principal may select such coach for another year term without the need for the coach to reapply.

3.   Coaches will teach one regularly scheduled period per day which will be for the purpose of co-teaching and/or providing a demonstration lesson for the regular classroom teacher and/or other staff.  Other than such regularly scheduled period, coaches shall not be required to teach or cover other classes.  In the event that the principal requires the coach to perform other appropriate duties during this regularly scheduled teaching period, the coach will be relieved of such teaching period.  Nothing in this paragraph shall prevent a coach from performing other demonstration lessons as part of his/her coaching duties.

4.   Coaches are eligible to apply for per session jobs appropriate to their regular license.

5.   A coach who leaves a coaching assignment at the end of the first year of the assignment shall return to the last school where he or she served before becoming a coach and take his or her rightful place in seniority order, unless he or she chooses to be placed in a vacancy in either the district he or she served in as a coach or the district he or she served in prior to becoming a coach (if different), at his or her option (though the Board retains the right to determine the vacancy in which the coach will be placed within the district chosen by the coach).

6.   A coach who leaves the assignment after the first year shall be returned to his or her former district in accordance with his or her seniority, unless he or she chooses to be placed in a vacancy in the school he or she served in prior to becoming a coach or in a vacancy in the district he or she served in as a coach (if different), at his or her option (though the Board retains the right to determine the vacancy in which the coach will be placed within the district chosen by the coach).

7.   If a coach is involuntarily removed in the middle of the year by the principal, the coach may be placed (a) in a vacancy in the district in which he or she is coaching, (b) in a vacancy in the district he or she served in prior to becoming a coach (if different) or, (c) in a vacancy in any other district, at the coach's option (though the Board retains the right to determine the vacancy in which the coach will be placed within the district chosen by the coach).  If there is no vacancy, the coach will be placed in the substitute pool in the district in which he or she served as a coach.  At the end of such school year, the coach shall be placed in a school pursuant to either paragraph 5 or 6 above, as applicable.

8.   Notwithstanding the number of years served as coach, any coach may be placed in a teaching vacancy in the school in which he or she is serving as a coach, with the consent of the coach and such school's principal.

9.   A coach's school seniority is determined in accordance with Article 28C of this Agreement.

10. Grievances regarding this provision, including selection of coaches, shall be governed by Article 22B1 of this Agreement.

11. The Board intends to provide coaches, with laptop computers or other similar computer devices to assist them with their work.

12. Coaches having to travel outside the geographic area that constituted their region prior to the BOE's 2007 reorganization for mandatory training are eligible for reimbursement for travel expenses under the Board's Standard Operating Procedures.

**D.  Lead Instructional Mentors**

1.  A Lead Instructional Mentor ("LIM") will be part of a School Support Organization team and will work with approximately 20-25 schools.  The primary responsibility of a LIM will be to build school capacity to develop the skills of its teaching population with a specific focus on new teachers.  Because each school will be providing mentors to its new teachers, the LIM will help schools design and execute effective school-based mentoring programs.

2.  Selections of Lead Instructional Mentors shall take place pursuant to a two-stage process.  First, selections will be made by a Citywide Personnel Committee (hereinafter the "LIM Committee").  The LIM Committee will be composed of a chair and three representatives designated by the BOE and three representatives designated by UFT.  The LIM Committee shall review all applications for the LIM position citywide and create a single pool of qualified applicants according to criteria established by the LIM Committee.  School Support Organizations ("SSOs") will select LIMs from this single pool, except that, in the case of Partnership Support Organizations ("PSOs"), the selections shall be made by the Office of Partnership Support.

3.  All applicants will receive one of three letters from the LIM Committee within 15 days of the closing date of the citywide posting.  The three letters are as follows: a) the applicant has been moved forward for inclusion in the pool; b) the applicant has been rejected; and c) the applicant is being invited to interview with the LIM Committee.  For applicants interviewed by the LIM Committee, the BOE shall attempt to notify rejected applicants on a "rolling basis" as soon as possible after the interview.  All applicants interviewed by the LIM Committee shall be notified whether they have been moved forward for inclusion in the pool or rejected no later than 15 days after the date of last interview.

4.  The same procedures as set forth in Article 22E for grievances filed by applicants for the Lead Teacher Pool shall apply to applicants for LIM positions.

5.  All LIMs will be required to attend three days of professional development during the summer preceding the start of the 2007-2008 school year.  LIMs will be compensated at the per session rate for this time.  For those unable to attend the summer professional development session, a make-up session will be required during the month of September.

6.  Prior to the end of the 2007-2008 school year, the Board and the UFT will meet to assess the operation of the LIM position and make any appropriate agreed upon changes.

## V. Teacher Leadership Positions

The Union and DOE wish to create opportunities for exemplary teachers to remain in their title of teacher but to extend their reach and role through the establishment of Teacher Leadership positions including Master Teacher, Model Teacher, and Teacher Ambassador.

A joint UFT-DOE Committee will be established for the Teacher Leadership Initiatives.  For the 2014-15 school year, the Joint Committee on Teacher Leadership Initiatives will begin meeting as soon as practicable to ensure a timely implementation of the Teacher Leadership Initiative.  Thereafter, the Joint Committee on Teacher Leadership Initiatives will meet on a monthly basis or on another mutually agreeable basis to discuss policy aspects of the Teacher Leadership Initiative such as: the focus for

Teacher Leadership work; identification and dissemination of best practices; professional development priorities and design; and research including focus groups and surveys to obtain feedback and ensure continuous improvement in implementation. The Joint Committee on Teacher Leadership Initiatives shall issue findings and proposed actions to the Chancellor and the UFT President.

**A. Teacher Ambassador**

1. Teacher Ambassadors are teachers and other educators who volunteer to participate and are selected to be assigned for one (1) year (the "Ambassador Year") to a paired Education Exchange School. Education Exchange Schools are schools paired within a borough where there has been a determination of interest and value in the sharing of instructional best practices, initiatives, and strategies through the temporary exchange of classroom teachers. Schools will be paired together based on a variety of factors such as school level, geography, and capacity to benefit from shared experience and exchange with another school community.

2. The Chancellor will solicit recommendations for pairings from the broader education community and invite interested schools to submit a proposal. Interested schools will submit a proposal with a plan indicating the reasons schools wish to participate; evidence of consultation with the school community through the appropriate channels, *e.g.* the School Leadership Team; anticipated benefits to both schools, and plan for implementation. The DOE and UFT will jointly review the applications. The UFT will be consulted on Education Exchange School pairings before final designations are made. Education Exchange Schools will be selected by the Chancellor and the number of schools, if any, positions, and licenses will be at the discretion of the Chancellor. The Chancellor reserves the right to cancel the exchange for any pairing by notification to the UFT and affected parties by August 31.

3. During the Ambassador Year, in addition to classroom teaching responsibilities, the Teacher Ambassadors will be expected, consistent with this Agreement, to support and engage in activities to promote the sharing, implementation and development of instructional best practices in both Exchange Schools. Teacher Ambassadors will have the same contractual rights and privileges as teachers except as set forth below.

4. Teacher Ambassadors shall receive additional compensation in the amount of $7,500 per year for the term of this Agreement above the applicable teacher salary in accordance with this Agreement.

5. Teacher Ambassadors will work an additional two (2) days during the summer to be scheduled during the week preceding Labor Day and an additional two (2) hours each month outside the normal workday, according to a schedule and plan set and approved by the Education Exchange School's principal.

6. For teachers serving as Teacher Ambassadors school seniority during and after the Ambassador year shall be considered to be continuous as if there is no change in schools.

7. Teaching program assignments shall be at the discretion of the Education Exchange School principal.

8. The Ambassador Year will be for one (1) school year, *e.g.* September to June. During that time, the Teacher Ambassador will be assigned to the Exchange School. At the conclusion of the Teacher Ambassador year, the teacher will be assigned back to their home school (*i.e.*, the school they were assigned to prior to the Ambassador Year).

Teacher Ambassadors must commit to serve the full school year in the Exchange School and must commit to serve at their home school at the conclusion of their Teacher Ambassador year for a minimum of one (1) additional school year. The Chancellor may waive these provisions in extraordinary circumstances.

9. Teacher Ambassadors will be selected in the following manner:

Postings will be developed jointly by the Exchange School principals in consultation with the UFT. The postings will delineate the teaching assignments in each school (*e.g.*, grade level(s) and subject). Postings will require an "Effective" or "Highly Effective" rating (or "Satisfactory" rating where applicable) in the prior school year for eligibility. Selection will be made by both principals in accord with the selection criteria contained in the posting. Selections will be made by the end of the school year or as soon thereafter as possible.

**B. Master Teacher**

1. In addition to their duties as a teacher, Master Teachers will take on additional responsibilities to support the instructional practice of other teachers in their school. Master Teachers will work closely with school leadership on developing instructional capacity through activities such as coordinating school-based instructional support activities; leading study groups around standards, assessments, and instruction; serving in teacher leadership positions on school teacher teams; coaching and debriefing with teachers after classroom visits; assisting in the establishment of teachers' professional development goals; and modeling best practices in their classroom. The Chancellor may establish Master Teacher positions under the auspices of the superintendent in a district whereby the Master Teacher may have the same responsibilities across more than one school in a district that he/she would have in a single school (i.e., developing instructional capacity through activities such as coordinating school-based instructional support activities; leading study groups around standards, assessments, and instruction; coaching and debriefing with teachers after classroom visits; assisting in the establishment of teachers' professional development goals; and modeling best practices). The superintendent will make selections of Master Teachers for this type of position from the pool of eligible candidates created by the UFT –DOE Joint Selection Committee. This type of Master Teacher position would be a citywide positing and upon the end of the term, the Master Teacher would be in excess in the district if they do not find another position. The posting will be jointly created by UFT and DOE and will address issues including but not limited to travel time, travel reimbursement, injury in the line of duty protections.

2. Master Teachers shall receive additional compensation in the amount of $20,000 per year for the term of this Agreement above the applicable teacher salary in accordance with this Agreement.

3. Master Teachers will work an additional eight days during the summer to be scheduled according to a schedule and plan set and approved by the principal or, in the case of Master Teachers that have responsibilities across more than one school in a district or are supporting citywide initiatives, the superintendent. Master Teachers will also work an additional eight (8) hours each month during the school year outside the contractual workday according to a schedule created by the Master Teacher and approved by the principal.

4.   Master Teachers will be relieved from a minimum of one (1) teaching period each day and will use this time as well as their professional periods to perform responsibilities associated with their position as a Master Teacher.

5.   The Master Teacher will carry out the additional responsibilities associated with his/her position as a Master Teacher during the contractual workday and the additional eight hours per month according to a plan created by the Master Teacher and reviewed and approved by the principal on a monthly basis.

6.   Participation by other teachers in activities involving the Master Teacher will be done in accordance with this Agreement.

7.   Master Teachers will be selected and assigned in the following manner:

a.   A UFT-DOE Joint Selection Committee consisting of an equal number of members selected by the Chancellor and by the UFT President will be established to screen and select qualified applicants to create a pool of eligible candidates.  Postings will require an "Effective" or "Highly Effective" rating (or "Satisfactory" rating where applicable) in the prior school year for eligibility.  The Joint Selection Committee may choose to have a process whereby incumbent Master Teachers may be renewed in the eligible pool through a modified screening and selection process.

b.   Unless otherwise agreed to by the parties, the Joint Selection Committee will post for the pool in the spring and conduct the screening and selection process by July 1. Final selections for candidates will be made by the conclusion of the Open Market.  The Joint Selection Committee will agree to a process whereby, if necessary, additional vacancies that arise during the school year can be filled from qualified candidates.

c.   Principals will make selections of Master Teachers only from the pool of eligible candidates selected by the Joint Selection Committee.  Individuals in the pool selected by a principal are not obligated to accept an offer for a Master Teacher position.

The Master Teacher position will be for a term of one (1) year.

## C.  Model Teacher

1.   In addition to their duties as a teacher, Model Teachers will take on additional responsibilities to support the instructional practice of other teachers in their school through activities such as establishing a laboratory classroom in their own classroom; demonstrating lessons; exploring emerging instructional practices, tools or techniques; and reflecting on and debriefing a visit from a colleague.

2.   Model Teachers shall receive additional compensation in the amount of $7,500 per year for the term of this Agreement above the applicable teacher salary in accordance with this Agreement.

3.   Model Teachers will work an additional two (2) days during the summer to be scheduled during the week preceding Labor Day according to a schedule and plan set and approved by the superintendent.  Model Teachers will also work an additional two (2) hours each month during the school year outside the contractual workday according to a schedule created by the Model Teacher and approved by the principal.

4.   Model Teachers will use their professional periods to perform responsibilities associated with their position as a Model Teacher.  In elementary schools organized on a seven-period per day schedule, Model Teachers will be relieved of teaching for a minimum of two (2) periods per week to perform responsibilities associated with their position as a Model Teacher.  In elementary schools organized on an eight-period per day schedule, Model Teachers will be relieved of teaching for a minimum of one (1) period

per week in addition to their weekly professional period to perform responsibilities associated with their position as a Model Teacher. In addition to these two periods, Model Teachers in elementary schools may request that principals work with them to try to identify additional opportunities in the school day/year to perform responsibilities associated with the position.

5.   The Model Teacher will carry out the additional responsibilities associated with their position as a Model Teacher during the contractual workday and the additional two (2) hours per month according to a plan created by the Model Teacher and reviewed and approved by the principal on a monthly basis.

6.   Participation by other teachers in activities involving the Model Teacher will be done in accordance with this Agreement.

7.   Model Teachers will be selected and assigned in the following manner:

a.   A UFT-DOE Joint Selection Committee consisting of an equal number of members selected by the Chancellor and by the UFT President will be established to screen and select qualified applicants to create a pool of eligible candidates. Postings will require an Effective or Highly Effective rating (or Satisfactory rating where applicable) in the prior school year for eligibility.  The Joint Selection Committee may choose to have a process where incumbent Model Teachers may be renewed in the eligible pool through a modified screening and selection process.

b.   Unless otherwise agreed to by the parties, the Joint Selection Committee will post for the pool in the spring and conduct the screening and selection process by July 1 with final selections for candidates made by the conclusion of the Open Market. The Joint Selection Committee will agree to a process whereby, if necessary, additional vacancies that arise during the school year can be filled from qualified candidates.

c.   Principals will make selections of Model Teachers only from the pool of eligible candidates selected by the Joint Selection Committee.  Individuals in the pool selected by a principal are not obligated to accept an offer for a Model Teacher position.

8.   The position will be for a term of one year.

**D.  Peer Collaborative Teacher**

1.   In addition to their duties as a teacher, Peer Collaborative Teachers will take on additional responsibilities to support the professional learning of their colleagues through peer coaching and intervisitation to improve student learning.  Peer Collaborative Teachers will work with school leadership and their colleagues to promote professional learning through activities such as designing and facilitating professional learning sessions; providing focused peer coaching via classroom visits, debriefs and modeling of best practices; and working on teacher teams in a leadership role.

2.   Peer Collaborative Teachers shall receive additional compensation in the amount of $12,500 per year for the term of CBA above the applicable teacher salary in accordance with the CBA.

3.   Peer Collaborative Teachers will work an additional five days during the summer to be scheduled during the week preceding Labor Day according to a schedule and plan set and approved by the superintendent.  Upon agreement with the UFT, the dates for these additional five days may be adjusted.  Peer Collaborative Teachers will also work an additional five hours each month during the school year outside the contractual workday according to a schedule created by the Peer Collaborative Teacher and approved by the principal.

4.   Peer Collaborative Teachers will be relieved from a minimum of one teaching period each day and will use this time as well as their professional periods to perform responsibilities associated with their position as a Peer Collaborative Teacher.

5.   The Peer Collaborative Teacher will carry out the additional responsibilities associated with his/her position as a Peer Collaborative Teacher during the contractual workday and the additional five hours per month according to a plan created by the Peer Collaborative Teacher and reviewed and approved by the principal on a monthly basis.

6.   Participation by other teachers in activities involving the Peer Collaborative Teacher will be in accordance with the CBA.

7.   Peer Collaborative Teachers will be selected and assigned according to the same procedures as are used to select and assign Master Teachers and Model Teachers.

8.   The Peer Collaborative Teacher position will be for a term of one year.

**E.  General**

1.   Selection decisions for the position of Master Teacher, Model Teacher, Peer Collaborative Teacher and Teacher Ambassador (together, "Teacher Leadership positions") shall not be grievable. This includes both the selection for the actual position by the principal or entry into the pool of qualified candidates as determined by the Joint Selection Committee.

2.   Only tenured DOE teachers who have earned a rating of "Highly Effective," "Effective" or "Satisfactory," where applicable, in the prior school year will be eligible to serve in Teacher Leadership positions.  A teacher earning any other rating is ineligible to continue to in the position. Additional criteria may be established by the Joint Selection Committee for each position. All DOE teachers, regardless of district, program or superintendency who meet the eligibility criteria, are eligible to apply.

3.   Teachers selected for a Teacher Leadership position are expected to remain in that position for the entire school year.  However, during the year should the teacher and principal mutually agree that a teacher will not continue in the Teacher Leadership position, the teacher will remain in the school as a teacher without the additional compensation or responsibilities associated with that Teacher Leadership position.

4.   Should a teacher in a Teacher Leadership position be reassigned or go on a leave with pay he/she shall cease to earn the additional compensation.

5.   Master Teachers, Peer Collaborative Teachers and Model Teachers who have transferred from another school and who do not serve a second school year in the position or who by mutual agreement have ceased serving in the position during the school year, may at the end of the first school year return to the last school they served in provided there is a vacancy in their license area. If there is no vacancy then the teacher may return to the district/superintendency.

6.   Other than the above provision, during or after the school year, any issue regarding a Teacher Leadership leaving their position and their school is subject to regular transfer procedures.

7.   For the 2014-15 school year only, should the Chancellor implement Education Exchange Schools with Teacher Ambassador positions, then the Master Teacher, Peer Collaborative Teacher and Model Teacher positions must also be in effect.

8.   No later than August 1, 2014, the Chancellor will determine, at his/her sole discretion, whether or not the Master Teacher, Peer Collaborative Teacher and Model Teacher positions will be in effect for the 2014-15 school year. The Chancellor's

determination shall be final and not grievable. Should the Chancellor choose to have Master Teacher, Peer Collaborative Teacher and Model Teacher positions, the DOE will ensure creation of the Master Teacher, Peer Collaborative Teacher and/or Model Teacher positions by a minimum of forty (40) schools at each of the levels: elementary, middle and high. The Chancellor shall have the discretion to increase the number of schools above the minimums at each level in differing amounts.

9. By August 1, for every subsequent school year, the Chancellor will make a determination whether or not the Teacher Leadership positions will be available for schools for the upcoming school year. The Chancellor's determination shall be final and not grievable. If the Chancellor determines in his or her discretion that Teacher Leadership positions will be created for that school year, then the Chancellor will ensure that at least 20% of the schools that create Master Teacher, Peer Collaborative Teacher and/or Model Teacher positions will be at each of the levels: elementary, middle and high.

10. Should the Chancellor determine by August 1st that there will be no Master Teacher, Peer Collaborative Teacher or Model Teacher positions in effect for the upcoming school year, any teacher who has been selected for a transfer to a Master Teacher, Peer Collaborative Teacher or Model Teacher position in a different school shall have the right to remain in their current school and the teacher shall be treated as if the transfer never occurred.

11. For purposes of this section, K-8 schools including those that have pre-K programs shall be considered elementary or middle schools and grades 6-12 schools shall be considered middle or high schools.

12. Except as expressly agreed to by the Joint Committee, Master Teachers, Peer Collaborative Teachers and Model Teachers shall teach a minimum program of one period per day.


## ARTICLE TWELVE
## CHAPTER 683 PROGRAM

Employees who elect to be employed in the Board's program which implements Chapter 683 of the Laws of 1986 ("Program") shall serve under the following terms and conditions of employment during July and August:

1. The gross annual salary rate of each such employee who serves the same student population during the regular work year (September through June) as is eligible to participate in the Program during July and August shall be computed by adding the sum of either:

a. Seventeen and one-half (17½) percent of the applicable gross annual salary rate; or

b. The number of hours served during July and August multiplied by the applicable per session rate; whichever is greater, to the employee's annual salary rate ascertained without consideration of said sum.

2. The pay rate of each such employee who does not serve the same student population during the regular work year (September through June) as is eligible to participate in the Program in July and August shall be the applicable per session pay rate.

103

3.   a. As set forth in the applicable Board Vacancy Circulars advertising the positions available for the 1988 Program, the selection procedure for the Program shall provide a priority to those employees who serve the same student population during their regular work year as is eligible to participate in the Program in July and August.

b.  Employees who serve satisfactorily in the Program during July and August for two successive years shall be retained for succeeding years if they apply to serve in the Program during July and August provided they continue to serve the same eligible student population during their regular work year.  Retention rights of other employees who serve satisfactorily in the Program during July and August for two successive years shall be subordinate to the rights of those employees who serve the same eligible student population during the regular work year.

c.  If there is a reduction of positions in the Program during July and August, employees who are lowest in order of priority for selection will be the first to be retrenched, in inverse seniority order.

4.  The work day for employees serving in the Program during July and August shall be six hours exclusive of one-half hour for a duty-free lunch.

5.  Employees paid in accordance with Paragraph 1 of this Article will receive two sick days for use during July and August on a self-treated basis.  Unused sick days shall be accrued and credited to the employee's cumulative absence reserve for use during the regular school year.

6.  Teachers shall have a daily professional resource period.  This period is designed to allow for consultation by the teacher with administrators, parents, teachers, related service providers and nurses: to up-date each student's Individual Educational Program (IEP) in order to provide for continuity of instruction, to provide a reporting mechanism (IEP) to each student, daily and cumulative attendance information, related service provision information to administration, and to finalize all student records for delivery to the September school location.

Other employees will have relief time, if any, equivalent to that to which they are entitled during the regular work year.

7.  Teachers will be consulted regarding class assignments and their assignment requests will be honored to the extent possible.

8.  The sabbatical leave pay of employees paid in accordance with Paragraph 1 of this Article shall be based on their annual salary including the amount computed pursuant to Paragraph 1 of this Article.

The applicable return provision applies to service in the Program with respect to that portion of the sabbatical salary attributable to Program compensation.

9.  Teachers, guidance counselors and school secretaries serving in the Program during July and August are restricted from serving in any per session activity unless no other qualified applicants are available.

10. In light of the needs of the student population served by the Program, the Board is committed to providing air-conditioned facilities for as many sites as possible.  The Board will keep the Union informed of its progress in achieving the objective of air-conditioning all sites utilized by students.

11. The Board official with responsibility for this Program shall meet and consult at times mutually agreed with representatives of the Union on matters of policy and implementation of this Article.

12. Except as otherwise set forth herein:

a.   The working conditions for employees paid in accordance with Paragraph 1 of this Article will be consistent with the standards of working conditions for the regular work year prescribed in the applicable collective bargaining agreements.

b.   The working conditions of employees paid in accordance with paragraph 2 of this Article will be those working conditions applicable to per session employees covered by the applicable collective bargaining agreements.

## ARTICLE THIRTEEN
## WORKING CONDITIONS OF PER DIEM SUBSTITUTES, SUBSTITUTE VOCATIONAL ASSISTANTS AND TEACHER'S ASSISTANTS

### I. Per Diem Substitutes

**A.  Applicability**

Per diem substitutes covered by this Agreement are:

1.   Full term substitutes: serving after the fifteenth day of the school term for the duration of that term in a full-time or regularly scheduled part-time position;

2.   Other-than-occasional: covering the absence of a particular employee for thirty consecutive work days or more.

Per diem substitutes covered by this Agreement shall serve under the terms and conditions of this Agreement applicable to regular substitutes except as otherwise set forth in this Article or elsewhere in this Agreement.

**B.  Pro-Rata Vacation Pay**

Per diem substitutes covered by this Agreement shall continue to receive vacation pay on the same basis as heretofore.

**C.  Health and Welfare Fund Benefits**

Only those full-term per diem substitutes who are assigned to a position which is expected to be vacant for the remainder of the term shall be covered by Article 3G (Health Insurance and Welfare Fund Benefits) of this Agreement.

Teachers and other pedagogues serving in a regularly scheduled part-time position (commonly known as F-status) will be entitled to full health and welfare fund benefits if scheduled to work for at least one-half of the regular full-time schedule for their title. Teachers and other pedagogues in a regularly scheduled but less than half-time position are not eligible for health insurance or welfare fund benefits.

**D.  Sick Leave**

Per diem substitutes covered by this Agreement shall continue to receive sick leave on the same basis as heretofore.

**E.  Retention and Job Security**

Article 17A2 of this Agreement shall apply only to regular substitutes.  However, service in the school for purposes of Article 17A2 shall include full-term and other-than-occasional per diem substitute service in the school.

Article 17F of this Agreement shall apply in accordance with its terms.

**F.  Inapplicable Provisions**

The following provisions of this Agreement shall not apply: Article Eleven "Rates of Pay and Working Conditions of Teachers Assigned, Education Administrators, Education Analysts, Education Officers, Professional Development Assignments and Positions, and Teacher Leadership Positions", Article Twelve "Chapter 683 Program ", Article Fourteen "Rates of Pay and Working Conditions of Adult Education Teachers", Article Fifteen "Rates of Pay and Working Conditions of Per Session Teachers", Article Sixteen A "Cumulative Absence Reserves and Sick Leave", Article Sixteen B "Sabbatical Leaves", Article Sixteen C "Special Study Sabbatical to Achieve Certification" Article Sixteen D "TB Sabbaticals", Article Sixteen E "Leaves of Absence Without Pay", and Article Sixteen H "Vocational High School Externship Program"; Article Seventeen (Retention, Excessing and Layoff-except to the extent provided in Section E above of this Article), Article Eighteen "Transfers and Staffing", and Article Twenty-One E "Suspension".

**G.  Continuation of Benefits**

Nothing contained in this Article or elsewhere in this Agreement shall be construed to deprive a per diem substitute of any benefit currently granted as a matter of Board policy and practice.

**H.  Pension Legislation**

The parties have agreed to jointly support pension legislation as set forth in the letter attached as Appendix K.

**I.  Tax Deferred Annuity Plan**

The parties agree to jointly support legislation and to obtain any other necessary regulatory approval, to enroll newly-hired employees who do not enroll in a retirement or pension system maintained by the City of New York in the Board's 403(b) Annuity Plan at the time the employee is hired.  It is further agreed that such employees will be provided with the option to withdraw from enrollment in the Board's 403(b) Annuity Plan.

**J.  Creation of F-Status Positions**

1.  Every one or more F Status position(s) in a single school that equal 1.0 FTE (i.e. positions equaling 5 days per week) in the same license will be considered one full-time position.  Only if no appointed teachers are reasonably available (through excesses, transfers and/or new hires assigned by the Division of Human Resources) may such school create F Status positions equaling 1.0 FTE.

2.  Notwithstanding the restriction in the preceding paragraph J 1, a school will be allowed to create such F Status positions in order to accommodate a hardship for a previously appointed pedagogue or because of the particular needs of the program.

## II. Substitute Vocational Assistants

**A.  Pay Rate**

Substitute vocational assistants shall be paid ninety percent (90%) of the salary of a regular substitute teacher on the base schedule (C1) with the same experience.

**B.  Fringe Benefits**

Substitute vocational assistants shall have the fringe benefits applicable to regular substitute teachers.

### C.  Coordinated Program

Substitute vocational assistants shall have a coordinated program of classroom service, work experience and study prescribed by the Chancellor and in accordance with criteria specified by the Chancellor, leading to qualification for licensure as Teacher of Shop Subject.

Substitute vocational assistants shall give a written commitment to complete the prescribed program of coordinated classroom service, work experience and study, to apply for the next examination leading to licensure as Teacher of a Shop Subject for which qualified by such program, and to serve if qualified by licensure or temporary per diem certification as Teacher of a Shop Subject in the public schools of the City of New York for a minimum of five years following such licensure or certification.

### D.  Salary and Seniority Credit

Upon commencement of service as a teacher of a shop subject, each five-month period of classroom service shall be considered one full term of prior teaching experience, and each twelve months of work experience shall be considered one full year of related occupational experience and, in addition, shall be deemed to satisfy one year of the occupational experience required for licensure as a teacher of a shop subject.

In computing seniority for purposes of layoff and excessing only SVA classroom service is counted.  Accordingly former SVA's who are appointed as teachers are credited with half their total SVA service for purposes of layoff and excessing.  However, all SVA service is credited toward salary, including longevity.

### E.  Hours and Workyear

The workyear of a substitute vocational assistant is twelve months, with five months (one term) served in a classroom position and seven months served working in the occupation.  The substitute vocational assistant is expected to complete at least six semester hours of study in a Board-approved college program each year.  The Board will pay tuition costs.

Substitute vocational assistants shall have school vacations and school holidays when they are serving in a classroom position.

Substitute vocational assistants shall have the hours of a regular substitute teacher when serving in a classroom position.

### F.  Layoff

In the event of layoff because of lack of work, the junior substitute vocational assistant in the shop subject shall be selected for layoff.

### G.  Work Experience

The parties shall develop appropriate conditions applicable to substitute vocational assistants during the time they are gaining their work experience.

### H.  Applicable Contract Provisions

Substitute vocational assistants shall be covered by the following provisions of this Agreement: Article One "Union Recognition", Article Two "Fair Practices", Article Three K2 "Transportation Benefit Program", Article Three M "Performance Incentives Committee", Article Three N "Ratification Bonus", Article Three O "Structured Retiree Claims Settlement Fund", Article Three P "Lump Sum Payments Stemming from the 2009-2011 Round of Bargaining", Article Three R "Parking", Article Four C "Pension Legislation", Article Four D "Tax Deferred Annuity Plan", Article Four E "Pension Benefits Agreement and Deferred Compensation Plan", Article Eight I "Reduction of

Paperwork", Article Eight L "Labor/Management Committee On Long Term Reforms", Article Ten "Safety and Health", Article Sixteen A "Cumulative Absence Reserves and Sick Leave", Article Sixteen F "Military Service Pay", Article Sixteen G "Payment for Jury Duty", Article Sixteen I "Discipline for Authorized Absences", Article Nineteen "Union Activities, Privileges and Responsibilities", Article Twenty "Matters Not Covered" first two paragraphs, Article Twenty-One "Due Process and Review Procedures", to the extent applicable to regular substitute teachers, Article Twenty-Two "Grievance Procedure", Article Twenty-Three "Special Complaints", Article Twenty-Five "Charter Schools", Article Twenty-Six "Progressive Redesign Opportunity Schools For Excellence (PROSE)", Article Twenty-Seven "Conformity to Law-Saving Clause", Article Twenty-Eight "No-Strike Pledge", Article Twenty-Nine "Definitions", Article Thirty "Notice-Legislative Action", Article Thirty-One "Copy of Agreement", Article Thirty-Two "Incorporation of Determination and Award", and Article Thirty-Three "Duration".

### III. Teacher's Assistants

**A. Pay Rate**

Teacher's Assistants shall be paid the following annual rates:

| Effective Date | Amount |
| --- | --- |
| May 19, 2008………………... | $31,349 |
| May 1, 2013…………………. | $31,662 |
| May 1, 2014…………………. | $31,979 |
| May 1, 2015…………………. | $32,945 |
| May 1, 2016…………………. | $34,095 |
| May 1, 2017…………………. | $35,646 |
| May 1, 2018…………………. | $36,345 |
| June 16, 2018………………... | $37,435 |

A former paraprofessional who becomes a teacher's assistant shall not have a salary reduction thereby.

**B. Fringe Benefits**

Teacher's assistants shall have the fringe benefits applicable to regular substitute teachers.

**C. Coordinated Program**

Teacher's assistants shall have a coordinated program of part-time classroom service and study prescribed by the Chancellor and in accordance with criteria specified by the Chancellor, leading to qualification for licensure as Teacher.

Teacher's assistants shall give a written commitment to complete the prescribed program of coordinated part-time classroom service and study, to apply for certification leading to the appropriately related teaching license for which qualified by such program, and to serve if qualified by licensure or temporary per diem certification as a teacher of such appropriately related subject area in the public schools of the City of New York for a minimum of five years following such licensure or certification.

### D.  Salary and Seniority Credit

Upon commencement of service as a teacher, each year of part-time classroom service as a teacher's assistant shall be credited as equivalent to one term of full-time regular substitute teaching service.

### E.  Work-Study Program

Teacher's assistants shall be assigned to appropriate classroom service for a minimum of three hours each school day under the direct supervision of a tenured teacher in the field.  Teacher's assistants will have their classroom service extended proportionately to that of teachers.  They must complete a minimum of 32 semester hours of required courses per year provided by the Board in a program leading to a baccalaureate degree at an approved institution of higher learning, until they meet the minimum requirements for the appropriately related teaching license.

### F.  Layoff

In the event of layoff among teacher's assistants, the junior teacher's assistant in the license shall be selected for layoff.

### G.  Applicable Contract Provisions

Teacher's assistants shall be covered by the following provisions of this Agreement: Article One "Union Recognition", Article Two "Fair Practices", Article Three K2 "Transportation Benefit Program" Article Three M "Performance Incentives Committee", Article Three N "Ratification Bonus", Article Three O "Structured Retiree Claims Settlement Fund", Article Three P "Lump Sum Payments Stemming from the 2009-2011 Round of Bargaining", Article Three R "Parking", Article Four C "Pension Legislation", Article Four D "Tax Deferred Annuity Plan", Article Four E "Pension Benefits Agreement and Deferred Compensation Plan", Article Eight I "Reduction of Paperwork", Article Eight L "Labor/Management Committee On Long Term Reforms", Article Ten "Safety and Health", Article Sixteen A "Cumulative Absence Reserves and Sick Leave", Article Sixteen F "Military Service Pay", Article Sixteen G "Payment for Jury Duty", Article Sixteen I "Discipline for Authorized Absences",   Article Nineteen "Union Activities, Privileges and Responsibilities", Article Twenty "Matters Not Covered" first two paragraphs, Article Twenty-One "Due Process and Review Procedures", to the extent applicable to regular substitute teachers, Article Twenty-Two "Grievance Procedure", Article Twenty-Three "Special Complaints", Article Twenty-Five "Charter Schools", Article Twenty-Six "Progressive Redesign Opportunity Schools For Excellence (PROSE)", Article Twenty-Seven "Conformity to Law-Saving Clause", Article Twenty-Eight "No-Strike Pledge", Article Twenty-Nine "Definitions", Article Thirty "Notice-Legislative Action", Article Thirty-One "Copy of Agreement", Article Thirty-Two "Incorporation of Determination and Award", Article Thirty-Three "Duration"

## ARTICLE FOURTEEN
## RATES OF PAY AND WORKING CONDITIONS
## OF ADULT EDUCATION TEACHERS

### A.  Statement of Principles

The parties agree that their mutual objectives are to support the continuation and expansion of the Board's adult education programs and to regularize and stabilize the conditions of employment of employees in these programs by encouraging the use of full-time personnel wherever possible.

The Board and the Union will consult as the need arises for the purpose of facilitating the achievement of these objectives and to resolve problems as they occur. This Article covers adult education teachers who are regularly assigned to work at least fifteen hours and twenty-five minutes per week.

**B. Salary and Workyear**

**1. Salary**

The annual salaries of full-time adult education teachers are set forth in Appendix F which is attached to and made a part of this Agreement.

The annual salary of full-time adult education teachers is based on assignments of six hours and 10 minutes per day for 191 ½ days (1,181 hours) per workyear. The salary of individual teachers is pro-rated up or down depending on their regular assignment of hours relative to 1,181 hours.

**2. Workyear**

The workyear begins on September 1 and ends on August 31. Full-time adult education teachers shall have 10 minutes of preparation time added to their six-hour workday, and they shall report the Thursday and Friday before Labor Day and on Brooklyn-Queens Day for professional development. In most cases there will be a ten month year scheduled to the extent possible between September and June. The Office of Adult and Continuing Education reserves the right, when programs dictate, to create ten month schedules other than between September and June and other than in a consecutive mode. Furthermore, it may be necessary to continue programs into the summer to meet the 191 ½ days.

**C. Sick Leave and Non-Attendance**

1. Full-time teachers shall accrue and use sick leave pursuant to Article 16A11 of this Agreement. Other teachers shall have a pro-rata entitlement.

2. Adult education teachers are covered by the Board's regulations governing non-attendance of teachers.

**D. Annuity Payment**

Adult education employees who are "eligible teacher contributors" pursuant to Section 13-521, Subdivision 8, of the Administrative Code of the City of New York shall receive the annual $400 annuity contributions provided in Article 4, Section A of this Agreement when they reach the maximum step of the salary schedule (i.e. step 8B on the applicable differential lane).

**E. Hours[4]**

**1. Assigned Hours Per Week**

Full-time teachers shall be assigned to work at least thirty hours and fifty minutes per week.

Adult education teachers shall be assigned during 2007-2008 for not less than the same number of hours per week they were assigned during 2006-2007. In each year thereafter such employees shall be assigned not less than the same number of hours per week they were assigned during the preceding year. It is understood and agreed that the implementation of this provision may require reassignment and reorganization of schedules.

The Office of Adult and Continuing Education shall use its best efforts to schedule such assignments in a manner which takes into account the needs of the program as well

---

[4] The parties disagree as to the applicability of Section 9 of the October 2005 MOA to this Article 14E.

as the goal of minimizing the need to travel and the gap in time between teaching assignments.

**2. Priority for Assignment to Additional Hours**

Teachers shall be assigned to additional hours in their license area as they become available in the following order of priority.

a. Restore appointed teachers to thirty hours and fifty minutes.

b. Increase hours of appointed teachers to thirty hours and fifty minutes.

c. Restore hours to other teachers whose hours were reduced during the current workyear.

d. Increase hours of other teachers to 30 hours and 50 minutes.

All teachers in a higher priority category shall be offered the additional hours before those in a lower priority category are offered the hours.

Within each priority category the additional hours shall be offered to teachers in order of their seniority.

**3. Maintenance of Hours**

The number of hours per week for which teachers are assigned pursuant to this Article shall be maintained as follows:

a. If a teacher's hours are reduced within the first five percent of a cycle's scheduled number of hours such teacher shall be assigned the additional hours necessary to restore his/her previous level of hours per week by assigning to him/her additional hours which become available or, if no additional hours are available, the hours of a per session teacher. The assignment of such hours shall be made in the following order of priority:

(1) Appointed teachers

(2) Other teachers

If no such hours are available, the excessing rules shall be followed to determine the teacher whose hours will be reduced.

b. Whenever possible, the Board will not reduce the hours of a teacher within the final five percent of a cycle's scheduled number of hours.

c. A teacher whose hours are reduced after the first five percent of a cycle's scheduled number of hours shall be restored to his/her previous level of hours per week in the same order of priority as set forth in paragraph a of this Section 3, (a) when additional new hours become available; or (b) at the start of the next cycle; or (c) when he/she has lost ten percent of his/her scheduled hours in the program, whichever occurs first.

d. A teacher whose hours are restored after he/she has lost ten percent of his/her scheduled hours in the program shall retain his/her full schedule of hours thereafter. Where necessary the excessing rules shall be followed to determine the teacher whose hours will be reduced.

**F. Excessing**

Before excessing an appointed teacher, non-appointed teachers in the license are discontinued, in inverse seniority. Before applying the Rules for involuntary excessing, the senior teacher within license who volunteers will be excessed from the work site to a vacancy within the same region. If no senior teacher volunteers, the following excessing rules shall be applicable to regularly appointed teachers in adult education licenses:

Rule 1.    When an excess condition in a license exists at a work site or in a region the appointed teacher in that license with the least seniority shall be excessed, but probationers shall be excessed before those who have completed probation.

Rule 2.    Unless a principal denies the placement, an excessed teacher will be placed by the Board into a vacancy within his/her district/superintendency; or if such a vacancy is not available, then in a vacancy within his/her region.  The Board will place the excessed teacher who is not so placed in an ATR position in the school from which he/she is excessed, or in another school in the same district or superintendency.

Rule 3.    Upon request a teacher who has been excessed to another work site or region shall be afforded the opportunity to return to the work site or region from which he/she was excessed, if within a year a vacancy in his/her license should occur at that work site or region, before any other teacher is assigned to the vacancy.  Such return shall be effectuated at the start of the next cycle.

Rule 4.    As used herein, an excess condition exists when a position is eliminated or when the hours are reduced below 15 hours and 25 minutes per week.

Rule 5.    Teachers identified as being at risk of being excessed at the commencement of the following school year will be informed of this no later than June 15, or as soon as is practicable if identified as being at risk of excess after June 15.  The deadlines for excessing teachers will continue to be governed by applicable law.

**G.  Layoff and Recall**

If a Citywide excess condition causes a layoff of staff in any licensed position, the hours of per session teachers shall be reassigned to teachers covered by this Article to the extent possible to prevent layoffs before any adult education teacher in the license is laid off.

Section 2588 of the Education Law shall be the basis for determining the adult education teacher to be laid off, without fault and delinquency with the understanding that said employee is to be placed on a preferred list for reinstatement to his/her former position.

Probationers shall be laid off before any teacher in the license who has completed the probationary period.  Teachers on layoff who may be placed on a preferred list in another license other than the one in which they are laid off will be so placed.

Non-appointed teachers shall have recall rights after appointees are recalled.

**H.  Seniority**

Except as otherwise expressly provided in this Article, seniority shall include all prior continuous service as an adult education teacher regularly assigned to at least fifteen hours per week  prior to February 2006 and to at least fifteen hours and twenty-five minutes per week thereafter.

Continuous service shall be defined as uninterrupted service except that leaves of absence without pay granted with the approval of the director, and layoffs because of lack of work shall not be deemed as an interruption of service but shall not be counted in the determination of length of continuous service.

**I.  Vacant Assignments**

When vacant assignments become available for September, adult education teachers will be notified and the wishes of the teachers who request assignment shall be taken into consideration.

**J.  Other Conditions**

The following provisions of this Agreement shall also apply to adult education teachers:

Article One "Union Recognition", Article Two "Fair Practices", Article Three G "Health Insurance and Welfare Fund Benefits", Article Three H "Reimbursement for Medical Expenses", Article Three K "Transportation Benefits Program", Article Three L "Salary Payment", Article Three M "Performance Incentives Committee", Article Three N "Ratification Bonus", Article Three O "Structured Retiree Claims Settlement Fund", Article Three P "Lump Sum Payments Stemming From the 2009-2011 Round of Bargaining", Article Three R "Parking", Article Four C "Pension Legislation", Article Four D "Tax Deferred Annuity Plan", Article Four E "Pension Benefits Agreement and Deferred Compensation Plan", Article Five A "Substitute Teacher Position", Article Five B "Regularized Licensure", Article Five C "Provisional Teachers", Article Five F "Absence Without Notice", Article Five G "Return to Former License of Appointment", Article Eight H "Professional Development and Second Differential", Article Eight I "Reduction of Paperwork", Article Eight J "Evaluation and Observation System", Article Eight L, "Labor/Management Committee On Long Term Reforms", Article Ten "Safety and Health" shall apply at all work sites, Article Sixteen A "Cumulative Absence Reserve and Sick Leave", Article Sixteen B "Sabbatical Leaves" shall apply with respect to sabbatical leaves for restoration to health and "special sabbatical leaves for restoration to health", Article Sixteen E "Leaves of Absence Without Pay", Article Sixteen F "Military Service Pay", Article Sixteen G "Payment for Jury Duty", Article Sixteen I "Discipline for Authorized Absences", Article Seventeen C "Appointment to New Program, License or Title", Article Seventeen F, "Voluntary Severance for Personnel Who Have Been Excessed", Article Eighteen A "General Transfers", Article Nineteen D "Exclusive Check-Off", Article Nineteen E "Agency Fee Deduction", Article Nineteen F "Bulletin Boards", Article Nineteen G "Chapter Meetings" shall apply whenever the meeting is conducted in a Board facility; Article Nineteen H "Consultation with the Union", Article Nineteen I "Information to the Union" shall also apply to information about adult education teachers, Article Nineteen K "Political Check-Off", Article Twenty "Matters Not Covered" first paragraph, Article Twenty-One "Due Process and Review Procedures", Article Twenty-Two "Grievance Procedure", Article Twenty-Three H "Expansion of Special Complaint Procedure to Include Supervisors", Article Twenty-Four "Professional Conciliation", Article Twenty-Six "Progressive Redesign Opportunity Schools For Excellence (PROSE)", Article Twenty-Seven "Conformity to Law-Saving Clause", Article Twenty-Eight "No-Strike Pledge", Article Twenty-Nine "Definitions", Article Thirty "Notice-Legislative Action", Article Thirty-One "Copy of Agreement", Article Thirty-Two "Incorporation of Determination and Award", and Article Thirty-Three "Duration".

**ARTICLE FIFTEEN**
**RATES OF PAY AND WORKING CONDITIONS**
**OF PER SESSION TEACHERS**

**A.  Rates of Pay**

1.  Except as otherwise provided in 3 below, the hourly compensation of per session teachers shall be:

| Effective Date | Rate |
|---|---|
| May 19, 2008………………..…... | $41.98 |
| May 1, 2013………………………. | $42.40 |
| May 1, 2014………………………. | $42.82 |
| May 1, 2015………………………. | $44.11 |
| May 1, 2016………………………. | $45.65 |
| May 1, 2017………………………. | $47.73 |
| May 1, 2018………………………. | $48.67 |
| June 16, 2018………………………. | $50.13 |

2.   The same hourly compensation prescribed above shall be in effect for per session teachers who are on Youth Board payrolls and are employed in a Board of Education per session activity.

3.   Teachers employed in the New Suspension Program's summer school program ("the Suspension Program") will be paid at the rate of 1/1147 of their regular annual salary per hour.[5]

**B.  Extracurricular Activities**

   **1.  Athletic**

Interscholastic/Intramural sports in day academic and vocational high schools, junior high schools and special day schools, day treatment centers and institutional settings:

**Schedule of Maximum Number of Sessions (School Year)**
(A session is defined as two (2) clock hours beyond the school day.)

BASEBALL

| | | |
|---|---|---|
| | Boys Jr. Varsity | 36 |
| | Boys Varsity | 96 |

BASKETBALL

| | | |
|---|---|---|
| | Boys Alt HS | 72 |
| | Boys Jr. Varsity | 66 |
| | Boys Varsity | 108 |
| | Girls Alt HS | 72 |
| | Girls Jr. Varsity | 66 |
| | Girls Varsity | 108 |

BOWLING

| | | |
|---|---|---|
| | Boys Varsity | 48 |
| | Coed Alt HS | 36 |
| | Girls Varsity | 48 |

CREW

| | | |
|---|---|---|
| | Coed Varsity | 72 |
| | Assistant Coach | 36 |

CRICKET

| | | |
|---|---|---|
| | Coed Varsity | 48 |

CROSS COUNTRY

| | | |
|---|---|---|
| | Boys Varsity | 48 |
| | Girls Varsity | 48 |

---

[5] See paragraph 6 of Appendix I.

|  |  |  |
|---|---|---|
| | Assistant Coach | 27 |
| FENCING | | |
| | Coed Varsity | 48 |
| FOOTBALL | | |
| | Boys Jr. Varsity | 90 |
| | Boys Varsity | 132 |
| | Assistant Coach | 132 |
| GOLF | | |
| | Boys Varsity | 48 |
| | Girls Varsity | 48 |
| GYMNASTICS | | |
| | Boys Varsity | 84 |
| | Girls Varsity | 84 |
| HANDBALL | | |
| | Boys Varsity | 48 |
| | Girls Varsity | 48 |
| INDOOR TRACK | | |
| | Boys Varsity | 72 |
| | Girls Varsity | 72 |
| | Assistant Coach | 36 |
| LACROSSE | | |
| | Boys Jr. Varsity | 42 |
| | Boys Varsity | 72 |
| | Girls Varsity | 72 |
| OUTDOOR TRACK | | |
| | Boys Varsity | 66 |
| | Girls Varsity | 66 |
| | Assistant Coach | 36 |
| SOCCER | | |
| | Boys Varsity | 72 |
| | Girls Varsity | 72 |
| SOFTBALL | | |
| | Coed Alt HS | 51 |
| | Girls Jr. Varsity | 42 |
| | Girls Varsity | 96 |
| SWIMMING | | |
| | Boys Varsity | 72 |
| | Girls Varsity | 72 |
| TENNIS | | |
| | Boys Varsity | 48 |
| | Girls Varsity | 48 |
| VOLLEYBALL | | |
| | Boys Varsity | 60 |
| | Girls Jr. Varsity | 41 |
| | Girls Varsity | 60 |
| | Alt. Program | 42 |

WRESTLING
Boys Varsity                                                72

**Sessions** shall be computed as follows:
An afternoon of coaching football ................................. 2 sessions
An afternoon of coaching (exclusive of football) ........... 1 session
A regularly scheduled football game.............................. 3 sessions
A regularly scheduled game of basketball
or baseball; track, cross country, soccer,
swimming meet, handball, fencing,
bowling, tennis, golf, wrestling or other
regularly scheduled game for the activities
listed above……………….............................................. 2 sessions
(A session is defined as two (2) clock hours beyond the school day)

**2.  Non-Athletic**

a.  Major non-athletic extracurricular projects in day academic high schools, day vocational high schools, day junior high schools:

**Schedule of Maximum Number of Sessions (School Year)**

Teacher in charge of school magazine:  18 sessions per issue; maximum 72 sessions for four (4) or more issues.

Teacher in charge of school newspaper:  6 sessions per issue; maximum 72 sessions for 12 or more issues.

Teacher in charge of senior year book:  34 sessions.

Teacher in charge of major school play or operetta:  55 sessions.

Assistant(s) to teacher in charge of major school play or operetta:  32 sessions for one assistant; 52 sessions for two or more assistants. (See Footnote (3)).

Teacher in charge of other musical project:  34 sessions.

Assistant(s) to teacher in charge of other major musical project:  32 sessions for one assistant; maximum of 42 sessions for two or more assistants. (See Footnote (3)).

Teacher in charge of band, orchestra or chorus: two (2) sessions each performance. (See Footnote (2)).

**Sessions** shall be computed in accordance with the following regulations:  (See Footnote  (4)).
An afternoon of extra service .........................................1 session
An afternoon of full rehearsal ........................................2 sessions
An evening or non-school day rehearsal ........................ 3 sessions
An afternoon performance (play, operetta, etc.)
(See Footnote (1)) ........................................................... 2 sessions
An evening or non-school day performance (play,
operetta, etc.  Not applicable to teacher in charge
of band, orchestra or chorus) ......................................... 3 sessions

**Footnotes:** (1) The term "afternoon" shall include extra service either after or before the teacher's regular school day. In some schools this service may be rendered in the morning.

(2)  For purposes of compensating a teacher in charge of band, orchestra or chorus, performances shall be only those given evenings, Saturdays or holidays and shall not include performances at graduation, parents' meetings, etc.

(3)  Where two  or more assistants are required, the aggregate compensation paid to all assistants is limited to the maximum number of sessions provided.  Assignment of individual assistants to sessions within the maximum limitation shall be made by the school principal.

(4) A session is defined as two (2) clock hours beyond the school day.

**b.  All City High School Music Program**: Maximum Number of Teachers to be Assigned:

All City Orchestra.................................................................5
All City Band..……………………………………………5
All City Marching Band……………………………..………5
All City Jazz Ensemble……………………………..………5
Maximum Number of Sessions per
Teacher Assigned…………………………………...………42

**Sessions** shall be computed in accordance with the following regulations:
A morning of coaching or rehearsal on Saturday
or other non-school day (9:00 a.m. to 12:30 p.m.)………… 1 session
A dress rehearsal (only if conducted on a
non-school day, and limited to one  dress
rehearsal per school year) (9:00 a.m. to 3:00 p.m.)……….. 2 sessions[6]
An evening performance limited to one
performance per school year……………………………….. 1 session

## C.  Working Conditions

### 1.  Sick Leave

Teachers employed on a regular basis in per session activities will be granted sick leave with pay for absence from duty due to personal illness as follows:

a.  One session during each month of service, or two sessions during the month of August, will be granted to those employed in summer day high schools, summer evening high schools, summer junior high schools, summer special day schools, day treatment centers, and institutional settings; summer day elementary schools, summer evening elementary schools for adults, and vacation day camps.

b.  One session after each period of 20 sessions of service will be granted to those employed in evening high and trade schools, after school centers, evening community and youth and adult centers, adult education classes, and the special after school instructional help program.

c.  Applications for excuse with pay for absence due to personal illness must be accompanied by a certificate of a physician, except that teachers in summer activities shall be granted refunds for illness on application without a statement from a physician for no more than one session per summer.

---

[6] The parties disagree as to whether a dress rehearsal is one or two sessions.

d.   Such sick leave shall not be cumulative from one school year to another school year nor from one per session activity to another per session activity, but shall be transferred to the teacher's regular cumulative absence reserve.

**2.   Retention**

Prior service shall govern in the retention of per session teachers employed on a regular basis in per session activities as follows:

a.   Teachers with at least two years of continuous satisfactory service in a particular activity shall have priority for retention in the same activity for the following school year. Teachers with retention rights in an activity will not lose those rights if their service is interrupted for a period of not more than one year because of sick leave without pay or involuntary change of day school session, or sabbatical leave.  Such teachers must return to service in the same activity at the first reorganization of the activity following the interruption of their service for the reasons stated above.[7]

b.   Teachers who have been granted priority for retention in one per session activity shall not be granted such priority for any other per session activity.

c.   Teachers will be permitted to serve in more than one per session activity only if no other qualified applicants are available.  The Union shall be given a list of per session positions which are held by teachers who have no retention rights in those positions and who are serving in more than one per session activity.  Per session activities of 25 hours or less and certain other activities as mutually agreed between the Board and the Union are not counted when determining the number of per session activities served in.

d.   No teacher who had retention rights in a per session activity on September 1, 1969, shall be displaced by reason of the Chancellor's determining that thereafter the position need not be held by a teacher.  During the period he/she remains employed in that per session position, the incumbent having retention rights as of September 1, 1969, shall be paid at the teacher compensation rate prescribed in this Agreement.

e.   If a per session position occupied by a teacher is terminated and is subsequently restored within the period of six months, the restored position shall be offered to its last teacher incumbent before any other person is employed to fill it.

f.   A teacher with retention rights who is promoted to teacher in charge shall not lose his/her retention rights as a teacher in the activity in the event that he/she receives an unsatisfactory rating as teacher in charge.

g.   So long as they continue to exercise their retention rights, no per session teachers who had retention rights in an adult education activity on September 8, 1987 shall be displaced by reason of the provisions of Article Fourteen (Rates of Pay and Working Conditions of Adult Education Teachers) of this Agreement unless a layoff or reduction in hours of a primary adult education employee would result.  The rights of a per session teacher who acquires retention rights in an adult education activity after September 9, 1987 shall be subordinate to the rights of primary adult education teachers as set forth in Article Fourteen, A, E (Hours), F (Excessing) and G (Layoff and Recall).  In addition, the Board agrees to follow a policy of attrition with respect to those per session teachers who had retention rights in an adult education activity on September 8, 1978 so long as they continue to exercise their retention rights in the adult education activity.

---

[7] Certain former SOS employees have retention rights for work in the 2008 Suspension Summer Program in accordance with paragraph 7 of Appendix I.

### 3.  Appeals from Unsatisfactory Ratings

Per session teachers who receive unsatisfactory ratings shall be entitled to the review procedures before the Chancellor as prescribed in Section 5.3.4 of the by-laws of the Board of Education.

### 4.  Selection of New Per Session Teachers[8]

a.  Selections for evening high schools, summer day high schools, and summer evening high schools will be made centrally in order of seniority within the system from applicants in the following order of priority: regularly appointed teachers in license, regular substitute teachers in license, regularly appointed teachers out-of-license subject, and regular substitute teachers out-of-license with prior experience in the out-of-license subject.

b.  In summer junior high schools, priority will be given to applicants serving in Title I schools.  Selection will be made centrally in order of seniority within the system from applicants in the following order of priority: regularly appointed teachers in license, regular substitute teachers in license, regularly appointed teachers out-of-license with prior experience in the out-of-license subject and regular substitute teachers out-of-license with prior experience in the out-of-license subject.

c.  For junior high school after school study centers (tutorial), selection will be made by the same method except that it will not operate system-wide.

d.  For summer day elementary schools and elementary school study centers, selection will be made according to seniority with two exceptions: (i) priority will be given to qualified teachers in Title I schools; (ii) not more than 10 percent of the positions may be filled from applicants who, in the principal's judgment, possess special qualifications, except that this 10 percent limitation shall not apply to teachers who have retention rights in another per session position.

e.  For vacation day camps, selection will be made in the following order of priority: (i) classroom teachers with vacation day camp license who have served previously in vacation day camps; (ii) classroom teachers with vacation day camp license who have not served previously in vacation day camps.

f.  For high school after school study centers (tutorial) selection will be made by the same method as provided in 4-a above, except that it will not operate system-wide.

g.  For non-summer adult education activities selection will be made in the following order of priority: (i) Primary adult education employees assigned to thirty hours and fifty minutes per week, for up to six per session hours in any week, including any substitute service; (ii) day school teachers with appropriate adult education licenses who have served satisfactorily in adult education activities; (iii) day school teachers with appropriate adult education licenses who have not served previously in adult education activities.

Selection for summer adult education per session activities shall be in the following order of priority: (i) appointed adult education teachers, by license; (ii) primary adult education teachers by discipline; (iii) day school teachers with appropriate license; (iv) other qualified applicants.

h.  Applicants for per session employment who are not employed in the Board's regular day school program or adult education program shall be considered for selection only if no qualified day school teacher or adult education employee is available.

---

[8] Selection rights of teachers in the Suspension Summer Program are set forth in Appendix I, paragraph 6.

**5.  Evening High School Non-Teaching Assignments**

In evening high schools, assignments to positions for which there is a compensatory time allowance shall be made in accordance with the same procedures as are provided for such assignments in the day high schools in Article Seven of this Agreement.

**6.  Reduction in Per Session Positions**

If the number of per session positions in an activity is reduced, teachers will be released on the basis of least seniority in the activity.  If positions are subsequently restored within a year in the per session activity teachers shall be reemployed on the basis of seniority.

**7.  Teacher Files**

The procedures of Article Twenty-One A entitled "Teacher Files'' shall apply to teacher files maintained for their per session employment.

**8.  Sabbatical Leave**

Teachers whose sabbatical leave begins August 1 will complete the per session activity in which they are serving, but may not return to the activity until the summer following completion of the sabbatical.

**D.  Consultation**

The head of each per session activity, or his/her representative, and the Union committee for the activity shall meet once each term in non-working hours to consult on matters of policy involving the professional interests of the per session teachers and on questions relating to the implementation of this Agreement.

**E.  Definitions**

The following are per session activities within the meaning of this Article: vacation day camps; after school centers; evening community and youth and adult centers; evening elementary schools for adults; summer evening elementary schools for adults; fundamental adult education day classes; summer day high schools; summer evening high schools; summer junior high schools; summer special day schools; day treatment centers; institutional settings; summer day elementary schools; evening high and trade schools; the special after-school instructional help program; and extra-curricular athletic and non-athletic programs in day academic and vocational high schools, day junior high schools and special day schools, day treatment centers and institutional settings; and the suspension summer program.

**ARTICLE SIXTEEN**
**LEAVES**

**A.  Cumulative Absence Reserves and Sick Leave**

1.  Teachers on regular appointment reinstated after retirement will be credited with the cumulative reserves remaining to their credit upon retirement and such reserves as they accumulated as regular substitutes.

2.  Teachers on regular appointment who resign or retire will be credited upon resuming service as regular substitute teachers with 120/200 of the unused cumulative reserves remaining to their credit upon resignation or retirement.

3.  Teachers on regular appointment accepting regular substitute teaching positions in order to establish eligibility for other licenses will be credited with their cumulative reserves as regular teachers during their period of substitute service.

4.   Teachers on regular appointment called to military duty will be credited upon their return with the same sick leave allowance for the period of their military service as they would have been entitled to in school service.

5.   Teachers on regular appointment whose licenses are terminated will be credited with 120/200 of their unused cumulative reserves if they then serve as regular substitutes, or if appointed anew, with their unused cumulative reserves.

6.   Employees of the City University of New York who transfer as regularly appointed teachers to the Board shall have their cumulative reserves transferred and credited to them, but not in excess of the maximum number of days creditable in this system.

7.   Unused sick leave accumulated as a per diem substitute shall be transferable to the teacher's "bank" as a regular substitute or appointed teacher.

8.   Unused leave accumulated as a paraprofessional or substitute vocational assistant or teacher's assistant shall be transferable to the teacher's "bank" as a regular substitute or an appointed teacher.

9.   A teacher on regular appointment who has exhausted his/her cumulative sick leave may borrow up to 20 days of additional sick leave.  However, in order to assure that borrowed sick leave is repaid, the employee may be required to sign an appropriate document prepared by the Board acknowledging a legal obligation to repay upon the cessation of service.  For purposes of this provision "cessation of service" shall mean resignation, retirement, termination for cause or death.

10. Sick leave privileges shall extend to the taking of annual physical checkups or the taking of annual laboratory tests.  Such absences shall be limited to one day in each school year.

11. Teachers on regular appointment shall be granted absence refunds for illness on application, without a statement from a physician, for a total of no more than 10 days in any school year.  Teachers will be allowed to use three of such 10 days of sick leave for personal business provided that reasonable advance notice is given to the head of the school.  Teachers may use the days allowed for personal business for the care of ill family members.  For the purpose of this provision, family member shall be defined as: spouse; natural, foster or step parent; child; brother or sister; father-in-law; mother-in-law; any relative residing in the household; and domestic partner, provided such domestic partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 et seq.  Days off for personal business are intended to be used only for personal business which cannot be conducted on other than a school day and during other than school hours.

12. Regular substitute teachers shall be granted absence refunds for illness on application, without a statement from a physician, for no more than five days in one school term.  However, regular substitute teachers who serve two terms in one school year shall be granted a total of no more than 10 such absence refunds during the two terms, three of which may be used for personal business provided that reasonable advance notice is given to the head of the school.  Regular substitute teachers may use two of the three days allowed for personal business in any school year for the care of ill family members.  For the purpose of this provision, family member shall be defined as: spouse; natural, foster or step parent; child; brother or sister; father-in-law; mother-in-law; any relative residing in the household; and domestic partner, provided such domestic

partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 et seq. Days off for personal business are intended to be used only for personal business which cannot be conducted on other than a school day and during other than school hours.

13. Teachers covered by the Workers' Compensation Law may receive full pay for the first five days of absence resulting from injury which they claim is sustained in the course of their employment. Subject to the limitations of Workers' Compensation Law, such absence may be charged against sick leave reserve if the teacher submits a doctor's certificate as required under the by-laws of the Board.

14. Teachers serving in schools shall not suffer loss of sick bank days for absence due to illness from the following children's diseases: rubeola (measles), epidemic parotitis (mumps), and varicella (chicken pox). It is understood that this paragraph does not apply to rubella (German measles).

15. The Board will approve absences without loss of sick bank days for teachers who contract Hepatitis B as a result of working with children who have been evaluated as presenting a substantial risk of exhibiting acting out behavior.

16. Employees who are absent due to allergic or positive reaction from a skin test shall not suffer loss of sick bank days.

17. Teachers who resign or retire shall, upon application, receive termination pay on a basis of one half of up to 200 days of the unused sick leave accumulated as a regularly appointed or regular substitute teacher. If the resignation or retirement becomes effective at any time other than the end of a school year, sick leave for the period of service during that school year shall be paid at the rate of one day for each two full months of service. Effective upon ratification and adoption of this Agreement termination pay pursuant to this provision shall be paid in three equal cash installments payable two months, fourteen months and twenty six months following his/her termination date.

18. The estate of a teacher who dies during the term of this contract shall receive termination pay calculated on the same basis. This paragraph shall not apply to those teachers who are presumed to have retired on the day immediately preceding their death pursuant to Section 13-545 of the Administrative Code of the City of New York, as amended.

19. Absence for illness after September 1, 1967, will be charged on a day-for-day basis to any unused sick leave accumulated prior to September 1, 1967.

20. Absence immediately prior to resignation shall be paid on the same basis as termination pay.

21. Employees on sabbatical leaves of absence shall not accrue days in their cumulative absence reserves for the period of the sabbatical leave.

**B. Sabbatical Leaves**

1. Teachers on regular appointment will be eligible for a sabbatical leave for study or restoration to health after each 14 years of service. The first 14 years of service may include a maximum of three years of substitute service for which salary credit was granted. Courses for study sabbatical shall be job related in accordance with criteria established by the Chancellor.

2. Approval of the school medical director is required for all sabbaticals for restoration to health. Teachers on regular appointment who have less than 14 years of

service will be eligible for a "special sabbatical leave for restoration to health" after seven years of service on regular appointment.

A "special sabbatical leave for restoration of health" shall be for a period of six months, beginning on August 1 and ending on January 31 of the following year or beginning on February 1 and ending July 31 of the same year. However, a "special sabbatical leave for restoration of health" may be taken for a period of at least one month but less than six months under the following circumstances:

a. The teacher meets all the eligibility criteria for a six-month "special sabbatical leave for restoration of health."

b. The teacher has exhausted his/her cumulative absence reserve.

c. The school medical director will determine when the teacher is fit to return to duty. The superintendent will return the teacher to his/her assignment in the school as soon as possible, but in no event later than the beginning of the next marking period following the date of return determined by the school medical director, unless there is a valid educational reason for a different assignment in the school.

d. The teacher will be deemed to have exhausted years of service for sabbatical eligibility based upon the formula.

$$\frac{\text{Calendar Days of Leave} \times 7 \text{ years}}{180}$$

3. A sabbatical leave shall be for a period of one year, beginning on August 1 and ending on July 31 of the following year.

4. Teachers on regular appointment serving in high schools organized on a semi-annual basis or in junior high or intermediate schools will be eligible for sabbatical leaves for study beginning February 1 and ending July 31 of the same year, after each seven years of service on regular appointment.

5. A teacher on sabbatical leave of absence shall receive compensation at the rate of seventy (70) percent of the teacher's regular salary. The sabbatical leave pay of teachers who receive a bonus shall be based upon their annual salary and the amount of the annual bonus received. The sabbatical leave pay of teachers who receive a license salary differential shall be based upon their annual salary and the amount of the license differential.

6. Teachers on special sabbatical leave for restoration of health (as defined in paragraph 2 above) shall receive compensation at the rate of sixty (60) percent of their regular salary during such leave. The pay for the "special sabbatical leave for restoration of health" (as defined in paragraph 2 above) of teachers who receive a bonus shall be based upon their annual salary and the amount of the annual bonus received. The pay for the "special sabbatical leave for restoration of health" of teachers who receive a license salary differential shall be based upon their annual salary and the amount of the license differential.

7. Teachers serving a probationary period in a second license within the bargaining unit shall be permitted to take a sabbatical leave of absence or a "special sabbatical leave for restoration of health" (as defined in paragraph 2 above) during such period if they are otherwise eligible; however, there shall be no reduction, by reason of such leave, of the total probationary period which they are required to serve.

8. An application for a sabbatical leave of absence or for a "special sabbatical leave for restoration of health" (as defined in paragraph 2 above) will not be denied to an

eligible teacher unless the leave would be contrary to applicable regulations.  When the number of eligible applicants in any school or organizational unit exceeds the number of sabbatical leaves and "special sabbatical leaves for restoration of health" (as defined in paragraph 2 above) permissible under applicable regulations, applications shall be granted in the school or organizational unit in order of the Citywide seniority of the applicants.  For this purpose, in the case of applications for sabbatical leave, seniority shall be determined by the number of years of service usable for eligibility for sabbatical leave, minus the years required for each sabbatical leave or "special sabbatical leave for restoration of health" (as defined in paragraph 2 above) already taken.

9.  In accordance with the LOBA determination and award in Case No. IA-1-85, the sabbatical cap shall be 5%.  Notwithstanding the 5% sabbatical cap, the taking of a sabbatical shall not cause a hardship in any department or subject area.

10. In accordance with the LOBA determination and award in Case No. IA-1-85, sabbaticals shall be conditional upon the employee remaining in the New York City school system for two (2) years after the employee's return.  Sabbaticals of six months or less shall be conditional upon the employee remaining in the New York City school system for one (1) year after the employee's return.   Failure to comply with the applicable return provision shall make the employee liable to the New York City Board of Education for the salary that the employee received during the sabbatical period.  If upon return from sabbatical, the services of the employee are terminated during the applicable return period, the requirement for any refund shall be eliminated.  If an employee is unable to return from a sabbatical or is unable to complete the applicable service requirement upon return from a sabbatical due to a medical incapacity which has developed since the commencement of the sabbatical, such employee shall receive a hardship exception to this return provision.   Such hardships shall be reviewed and approved by the Board's Medical Bureau on a case-by-case basis.

## C.  Special Study Sabbaticals to Achieve Certification

1.   Teachers on regular appointment may apply for a special one year or six month sabbatical leave of absence for study to be granted for the following purposes:

a.   Study to meet certification requirements for a license designated by the Board of Education and the Union as a shortage area; and/or

b.   Study to become certified in the license appropriate to the teacher's current assignment.

The Board and the Union will meet annually to decide the number of these special sabbatical leaves of absence for study to be granted depending on the funds available for this purpose.

2.   These special sabbatical leaves of absence for study will be granted to the senior applicants with priority for those who need 16 credits or less to complete certification.

3.   This special sabbatical leave of absence for study may be for a period of one year or for a period of six months.  One year special sabbatical leaves of absence for study begin on August 1 and end on July 31 of the following year.  Six month special sabbatical leaves of absence for study begin on August 1 and end on January 31 of the following year or begin on February 1 and end on July 31 of the same year.

4.   A teacher on special sabbatical leave of absence for study shall receive compensation at the rate of seventy (70) percent of the teacher's regular salary.  The sabbatical leave pay of teachers who receive a bonus shall be based upon their annual

salary and the amount of the annual bonus received.  The sabbatical leave pay of teachers who receive a license salary differential shall be based upon their annual salary and the amount of the license differential.

5.  A teacher who receives this special sabbatical leave of absence for study will commit to completing certification and will accept assignment to teach in the license area for a minimum of two years.

6.  The Board and the Union will jointly seek funding to provide tuition reimbursement for teachers on these sabbaticals.

7.  These special sabbatical leaves of absence for study are not subject to the five percent cap, but shall count as used sabbaticals in determining eligibility for any future sabbatical.

8.  The substitute service creditable toward sabbatical leave eligibility pursuant to paragraph 1 of Section B above may be applied to a twelve month special sabbatical leave of absence for study.  Furthermore, such substitute service, if otherwise creditable toward sabbatical leave eligibility, shall not be lost or diminished as a result of taking a six-month special sabbatical leave of absence for study.

9.  Administrative procedures for the effectuation of these provisions are to be formulated by the Board in consultation with the Union.

**D.  TB Sabbaticals**

Teachers excused from service by the Board of Health of the City of New York because of tuberculosis may be granted up to five terms of sabbatical leave.  Approval of the School Medical Director is required.  Sabbaticals of this type are granted without reference to other regulations at the rate applicable to special sabbatical leaves for restoration of health.

**E.  Leaves of Absence Without Pay**

  **1.  Purposes for Which Granted**

Leaves of absence without pay shall be granted upon application to teachers on regular appointment for the following purposes:

  a.  Study related to the teacher's license field;

  b.  Study to meet eligibility requirements for a license other than that held by the teacher;

  c.  Acceptance of a teaching position in a foreign country for one year, with such leave renewable for an additional year.  Such teaching position shall be sponsored or approved by the government of the United States.

The Board will recommend to the Teachers' Retirement Board the granting of retirement credit for the duration of the aforesaid leaves.

Teachers may be granted a leave of absence without pay of up to two years to adjust personal affairs (such as the winding up of a family business on the death or incapacitation of the family member in charge) in accordance with existing rules and regulations.  The teacher may consult with the Union with respect to the matter. Teachers who are denied such a leave may refer the matter to the Chief Executive of the Division of Human Resources for review and final determination.

"Urgent needs" of the school to which the teacher is assigned may be asserted by the Board as justifying a temporary denial of any application for leave without pay.

Through at least July 31, 1995, the Board will implement a liberal policy concerning the granting of leaves of absence without pay to UFT bargaining unit members who meet

the stated criteria for such leaves. Bargaining unit members who are denied such a leave at the school or district level may appeal to the Chief Executive of the Division of Human Resources, for review and final determination.

### 2. Per Diem Service While on Leave

Teachers on maternity leave and teachers on leave of absence without pay for study and related professional experience shall be permitted to perform per diem teaching service.

## F. Military Service Pay

### 1. Excuse for Selective Service Examination

Teachers called for selective service physical examination shall be excused without loss of pay for such purpose.

### 2. Pay During Military Service

Teachers on regular appointment who enter the military service shall be on leave of absence with pay during the first 30 days of such service unless the Board is otherwise required to make payment of salary during such military service.

## G. Payment for Jury Duty

Teachers who are required to serve on jury duty will receive full salary during the period of such service, subject to their prompt remittance to the Board of an amount equal to the compensation paid to them for such jury duty.

## H. Vocational High School Externship Program

The Board and the Union agree that the following conditions apply to teachers who participate for up to one semester in the Vocational High School Teacher Externship Program ("Program") to upgrade their skills:

1. Participation in the Program shall be on a voluntary basis, by application following posting in the school of the qualifications required, identification of the sites where and the time schedule for the training. A copy of the Agreement will also be made available.

2. Priority for selection shall be to the teacher(s) in whose room(s) the equipment is being installed for which skills upgrading is being offered through the Program. Thereafter preference shall be to the qualified teacher with the highest seniority in the school who applies (or intends to apply) for the particular shop, if not inconsistent with the needs of the school.

3. During and after participation in the Program the teacher will continue in his/her position at the High School of Graphic Communication Arts, or other participating vocational high school, subject to the provisions of the Collective Bargaining Agreement.

4. While participating in the Program the teacher will be relieved of classroom and other school based professional responsibilities.

5. All compensation, seniority and benefits applicable to the teacher shall continue to accrue during the time he/she is participating in the Program.

6. Participation in the Program shall be within the work day set forth in Article 6A of the Agreement, Monday through Friday, and in accordance with the Board calendar with respect to holidays, recesses and vacations.

7. Teachers may continue to work in per session programs that do not interfere with their attendance in the Program. If a teacher is unable to continue the per session job due to conflict with the Program's schedule of hours, his/her retention rights in the per session job will be treated as though he/she were on sabbatical leave.

8.   Participation in the Program is conditioned upon the teacher remaining in the school system for at least two years after completion of the externship and accepting assignments in his/her school using the upgraded skills.   But this provision shall not entitle the Board to involuntarily transfer the teacher except as authorized under the Collective Bargaining Agreement.   Similarly, the teacher may not transfer out of the school during the two year period.   Failure to comply with this return requirement shall be treated in all respects as provided in Article 16 B10.

9.   The Board and the Union strongly recommend that the teacher's professional activity following participation in the Program consist of development of skills and/or materials reflective of the externship.

10. Teachers who wish to earn differential credit based on their participation in the Program shall develop and submit a work/study plan including a final project that reflects what was learned and is applicable to classroom instruction and practice.   Three "G" credits will be granted in accordance with Board policy upon successful completion of the work/study plan, including evaluation of the project and payment of a $100 registration fee.

## I.   Discipline for Authorized Absences

No employee shall be disciplined, adversely rated or have any derogatory material placed in his/her file for taking an approved sabbatical for restoration of health, approved unpaid leave for restoration of health or a central DOE approved paid leave. Discipline for time and attendance is not a reflection of the employee's performance while at work.

## J.   Return from Leave of Absence

(a) Commencing with the beginning of the 2014-15 school year, employees on leaves of absence, for one school year or semester, through the end of the school year, must notify the DOE's Chief Executive Officer of the Division of Human Resources or his/her designee in a manner prescribed by the DOE on or before May 15th of their intent to either return to service or apply to extend their leave of absence for the following school year. Failure to comply with this deadline shall be deemed as a voluntary resignation from the DOE, except in cases where it can be demonstrated that special circumstances prevented the employee from notifying the DOE.

(b) Notwithstanding this notification given to the Board (DOE), prior to the commencement of the school year an employee may return to service or apply to extend his/her leave if he/she can demonstrate relevant circumstances materially changed after May 15th provided that the employee acts expeditiously following the change in circumstances.  An application to extend a leave made under these circumstances shall be granted under the same circumstances as one made on or before May 15th.

(c) An employee on leave for a restoration of health shall be required to notify the DOE's Chief Executive Officer of the Division of Human Resources or his/her designee, in a manner prescribed by the DOE on or before May 15th, of his/her medical status and any plans, if known, as to whether he or she intends to return to work the following school year. Failure to notify the DOE in writing by May 15th shall be deemed as a voluntary resignation from the DOE, except in cases where it can be demonstrated that special circumstances prevented the employee from notifying the DOE.

(d) Whether special circumstances prevented an employee from notifying the DOE on or before May 15th, relevant circumstances materially changed after May 15th, or an

employee acted expeditiously shall be subject to the grievance procedure, including binding arbitration.

## ARTICLE SEVENTEEN
## RETENTION, EXCESSING AND LAYOFF

### A. Retention of Assignment--Regular Substitutes

1. A regular substitute who, upon completion of one year of service in a school, has been notified in writing by the principal that he/she will be reassigned in that school for the following school year shall be assigned for the following school year to a regular substitute opening in that school unless the opening has ceased to exist. In the event that the opening has ceased to exist, the substitute shall be given at least fourteen (14) days notice prior to the beginning of the following school year that the opening has ceased to exist and that he/she will not be reassigned to the school. If such notice is not given and the substitute has not been assigned to another school, the community or assistant superintendent in charge of the school will provide the substitute with the opportunity during the first twenty (20) days of the following school year to perform per diem service available in the district. The opportunity to perform such service will be provided for a number of days, not to exceed ten (10), equal to the difference between fourteen (14) days and the actual number of days notice given to the substitute prior to the beginning of the school year.

2. Regular substitute teachers with more than one year of continuous satisfactory service in a school shall have priority for retention in that school according to their length of service in the school. If it becomes necessary to terminate the services of a regular substitute with more than one year of continuous satisfactory service in a school by reason of appointment, or return from leave or other absence of a regular teacher, or by reason of contraction in the school organization, the regular substitute teacher with the least service in the school will be the first to be released.

3. Where a CPT has been released because the position in the school has ceased to exist, that CPT will have priority for assignment to an unencumbered vacancy in the district. If no such position exists in the district, the Board will place the CPT in a position within the district held by a PPT who has less than one year of continuous satisfactory service in any school within the district. If no PPT in the district has less than one year of such service, the CPT will be placed in an available position within the school system.

4. The seniority rules hereby established shall be applied on the basis of license held, except that elementary school teachers of common branches and early childhood will be grouped together and elementary school teachers of common branches (bilingual) and early childhood (bilingual) according to language will be grouped together for these purposes. Licensed teachers of CRMD, EH, HC and Special Education will be grouped together and licensed teachers of CRMD (bilingual), EH (bilingual) HC (bilingual) and Special Education (bilingual) according to language shall be grouped together for purposes of excessing.

5.   Regular substitutes teaching out-of-license shall be given preference, on the basis of seniority in the school, over outside applicants for any position in license which becomes available in the school at the beginning of the school year or the school term.

6.   A regular substitute whose services must be terminated at any time before the last two weeks of the term by reason of appointment, or return from leave or other absence of a regular teacher, or by reason of contraction in the school organization shall be given ten (10) school days notice of the termination and the reason therefor.  If such notice is not given, the community or assistant superintendent in charge of the school will provide the substitute with an opportunity to perform per diem service available in the district or in a high school for a number of days equal to the difference between ten (10) days and the actual number of days notice given.

7.   Regular substitute teachers who have completed one term or more of service in a school and who will not be rehired in that school for the following term shall be given five (5) days notice before the end of the term that they will not be rehired.

8.   Regular substitutes are to be given ten (10) school days notice of discharge, except in cases of emergency.

**B.  Excessing Rules--Appointed Teachers**

Before applying the Rules for involuntary excessing, the senior teacher within license (including those whose seniority is determined by Rule 3, 3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H or 3I) who volunteers will be excessed from the school to a vacancy within the same district or, in the case of high schools, within the jurisdiction of the responsible high school superintendent.  If no senior teacher volunteers, the following excessing rules shall be adhered to in all levels.

**Rule 1.**      Within the school, district or other organizational unit, the teacher with the least seniority within license will be the first to be excessed, and probationers will be excessed before those who have completed probation; except that elementary school teachers of common branches and early childhood will be grouped together and elementary school teachers of common branches (bilingual) and early childhood (bilingual) according to language will be grouped together for purposes of excessing. Licensed teachers of CRMD, EH, HC and Special Education will be grouped together, and licensed teachers of CRMD (bilingual), EH (bilingual), HC (bilingual) and Special Education (bilingual) according to language will be grouped together for purposes of excessing.

For purposes of excessing only: (i) Any one or more F-Status positions within a license that equals 1.0 FTE (i.e. positions equaling 5 days a week) will be considered a single position (if in one school) or a single position on split assignment (if in different schools within a district). (ii) Prior to an employee being excessed out of a district s/he will be offered the position described in the preceding sentence. (iii) Notwithstanding the restrictions in this paragraph, a school will be allowed to create or maintain the F-Status positions described in (i) in order to accommodate a hardship for a previously appointed pedagogue or because of the particular needs of the program.

**Rule 1-A.**  To minimize excessing in elementary schools, a junior teacher of common branches or early childhood who has a bilingual ancillary certificate may be retained in the school if no senior teacher of common branches or early childhood has the qualifications to teach a bona fide bilingual class.  For this purpose, a bilingual class is

one where the majority of students are classified as limited English proficient (LEP) in accordance with the Chancellor's regulations.

**Rule 1-B.** To minimize excessing, a junior teacher serving in a special education program under a non-special education license who has met the qualifications set forth in Chancellor's Regulation C-311 or C-312 may be retained in the school if no senior teacher in the same license who meets the qualifications set forth therein volunteers to serve in the special education program.

Rule 1-C. To minimize excessing, a junior teacher serving in a resource room or SETSS position may be retained in the school if no senior teacher in the same license who meets the Citywide qualifications volunteers to serve in the resource room or SETSS position.

**Rule 2.**    In determining the seniority of a teacher for purpose of excessing, layoff seniority shall apply.

**Rule 2-A.** A teacher whose seniority just prior to appointment was determined pursuant to Rule 3, 3A, 3B, 3C, 3F or 3G to be in the same license as present regular appointment shall be deemed to have completed probation in the license for purpose of these excessing rules only.

**Rule 3.**    Except as otherwise provided in Rule 3-G, where teachers of common branches are serving in the junior high schools and intermediate schools and have taught most of their time for three years in a subject area, they shall be considered for seniority purposes with licensed probationary teachers of the subject in which they have taught for the most recent three years.

**Rule 3-A.** Except as otherwise provided in Rule 3-G, where teachers have served under a high school license in the junior high schools and intermediate schools for three years they shall be considered for seniority purposes with licensed probationary junior high school teachers in the subject area of their license.

**Rule 3-B.** Except as otherwise provided in Rules 3-C and 3-G, where secondary teachers are serving in elementary schools and have served for three years in the school or for five years at the elementary level, they shall be considered for seniority purposes with licensed probationary teachers of common branches and early childhood.

**Rule 3-C.** Except as otherwise provided in Rule 3-G, where teachers have served for three years in the elementary schools under a secondary school license for which there is an elementary school license in the same subject area, they shall be considered for seniority purposes with licensed probationary elementary school teachers in the subject area of their license.

**Rule 3-D.** Teachers serving in Resource Rooms or SETSS positions in the school shall be grouped for seniority purposes and the Resource Room or SETSS teacher with the least seniority will be the first to be released from the Resource Room or SETSS in the school; except that Resource Room teachers and SETSS teachers who have served less than three years in Resource Rooms and SETSS will be released before those who have completed three years in Resource Rooms and SETSS.

**Rule 3-E.** Where teachers are serving in a Special Education program under a Special Education license which is inappropriate for the program, they shall be grouped regardless of program for purposes of excessing, and such out-of-license teachers shall be excessed in reverse seniority order before any appropriately licensed teacher is excessed.

Where teachers are serving in a Special Education program under a non-Special Education license and possess valid New York State certification in Special Education, they shall be grouped together regardless of program and excessed in reverse seniority order before any Special Education licensed teacher is excessed; and teachers serving under non-Special Education licenses, lacking valid New York State certification in Special Education, shall be grouped together regardless of program and excessed in reverse seniority order before any teacher who possesses a valid New York State certification in Special Education is excessed.

**Rule 3-F.**  These excessing rules will apply to the excessing of teachers from the non-public schools program, except that for purposes of excessing teachers from the corrective mathematics component common branches and junior high school mathematics licenses shall be grouped.

**Rule 3-G.** After October 1, 1987, teachers whose seniority on September 30, 1987 was determined pursuant to former Rule 5, 5A, 5B or 5C to be in a particular license shall be deemed to have completed probation in that particular license for purposes of excessing hereunder.

**Rule 3-H.** Teachers serving pursuant to an academic license where few opportunities exist for a full program in the license area will be considered for seniority purposes along with licensed teachers of the subject in which they have taught for the most recent three years.  A list of license areas subject to excessing under this Rule will be made jointly by the Board and the Union, who will review the listed licenses every two years.  Should the parties agree that opportunities for a full program in any listed license are sufficient, it will be removed from the list, and this excessing Rule will no longer apply to holders of the license.

**Rule 3-I.**   For purposes of excessing from a school or site, teachers serving under the Pre-K-12 arts licenses will be grouped with teachers serving under secondary licenses in the same specific arts areas, and the least senior teacher in the specific arts area will be excessed to a vacancy if one exists at the same level within the district/superintendency.  If there is no vacancy at the same level, the teacher will be offered the option to be excessed to a vacancy at a different level within the district/superintendency if one exists.

**Rule 4.**     Teachers in excess in a school unit or office under the jurisdiction of a community district must be placed in vacancies within the district to the fullest degree possible.  For school units, districts, or other organizational units under the jurisdiction of the central board, teachers in excess must be placed in appropriate vacancies within the district or central office.

**Rule 5.**     To minimize movement of personnel, excessed teachers shall be placed within the district/superintendency in appropriate openings or vacancies.

**Rule 6.**     The central board has the responsibility for placing teachers who are excessed from a school or office and cannot be accommodated by their own district/superintendency.  Where possible, the wishes of the teacher will be taken into account in his/her placement by the central board.  Should a Citywide excess condition, as defined in Section 2588(3)(a) of the Education Law, occur Section D of this Article shall apply.

**Rule 7.**     When a teaching position in central headquarters is abolished, the occupant of that position is excessed, and he/she shall be granted the same rights for placement as a teacher who is excessed from a community district.

**Rule 8.**   A teacher who has been excessed to another school may request an opportunity to return to the school from which he/she was excessed if within a year a vacancy should occur in that school.  Such a request will have priority over any other transfer or appointment to that vacancy, and it shall be effectuated at the next reorganization of the school to which the teacher is returning, except that should the vacancy occur within ten school days after the teacher is excessed, he/she shall be informed of the vacancy and he/she may return to the school immediately.   The opportunity to return of a teacher released or excessed from a Resource Room or SETSS position is to a Resource Room or SETSS vacancy in the school from which the teacher was released or excessed.[9]

**Rule 9.**   A teacher under the jurisdiction of the Special Education District Superintendent who is excessed from an elementary or junior high school shall be placed within license in a vacancy under the jurisdiction of the central board located within the community school district.  When possible the wishes of the teacher will be taken into account in his/her placement by the central board.  Should a Citywide excess condition, as defined in Section 2588(3)(a) of the Education Law, occur Section D of this Article shall apply.

**Rule 9-A.** If an excessing situation exists in the Resource Room or SETSS Program in a school or unit other than a high school, the Resource Room or SETSS teacher in the school or unit with the least seniority, determined pursuant to Rule 3-D will be the first to be excessed to a Resource Room or SETSS vacancy located within the boundaries of the community school district or at the option of the teacher to a position in license in the school in accordance with seniority.

If an excessing situation exists in the Resource Room or SETSS Program in a high school, the Resource Room or SETSS teacher in the high school with the least seniority, determined pursuant to Rule 3-D will be the first to be excessed from the high school to a High School Resource Room or SETSS vacancy within the superintendency or at the option of the teacher to a position in license in the school in accordance with seniority.

**Rule 9-B.** Notwithstanding any other Rule except Rule 10 governing excessing, teachers serving in special education programs may remain in a school, where they are subject to excessing provided they are senior (under the applicable Rule) to another teacher in the school.

**Rule 10.**   Teachers at all levels who have served 20 years or longer on regular appointment shall not be excessed except as follows and except for those in neighboring schools who are excessed to staff a newly organized school:

**Rule 10-A.**   Teachers with twenty (20) years or more of seniority who are covered by Rule 10 ("Rule 10 status") may be excessed consistent with all other applicable provisions of this Agreement, but they will be placed in the school from which they were excessed as an Excessed Employee/ATR and will not be rotated (as defined in Rule 11(B)(6)(a).  These individuals will have all the rights and privileges of other teachers on the school's table of organization except for program preference rights, and may be used for coverages or other teacher related duties.  However, teachers who have attained Rule 10 status and are in schools that are phasing out may only be excessed in the last year of the phase out and only if there is no program in their license area or they have not taught

---

[9] The right of return to a vacancy in New Programs of District 79 teachers excessed from Closing Programs is set forth in Appendix I, paragraph 10.

a program in a different license area with a program satisfactorily during the past two (2) years.  Rule 10 status cannot be attained while an individual is in excess.

**Rule 10-B**.  It is expressly understood that the obligation in Rule 11(II) to send Excessed Employees/ATRs for consideration for placement or to cover vacancies in their license area shall not apply to teachers with twenty (20) years or more of seniority who are excessed and become ATRs/Excessed Employees assigned to the schools from which they are excessed.

**Rule 11.**  Unless a principal denies the placement, an excessed teacher will be placed by the Board into a vacancy within his/her district/superintendency.  The Board will place the excessed teacher who is not so placed in an ATR position in the school from which he/she is excessed, or in another school in the same district or superintendency.[10]

### A. ATR Program

For purposes of this Rule 11(A), ATRs shall be defined as all UFT-represented school based titles in excess after the first day of school, except paraprofessionals and occupational and physical therapists.

### 1. Interviews

During the period September 15, 2014 through October 15, 2014 (and during the same period in each subsequent year to the extent this ATR Program is continued as set forth below), the Board ("DOE") will arrange, to the greatest extent reasonably possible, for interviews between ATRs and schools with applicable license-area vacancies within the district or borough to which the ATR is assigned.  After October 15th, ATRs may continue, at the DOE's discretion, to be sent to interviews within the district or borough for applicable license-area vacancies.  An ATR that declines or fails to report to an interview, upon written notice of it, two or more times without good cause shall be treated as having voluntarily resigned his/her employment.

When an ATR is selected by a principal for a permanent placement in either the district or borough, the ATR shall be assigned to fill the vacancy in his/her license area, be placed on the school's table of organization and take his/her rightful place in seniority order. Schools may continue to hire ATRs on a provisional basis consistent with existing agreements between the parties. An ATR that fails to accept and appear for an assignment within two (2) work days of receiving written notice of the assignment without good cause shall be treated as having voluntarily resigned his/her employment.

Any school that selects an ATR for a permanent placement will not have that ATR's salary included for the purpose of average teacher salary calculation.

ATRs in Districts 75 and 79 shall be sent for interviews only in the same borough, within their respective district, as the school to which they were previously assigned.

ATRs in BASIS shall be sent for interviews only in the same borough as the school to which they were previously assigned.

### 2. Assignments of ATRs

After October 15, 2014, ATRs, except those who have been penalized (as a result of a finding of guilt or by stipulation) in conjunction with §3020-a charges with a suspension of thirty (30) days or more or a fine of $2,000 or more, will be given a temporary provisional assignment to a school with a vacancy in their license area where available.

---

[10] Placement rights of teachers excessed from District 79 Closing Programs are set forth in Appendix I, paragraphs 3, 4 and 5.

The DOE, at its sole discretion, may choose to assign ATRs to a temporary provisional assignment who have been penalized (as a result of a finding of guilt or by stipulation) in conjunction with §3020-a charges with a suspension of thirty (30) days or more or a fine of $2,000 or more.

The DOE shall not be required to send more than one (1) ATR at a time to a school per vacancy for a temporary provisional assignment. These assignments will first be made within district and then within borough. For purposes of the ATR Program, ATRs shall also be given temporary provisional assignments to cover leaves and long term absences within their license area within district and then within borough. ATRs in Districts 75 and 79 shall be given temporary provisional assignments only in the same borough, within their respective district, as the school to which they were previously assigned.

All temporary provisional assignments for an ATR in BASIS will be within the same borough as the school to which they were previously assigned.

It is understood that at any time after a temporary provisional assignment is made, a principal can remove the ATR from this assignment and the ATR will be returned to the ATR pool and be subject to the terms and conditions of employment then applicable to ATRs pursuant to this Agreement.

If a principal removes an ATR from an assignment to a vacancy in his/her license area because of problematic behavior as described below and the ATR is provided with a signed writing by a supervisor describing the problematic behavior, this writing can be introduced at an expedited §3020-a hearing for ATRs who have completed their probationary periods, as set forth below.

If, within a school year or consecutively across school years, two (2) different principals remove an ATR who is on a temporary provisional assignment to a vacancy in his/her license area for problematic behavior and provide the ATR with a signed writing describing the problematic behavior, the ATR shall be subject to discipline up to and including discharge as provided below. The ATR will be returned to the ATR pool pending completion of the expedited ATR §3020-a procedure set forth below.

An ATR who has been placed back in the ATR pool will be in the rotation to schools (as defined in Rule 11(B)(6)(a)) unless he/she is again offered a temporary provisional assignment at another school. Rotational assignments or assignments to a school (as opposed to a vacancy in his/her license area) shall not form the basis of an incident of problematic behavior as described herein.

To the extent that the provisions of this Rule 11(A)(2) conflict with the provisions of Rule 11(B) the provisions of this Rule 11(A)(2)shall govern.

**3. ATR §3020-a Procedure**

If, within a school year or consecutively across school years, an ATR has been removed from a temporary provisional assignment to a vacancy in his/her license area by two (2) different principals because of asserted problematic behavior, a neutral arbitrator from a panel of arbitrators jointly selected for this purpose (the panel presently consisting of Martin F. Scheinman, Howard Edelman and Mark Grossman) shall convene a §3020-a hearing as soon as possible.

Based on the written documentation described above and such other documentary and/or witness evidence as the employer or the respondent may submit, the hearing officer shall determine whether the ATR has demonstrated a pattern of problematic

134

behavior. For purposes of this program, problematic behavior means behavior that is inconsistent with the expectations established for professionals working in schools and a pattern of problematic behavior means two (2) or more instances in a vacancy in the ATR's license area of problematic behavior within a school year or consecutively across school years.  Hearings under this provision shall not exceed one full day absent a showing of good cause and the hearing officer shall issue a written decision within fifteen (15) days of the hearing date.

The parties agree that in order to accomplish the purpose of establishing an expedited §3020-a process, the following shall serve as the exclusive process for §3020-a hearings for ATRs that have been charged based on a pattern of problematic behavior in accordance with this Agreement.

- The ATR shall have ten (10) school days to request a hearing upon receipt of the §3020-a charges;
- At the same time as the ATR is charged, the Board (DOE) will notify the UFT as to where the ATR is assigned at the time charges are served;
- The DOE shall provide the Respondent all evidence to be used in the hearing no more than five (5) school days after the DOE receives the Respondent's request for a hearing;
- Within five (5) school days of receipt of the DOE's evidence, the Respondent shall provide the DOE with any evidence the Respondent knows at that time will be used in the hearing;
- The hearing shall be scheduled within five to ten (5-10) school days after the exchange of evidence is complete;
- The hearing time shall be allocated evenly between the parties, with time used for opening statements, closing statements and cross-examination allocated to party doing the opening statement, closing statement or cross-examination and with time for breaks allocated to the party requesting the break;
- The hearing officer shall issue a decision within fifteen (15) days of the hearing date.

For the purposes of charges based upon a pattern of problematic behavior under this section only, if the DOE proves by a preponderance of the evidence that the ATR has demonstrated a pattern of problematic behavior the hearing officer shall impose a penalty under the just cause standard up to and including discharge.

All hearing officer fees in excess of the SED rate shall be shared equally by the parties.

It is understood that allegations of conduct which would fall within the definition of sexual misconduct or serious misconduct as defined in the applicable collective bargaining agreements shall be addressed through the existing process in Article 21G of this Agreement.

### 4. Term

This Rule 11(A) with respect to the absent teacher reserve (referred to above as the "ATR Program") shall run through the end of the 2015-16 school year.  At the end of that term, the parties must agree to extend the ATR Program and absent agreement, the parties shall return to the terms and conditions for ATR assignment as set forth in Rule 11(B).

The parties agree and understand that the due process protections provided in this provision shall modify the provisions of Education Law §3020-a and any other agreements between the parties.

**B. Excessed Employees/ATRs**

**1.  General Provisions**

a.  Except as expressly provided herein, this Rule 11(B) shall not in any way constitute a modification of, limitation on or a waiver of any other provision of this Agreement or past practice.

b.  For purposes of this Rule 11(B) the term "Excessed Employee" shall refer to all UFT-represented employees that have been excessed, including Excessed Employees that have been sent to a school to be considered for placement and not selected (an "ATR"). For employees that do not have licenses, the term "license" as used herein shall mean the appropriate title.

**2.  Consideration for Placement of Excessed Employees**

a.  An Excessed Employee/ATR, upon notification of being excessed, shall be required to register on the Open Market System for purposes of providing updated contact information.  Failure to so register shall eliminate the DOE's obligation as to that Excessed Employee/ATR under this Rule 11(B).

b.  Employees excessed after the execution of this Agreement shall be sent to schools for consideration for placement as follows:

(1) When one or more vacancies occur, the DOE shall send the most senior Excessed Employee in the district/superintendency with the appropriate license to the school(s) for consideration for placement, except that the DOE shall not be required to send Excessed Employees who have already been sent to a school for consideration for placement pursuant to this paragraph.

(2) An Excessed Employee sent to a school for consideration for placement shall meet with a Principal or Assistant Principal. For non-school based employees, the term "Principal or Assistant Principal" shall refer to the equivalent supervisory title.

(3) If the Principal denies the placement, and the vacancy remains, the DOE shall send a second Excessed Employee in the district/superintendency with the appropriate license to be considered for placement.  Such Excessed Employee shall be the most senior in the district/superintendency who has not previously been sent for consideration for placement.  No school shall be required to consider for placement more than two (2) excessed employees in a term.  For purposes of this Agreement, a "term" shall be from September to January 31 or February 1 through of the end of the school year.

(4) If the DOE notifies an Excessed Employee of the school he or she is being sent to for consideration for placement before the school year begins, he/she may choose to meet with the supervisor before the school year begins if a mutually agreeable time can be arranged.  The DOE shall inform Excessed Employees that are notified subsequent to the start of the school year as soon thereafter as reasonably possible of the school to which he/she is being sent for consideration for placement.

(5) Notwithstanding the above, an Excessed Employee who has not been sent for consideration for placement shall be sent for consideration for placement prior to an Excessed Employee with the same license who has been excessed in a subsequent term, even if the subsequently excessed employee has more seniority.

(6) No release by an Excessed Employee's current Principal/Supervisor shall be required if a Principal/Supervisor accepts the Excessed Employee for placement.

(7) The Principal or Assistant Principal shall meet with the Excessed Employee/ATR for consideration for placement during the regular work day.  No supervisor shall prevent the Excessed Employee/ATR from attending such meetings.   If Excessed Employees/ATRs fail to appear at a school for consideration for placement when properly notified, the DOE shall have fulfilled its obligation to the Excessed Employee/ATR under this section, except if the Excessed Employee/ATR has a reasonable excuse. If reasonably possible, the Excessed Employee/ATR shall notify the Principal of his/her inability to attend.

(c) All employees currently in excess status shall be sent, in seniority order, to schools in their district/superintendency for consideration for placement in vacancies in their license area prior to any employee excessed after the date of this Agreement. Employees who are sent to a school for consideration for placement pursuant to this Rule 11(B)(3) shall count for purposes of the provision in Rule 11(B)(2)(b)(3) limiting the number of Excessed Employees that a school must consider for placement to two (2) per term.

**3.   Leaves and Long Term Absences**

a.   The Principal shall select an appropriately licensed Excessed Employee/ATR in the district/superintendency, if any such employee exists, to fill all leaves and long-term absences.   The Principal retains the right to remove an Excessed Employee/ATR from the filling of such leaves or long-term absences at any time and replace him or her with another appropriately licensed Excessed Employee/ATR.  In the event that only one (1) Excessed Employee/ATR in a license area in a district/superintendency is available, the Joint Oversight Committee created in Rule 11(B)(7) shall address the issue.

b.   As used in this Rule 11(B)(3), the definition of "long term absences" shall be absences of longer than twenty-nine (29) work days.

**4.   Vacancies**

a.   After September 15th an appropriately licensed Excessed Employee/ATR in the district/superintendency shall be temporarily utilized in a vacancy until the Principal makes a final determination whether to keep the employee in the position.  An Excessed Employee/ATR that is filling a leave or long term absence may decline to be moved to or utilized in a vacancy.   If the school has not yet considered two Excessed Employees/ATRs pursuant to Rule 11(B)(2)(b)(3), it shall do so as soon as possible so long as the vacancy exists.

b.   If a Principal decides not to continue to utilize an Excessed Employee/ATR in the assignment, another Excessed Employee/ATR shall be utilized pursuant to the terms of this Section 4, if such an employee exists, beginning no later than the first work day of the following work week, except where three Excessed Employees/ATRs have been utilized or declined to be utilized in that vacancy. From the day the Principal decides not to continue to utilize a particular Excessed Employee/ATR until the first workday of the following week, the Principal may utilize a substitute.

c.   At the end of the school year in which the temporary utilization occurs, if both the Principal and the Excessed Employee/ATR agree in writing, the employee shall be appointed to fill the vacancy in the school and take his/her rightful place in seniority

order.  If the employee or Principal do not wish the assignment to continue, the employee shall remain an ATR in their district/superintendency in a different school.

d.  An employee that is temporarily utilized in a school shall maintain all of his/her contractual rights.

e.  The prohibition against moving an Excessed Employee/ATR during a week pursuant to Rule 11(B)(5)(b) below shall not apply to an Excessed Employee/ATR who agrees to be moved to a vacancy pursuant to this Rule 11(B)(4).

**5.  Assignment of Excessed Employees**

a.  To the maximum extent possible, as provided herein, an Excessed Employee/ATR shall be used to cover for a UFT-represented employee in his/her title who is absent, prior to the employment of a substitute or paying another employee in the school to cover a class or classes (or other appropriate assignments).   If the Principal determines for a legitimate educational reason that it is unacceptable to allow the excessed employee/ATR to continue to cover a particular position, the principal may employ a substitute for the remainder of the work week.  The Principal shall not be permitted to hire a substitute beginning with the first work day of the following work week for the same absence, unless no Excessed Employee/ATR is available.

b.  An Excessed Employee/ATR shall be assigned to a school within his/her district/superintendency for no less than a week, but may be assigned to a different school within his/her district/superintendency each week.  A "week" shall be Monday through Friday, or shorter if the work week is less than five (5) days.

c.  An Excessed Employee/ATR shall be notified no later than Friday (or the last work-day of the week) if he/she will be assigned to a different school the following week and, if so, to which school.  An ATR who has not been notified that he/she has been assigned to a different school by Friday shall report on Monday, or the first work day of the work week, and for the duration of that week, to the last school to which he/she was assigned.

**6.   Other Applicable Provisions**

a.  For purposes of this Rule 11(B), the terms "rotated" or "rotation" shall refer to the assignment of certain Excessed Employees/ATRs to a different school within his/her district/superintendency on a revolving basis.

b.  The parties agree that for purposes of Rule 11(B)(3), starting with the commencement of the rotation, the DOE will assign ATRs/Excessed Employees to schools on a temporary basis to fill positions caused by leaves or long term absences as defined above that are not covered internally by a school through contractually permissible methods and where a substitute teacher would otherwise be utilized to cover for the absence or leave.  The ATRs/Excessed Employees covering leaves and long term absences will not be rotated until the completion of the assignment unless the principal requests the removal of the ATR/Excessed Employee prior to its completion.

c.   The parties agree that for purposes of Rule 11(B)(4), the date the DOE shall begin temporarily utilizing appropriately licensed ATR/Excessed Employee will be the date of the start of the rotation of ATRs/Excessed Employees as determined by the DOE in a given school year.

d.  It is expressly understood that the obligation in this Rule 11(B) to send Excessed Employees/ATRs for consideration for placement or to cover vacancies, leaves or long term absences in their license area shall not apply to those Excessed Employees/ATRs

who are not in the weekly rotation (*e.g.,* those temporarily utilized to cover a vacancy, leave or long term absence/assignment) to cover other vacancies, leaves or long term absences/assignments.

e.  The parties agree that ATRs/Excessed Employees in the Brooklyn and Staten Island High School District (BASIS) who are rotated, shall be rotated within seniority district but not outside the borough in which the school they were originally excessed from is located.

It is expressly understood that the obligation in this Rule 11(B) to send Excessed Employees/ATRs for consideration for placement or to cover vacancies, leaves or long term absences in their license area shall only apply to BASIS ATRs within the borough in which the school they were originally excessed from is located.

### 7.  Joint Committee

There shall be a Joint Oversight Committee comprised in equal parts of representatives appointed by the President of the UFT and the Chancellor of the City School District, respectively. The Joint Oversight Committee shall meet regularly, but no less than twice each term, as defined herein. The Joint Oversight Committee shall monitor the implementation of this agreement to maximize cost savings and ensure proper implementation.  The DOE shall promptly provide the Joint Oversight Committee with all appropriate data and information, so long as it is requested in a reasonable amount of time.

The parties agree that starting in October of the school year, the Joint Oversight Committee (the "Oversight Committee") will meet monthly, and at each meeting the DOE will provide reports on the number of ATRs/Excessed Employees by license and district, the number of ATRs/Excessed Employees in long term assignments and the number of leaves commenced at the start of each month.  The parties also agree to discuss any and all particular issues concerning the implementation of this or  Rule 11(B) at these Oversight Committee meetings.

It is the intent of the parties to resolve issues relating to compliance with this agreement through the operation of the Oversight Committee.  The UFT agrees that issues will be raised at the Oversight Committee prior to the commencement of any union initiated grievance or arbitration.  The DOE agrees that should the committee agree about an issue of non compliance, the Division of Human Resources and Talent will reach out to DOE Staff and/or the school to ensure compliance.  If a particular issue at a particular school warrants further intervention, the Deputy Chancellor for the Division of Talent, Labor and Innovation will intervene with appropriate DOE staff to ensure compliance with this agreement.  At any time after an issue has been brought to the Oversight Committee, upon five (5) days written notice to the DOE, the UFT may proceed with a union initiated grievance.  The DOE will issue a memorandum to schools outlining all the changes above and share a draft of the memo with the UFT for consultation purposes before issuing.  This memo will be issued prior to the start of 2012-2013 school year.

### 8.  Provisional Agreement

a.  The parties agree that after the end of the open market hiring period, if both the school's principal and the Excessed Employee/ATR agree in writing, the Excessed Employee/ATR will be staffed to a school on a provisional basis for the school year or remainder of the school year.  An agreement to be staffed provisionally for either all or

the remainder of the school year shall be in writing and signed by both the schools' principal and the Excessed Employee/ATR.

b.   An Excessed Employee/ATR that has been provisionally staffed for the year or remainder of the year by a school shall be treated in all respects as an employee on the school's table of organization for that year or remainder of the school year.

c.   An employee that has been provisionally staffed by a school shall become an Excessed Employee/ATR again at the end of that school year unless both the employee and school principal agree in writing that he/she be hired and placed on the schools' table of organization in their rightful spot in seniority order.

d.   Nothing in this Agreement is intended to alter or change the right of a principal to temporarily utilize an Excessed Employee/ATR in a vacancy and, if both the Principal and the Excessed Employee/ATR agree in writing at the end of the school year, to staff the employee to fill the vacancy in the school pursuant to this Rule 11(B).

**C.   Resolved Grievances**

a.   The UFT shall withdraw the UI ATR Grievance (UFT Case#C16257, OLR #11-27224, AAA # 13 390 02 368 10)

b.   This agreement resolves the issues that formed the basis of the arbitration requests UFT Case #C18754, AAA Case No. 13 390 00878 12 (ATR June 27, 2011 MOA) and this grievance and subsequent request for arbitration are withdrawn with prejudice.

**Rule 12.**   Teachers identified as being at risk of being excessed at the commencement of the following school year will be informed of this no later than June 15, or as soon as is practicable if identified as being at risk of excess after June 15.   The deadlines for excessing teachers will continue to be governed by applicable law.

**C.   Appointment to New Program, License or Title**

Teachers who are displaced by the establishment of a new program, license or title shall be given an opportunity to present their qualifications and if found qualified shall be given preference for appointment to such new program, license or title.

**D.   Layoff**

1.   If a Citywide excess condition causes a layoff of staff in any licensed position, applicable provisions of law will be followed to determine the staff members to be laid off, without fault and delinquency with the understanding that said member of staff is to be placed on a preferred list for reinstatement to his/her former position.

2.   Employees on layoff who may be placed on a preferred list in another license other than the one in which they are laid off will be so placed.

**E.   Tipping**

Beginning the Spring term in 1992 education funds in the Mayor's Safe City/Safe Streets Program will be utilized to eliminate tipping by establishing a dispute resolution program staffed by teachers.

**F.   Voluntary Severance for Personnel Who Have Been Excessed**

1.   The Board ("DOE") may offer excessed personnel who have not secured a regular assignment after at least one year of being excessed, a voluntary severance program in an amount to be negotiated by the parties.   If the parties are unable to reach agreement on the amount of the severance payment, the dispute will be submitted to arbitration pursuant to the contractual grievance and arbitration procedure.   Such a severance program, if offered, will be offered to all personnel who have been in excess for more than one year.

In exchange for receipt of such severance, an excessed person shall submit an irrevocable resignation or notice of retirement.

2.   ATR Voluntary Severance Program

The DOE shall offer a voluntary severance benefit (the "Severance Program") to ATRs who volunteer to resign/retire and who execute an appropriate release in a form prescribed by the Board (DOE) and subject to legal requirements.

The period during which ATRs may volunteer to separate from the DOE in accordance with the terms of the Severance Program shall commence on the 30th day and shall terminate at 5:00 p.m. on the 60th day following the Union's ratification of this Agreement.

Other than employees who have agreed in writing to resign from the DOE, employees who are ATRs as of June 1, 2014 who volunteer for the Severance Program shall receive a severance payment according to the following schedule:

One (1) week of pay for ATRs with three (3) years of service or more, but less than four (4) years of service, as of the date of ratification of this Agreement.

Two (2) weeks of pay for ATRs with four (4) years of service or more, but less than six (6) years of service, as of the date of ratification of this Agreement.

Three (3) weeks of pay for ATRs with six (6) years of service or more, but less than eight (8) years of service, as of the date of ratification of this Agreement.

Four (4) weeks of pay for ATRs with eight (8) years of service or more, but less than ten (10) years of service, as of the date of ratification of this Agreement.

Five (5) weeks of pay for ATRs with ten (10) years of service or more, but less than twelve (12) years of service, as of the date of ratification of this Agreement.

Six (6) weeks of pay for ATRs with twelve (12) years of service or more, but less than fourteen (14) years of service, as of the date of ratification of this Agreement.

Seven (7) weeks of pay for ATRs with fourteen (14) years of service or more, but less than sixteen (16) years of service, as of the date of ratification of this Agreement.

Eight (8) weeks of pay for ATRs with sixteen (16) years of service or more, but less than eighteen (18) years of service, as of the date of ratification of this Agreement.

Nine (9) weeks of pay for ATRs with eighteen (18) years of service or more, but less than twenty (20) years of service, as of the date of ratification of this Agreement.

Ten (10) weeks of pay for ATRs with twenty (20) years of service or more, as of the date of ratification of this Agreement.

For purposes of this Severance Program, one (1) week of pay shall be defined as 1/52nd of an ATR's annual salary.

In the event that any ATR who volunteers to participate in the Severance Program returns to service with the DOE, the ATR shall repay the severance payment received pursuant to the above within six (6) months of the ATR's hiring to such position, through payroll deductions in equal amounts. This repayment provision shall not apply to ATRs who return to work as day-to-day substitute teachers.

## ARTICLE EIGHTEEN
## TRANSFERS AND STAFFING

The Board and the Union recognize the need to maintain both staff stability and an equitable balance of experienced and inexperienced teachers in the schools.  To meet this

need, and to provide opportunities within this framework for teachers to transfer from one school to another, the Board and the Union agree that transfers shall be based upon the following principles:

## A.  General Transfers

Principals will advertise all vacancies.  Interviews will be conducted by school-based human resources committees (made up of pedagogues and administration) with the final decision to be made by the principal.  Vacancies are defined as positions to which no teacher has been appointed, except where a non-appointed teacher is filling in for an appointed teacher on leave.  Vacancies will be posted as early as April 15 of each year and will continue being posted throughout the spring and summer.  Candidates (teachers wishing to transfer and excessed teachers) will apply to specifically posted vacancies and will be considered, for example, through job fairs and/or individual application to the school.  Candidates may also apply to schools that have not advertised vacancies in their license areas so that their applications are on file at the school should a vacancy arise.

Selections for candidates may be made at any time; however, transfers after August 7th require the release of the teacher's current principal.  Teachers who have repeatedly been unsuccessful in obtaining transfers or obtaining regular teaching positions after being excessed, will, upon request, receive individualized assistance from the Division of Human Resources and/or the Peer Intervention Program on how to maximize their chances of success in being selected for a transfer.

## B.  Hardship Transfers

In addition to the vacancies available for transfer pursuant to Section A of this Article, transfers on grounds of hardship shall be allowed in accordance with the following:

Transfers of teachers after three years of service on regular appointment may be made on grounds of hardship on the basis of the circumstances of each particular case, except that travel time by public transportation of more than one hour and thirty minutes each way between a teacher's home (or City line in the case of a teacher residing outside the City) and school shall be deemed to constitute a "hardship" entitling the applicant to a transfer to a school to be designated by the Division of Human Resources which shall be within one hour and thirty minutes travel time by public transportation from the teacher's home, or City line in the case of a teacher residing outside the City.

## C.  Voluntary Teacher Exchange

The Chancellor shall issue a memorandum promoting the exchange of new ideas and methodology and encouraging teachers to share their special skills with students and colleagues in other schools.  To facilitate achievement of this goal, the Board and the Union agree to allow teachers to exchange positions for a one year period provided that the principals of both schools agree to the exchange.  The exchange may be renewed for an additional one year period.  For all purposes other than payroll distribution, the teachers will remain on the organizations of their home schools.

## D.  Staffing New or Redesigned Schools[11]

The following applies to staffing of new or redesigned schools ("Schools")

1. A Personnel Committee shall be established, consisting of two Union representatives designated by the UFT President, two representatives designated by the community superintendent for community school district schools or by the Chancellor for

---

[11] The rights of teachers to staff the New Programs in District 79 are set forth in Appendix I, paragraph 2.

schools/programs under his/her jurisdiction, a Principal/or Project Director, and where appropriate a School Planning Committee Representative and a parent.

2.  For its first year of operation the School's staff shall be selected by the Personnel Committee which should, to the extent possible, make its decisions in a consensual manner.

In the first year of staffing a new school, the UFT Personnel Committee members shall be school-based staff designated from a school other than the impacted school or another school currently in the process of being phased out.  The Union will make its best effort to designate representatives from comparable schools who share the instructional vision and mission of the new school, and who will seek to ensure that first year hiring supports the vision and mission identified in the approved new school application.

In the second and subsequent years, the Union shall designate representatives from the new school to serve on its Personnel Committee.

3.  If another school(s) is impacted (i.e., closed or phased out), staff from the impacted school(s) will be guaranteed the right to apply and be considered for positions in the School.  If sufficient numbers of displaced staff apply, at least fifty percent of the School's pedagogical positions shall be selected from among the appropriately licensed most senior applicants from the impacted school(s), who meet the School's qualifications.  The Board will continue to hire pursuant to this provision of the Agreement until the impacted school is closed.

4.  Any remaining vacancies will be filled by the Personnel Committee from among transferees, excessees, and/or new hires.  In performing its responsibilities, the Personnel Committee shall adhere to all relevant legal and contractual requirements including the hiring of personnel holding the appropriate credentials.

5.  In the event the Union is unable to secure the participation of members on the Personnel Committee, the Union will consult with the Board to explore other alternatives. However the Union retains the sole right to designate the two UFT representatives on the Personnel Committee.

## ARTICLE NINETEEN
## UNION ACTIVITIES, PRIVILEGES
## AND RESPONSIBILITIES

**A.  Restriction on Union Activities**

No teacher shall engage in Union activities during the time he/she is assigned to teaching or other duties, except that members of the Union's negotiating committee and its special consultants shall, upon proper application, be excused without loss of pay for working time spent in negotiations with the Board or its representatives.

**B.  Time for Union Representatives**

1.  Chapter leaders shall be allowed time per week as follows for investigation of grievances and for other appropriate activities relating to the administration of the Agreement and to the duties of their office:

a.  In the elementary schools, four additional preparation periods.

b.  In the junior high schools, and in the high schools, relief from professional activity periods.  In the junior high schools, chapter leaders shall be assigned the same number of teaching periods as homeroom teachers.

c.   The Union shall inform the Board each school year of the UFT chapter leaders in large high schools who shall be relieved of one teaching period per day to perform the duties and responsibilities of their chapter leader positions.  The Union shall reimburse the Board for each such chapter leader who is so relieved at the rate of twenty percent of the total employer cost of an entry level teacher, as more fully set forth in a separate memorandum between the parties.

In addition to their other responsibilities, the duties and responsibilities referred to herein specifically include those associated with the implementation of contractual provisions and Board policy encouraging greater involvement of UFT-represented staff in various professional initiatives.  It is expected that UFT chapter leaders will play a vital role in implementing these initiatives.

d.   In those special education schools, buildings or sites formerly known as the special day schools, day treatment centers and institutional settings, two additional preparation periods.

e.   The Chapter Leader of the Teachers Assigned, Education Administrators and Education Analysts/Officers Chapter shall be allowed one-day per week for the investigation of grievances of employees covered by this Article, and for other appropriate activities relating to the administration of this Agreement and to the duties of his/her office.

2.   Consistent with the needs of the school program, the principal in consultation with the school's chapter leader will arrange to provide appropriate space and facilities (including but not limited to a desk, file and chairs) for the use of the school's chapter leader in carrying out the functions of the office.

3.   District representatives and Union officers who are assigned to schools shall teach one period per day and shall be excused after their teaching period.  They shall also be relieved of all homeroom and official classes.

The Union will reimburse the Board at the applicable coverage rate per period for the loss of three teaching periods each day for district representatives and Union officers.

## C.  Leaves of Absence for Union Officers

Employees who are officers of the Union or who are appointed to its staff shall, upon proper application, be given a leave of absence without pay for each school year during the term of this Agreement for the purpose of performing legitimate duties for the Union. Employees given leaves of absence without pay shall receive credit toward annual salary increments on the schedules appropriate to their rank.  The Board agrees to recommend to the Teachers' Retirement Board that the time spent on leave of absence pursuant to this section be granted as service credit for retirement purposes and that the employees receiving such leave of absence be permitted to pay regular monthly contributions based upon their earnable salaries as members of the teaching staff for the period of such leave.

No more than 32 leaves of absence without pay shall be granted for each school year.

Effective September 2, 2014, the number of leaves of absence without pay shall increase by eighteen (18).  The UFT agrees to pay the cost of the Board's pension contributions and FICA taxes for individuals on these eighteen (18) additional leaves. The UFT shall provide the Office of the Chief Executive Officer of the Division of Human Resources with the names of those individuals applying for leaves.

**D. Exclusive Check-Off**

The Board will honor, in accordance with their terms, only such written authorizations as are properly executed by employees in the unit covered by this Agreement for the deduction of their dues in behalf of the Union.

The Board will honor individual written authorizations for the deduction of Union dues in accordance with their terms, including authorizations stating that they are irrevocable until the following June 30 and automatically renewable for another year unless written notice is given to the Board between June 15 and June 30.

**E. Agency Fee Deduction**

The Board shall deduct from the wage or salary of employees in the bargaining unit who are not members of the UFT the amount equivalent to the dues levied by the UFT and shall transmit the sum so deducted to the UFT, in accordance with Section 208(3)(b) of Article 14 of CSL. The UFT affirms it has adopted such procedure for refund of agency shop deduction as required in Section 208(3)(b) of Article 14 of CSL. This provision for agency fee deduction shall continue in effect so long as the UFT establishes and maintains such procedure.

The Union shall refund to the employees any agency shop fees wrongfully deducted and transmitted to the Union.

The Union agrees to hold the Board harmless against claims arising out of the deduction and transmittal of agency shop fees where there is a final adjudication by a court or arbitrator or by PERB that said agency shop fees should not have been deducted and/or transmitted to the Union.

The agency shop fee deductions shall be made following the same procedures as applicable for dues check-off, except as otherwise mandated by law or this Article of the Agreement.

**F. Bulletin Boards**

1. At least one bulletin board shall be reserved at an accessible place in each school for the exclusive use of the Union for purposes of posting material dealing with proper and legitimate Union business.

2. A bulletin board shall be provided at an accessible place in the bureau office for the exclusive use of the homebound teachers chapter leader for purposes of posting material dealing with proper and legitimate Union business.

**G. Chapter Meetings**

Upon request to the head of the school, the school chapter shall be permitted to meet within the school under circumstances which will not interfere with the instructional program. Such meetings may be held only during the lunch period or before or after school hours, at a place to be assigned by the head of the school, where other teachers or children are not present. Union officials may attend such meetings.

**H. Consultation with the Union**

1. The Chancellor or his/her designated representative shall meet and consult once a month during the school year with representatives of the Union on matters of educational policy and development and on other matters of mutual concern.

2. The community or high school superintendent shall meet and consult once a month during the school year with representatives of the Union on matters of educational policy and development and on other matters of mutual concern.

3.   The head of the school and the school chapter committee shall meet once a month during the school year to consult on matters of school policy and on questions relating to the implementation of this Agreement.

4.   A Union designated committee of teachers of library will meet once a month during the school year after school hours with the head of the Office of Media and Telecommunications on matters of policy involving the professional interests of the teachers of library.

5.   A Union designated committee of special education teachers will meet with the assistant superintendent for Citywide programs or his or her designees, who may not be a teacher covered by this Agreement, once a month during the school year after school hours to consult on matters involving the professional interests of the teachers.  Meetings for teachers of the "400" schools will be with the person designated to supervise such schools.

6.   The Board and the Union will consult on the special needs of the multiple handicapped pupils in schools for the deaf.

7.   The Board and the Union shall establish a committee to review and consider issues raised by the Union relating to contracting-out of bargaining unit work.

8.   The parties shall establish a labor-management committee, to be known as the "Implementation Committee," that will meet periodically, and at the end of each school year, to review and discuss the efficacy and success of the Lead Teacher program including whether Lead Teachers are being utilized consistently with the goals of the Lead Teacher Program.

**I.   Information to the Union**

1.   Lists of vacancies and any lists which may be established by the community school district or by the central board showing seniority of the teachers for purposes of implementing provisions of this Agreement shall be made available to the Union.   In individual cases specific information as to seniority will be made available to the Union upon request.

2.   Copies of all official Board circulars and directives shall be sent to the Union.

3.   Available class statistics and other information necessary for implementation of the contract shall be furnished annually to the Union, and semiannually in the case of high schools organized on a semiannual basis.

**J.   Information at the School**

1.   All official circulars shall be posted on school bulletin boards for the inspection of teachers and shall be made available to teachers on request.

2.   Specific information as to the rotation of assignments, or as to seniority in the school will be made available by the principal upon the request of a teacher.

3.   A copy of current teaching and non-teaching assignments will be posted in each school and will also be given to the chapter leader.

4.   Copies of annual financial statements and audits of school monies shall be posted on school bulletin boards and made available to chapter leaders.

5.   The chapter leader shall have access to such school information as may be necessary to the performance of his/her duties, including teacher programs, room assignments, and allocation of non-teaching time.

6.   A copy of teacher assignments shall be given to the chapter leader of the homebound teachers chapter upon request.

**K.  Political Check-Off**

The Board will arrange for voluntary payroll deduction contributions for federal political contests in accordance with Title 2, Section 441b of the U.S. Code.

## ARTICLE TWENTY
## MATTERS NOT COVERED

With respect to matters not covered by this Agreement which are proper subjects for collective bargaining, the Board agrees that it will make no changes without appropriate prior consultation and negotiation with the Union.

The Board will continue its present policy with respect to sick leave, sabbatical leaves, vacations and holidays except insofar as change is commanded by law.

All existing determinations, authorizations, by-laws, regulations, rules, rulings, resolutions, certifications, orders, directives, and other actions, made, issued or entered into by the Board of Education governing or affecting salary and working conditions of the employees in the bargaining unit shall continue in force during the term of this Agreement, except insofar as change is commanded by law.

## ARTICLE TWENTY-ONE
## DUE PROCESS AND REVIEW PROCEDURES

**A.  Teacher Files**

Official teacher files in a school shall be maintained under the following circumstances:

1.  No material derogatory to a teacher's conduct, service, character or personality shall be placed in the files unless the teacher has had an opportunity to read the material. The teacher shall acknowledge that he/she has read such material by affixing his/her signature on the actual copy to be filed, with the understanding that such signature merely signifies that he/she has read the material to be filed and does not necessarily indicate agreement with its content.  However, an incident which has not been reduced to writing within three months of its occurrence, exclusive of the summer vacation period, may not later be added to the file.

2.  The teacher shall have the right to answer any material filed and his/her answer shall be attached to the file copy.

3.  Upon appropriate request by the teacher, he/she shall be permitted to examine his/her files.

4.  The teacher shall be permitted to reproduce any material in his/her file.

5.  Members may not grieve material in file, except that if accusations of corporal punishment or verbal abuse against a UFT-represented employee are found to be unsubstantiated, all references to the allegations will be removed from the employee's personnel file.

However, the teacher shall have the right to append a response to any letter.  If disciplinary charges do not follow, the letter and response shall be removed from the file three years from the date the original material is placed in the file.

6.  The following issues shall not be the basis for discipline of pedagogues: a) the format of bulletin boards; b) the arrangement of classroom furniture; and c) the exact duration of lesson units.

**B.  Counseling Memos**

Supervisors may issue counseling memos.  Counseling memos are not disciplinary. Counseling memos provide the opportunity for supervisors, in a non-disciplinary setting, to point out to employees areas of work that the supervisor believes need improvement. Counseling memos should include the supervisor's proposals for how such improvement may be achieved.  Any employee who receives a counseling memo may request from the supervisor either suggestions for how to improve or requests for the supervisor to model such improvement for the member.  Counseling memos are a vehicle for supportive improvement.

1.  A counseling memo may only be written to an employee to make him/her aware of a rule, regulation, policy, procedure, practice or expectation.  A counseling memo cannot include any disciplinary action or threat of disciplinary action.

a.  "Counseling Memo" must appear at the top of the memo in bold print and capital letters.  At the conclusion of the memo the following must appear in bold print:

"A counseling memo is not disciplinary in any manner and cannot be used in action against an employee except to prove notice if the employee denies notice."   If the language required in (a) is not included in the memo, it must be added.

b.  A counseling memo must be presented to an employee within one (1) month of the latest incident recounted in the memo.  The memo may only reference similar prior incidents that occurred no more than four (4) months from the date of the latest incident.

2.  Counseling memos may not be used in any action or evaluation involving an employee in the bargaining unit ("U" rating, per session job, etc.) except to establish that the employee who denies knowledge of a rule, regulation, policy, procedure, practice or expectation was given prior notice of it, or to impeach factual testimony.

a.  Counseling memos may not be used in the rating of an employee in the bargaining unit.

b.  Counseling memos may not be referred to in, or attached to, any other letter sent to an employee for their official school file.

3.  Counseling memos may not be grieved.

Any employee who receives a counseling memo shall have the right to answer within one (1) month of receipt of the counseling memo and the answer shall be attached to the file copy of the counseling memo.

4.  All counseling memos will be permanently removed from employee's official school files three (3) years after the latest incident referred to in the memo.

**C.  Summons**

1.  A teacher summoned by the principal to a conference which may lead to disciplinary action for reasons of misconduct may be accompanied, at his/her option, by the chapter leader or his/her designated alternate.

2.  Teachers summoned to the office of a community or high school superintendent or to the Division of Human Resources shall be given two days notice and a statement of the reason for the summons, except where an emergency is present or where considerations of confidentiality are involved.

Whenever an employee is summoned for an interview for the record which may lead to disciplinary action, he/she shall be entitled to be accompanied by a representative who is employed by the city school system, or by an employee of the Union who is not a lawyer, and he/she shall be informed of this right.  However, where the community or

high school superintendent or the Division of Human Resources permits an attorney who is not a member of the city school system to represent any participant in the interview, the employee shall be entitled to be represented by an attorney.  An interview which is not held in accordance with these conditions shall not be considered a part of the employee's personnel file or record and neither the fact of the interview nor any statements made at the interview may be used in any subsequent Board proceeding involving the employee.  It is understood that informal conferences, such as those between a community or assistant superintendent and a teacher, or the Division of Human Resources and a teacher, for professional improvement, may be conducted off the record and shall not be included in the employee's personnel file or record.

3.  Incidents investigated by the Chancellor or by a governmental investigatory agency must be reduced to writing by the appropriate supervisor within 6 months and 12 months respectively from the date the incident either occurred or should have been discovered by the appropriate school officials.  Employees must receive a complete copy of any such writing and an opportunity to answer in writing and to have such response attached.  The writing may not be incorporated into the employee's personnel file or record, unless this procedure is followed, and any such writing will be removed when an employee's claim that it is inaccurate or unfair is sustained.[12]

**D.  Discontinuance of Probationary Service and Appeals of Unsatisfactory Ratings**

1.  Regular substitutes and teachers on probation, except as provided in subparagraph 2 below, shall be entitled to the review procedures before the Chancellor as prescribed in Section 4.3.2 of the by-laws of the Board of Education.

By-law 4.3.2 procedures for the review of a recommendation by a superintendent for discontinuance of probationary service of a teacher shall be modified to provide for the following:

a.  The 4.3.2 committee shall be a tripartite committee of professional educators, one selected by the teacher, one by the Board and a third selected by the other two from a list agreed upon by the Board and the Union.

b.  The committee will make an advisory recommendation to the community school board or the Chancellor for central programs within 20 days after the hearing.

c.  The costs of the teacher's representative shall be paid by the teacher.  The costs of the Board's representative shall be paid by the Board.  The costs of the mutually selected member of the committee shall be shared by the Board and the teacher.

2.  Teachers on probation who have completed at least three years of service on regular appointment in the school shall be entitled, with respect to the discontinuance of their probationary service, to the same review procedures as are established for tenured teachers under Section 3020-a of the Education Law.

3.  Teachers who receive doubtful or unsatisfactory ratings may appeal under Section 4.3.1 of the by-laws of the Board of Education.

**E.  Suspension**

Any teacher who is suspended pending hearing and determination of charges shall receive full compensation pending such determination and imposition of any penalty except as set forth in Article 21G5 and 21G6.

---

[12] The parties disagree as to the applicability of Section 10 of the October 2005 MOA to this Article 21C3.

**F.  Rating "Not Applicable"**

A rating of "Not Applicable (NA)" is to be used only in situations where a pedagogical employee is reassigned out of his/her regular assignment for disciplinary reasons.  The "NA" rating will apply only for the period of reassignment, cannot be used in any proceeding as evidence of wrongdoing and will not otherwise affect any other rights afforded in the Agreement where ratings are an issue.

**G.  Education Law §3020-a Procedures**

Tenured teachers facing disciplinary charges filed, or in the case of Section 1 "Time and Attendance", discipline pursuant to that Section, will be subject to Section 3020-a of the Education Law as modified by paragraphs 1-16 below.

**1.  Time and Attendance**

If the Board seeks to discipline a tenured pedagogue regarding absences and/or lateness but seeks a penalty short of termination, the following expedited procedure will apply:

The Board will notify the employee that it intends to bring disciplinary action against the employee pursuant to this section.  The Board will include in this notice the employee's attendance record and any other documentation it intends to introduce at the hearing and a statement that pursuant to this section the arbitrator may award any penalty, or take other action, short of termination.

Within 15 calendar days following this notice, the employee must notify the Board in writing of the nature of his\her defense and submit any documentation s\he intends to submit into evidence as well as a medical release for any medical documents related to such defense.

If either party believes that it requires additional documents, it may request a telephonic conference with the arbitrator.

The expedited hearing will occur within one month of the Board's notification to the employee mentioned above.  The hearing will be informal and the normal rules of trial procedure and evidence shall not apply.  The arbitrator will issue an award and short decision within 15 calendar days of the hearing.  The arbitrator's award will be final and binding on all parties.  The award may be introduced in another Education Law §3020-a hearing and any findings shall be binding on the §3020-a arbitrator.

One arbitrator, agreed upon between the parties, will hear all absence and lateness cases hereunder.  The parties may expand the number of arbitrators if necessary.  The arbitrator will hear 4 cases per hearing date on a staggered schedule, but in no situation will one case take more than ½ a day.  The parties may expand the number of cases heard in a day if they deem it practical.

**2.  Rotational Panel**

As discussed and agreed upon, all parties would be served better by the implementation of a permanent arbitration panel (the "Panel").  The Panel members (referred to as hearing officers or arbitrators) must be agreeable to both sides, except as set forth herein.

**a.  Subpanels**

A sub-panel of arbitrators on the Panel will hear cases based predominantly on charges of incompetence (TPU cases) and a sub-panel of arbitrators on the Panel will hear cases based predominantly on charges of misconduct (ATU cases).  Expedited Cases shall be heard by a panel of hearing officers, the size of which will be set as described

below.   A labor-management committee composed, in equal parts, of UFT and DOE representatives shall meet as needed to discuss any issues regarding the §3020-a Panel or process.

**b.   Number of Hearing Officers**

(1) The parties agree to seat a minimum of twenty-five (25) hearing officers to hear all §3020-a cases. Should the parties fail to agree on the number of hearing officers by April 30th of preceding given school year and/or the Panel on which they will serve, either the Board ("DOE") or UFT shall submit the matter to the Fact-Finding Panel consisting of Martin F. Scheinman, Howard Edelman, and Mark Grossman for binding arbitration to determine the number of hearing officers and/or the sub-panel on which they will serve that will sit for §3020-a cases the following school year. For the 2014-15 school year the parties have agreed to seat twenty-five (25) hearing officers to hear §3020-a cases.

(2) To select hearing officers, the parties shall, each year, following April 30th, exchange in good faith lists of no fewer than ten (10) hearing officers for consideration every other week.  If the full Panel is not seated by October 15th of that school year, the DOE or UFT may request the Fact-Finding Panel consisting of Martin F. Scheinman, Howard Edelman, and Mark Grossman select the remaining hearing officers, subject to an individual hearing officer's agreement to serve, necessary to complete the Panel of §3020-a hearing officers.

(3) Representatives of the UFT and DOE shall meet at least twice a year to discuss the appropriateness of the number of hearing officers, including the possibility of agreeing to increase or decrease the number of hearing officers on either the incompetence or misconduct sub-panels on either a temporary or permanent basis.

**c.   Term of Panel Members' Service**

Panel members shall serve for a maximum of a one-year term.  At the expiration of such term, the parties must agree to have arbitrators continue to serve on the Panel, and if not, replacement members will be selected by the method outlined herein.  Removal prior to the end of the one-year term must be for good and sufficient cause upon mutual agreement of the parties.

**d.   Scheduling**

Any arbitrator who agrees to serve on the Panel must agree to the following terms:

(1) Each arbitrator selected to serve on Panel, including but not limited to those serving on the competence (TPU) sub-panel, must agree to provide five (5) consecutive hearing dates per month for the months of September through June and two (2) hearing dates for the months of July and August.  Consecutive days may be construed to mean five (5) dates within two (2) weeks unless otherwise agreed.

(2) Arbitrators must provide three (3) dates, within ten (10) to fifteen (15) calendar days from the date the case was assigned to him or her, for a pre-hearing conference. One of the dates shall be at 9:00 a.m.  Advocates must accept one (1) of the three (3) dates offered or it will be assumed that the date or dates offered at 9:00 a.m. is (or are) acceptable.  Said dates must be in compliance with Education Law §3020-a (within 10 to 15 days from the date selected to serve) and the timeframes in section 13 below.

(3) At the pre-hearing conference, arbitrators must provide and parties must accept five (5) consecutive hearing dates within the statutory timeframe as delineated in

Education Law §3020-a and the timeframes in section 13 below. Consecutive days may be construed to mean five (5) dates within two (2) weeks unless mutually agreed.

(4) The parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates. It should be noted that normally attorney or party scheduling conflicts are not extraordinary circumstances.

(5) In all cases, the final hearing shall be completed and a decision issued within timeframes set forth in Education Law § 3020-a and the timeframes in section 13 below.

(6) There is a presumption that charges against the same employee will be consolidated unless the arbitrator finds that to do so would deny a fair hearing. Additionally, in routine matters, any motions must be made and responded to orally. Thereafter, a decision shall be rendered on the issue the same date the motion was made. Should the arbitrator find that written motion practice is necessary, either party reserves the right to respond orally but in no case shall motion practice take place outside the scope of the timelines as outlined in Education Law §3020-a and the timeframes in section 13 below.

Failure to abide by these rules shall be "good and sufficient" grounds for removal of an arbitrator.

### 3. Expedited Hearings

Prior to the pre-hearing conference, the Board shall determine whether the nature of the case would permit offering Respondent expedited arbitration rather than regular arbitration of the case.

If the Respondent accepts the offer of expedited arbitration, the hearing shall proceed in accordance with the expedited procedure set forth below and the Board may not seek a penalty to exceed six (6) months suspension or the equivalent monetary penalty. Should the Respondent reject the offer of expedited arbitration, the case shall proceed in accordance with the regular arbitration proceeding and the Board may seek any penalty including termination.

Where the offer of expedited arbitration was rejected, the arbitrator (or the arbitration panel) shall not be informed of the offer of expedited arbitration nor that the offer was rejected.

Cases heard under the expedited arbitration procedure shall be completed in three (3) consecutive days. Each advocate shall be provided equal time to present his or her respective case. Cross-examination usually will not go beyond the scope or duration of the direct examination.

During the course of the hearings, should the evidence reveal more serious misconduct than originally charged, the arbitrator, upon his or her initiative, or upon the Board's motion, is empowered for good cause to end the expedited proceeding and order a new, regular arbitration proceeding before a different arbitrator. At the regular arbitration, the Board may seek any penalty including termination. Upon a showing of unavailability during the regular arbitration, the prior record of a completed witness who testified in the expedited arbitration shall be admissible.

Notwithstanding the above, if the Board ("DOE") decides not to seek a penalty of more than a suspension of four (4) weeks or an equivalent fine, the case shall be heard under the expedited procedures provided in this section 3, without the need for the Respondent to accept an offer of expedited arbitration.

A separate track of "non-termination" cases will be established with a separate panel of additional hearing officers that exclusively hears expedited cases.

The DOE will continue to submit cases through the expedited time and attendance procedures if the DOE deems the particular case appropriate for that procedure.

**4. Investigations and Reassignments**

Nothing in this section 4 shall be construed to convert non-mandatory subjects of bargaining into mandatory subjects of bargaining.

For purposes of this section 4, all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays.[13]

**a. Misconduct Cases (i.e., any case deemed by the DOE to deal exclusively or primarily with an employee's behavior, not his or her pedagogy)**

Pending investigation of possible misconduct and completion of the §3020-a hearing, the Board ("DOE") may reassign an employee only to (i) a DOE administrative office to do work consistent with law (an "Administrative Office Assignment") or (ii) an administrative assignment within his or her school with a program consisting of Professional or Administrative Activities (as listed in Articles 7(A)(6)(a), 7(B)(8)(a), 7(C)(4)(g)(1), or 7(K)(3)(d)) other than items #1 (small group instruction), #2 (one to one tutoring), #3 (advise student activities such as clubs, teams or publications) and #7 (conflict resolution for students), which shall be scheduled consistent with Article 7(B)(2)(c) regardless of the division in which the employee works ("Administrative School Assignment"). Where the Chancellor or his/her designee determines that it is in the best interests of the school system that an employee accused of sexual misconduct as defined in Article 21(G)(6) or serious financial misconduct involving more than $1,000 not be allowed to work in an Administrative Office Assignment or an Administrative School Assignment pending the outcome of the investigation, the DOE may suspend the employee with pay rather than reassign him/her. The determination of the Chancellor or his/her designee to suspend an employee with pay shall be in writing. Prior to a suspension from all duties with pay, the Chancellor or his/her designee shall consult with the UFT President or his/her designee.

The DOE shall prefer charges pursuant to Education Law §3020-a within sixty (60) days of an employee being reassigned or suspended, except in cases where the reassignment or suspension was caused by (i) an allegation of sexual misconduct as defined in section 6 below that is being investigated by the Special Commissioner of Investigation for the New York City School District ("SCI"); (ii) an allegation of serious financial misconduct involving more than $1,000 that is being investigated by SCI; (iii) criminal charges pending against the employee; (iv) an allegation of serious assault that is being investigated by SCI; (v) an allegation of tampering with a witness or evidence, where the allegation of tampering is being investigated by SCI. In cases where the sixty (60) day period does not apply, when SCI issues a report or, in the case of criminal charges, the employee notifies the DOE of the disposition of the criminal case pursuant to Chancellor's Regulation C-105, the DOE shall have fifteen (15) days to bring §3020-a charges against the employee or return the employee to his or her prior assignment.

---

[13] Probationary employees will be reassigned in the same manner as tenured employees under this section, *i.e.*, to an Administrative Office Assignment, Administrative School Assignment, or suspension with pay (if permitted by this section). This section shall not be construed to create tenure or Education Law § 3020-a rights for an employee.

Nothing herein shall waive any limitations period for the bringing of charges pursuant to Education Law §3020-a. The Chancellor or his/her designee and the President of the UFT or his designee shall meet monthly, or less frequently if the UFT and DOE agree, to review the status of these cases. If requested by the UFT, the DOE and the UFT will meet to review the issue of investigations and reassignments extending beyond sixty (60) days and, if there has been a significant increase in the number of such investigations and reassignments, to negotiate ways to address this issue.

Except in those cases where the DOE is not required to prefer charges within sixty (60) days, should the DOE not prefer §3020-a charges within sixty (60) days, the employee shall be returned to his/her prior assignment. If an employee is returned to his/her prior assignment, adverse action shall not be taken against the employee solely because of the reassignment. If §3020-a charges are preferred subsequent to the expiration of the sixty (60) day period, the employee may then again be reassigned to an Administrative Office Assignment or an Administrative School Assignment or, where the Chancellor or his/her designee determines that it is in the best interests of the school system that an employee accused of sexual misconduct as defined in Article 21(G)(6) or serious financial misconduct involving more than $1,000 not be allowed to work in an Administrative Office Assignment or an Administrative School Assignment pending the outcome of the investigation, suspend the employee with pay rather than reassign him/her pending determination of the §3020-a charges. The determination of the Chancellor or his/her designee to suspend an employee with pay shall be in writing. Prior to a suspension from all duties with pay, the Chancellor or his/her designee shall consult with the UFT President or his designee. An employee's assignment pending investigation and/or a hearing shall not be raised at the hearing or deemed relevant in any way to the determination of the charges, any penalty issued or the adjudication of any issue in the hearing.

**b.  Incompetence Cases (i.e., any case deemed by the DOE to deal exclusively or primarily with an employee's pedagogy)**

Pending the bringing of Education Law §3020-a charges for alleged incompetence and completion of the §3020-a hearing, the DOE may reassign an employee only to an (i) Administrative Office Assignment or (ii) an Administrative School Assignment. The DOE shall prefer charges pursuant to Education Law §3020-a within ten (10) days of an employee being reassigned. Should the DOE not prefer §3020-a charges within ten (10) days, the employee shall be returned to his/her prior assignment. If an employee is returned to his/her prior assignment, adverse action shall not be taken against the employee solely because of the reassignment. If §3020-a charges are preferred subsequent to the expiration of the ten (10) day period, the employee may then again be reassigned to an Administrative Office Assignment or an Administrative School Assignment pending determination of the §3020-a charges.

**c.  Tolling**

If the DOE gives a reassigned employee forty-eight (48) hours notice of an interview which may lead to disciplinary action and the reassigned employee either fails to appear on the scheduled day or fails to notify the DOE that s/he is invoking any right he/she may have to not answer questions, the DOE shall reschedule the interview within a reasonable period of time and the time between the originally scheduled interview and the rescheduled interview shall not count towards the applicable 60-day or 10-day limits on

the length of time an employee may be reassigned or suspended with pay. Where a principal schedules an interview which may lead to disciplinary action of an employee that has been given an Administrative School Assignment and forty-eight (48) hours notice is not required by this Agreement, Chancellor's regulations, or law, the following shall apply: If the reassigned employee either fails to appear on the scheduled day or fails to notify the principal that s/he is invoking any right he/she may have to not answer questions, the principal shall reschedule the interview within a reasonable period of time and the time between the first scheduled interview and the rescheduled interview shall not count towards the applicable 60-day or 10-day limits on the length of time an employee may be reassigned. Nothing herein shall constitute a waiver or alteration of any right the DOE may have to compel an employee to attend an interview which may lead to disciplinary action or any right an employee may have to not answer questions.

**d. Status of Investigations**

The DOE agrees to meet on a bimonthly basis with the UFT to assess the status of investigations extending beyond sixty (60) days where the employee has been suspended without pay.

**e. Notice of Grounds for Reassignment**

The letter the DOE provides to each UFT-represented employee ("Employee") to inform the Employee that he or she has be reassigned will indicate the general grounds for each reassignment (where an Employee is being investigated by the Office of the Special Commissioner of Investigation ("SCI"), just that information will be supplied). The DOE will provide all currently reassigned Employees who have not been arrested or charged under Education Law §3020-a with written confirmation of the general grounds for the reassignment.

**f. Reassignment Process**

(1) The DOE has identified a unit within the Division of Human Resources that will be responsible for managing and tracking all reassignment cases, ensuring that all reassignments are made consistent with applicable policy, and working with the other DOE offices involved to make sure that the process is accelerated based on, among others, the initiatives set forth in this Agreement. This unit will be making regular quarterly reports that will be shared with the UFT.

(2) Absent unusual circumstances, allegations being investigated by principals will not result in an Employee being removed from his or her school.

(3) Any reassignments that are not authorized by the Office of Personnel Investigation or OSI will be reviewed by central DOE. The DOE will provide the UFT with regular listings of reassigned pedagogues, no less frequently than on a weekly basis, and if the UFT disagrees with any reassignment decisions it can present its objections for consideration to the Office of Labor Relations. Should a principal reassign an Employee without proper approval pursuant to the central DOE process, the central DOE shall return the Employee to the school from which the Employee was reassigned and the principal's school-based budget shall be charged for the salary the Employee earned while reassigned (the agreement contained in this sentence shall not be a mandatory subject of bargaining).

(4) Wherever possible, Employees reassigned will be reassigned in the borough in which such Employee works. This paragraph shall not be construed as a modification to Chancellor's Regulation C-770.

(5) The DOE will review issues raised by the UFT with respect to the facilities and work space provided to reassigned Employees.  In order to help ensure a safe working environment, the UFT and DOE will work together to develop a facilities protocol for building concerns consistent with the Public Employee Safety and Health Act.

**5. Serious Misconduct**

The parties agree that certain types of alleged misconduct are so serious that the employee should be suspended without pay pending the outcome of the disciplinary process.  Serious misconduct shall be defined as actions that would constitute:

- the felony sale, possession, or use of marijuana, a controlled substance, or a precursor of a controlled substance or drug paraphernalia as defined in Article 220 or 221 of the Penal Law; or
- any crime involving physical abuse of a minor or student (crimes involving sexual abuse of a minor or student are addressed in paragraph 6 below); or
- any felony committed either on school property or while in the performance of teaching duties; or
- any felony involving firearms as defined in Article 265 of the Penal Law; or
- actions that would constitute a class A-I or A-II felony or any felony defined as a violent felony offense in NY Penal Law § 70.02.

If an employee is accused of committing serious misconduct, the employee shall be removed from payroll for a term not to exceed two (2) months after a finding by the "probable cause arbitrator" that there is probable cause to believe that the actions alleged were committed by the employee and that they constitute "serious misconduct" as defined above.  Probable cause exists when evidence or information which appears reliable discloses facts or circumstances making it likely that such conduct occurred and that such person committed the conduct.  To establish probable cause, the investigator assigned to the matter must be present and testify under oath before the arbitrator.  The Board may also be required to produce signed statements from the victim or witnesses, if any.  Thereafter, the Respondent shall have an opportunity to respond orally to the offer of proof.  The arbitrator may ask relevant questions or may make further inquiry at the request of Respondent.  The hearing shall not require testimony of witnesses nor shall cross-examination be permitted.  An indictment on a class A-I or A-II felony, an indictment on any felony defined as a violent felony offense in NY Penal Law § 70.02, or a felony indictment on any other conduct that constitutes serious misconduct pursuant to this section 5 shall create a rebuttable presumption of probable cause.

Said probable cause hearing usually shall not exceed one half of a hearing day.

One arbitrator, agreed to by both parties, shall be assigned to hear all probable cause matters for a period of one year.  If the parties cannot agree upon one arbitrator, each party shall select one arbitrator who together will select the probable cause arbitrator.

Should the Board meet its burden of establishing probable cause of serious misconduct, the employee shall remain suspended without pay during the pendency of the disciplinary action, but in no event shall such period exceed two months except as set forth herein.

The parties expect that these cases shall be completed within two (2) months.  However, where it is not possible to complete the hearing within the two (2) month period despite the best efforts of all parties, and where the arbitrator believes that the evidence already presented tends to support the charges of serious misconduct, the

arbitrator may extend the period of suspension without pay for up to thirty (30) days in order to complete the proceedings.

If the Respondent requests not to have the case proceed for a period of thirty (30) days or more and that request is granted, during the period of this adjournment, the Respondent shall remain in non-paid status. As noted above, however, the parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates.

While suspended without pay pending the arbitration hearing on serious misconduct charges, the Respondent may continue his or her existing health coverage, except that in no event shall the Respondent be entitled to continue his or her existing health coverage for more than six (6) months while on non-paid status except at the absolute discretion of the Chancellor. In the event that the Respondent is exonerated of all serious misconduct charges, the employee shall be restored to his or her position and be entitled to receive back pay and be made whole for the amount of time he or she remained off payroll. In the event that the arbitrator finds the employee guilty of the serious misconduct and imposes a penalty less than termination, the arbitrator shall decide whether and to what extent a reinstated employee shall be entitled to receive any back pay for the time the employee was suspended without pay.

If a finding of probable cause was based on an indictment pursuant to this section 5, the employee shall remain off payroll pending the disposition of the criminal case. The Board ("DOE") shall have fifteen (15) days after the employee notifies the DOE of the disposition of the criminal case pursuant to Chancellor's Regulation C-105 to bring Education Law §3020-a charges based on the same conduct as was at issue in the criminal case. If the DOE prefers §3020-a charges on the same conduct as was at issue in the criminal case within the fifteen (15) days, and the employee was convicted in the criminal case of any offense that constitutes serious misconduct, he/she shall remain off payroll until a decision in the §3020-a case and such §3020-a case shall be completed within the timeframes for hearings set forth in section 13 below. If the DOE prefers §3020-a charges on the same conduct as was at issue in the criminal case within the fifteen (15) days, and the employee was acquitted of all offenses that constitute serious misconduct, the DOE shall reassign the employee to an Administrative Office Assignment or an Administrative School Assignment, suspend the employee with pay (if permitted pursuant to section 13 below) or request a second probable cause hearing to continue the suspension without pay until the final outcome of the §3020-a hearing and such §3020-a case shall be completed within the timeframes for hearings set forth in section 13 below. If the DOE does not bring Education Law §3020-a charges within those fifteen (15) days, the employee shall be restored to the payroll effective as of the date the disposition of the criminal case and returned to his/her prior position. Nothing in this paragraph shall alter the provisions of this section with respect to entitlement to back pay. The DOE agrees to meet on a bimonthly basis with the UFT to assess the status of investigations extending beyond sixty (60) days where the employee has been suspended without pay. For purposes of this paragraph, all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays.

The parties agree that these types of cases shall receive the highest priority, and, upon the Board's request, hearings may be held on such matters during any days previously committed by the Panel to other employees, as set forth above. In other words, hearings

for serious misconduct take precedence over other disciplinary matters, and the Board may require adjourning other cases previously scheduled before the assigned arbitrator during that time frame in order for that arbitrator to hear serious misconduct cases within the two-month time frame.

**6. Sexual Offenses Involving Students or Minors**

A tenured pedagogue who has been charged under the criminal law or under §3020-a of the New York State Education Law with an act or acts constituting sexual misconduct (defined below) shall be suspended without pay upon a finding by a hearing officer of probable cause that sexual misconduct was committed.

A rebuttable presumption of probable cause shall exist where the Special Commissioner of Investigations ("SCI") substantiates allegations of sexual misconduct, or a tenured pedagogue has been charged with criminal conduct based on act(s) of sexual misconduct.

A report from the Chancellor's Office of Special Investigations ("OSI") substantiating allegations of sexual misconduct is relevant evidence of probable cause but does not create a rebuttable presumption of probable cause.

If a finding of probable cause was based on criminal charges pursuant to this section 6, the Board ("DOE") shall have fifteen (15) days after the employee notifies the DOE of the disposition of the criminal charge pursuant to Chancellor's Regulation C-105 to bring Education Law §3020-a charges based on the same conduct as was at issue in the criminal charge. If the DOE brings such a §3020-a charge, the employee shall remain off payroll until a decision in the §3020-a case and such §3020-a case shall be completed within the timeframes for hearings set forth in this Agreement. If the DOE does not bring §3020-a charges based on the same conduct as was at issue in the criminal charge within fifteen (15) days of the employee notifying the DOE of the disposition of the criminal charge pursuant to Chancellor's Regulation C-105, the employee shall be restored to the payroll effective as of the date the disposition of the criminal charge. Nothing in this paragraph shall alter the provisions of this section with respect to entitlement to back pay. The DOE agrees to meet on a bimonthly basis with the UFT to assess the status of investigations extending beyond sixty (60) days where the employee has been suspended without pay. For purposes of this paragraph, all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays.

In §3020-a proceedings, a mandatory penalty of discharge shall apply to any tenured pedagogue a) found by a hearing officer to have engaged in sexual misconduct, or b) who has pleaded guilty to or been found guilty of criminal charges for such conduct.

The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the proceeding. The suspension without pay shall also be extended until a criminal action is resolved and any §3020-a proceeding is also completed.

If the §3020-a hearing results in a dismissal of the charges or if the criminal proceeding ends in an acquittal or dismissal (and the Board has decided not to prefer charges), the pedagogue shall be entitled to back pay with interest for the entire period of the suspension without pay.

For purposes of this section, sexual misconduct shall be defined as follows:

For purposes of this definition, "student" shall mean a student or any minor. Sexual Misconduct, as used herein, shall not be construed to include nonsexual touching or other nonsexual conduct.

a. Sexual Misconduct is behavior that is intended to initiate, create, foster or advance a romantic or sexual relationship by an employee with a student, whether physical, verbal, in writing or by electronic means, regardless of location. It includes:

(1) Any sexual physical contact, or touching, without a legitimate purpose, including any act of sexual penetration with an object or body part;

(2) Exposing a student to drawings, photographs or other representations of a sexual nature, whether verbal, written, electronic or physical, without a legitimate purpose (this prohibition is not intended to preclude the use of depictions of nudity for legitimate purposes, for example, with reference to biology, health or art);

(3) Providing a gift to a student, making sexual or romantic comments or discussing sexual acts with a student, for the purpose of initiating, creating, fostering or advancing a romantic or sexual relationship.

b. Sexual Misconduct also includes:

i.   Publishing, recreating or reproducing images of a sexual act involving a student;

ii.   Any act of public lewdness, as defined in section 245.00 of the Penal Law, or exposure, as defined in section 245.01 of the Penal Law, directed at a student, that occurs on or off of school grounds;

iii.   Possession or use of child pornography as defined by the Penal Law, unless the respondent can demonstrate that such possession was inadvertent;

iv.   Serious or repeated verbal abuse, as defined in the Chancellor's regulations, of a sexual nature;

v.   Any action involving the use of an imaging device that would constitute criminal conduct as defined under sections 250.40, 250.45 or 250.50 of the Penal Law;

vi.   Inducing or attempting to induce incapacitation or impairment of a student for the purpose of having sexual intercourse, sexual contact or for the purpose of creating pornographic images or materials, regardless of whether sexual activity actually takes place; and

vii. Any action that would constitute criminal conduct under Article 130 of the Penal Law against a student.

A letter of agreement dated October 2, 2005 regarding sexual misconduct is attached as Appendix G.

## 7.   Other Felony Offenses

Tenured pedagogues who have been convicted of, or who have pled guilty to, any felony not addressed in paragraph 5, above shall be suspended without pay pending the final outcome of the Education Law §3020-a disciplinary proceeding. The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the case.

## 8.   Discovery Procedures and Testimony

In order to comply with timelines for hearings, the UFT and the Board ("DOE") agree that hearings must be held in as efficient a manner as possible. Disputes relating to document production, witness lists and other procedural issues often consume hearing

time and should be dealt with to the maximum extent possible in the pre-hearing conference.

### a. Discovery

Without waiver or limitation of any other materials and information that the respondent Employee ("Respondent") is entitled to under Education Law §3020-a and the relevant collective bargaining agreements ("Discovery"), or the timing for providing such other Discovery, at least one (1) week prior to the Pre-Hearing Conference, the DOE's attorney will supply the Respondent (or Respondent's attorney) with the following:

(1) Copies of all letters in the Respondent's personnel file(s) related to the Education Law §3020-a charges;

(2) Copies of the final report regarding the investigation conducted by either the Special Commissioner of Investigations ("SCI"), the Office of Special Investigations ("OSI") or by a principal; and

(3) Copies of all witness statements related to the charges in the DOE's possession at that time. (The DOE will diligently attempt to obtain all witness statements prior to providing copies to Respondent or Respondent's attorney pursuant to this provision "c" though failure to do so will not be grounds for exclusion of evidence from an Education Law §3020-a hearing.)

Without waiver or limitation of any other materials and information that the DOE may be entitled to from Respondent, or the timing for providing such other Discovery, at least one week prior to the Pre-Hearing Conference, the Respondent (or Respondent's attorney) will provide a witness list to the DOE's attorney if the Respondent (or Respondent's attorney) has possession of such. Otherwise, a witness list will be provided to the DOE's attorney by Respondent (or Respondent's attorney) whenever practicable one week prior to the presentation of Respondent's defense.

This Agreement shall not constitute a waiver of either the Respondent's or the DOE's right to object to the admissibility of documents obtained in the regular course of discovery pursuant to the Education Law and/or this Agreement.

In addition to any other obligations the DOE may have to preserve potential Discovery material, at the time the DOE prefers Education Law § 3020-a charges against an Employee, the Office of Legal Services will send a letter to the relevant principal or school leader requiring the principal or school leader to direct all DOE employees and agents under his/her supervision to preserve (i) any relevant records related to students who may be called to testify and (ii) all relevant class rosters.

At the Pre-Hearing Conference, the DOE's attorney and the Respondent (or Respondent's attorney), along with the Hearing Officer, will attempt to: (i) pre-mark exhibits; (ii) stipulate to any facts which are not in dispute; and (iii) stipulate to the admission of any documents to which there is not a dispute about admissibility.

Every effort should be made for a Respondent to attend the Pre-Hearing Conference as well as for the DOE to have a person available who has authority to approve a settlement of the case.

The DOE will provide the student records for testifying students to the Hearing Officer for in camera inspection by the Hearing Officer prior to the hearing date at which the student testifies. It will continue to be the Hearing Officer's decision, within the requirements of Education Law § 3020-a and the relevant collective bargaining agreements, as to whether, and when, these student records are provided to Respondent or

Respondent's attorney.   This provision remains subject to the Family Educational Rights and Privacy Act.

The UFT and the DOE shall jointly hold meetings with the Hearing Officers and instruct them with respect to the applicable time limitations in Education Law § 3020-a and the relevant collective bargaining agreements.

To effectuate the purpose of the statute, the parties agree that Education Law §3020-a authorizes the following in advance of the hearing, to the extent it is not required to be produced earlier as provided above:

Both sides will exchange witness lists, witness statements, and physical evidence (e.g., photographs) at least before the presentation of their direct case and earlier upon motion to the arbitrator.

The Respondent shall receive copies of investigatory statements, notes, other exculpatory evidence, and relevant student records after in camera review.

The Board shall receive evidence and documents from the Respondent upon a showing during the hearing that it is relevant.

Additionally, if the case has stemmed from an investigation conducted by the Special Commissioner of Investigation (SCI), the Board will provide the entire SCI file to Respondent, including exculpatory evidence, during the discovery phase of the §3020-a hearing unless such information is privileged.   Failure to do so shall form the basis of such evidence being precluded from introduction in the §3020-a proceedings.   This provision remains subject to the Family Educational Rights and Privacy Act.

**b.  Testimony**

The hearing process itself can be conducted in a more efficient manner that allows for issues to be fully and fairly litigated.  To accomplish this, the parties to the hearings shall adhere to the following guidelines:

(1) It is the intent of the UFT and DOE that, to the extent practicable, hearing days shall be fully utilized, that hearing days not end before 5:00 p.m. and the parties to the hearing have multiple witnesses ready to testify to avoid the loss of part of the day.

(2) Where a hearing day is not fully used, the unused time will be counted towards the time allocated to the party that caused the delay.

(3) Attorneys shall not meet with others between direct and cross examination for longer than twenty (20) minutes, except in unusual circumstances.

(4) Hearing Officers shall ensure that cross-examination is not used by either party as a dilatory tactic in order to reduce one of the parties' allotted time to present its case.

(5) Evidence shall be limited to relevant matters.

(6) Rebuttal shall be used only to deny some affirmative fact that the opposing party has tried to prove.   During rebuttal, a party to the hearing may not offer proof to corroborate evidence that has already been presented by that party or proof tending merely to support that party's case after the opposing party has rested.

If relevant and requested at the pre-hearing conference, either party may introduce (i) relevant background evidence about a witness by affidavit from the witness; (ii) an affidavit from a doctor's office attesting to an employee's visit or non-visit on a particular date; (iii) an affidavit attesting to the date of an employee's arrest, the charge (if any) against the arrested employee, and the disposition of that charge.  Such a witness may be cross-examined regarding any matter discussed in an affidavit.

If relevant, a (i) business record, (ii) attendance list from a faculty meeting, orientation and/or training session, or (iii) any human resource document submitted by a respondent (*e.g.,* absence or sick note) may be admitted with an affidavit from a custodian of the record, without the need for live testimony from a witness to authenticate the document.

Nothing in this section 8(b) shall be construed to convert non-mandatory subjects of bargaining into mandatory subjects of bargaining.

**9.  Incompetence Cases**

The parties agree that in the spirit of progressive discipline, rather than necessarily charge an employee with incompetence, an employee who receives an unsatisfactory rating for the first time may be offered the opportunity to enroll in the Peer Intervention Program ("PIP") for a term of one year.  Refusal to enter the PIP program is admissible in any future disciplinary proceedings.  The parties further agree that during the first school term of the intervention, no formal observations will be made.  During the second school term, although the employee will still be in the PIP, the administration is free to conduct observations and to rate the employee accordingly.  Since the end-of-year rating will be based on these observations, a minimum of two (2) observations shall be conducted during the second school term.  PIP may not be invoked by the employee once the disciplinary process has commenced.

Pursuant to, and as further described in section J "Peer Intervention Plus Program" below, during their participation in the Peer Intervention Plus Program ("PIP Plus"), participating teachers shall not be charged with incompetence pursuant to Education Law §3020-a.  The fact that an employee has declined to participate or that the BOE has denied a request to participate or has not offered the teacher an opportunity to participate in the programs will be admissible in §3020-a proceedings.  Observation reports of the consulting teachers will be admissible in §3020-a proceedings.

**10. Attorney Teams**

Each Board attorney will be paired with a Union attorney for four (4) consecutive cases.  Should one case settle, another case between the same attorneys shall be substituted for the case settled in an effort to utilize the dates set by the parties with the arbitrator.

**11. ATR §3020-a Procedure**

The terms of the ATR §3020-a Procedure are set forth in Rule 11(A)(3) of Article 17B.

**12. Service of Charges**

In order to make the process as efficient as possible, service of notice of the nature of the charges and the actual charges shall be consolidated and served together upon an employee along with specifications and, in incompetence cases, a bill of particulars. Nothing in this Agreement shall alter a Respondent's entitlement, if any, to a bill of particulars in misconduct cases.

**13. Timeframe for Hearings**

Within 10 - 15 days of the Board's receipt of the request for a hearing from an employee charged under Education Law § 3020-a, a pre-hearing conference shall be held. Both Education Law § 3020-a and this Agreement require hearings, including closing statements, to be completed within sixty (60) days of the pre-hearing conference and a decision to be rendered within thirty (30) days of the final hearing date. The UFT and the

Board ("DOE") agree this timeframe must be adhered to by all parties to the hearings and strictly enforced by hearing officers.  Hearing officers shall establish a trial schedule at the pre-hearing conference to ensure that hearings are completed within the required statutory and contractual timeframes and ensure an equitable distribution of days between the DOE and the charged employee.

Education Law § 3020-a permits "limited extensions" beyond the sixty (60) days where it is determined that "extraordinary circumstances" warrant.  "Extraordinary circumstances" shall be construed narrowly by hearing officers so that the granting of "limited extensions" allowing hearings to last beyond sixty (60) days is the exception and not the rule.  Pursuant to section 2, above, a hearing officer may be removed prior to the end of his or her one-year term only for good and sufficient cause, which may include failure to comply with this Agreement, upon mutual agreement of the UFT and DOE.

If the hearing officer determines that a necessary witness is a former student who is unavailable because he/she is residing outside of New York City or a current student who is unavailable because he/she has left New York City for an extended period of time, this shall constitute an "extraordinary circumstance."  In such a case, the hearing officer shall schedule the hearing to begin or continue as soon as possible given the availability of the witness as demonstrated to the hearing officer.

A party to the hearing or the hearing officer may request an unedited copy of the relevant transcript if a certified transcript is not available when needed.  The unavailability of a certified transcript shall not excuse adherence to the time limitations for completion of a hearing and issuance of a decision.  The UFT and DOE will jointly explore the feasibility of expediting the receipt of Education Law §3020-a hearing transcripts by the UFT and DOE jointly paying the court reporters' fees and then seeking reimbursement from the New York State Education Department.

For purposes of this section 13, all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays.

**14. Decisions**

Both Education Law §3020-a and this Agreement require decisions within thirty (30) days of the completion of the hearing.

**15. Meeting with the Panel of Hearing Officers**

The Chancellor and the President of the UFT will personally, jointly meet with the panel of hearing officers annually to impress upon the hearing officers that both parties to this Agreement are serious about meeting the timelines in the law, the collective bargaining agreements, and this Agreement.  The Chancellor and the President will urge the hearing officers to strictly control the hearings and require all parties to the hearing to conform to the timelines provided herein.  They will assure the hearing officers that no hearing officer will be removed by either party to this Agreement for enforcing these rules.

**16. Settlements**

The UFT and the Board ("DOE") are committed to exploring innovative settlement approaches that would permit the parties to Education Law §3020-a proceedings to reach settlement in a greater number of cases brought under Education Law §3020-a.

**H.  False Accusations**[14]

Knowingly false accusations of misconduct against employees will not be tolerated.

---

[14] See Appendix J

1.  If an accusation of sexual misconduct or physical abuse against an employee is found by the Board or Special Commissioner of Investigation to have been knowingly false when made, the Board will take the following actions to restore the falsely accused employee's reputation: removing all references to the charges from the employee's personnel file(s) and adding evidence of the unfounded nature of the charge to departmental files that may have to be maintained to satisfy other legal requirements, if any; and restoring any back pay owed with interest and, at the employee's request, confirming to any regulatory agency the finding that the employee was falsely accused. In addition, where the knowingly false accusation was made by a student of the employee, absent compelling and extraordinary circumstances the student will be permanently reassigned from the employee's class.

2.  The disciplinary process should never be used to retaliate against whistleblowers or for any other illegal reasons.  All employees who make a knowingly false allegation shall be subject to discipline, but decisions relating to the imposition of such discipline on non-UFT bargaining unit members shall not be subject to the grievance processes set forth in the relevant collective bargaining agreements.

**I.  Peer Intervention Program (PIP)**

The Board and the Union recognize that instructional services should be delivered by a highly qualified and motivated staff, accorded the respect and professional treatment to which they are entitled.  Towards that end the Board and the Union have agreed to provide resources and peer assistance on a voluntary confidential basis to staff who have completed probation and who believe that their teaching competence will benefit from that assistance in the manner provided below:

1.  The Peer Intervention Panel shall be composed of nine members, six of whom shall be selected by the Union and three of whom shall be administrators selected by the Board.

2.  This Panel will set qualifications and procedures for the selection of intervenors, an alternative careers liaison and a coordinator of the program.  The Panel shall advertise, as needed, the intervenor, coordinator and alternative careers liaison positions on a Citywide basis, posting the qualifications and procedures previously developed.  The program's professional staff shall be selected in accordance with the posted procedure.

3.  The Panel will also design and continually monitor a professional development program that enables the selected staff to meet the goals set forth above.

4.  The intervenors shall serve for four year renewable terms.

5.  Any teacher who has a reasonable basis for needing such assistance and/or receives a U-rating or formal warning may request assistance from the Peer Intervention Program, in writing on a form promulgated by the Panel.  The Panel will review requests and promptly notify the teacher of its determination as to whether assistance will be provided in that case. Such communications will be kept completely confidential.

6.  The intervenor will develop a plan to assist the participating teacher tailored to the specific needs of that teacher and will work with the teacher directly for not more than one year.

7.  For three months following the start of the intervention period, supervisors will not evaluate or observe the participating teacher.  However, supervisors will otherwise continue to exercise their responsibilities.

8.   The Board, the Union, and the participating teacher agree that for any disciplinary action other than an appeal of a previous U-rating, all time limitations within which to bring such actions will be tolled for the three month period in which the supervisor does not evaluate or observe the participating teacher.  For such U-rating appeals, the parties agree that the time limitations are tolled for the entire period of intervention.

9.   All communications between the intervenor and the participating teacher shall be completely confidential.  As a condition of involvement in the program, all participants in the program, including the intervenor and the participating teacher, must consent to the confidentiality provisions set forth in this paragraph.  The Board and Union agree that the intervenor, or any other person involved in the peer intervention program shall not be subpoenaed by the Board or the Union or called to testify, produce documents or participate in any other way concerning the intervention in any proceedings under §3020-a of the Education Law as modified by Article 21G above (hereinafter "§3020-a proceeding").  No arbitrator, in any proceeding under the parties' control, shall accept evidence regarding such communications.  If PIP is used as a remedy in a §3020-a proceeding or if the parties agree to use it as a settlement to such a proceeding, this paragraph continues to apply except that if the intervention was not successful a statement from the program saying "PIP was attempted and was not successful" may be submitted into evidence in any subsequent §3020-a proceeding with respect to charges concerning teaching competence.

10. Except as otherwise herein provided, the Union, the Board or any participating teacher may exercise any constitutional, statutory, regulatory or contractual right otherwise provided by law, regulation or contract.

11. The Board agrees to make available on a best efforts basis alternative career opportunities in the Board and/or the City for teachers who decide to leave the teaching profession in the course of or following intervention through access to other employment alternatives within the system and/or the City; and/or retraining/redeployment through the Board of Education or New York City.

12. Administrative procedures for effectuation of these provisions will be formulated by the Panel in consultation with the Board and the Union and thereafter distributed by the Panel.

13. These procedures relate solely to issues of competency and no other grounds of discipline.

14. The acts of the panel, intervenor, coordinator, Union and Board shall be final.

**J.  Peer Intervention Plus Program ("PIP Plus")**

1.   The existing Peer Intervention Program (PIP) will work with any teachers who would like assistance (as capacity permits) except those in danger of receiving charges pursuant to Education Law §3020-a for incompetence who have been recommended for the new program established below.

2.   A new program (PIP Plus) will be created for tenured teachers in danger of receiving charges pursuant to §3020-a for incompetence, which will be staffed by independent consulting teachers.  These consulting teachers will not be employed by the Board of Education and will not be active members of the UFT, and instead will be provided by an independent third party vendor, mutually agreed to by the parties, pursuant to a contract in a form developed by the Board and approved by the UFT.

3.  Consulting teachers in the PIP Plus will develop plans to assist the participating U-rated tenured teachers, tailored to the specific needs of the teachers.  During their participation in the PIP Plus, participating teachers will not be charged with incompetence pursuant to §3020-a.  Observation reports of the consulting teachers will be provided to the participating teachers, and will be admissible in §3020-a proceedings.  Participation in the program is voluntary.  A principal may recommend participation or a teacher may volunteer to participate.  The fact that an employee has declined to participate or that the Board has denied a request to participate or has not offered the teacher an opportunity to participate in the programs will be admissible in §3020-a proceedings.

4.  A labor/management committee will review the PIP Plus program annually and agree on necessary changes, if any.

5.  The existing Peer Intervention Program will not be decreased in size because of the establishment of this new PIP Plus program.

6.  The Board ("DOE") will evaluate cases of tenured Employees receiving unsatisfactory rating(s) for poor performance and, where it deems it appropriate, will refer the case to PIP Plus.

## K.  Medical Review Procedures

### 1.  Requests for Medical Examination of Teachers

The report of the immediate supervisor requesting examination of a teacher pursuant to Education Law §2568 shall be made in duplicate.  A copy of the report shall be forwarded to the teacher.

### 2.  Skin Test

The Board and the Union shall seek legislation to permit employees a choice of skin test or X-Ray.  Until such legislation is enacted teachers in this system will be given a skin test.  The skin test will be administered by the Department of Health.  Where a skin test result proves to be positive, the Board may require an X-Ray test.  An enabling resolution to this effect was adopted by the Department of Health on May 6, 1962.

### 3.  Injury In the Line of Duty

In order to provide for an expeditious handling of injury in the line of duty claims, the following is provided:

a.  Within five school days of a claim of injury in the line of duty requiring an employee to be absent, the superintendent shall make a determination as to whether the accident occurred in the line of duty.

b.  Where the employee is in a non-pay status pending a determination by the Medical Bureau of the duration of absence attributable to injury in the line of duty, the Medical Bureau will make its determination within ten days of the employee's submitting himself or herself for the required physical examination.

### 4.  Medical Report and Review

a.  The report of the Medical Bureau on a teacher who was called for medical evaluation shall, upon written request of the teacher, be sent to the teacher's physician within 25 days after the evaluation.

b.  Upon the teacher's request to the Medical Bureau, his/her physician shall have the right to examine his/her medical file.

c.  A regular teacher shall have the right to an independent evaluation by a medical arbitrator selected from rotating panels of doctors to be selected by mutual agreement of

the Board and the Union if the finding of the Medical Bureau to the Chancellor has resulted in:

(1) Placement of the teacher on a leave of absence without pay for more than one month; or

(2) Termination of the teacher's services; or

(3) A recommendation for disability retirement; or

(4) A denial of a leave with or without pay for more than one month.

A request for an independent evaluation of the finding of the Medical Bureau shall be submitted in writing by the teacher to the Division of Human Resources within 10 school days of receipt of notice from the Division of Human Resources that he/she has been placed on leave of absence without pay for more than one month, or that his/her services have been terminated, or that he/she has been recommended for disability retirement, or that he/she has been denied a leave with or without pay for more than one month.  The Board and the Union may agree on a case by case basis to permit, in special circumstances, an independent medical evaluation to teachers who do not otherwise qualify for one under this Agreement.

The medical arbitrator shall examine the teacher and consult with the teacher's physician and the Board's physician.  The arbitrator's authority shall be limited to determining the medical aspects of the teacher's claim.  The arbitrator's decision shall be rendered within 10 days after he/she has completed the evaluation of the teacher, and if made within his/her authority under this Agreement shall be accepted as final and binding by the Board and the teacher.

The fee of the medical arbitrator shall be shared equally by the Board and the teacher.

## ARTICLE TWENTY-TWO
## GRIEVANCE PROCEDURE

It is the declared objective of the parties to encourage the prompt and informal resolution of employee complaints as they arise and to provide recourse to orderly procedures for the satisfactory adjustment of complaints.  A resolution should occur at the earliest possible step in every case that can reasonably be resolved.

In order to accomplish its stated purpose, a grievance conference must be attended by those individuals who may be able to promote resolution or, if resolution is not possible in a particular case, to provide the necessary information for a fair determination of the grievance.  At the Chancellor's level, principals will be expected to attend or to have a suitable representative present at the conference.  Failure to attend may result in sustaining the grievance on procedural grounds.

### A.  Definition

A "grievance" shall mean a complaint by an employee in the bargaining unit (1) that there has been as to him/her a violation, misinterpretation or inequitable application of any of the provisions of this Agreement or (2) that he/she has been treated unfairly or inequitably by reason of any act or condition which is contrary to established policy or practice governing or affecting employees, except that the term "grievance" shall not apply to any matter as to which (1) a method of review is prescribed by law, or by any rule or regulation of the State Commissioner of Education having the force and effect of law, or by any bylaw of the Board of Education or (2) the Board of Education is without authority to act.

In the case of per session employees, a "grievance" shall mean a complaint by a per session employee that there has been as to him/her a violation, misinterpretation or inequitable application of any of the provisions of this Agreement covering his/her particular per session employment.

In the case of teachers assigned, education administrators, education officers, education analysts, adult education teachers covered by this Agreement, lead teachers, math and literacy coaches, mentors, substitute vocational assistants, and teacher's assistants, a "grievance" shall mean a complaint by such an employee that there has been as to him/her a violation, misinterpretation or inequitable application of any of the provisions of this Agreement covering his/her employment as a teacher assigned, an education administrator, an education officer, an education analyst, a WNYE teacher, an adult education teacher covered by this Agreement, a lead teacher, a math and literacy coach, a mentor, a substitute vocational assistant or a teacher's assistant.

As used in this article, the term "employee" shall mean also a group of employees having the same grievance.

**B. Adjustment of Grievances**

Grievances of employees within the bargaining unit shall be presented and adjusted in the following manner:

    **1. General Procedures**

    **a. School Level (Step 1)**

Any employee within the bargaining unit may, either orally or in writing, present a grievance to the head of the school within thirty school days after the employee has knowledge of the act or condition which is the basis of the complaint. A grievance which is presented in writing shall set forth specifically the act or condition and the grounds on which the grievance is based, the contractual provision which is alleged to have been violated and the remedy sought. A Step 1 Grievance Form such as the one set forth in Appendix C shall be used, but failure to use the form will not result in forfeiture of the grievance. A grievance which is technically flawed at Step 1 may be promptly amended or refiled without regard to the stated time limitations.

The employee and the head of the school shall confer on the grievance with a view to arriving at a mutually satisfactory resolution of the complaint. At the conference, the employee may appear personally or he/she may be represented by a Union representative or by any teacher of his/her choice in the school; but where the employee is represented he/she must be present. The Union representative shall be the chapter leader or his/her alternate in the school or, where there is no Union member in the school, any other designated Union representative.

Whenever a grievance presented to the head of the school by the employee personally or through a personal representative would involve the application or interpretation of the terms of this Agreement, or would affect the working conditions or welfare of the employees in the bargaining unit, he/she shall give the chapter leader or his/her alternate in the school the opportunity to be present and state the views of the Union, except that, where there is no Union member in the school, the Union may be represented by any other designated Union representative.

The head of the school shall communicate his/her decision to the aggrieved employee and to his/her representative and to any Union representative who participated in this step within five school days after receiving the complaint. Where the grievance has been

presented in writing, the decision shall be in writing and the decision shall include supporting reasons in response to the information supplied by the grievant on the Step 1 Grievance Form or its equivalent.

**b.  Chancellor (Step 2)**

If the grievance is not resolved at Step 1 the Union may appeal from the decision at Step 1 to the Chancellor addressed to the attention of the Deputy Executive Director, Office of Labor Relations and Collective Bargaining within 15 school days after the Step 1 decision was given to the employee.  The appeal shall be in writing, shall set forth specifically the reasons for the appeal, and shall be accompanied by a copy of the decision at Step 1.  It shall also state the name of the employee's Union representative.

The Chancellor or his/her designated representative shall meet and confer with the Union representative and the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint.  The Union representative and the aggrieved employee shall be given at least two school days notice of the conference and an opportunity to be heard.  The Union representative may be the representative at Step 1 or a representative designated by the Union grievance department, or both.

Notice of the conference shall also be given to the head of the school.  The head of the school will be expected to attend the conference or to have a suitable representative present at the conference in order to promote resolution of the grievance or, if resolution is not possible, to provide the necessary information for a fair determination of the grievance.

The Chancellor shall communicate his/her decision in writing, together with the supporting reasons, to the aggrieved employee and to the Union representative who participated in this step, within 20 school days after receiving the appeal.

The head of the school shall also receive a copy of the decision at this step.  The Union shall receive a copy of any decision at this step.

**2.  Procedures for Special Groups of the Teaching Staff**

a.  The procedures set forth in paragraph 1 of this Article shall apply to all employees in the unit, except that:

(1) In the case of teachers of the homebound, the grievance shall be presented at Step 1 to the borough supervisor.

(2) In the case of per session employees, the grievance shall be presented at Step 1 to the head of the particular per session activity or his/her designated representative and at Step 2 to the Chancellor or his/her designated representative.  The Union representative at each step shall be a member of the Union's grievance committee.  The decision at Step 1 shall be communicated within five working days after receiving the complaint of employees employed in summer per session activities and within 10 school days after receiving the complaint of employees employed in all other per session activities. However, grievances arising under Article 15C 2 (Retention), 4 (Selection of New Per Session Teachers) or 6 (Reduction in Per Session Positions) must be presented within two workdays after the employee has knowledge of the act or condition which is the basis of the complaint.  The decision at Step 1 shall be communicated within two working days after receiving the complaint.  The grievance may be appealed by the Union to the Chancellor within five working days after the decision at Step 1 has been received.  The Chancellor shall communicate his/her decision within ten working days after receipt of the appeal.  If the grievance is not resolved at the Chancellor's level, it may be appealed

to arbitration by the Union within 15 working days and the parties shall arrange for the prompt hearing of the grievance at arbitration. The parties will make every effort to process these grievances more expeditiously than the time limits prescribed above. The arbitrator shall render the award within five days after the close of the hearing.

(3) Chapter 683 grievances regarding summer assignments shall be heard according to the following procedure:

(a) All internal District 75 postings, vacancy notices and turnaround (retention rights) lists will be prominently posted and made available to employees in all District 75 sites.

i. All internal application notices/postings for District 75 staff who do not claim retention rights shall be posted in the schools no later than April 30.

ii. Retention rights turnaround documents shall be posted in the schools no later than May 15.

iii. The Final Assignment list shall be posted in all schools no later than June 7.

(b) Subsequently, an employee who has a complaint regarding a non-per session summer assignment shall attempt to resolve it informally. If the complaint has not been resolved, the complainant shall file a grievance with the Superintendent no later than the 10th workday from the posting of the final assignment list, or in the case of assignments that were not contained in the final assignment list, no later than the 10th workday from knowledge of the assignment which is the basis for the complaint. The Superintendent or his or her designee shall meet and confer with the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint. The employee shall be entitled to Union representation. The employee shall be present at this conference. The Superintendent shall communicate his/her decision in writing, together with supporting reasons, to the aggrieved employee and to the Union District Representative within five (5) working days after having received the appeal.

If the grievance is not resolved at the Superintendent's level, the Union may appeal the decision to the Chancellor within five (5) working days after the decision by the Superintendent or his or her designee has been issued. The appeal shall be in writing, shall set forth specifically the reasons for the appeal and shall be accompanied by a copy of the appeal and decision at Step 1. The Chancellor or his/her designated representative shall meet and confer with the Union Representative and the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint.

The Chancellor shall communicate his/her decision in writing, together with the supporting reasons, to the aggrieved employee and to the Union Representative who participated in this step within five (5) working days after receiving the appeal. If the grievance is not resolved at the Chancellor's level, or if no decision is issued within five (5) working days from the receipt of the appeal, the UFT may proceed to arbitration. The UFT shall notify the Superintendent and the Board's Office of Labor Relations and Collective Bargaining of its intent to proceed to arbitration no later than the Monday following Labor Day of the year in which the grievance arose.

The Superintendent shall also receive a copy of the decision at this Step. The Union shall receive a copy of any decision at this Step.

(4) In the case of adult education teachers covered by this Agreement, the grievance shall be presented at Step 1 to the Executive Director or head of the particular program and at Step 2 to the Chancellor. The Union representative at each step shall be a member

of the Union's grievance committee. The decision at Step 1 shall be communicated within 10 working days after receiving the complaint of the employee.

(5) In the case of teachers assigned, education administrators, education officers and education analysts, the grievance shall be presented at Step 1 to the appropriate community superintendent or his/her designee, assistant superintendent for high schools, or the Executive Director responsible for the office, and at Step 2 to the Chancellor. The Union representative at each step shall be a member of the Union's grievance committee. The decision at Step 1 shall be communicated within 10 working days after receiving the complaint of the employee.

(6) In the case of lead teachers and math and literacy coaches, the grievance shall be presented at Step 1 to the principal and at Step 2 to the Chancellor. The Union representative at each step shall be a member of the Union's grievance committee. The decision at Step 1 shall be communicated within 10 working days after receiving the complaint of the employee.

(7) In the case of mentors the grievance shall be presented at Step 1 to the principal and at Step 2 to the Chancellor. The Union representative at each step shall be a member of the Union's grievance committee. The decision at Step 1 shall be communicated within 10 working days after receiving the complaint of the employee.

b. The special procedures set forth in paragraph 4 of this Article shall not apply to per session employees, adult education teachers covered by this Agreement, teachers assigned, education administrators, education officers and education analysts.

**3. Special Procedures for Grievances Relating to Salary and Leave Matters**

Any grievance relating to salary and leave matters shall be filed by the Union directly with the Executive Director of the Division of Human Resources. In such cases, the provisions of the general procedures relating to Step 2 shall apply to the presentation and adjustment of the grievance at the level of the Executive Director except that (1) the grievance shall be filed within a reasonable time not to exceed three months after the employee has knowledge of the act or condition which is the basis of the complaint and (2) the employee need not be present at the conference. The Executive Director shall render a decision on behalf of the Chancellor and such decision shall be considered a decision at the level of the Chancellor under this Article.

**4. Special Procedures for Grievances Arising out of School Reorganization**

Where the grievance arises out of school reorganization and involves class size, teacher programs or assignments and is not covered by paragraphs 5 or 6 below, the time limits prescribed in B1 above shall be modified in these respects:

a. The grievance must be presented within two school days after the employee has knowledge of the act or condition which is the basis of the complaint, except that conformity to class size limits shall not be the subject of grievance during the first ten school days of each term.

b. The head of the school shall communicate his/her decision within two school days after receiving the complaint.

c. The grievance must be appealed by the Union to the Chancellor (Step 2) within five school days after the decision at Step 1 has been received.

d. The Chancellor shall communicate his/her decision within ten school days after receipt of the appeal.

e.  If the grievance is not resolved at Step 2, it may be appealed to arbitration by the Union within 15 school days and the parties shall arrange for the prompt hearing and resolution of the grievance at arbitration.

f.  The Union shall designate an order of priority for arbitration of unresolved reorganization grievances involving teacher programs or assignments.  Such grievances shall be expeditiously arbitrated.  Grievances heard on or before October 5th shall be decided, and the award rendered within five days.  If the grievance is sustained, it shall be implemented immediately.  If not rendered by October 10th, an arbitration award sustaining a grievance shall be implemented no later than the next reorganization.

**5.  Expedited Reorganization Grievance Procedure**

The parties are committed to resolving reorganization grievances on an expedited basis.  To that end, they have jointly adopted the appropriate and agreed upon standards for determining these cases in the hope that school administration and UFT representatives will be able to resolve many of these matters locally, without the need to resort to arbitration.  The parties intend joint training to familiarize those involved with the cases in the agreed upon standards and the new procedure being adopted.

a.  Reorganization arbitrations shall be scheduled during the last two (2) weeks of June, and the first three (3) weeks in September.  If necessary, cases may be heard through the end of September.  For reorganizations that take place in February, arbitrations shall be scheduled during the month of February.  Complaints arising at any time during the school year will follow the expedited time frame detailed below.  These arbitrations shall count toward the two hundred (200) arbitration dates that are permitted to be scheduled per year for all UFT grievances.

b.  The current deadlines by which teachers must receive their programs shall continue.

c.  The chapter leader shall be considered a proper grievant in all grievances relating to program deadlines and contractually mandated consultations, including allegations that postings are inconsistent with an agreement reached at contractually mandated consultations.

d.  An employee shall notify the principal or his or her designee of a complaint within two (2) school days, after the employee has knowledge of the act or condition which is the basis for the complaint.  Within two (2) school days following notification, the principal or his or her designee must meet with the employee in an effort to resolve the complaint.  The employee may choose to be accompanied by the chapter leader.  If the complaint remains unresolved, the employee shall have two (2) school days from the date of the grievance conference to file a grievance appeal with the Superintendent.  A copy of the grievance appeal shall be forwarded to the chapter leader and the UFT district representative.

e.  A Demand for Arbitration shall be filed contemporaneously with the district level grievance, with a copy to be forwarded to the appropriate Superintendent(s) and the Board's Office of Labor Relations and Collective Bargaining.

f.  Both the employee and principal, or his or her designee, must attend a conference conducted by the Superintendent or his or her designee.  The UFT district representative or his or her designee shall be present to observe the process and represent the UFT.  The conference shall be held within three (3) school days of receipt of the district level

grievance appeal.  The Superintendent or his or her designee shall have four (4) school days from the conference to render a decision on the grievance.

g.   The decision shall set forth reasons.  If no decision is issued within four (4) school days of the conference, the UFT may proceed to arbitration.  The UFT shall notify the Superintendent(s) and the Board's Office of Labor Relations and Collective Bargaining of its intent to proceed to arbitration.

h.   Arbitrations may commence as early as seven (7) school days from the initial filing of the grievance and shall proceed using procedures detailed in paragraph F of this Article.

i.   Only the following issues arising under Article 7 (A, B, C, D, E, F, J and K) are appropriate reorganization grievances within the meaning of this subsection 5:

(1) Program Preference
    (a)    Grade level
    (b)    More/less difficult
    (c)    Subject
    (d)    Sessions
    (e)    Special classes
    (f)    Special education classes
(2) Special Teaching Positions
(3) Cluster Positions
(4) Compensatory Time Positions
(5) Rotation
(6) Number of Preparations
(7) Numbers of Rooms
(8) Postings
(9) Consultations

**6.   Expedited Procedure for Class Size and Group Size Grievances**

The parties are committed to resolving class size and group size grievances on an expedited basis.  To that end, they have jointly adopted the appropriate and agreed upon standards for determining these cases in the hope that school administration and UFT representatives will be able to resolve many of these matters locally, without the need to resort to arbitration.  The parties intend joint training to familiarize those involved with the cases in the agreed upon standards and the new procedure being adopted.

a.   During the first ten (10) school days of each term, the chapter leader and the principal shall attempt to resolve informally all class size and group size problems within the school.  It is expected that during the first ten (10) school days, the principal will consult and seek assistance from the superintendent and the chapter leader will consult with the UFT district representative to attempt to resolve all class size and group size problems.  Complaints arising at any time during the school year will follow the expedited time frame detailed herein.

b.   If the principal and chapter leader cannot resolve class size and group size problems within the school, after the first ten (10) school days, the Union may file a demand for arbitration within two (2) school days of their failure to resolve the grievance.

Such demand shall be filed by facsimile, or any other agreed upon method, to the affected Superintendent(s) and the Board's Office of Labor Relations and Collective Bargaining.

c.   Arbitrations shall commence within five (5) school days of the demand for arbitration.   The class size arbitrations shall count toward the two hundred (200) arbitration dates that are permitted to be scheduled per year for all UFT grievances and shall proceed using procedures detailed in paragraph G of this Article.   Group size arbitrations do not count toward the two hundred (200) arbitration dates, and shall proceed pursuant to paragraph G of this Article.

**7.   Priority Handling of Grievances**

The Board and the Union will consult periodically on the priority of handling grievances pending at Step 2 with a view to expediting the processing of grievances which require prompt disposition.

**8.   Initiation or Appeal of Special Types of Grievances or Complaints**

a.   Grievances arising from the action of officials other than the head of a school may be initiated with and processed by such officials in accordance with the provisions of Step 1 of this grievance procedure.  Where appropriate, such grievances may be initiated with the Chancellor by the Union.

b.   Where a substantial number of employees in more than one school (or, in the case of teachers of the homebound, in more than one borough) have a complaint arising from the action of authority other than the head of a school (or borough supervisor) the Union, upon their request, may initiate a group grievance in their behalf.

c.   The Union has the right to initiate or appeal a grievance involving alleged violation of the Agreement.   Such grievance shall be initiated with the appropriate community or assistant superintendent or where appropriate, with the Chancellor.

**9.   Appearance and Representation**

Conferences held under this procedure shall be conducted at a time and place which will afford a fair and reasonable opportunity for all persons entitled to be present to attend.  When such conferences are held during Board of Education working hours, all persons who participate shall be excused without loss of pay for that purpose.

**10. Time Limits**

a.   Failure at any step of this procedure to communicate the decision on a grievance within the specified time limits shall permit the aggrieved employee to proceed to the next step.  Failure at any step of this procedure to appeal a grievance to the next step within the specified time limits shall be deemed to be acceptance of the decision rendered at that step.

b.   The time limits specified in any step of this procedure may be extended, in any specific instance, by mutual agreement.

**C.   Arbitration**

A grievance dispute which was not resolved at the level of the Chancellor under the grievance procedure may be submitted by the Union to an arbitrator for decision if it involves the application or interpretation of this Agreement.   Grievances involving the exercise of Board discretion under any term of this Agreement may be submitted to arbitration to determine whether the provision was disregarded or applied in a discriminatory or arbitrary or capricious manner so as to constitute an abuse of discretion, namely: whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences, or the absence of supporting factual reasons.

A grievance may not be submitted to an arbitrator unless a decision has been rendered by the Chancellor under the grievance procedure, except as provided in Section B6b of this Article, and except in cases where, upon expiration of the 20-day time limit for decision the Union filed notice with the Chancellor of intention to submit the grievance to arbitration and no decision was issued by the Chancellor within five school days after receipt of such notice.

The proceeding shall be initiated by the Union filing with the Board a notice of arbitration.  The notice shall be filed within 15 school days after receipt of the decision of the Chancellor under the grievance procedure or, where no decision has been issued in the circumstance described above, three days following the expiration of the five school day period provided above.  The notice shall include a brief statement setting forth precisely the issue to be decided by the arbitrator and the specific provision of the Agreement involved.  The parties shall jointly schedule the arbitration hearings.

A panel of seven arbitrators, or more, shall be designated by mutual agreement of the parties to serve for any case or cases submitted to them in accordance with their ability to promptly hear and determine the case or cases submitted;

Arbitrators shall serve one year terms which extend from September 1 through August 31 of the following year.  Arbitrators who are selected after September 1 shall hear cases for a minimum of one year, with a term ending on August 31;

Arbitrators will be continued for additional one year terms, unless either party discontinues the services of any of the panel arbitrators by notification to the other party by May 15 that such arbitrators shall not be selected for an additional term.  Arbitrators not selected by the parties to serve an additional term will be notified jointly by the parties;

Arbitrators who are not continued for an additional term shall finish any case they have begun hearing;

If a panel arbitrator(s) is not continued for an additional one year term, a replacement(s) shall be selected to serve on the panel by the mutual agreement of the parties.  Should agreement not be reached in sufficient time to ensure that the replacement arbitrator(s) commences service on September 1, the parties shall maintain the same number of hearing dates which would have existed if the replacement arbitrator(s) could have provided dates starting in September.  The parties further agree to schedule the same number of dates, regardless of the number of arbitrators on the panel, normally scheduled in a school year.  This maintenance of service shall be accomplished in the following manner:

a.  First, by requesting additional hearing dates from the panel arbitrators; and

b.  If necessary, by requesting hearing dates from arbitrators previously agreed upon for this purpose; and

c.  If necessary, by requesting that the American Arbitration Association provide simultaneously to each party an identical list of names of persons chosen from the Panel of Labor Arbitrators, as outlined in Rule 12 of the A.A.A. Labor Arbitration Rules (as amended and in effect January 1, 1992).

The parties agree to enter into a stipulation of facts whenever possible in advance of the hearing.

The parties seek the most expeditious decisions in arbitrations and will not normally file briefs or order transcripts.  If either or both parties order transcripts, it shall be on an

expedited basis.  The parties may agree to file post-hearing briefs.  However, if a party unilaterally files a brief, it shall be filed within five working days of the hearing or receipt of the transcript, if one is ordered.  The other party shall have the right to file a reply brief within five working days of receipt of the brief.

The voluntary labor arbitration rules of the American Arbitration Association shall apply to the proceedings insofar as they relate to the hearings and fees and expenses.

The arbitrator shall issue his/her decision not later than 30 days from the date of the closing of the hearings or, if oral hearings have been waived, then from the date of transmitting the final statements and proofs to the arbitrator.  The decision shall be in writing and shall set forth the arbitrator's opinion and conclusions on the issues submitted.  The arbitrator shall limit his/her decision strictly to the application and interpretation of the provisions of this Agreement and he/she shall be without power or authority to make any decision:

1.  Contrary to, or inconsistent with, or modifying or varying in any way, the terms of this Agreement or of applicable law or rules or regulations having the force and effect of law;

2.  Involving Board discretion under the provisions of this Agreement, under Board by-laws, or under applicable law, except that the arbitrator may decide in a particular case whether the provision was disregarded or applied in a discriminatory or arbitrary or capricious manner so as to constitute an abuse of discretion, namely whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences or the absence of supporting factual reasons.

3.  Limiting or interfering in any way with the powers, duties and responsibilities of the Board under its by-laws, applicable law, and rules and regulations having the force and effect of law.

The decision of the arbitrator, if made in accordance with his/her jurisdiction and authority under this Agreement, will be accepted as final by the parties to the dispute and both will abide by it.

The arbitrator may fashion an appropriate remedy where he/she finds a violation of this Agreement.  To the extent permitted by law, an appropriate remedy may include back pay.  The arbitrator shall have no authority to grant a money award as a penalty for a violation of this Agreement except as a penalty is expressly provided for in this Agreement.

The arbitrator's fee will be shared equally by the parties to the dispute.

The Board agrees that it will apply to all substantially similar situations the decision of an arbitrator sustaining a grievance and the Union agrees that it will not bring or continue, and that it will not represent any employee in, any grievance which is substantially similar to a grievance denied by the decision of an arbitrator.

Two hundred (200) arbitration dates may be scheduled per year for all UFT grievances.  The use of the two hundred (200) days will governed in all respects by the rules in this Agreement, including, but not limited to, rules that exclude certain arbitrations from the two hundred (200) day limit.

Principals may testify at arbitrations by telephone subject to the following conditions: (i) the principal may not look at any written material or be aided by anyone in the room during his/her testimony except as authorized or directed by the arbitrator; (ii) the

principal may not be joined in the room by anyone without notifying the arbitrator, all parties and their representatives; (iii) the UFT district representative, or the UFT district representative's designee, may be present in the room with the principal;  and (iv) the principal's testimony shall still be under oath.  The sole role of the UFT district representative, or the UFT district representative's designee, shall be to verify the principal's compliance with these conditions; the UFT district representative or designee may not participate in the proceedings except to notify the arbitrator and/or the parties' representatives if he or she believes these conditions are being violated.  The UFT district representative, or the UFT district representative's designee, shall not be released from his/her classroom responsibilities for this purpose.  Nothing in this Agreement shall in any way limit the right of the UFT arbitration advocate to cross-examine the principal.  If the arbitrator orders the principal to testify or be cross-examined in person, the principal shall not be allowed to testify or be cross-examined by telephone.

Nothing in this Agreement shall in any way limit the currently existing rights of Employees to attend arbitrations.

**D.  General Provisions as to Grievances and Arbitration**

1.  The filing or pendency of any grievance under the provisions of this Article shall in no way operate to impede, delay or interfere with the right of the Board to take the action complained of, subject, however, to the final decision on the grievance.

2.  Nothing contained in this Article or elsewhere in this Agreement shall be construed to permit the Union to present or process a grievance not involving the application or interpretation of the terms of this Agreement in behalf of any employee without his/her consent.

3.  Nothing contained in this Article or elsewhere in this Agreement shall be construed to deny to any employee his/her rights under Section 15 of the New York Civil Rights Law or under the State Education Law or under applicable Civil Service Laws and Regulations.

4.  (a) Procedural arbitrability objections based upon the asserted untimeliness of a grievance or appeal, or failure to follow or properly adhere to contractual grievance procedures will, normally, be raised at the Chancellor's level.  In instances where the employer could not reasonably have been able to raise such a claim at the Chancellor's level, but intends to raise such a claim at the arbitration level, for the first time, the employer shall communicate to the Union within one week prior to the scheduled hearing of such intent.

(b) These guidelines are not intended to be applied to preclude a party from raising an arbitrability objection at a hearing where such preclusion would appear to be unfair or substantially prejudicial to a party's interest in the ultimate outcome of a case.

(c) Nothing contained herein shall be construed as a waiver of any substantive arbitrability objection or to preclude any other resort to judicial proceedings as provided by law.

**E.  Expedited Arbitration Procedure for the Lead Teacher and Lead Instructional Mentor Applicant Pool**

The purpose of this procedure is to carry out the intent of the parties set forth in Article 11 IV A10 and Article 11 IV D4 to resolve promptly all disputes regarding the Applicant Pool of Lead Teachers and Lead Instructional Mentors subject to expedited arbitration.

To the extent possible, each expedited arbitration shall be completed by the last day of June of the school year in which the application was made.  The parties to the arbitration shall make all necessary reasonable efforts to complete the procedure by the deadline, including shortening the time frames if necessary.

1.  If the central personnel committee (the "Committee") rejects an application for inclusion in the pool, it shall notify the rejected candidate of the right to challenge the decision according to this procedure within ten calendar days if the applicant applied for a lead teacher position and within fifteen calendar days if the applicant applied for a Lead Instructional Mentor position.

2.  The Appellant - a candidate who is not selected by the Committee - shall initiate the challenge by filing a written request for review with the United Federation of Teachers Coordinator.  The request must be filed within five calendar days (not counting weekends and holidays) after the Appellant receives the Committee's decision and right-to-challenge notice.  The Appellant is limited to filing no more than three review requests.

3.  The request shall include the name, address and phone number of the Appellant, the Pool applied for, and a statement that the review of the Committee's decision is requested.  A form for this purpose shall be available from the Board, the Union and the School Personnel Committee.

4.  Upon receiving the request, the UFT Coordinator shall notify the Committee and the arbitrator that a request for review has been filed.  The Committee shall respond within five calendar days to the UFT Coordinator with the following information: the names of the successful candidates; the qualifications for the position; and the reasons it rejected the Appellant.  The UFT Coordinator shall then send that information to the Appellant.

5.  The Chancellor and the UFT President or their designees shall jointly select an arbitrator (or arbitrators) to arbitrate these cases.  The Board and the Union shall share the arbitrators' fees equally.

6.  The parties to the proceeding shall be the Committee and the Appellant(s).  The parties agree to continue to schedule arbitrations as efficiently as possible (i.e. multiple cases before one arbitrator each day).

7.  The arbitrator shall schedule the hearing to start not later than seven (7) days (not counting weekends and holidays) after the UFT Coordinator received the request for review.

8.  In order to develop a full and complete basis for a decision, the arbitrator shall inquire fully into all matters in issue.  The Appellant(s) should be prepared to state the basis of the challenge and may do so at any time during the hearing.  The Committee should be prepared to support the basis for its decision.

9.  The arbitrator shall issue a written, signed award within five (5) days of the close of the hearing.  If the arbitrator sees the need for an opinion, it shall be in summary form.

10. If the arbitrator sustains the challenge, the Appellant shall be included in the Pool.

11. The arbitrator's power and authority under this procedure shall be only to resolve an Appellant's challenge to the decision of the Committee.  The arbitrator's decision shall be limited strictly to the application and interpretation of the applicable provisions of Articles 11(IV)A5 and Article 11(IV)D2 and 3.  Other grievances or complaints arising in a school shall be resolved through the procedures appropriate to them.

12. The parties shall accept as final the arbitrator's award and abide by it if it is made in accordance with the jurisdiction and authority granted under this procedure.

13. Regarding the hearings, fees and expenses, the proceedings shall follow the Expedited Labor Arbitration Procedures of the American Arbitration Association as amended and effective on September 1, 1993, as long as they do not conflict with the procedures described above.

### F.  Arbitrations Pursuant to the Expedited Reorganization Grievance Procedure

Arbitrations filed pursuant to the Expedited Reorganization Grievance Procedure in B5 above shall be processed as follows:

1.  Each arbitrator shall hear up to five (5) reorganization grievances in a day.  Where possible, grievances from the same school and/or borough shall be scheduled on the same day.

2.  The arbitration shall be informal and proceed in the following manner:

a.  The parties shall provide the Arbitrator at the beginning of each case all relevant documents, such as, but not limited to: 1) Postings; 2) Preference sheets; 3) Resumes; and 4) Seniority lists.

b.  The grievant and the principal, or his or her designee, must be in attendance. Each side shall have thirty (30) minutes to present their respective cases.  The arbitrator may extend this time limit.  Only disputed facts shall be presented to the arbitrator.

c.  Witnesses for the Union and the Board shall be limited to discuss only those facts in dispute.

d.  In order to develop a full and complete basis for a decision, the arbitrator shall inquire fully into all matters at issue.

3.  Each arbitrator shall be given precedential reorganization decisions with the agreed upon reorganization standards.  No other decisions shall be presented except relevant regular panel member decisions decided subsequent to July 1, 2001.

4.  At any time prior to issuance of an award, either party may decide that a case may have precedential value and shall be referred for an arbitration hearing pursuant to Article 22C, and the rules applicable to that procedure shall apply.  The next panel member in the established rotation shall be assigned the case.

5.  The arbitrator shall issue an award within five (5) school days of the arbitration hearing.  Such award may be transmitted by facsimile directly to the parties, including the Board's Office of Labor Relations and Collective Bargaining and the UFT's Grievance/Arbitration Department.  Arbitrators shall not issue written opinions unless jointly requested by the parties.  The award is non-precedential unless the parties jointly request a formal written opinion.

6.  All sustained awards shall be implemented within five (5) school days of issuance, unless otherwise specified by the award, except that decisions rendered on or after October 10th shall be implemented no later than the next reorganization.

7.  The arbitrator shall retain jurisdiction until the next reorganization unless otherwise specified in the award.

8.  If an arbitrator is unable to complete his or her assignment before issuing his or her award, the American Arbitration Association shall appoint the next panel member in the established rotation.

**G. Arbitrations Pursuant to the Expedited Procedure for Class Size and Group Size Grievances**

Arbitrations filed pursuant to the Expedited Procedure for Class Size and Group Size Grievances in B6 above shall be processed as follows:

1. Each arbitrator shall hear up to five (5) schools' class size and/or group size cases in a day. Where possible, schools within the same superintendency shall be scheduled on the same day.

2. The arbitration hearing shall be expedited in the following manner:

a. The Union shall provide the arbitrator with a standardized form, agreed upon by the parties, with the following agreed upon information at the beginning of each case:

(1) Name of Teacher (for identification purposes only)

(2) School

(3) District

(4) Classes/Groups which are oversized

(5) Registers of each class/group on the grade or subject/course name, as applicable, being grieved

(6) Prior grievance history

b. The UFT District Representative and Superintendent, or their designee, shall each have thirty (30) minutes to present their respective cases. The arbitrator may extend this time limit. Only disputed facts shall be presented to the arbitrator.

c. Witnesses for the Union and the Board shall be limited to discuss only those facts which are in dispute.

d. In order to develop a full and complete basis for a decision, the arbitrator shall inquire fully into all matters at issue.

e. Each arbitrator shall be given precedential class/group size decisions with the agreed upon class/group size decision summaries. No other decisions shall be presented except relevant regular panel member decisions decided subsequent to July 1, 2001.

f. At any time prior to issuance of an award, either party may decide that a case may have precedential value and shall be referred for an arbitration hearing pursuant to Article 22C, and the rules applicable to that procedure shall apply. The next panel member in the established rotation shall be assigned the case.

g. The arbitrator shall issue an award within five (5) school days of the arbitration hearing. Such award shall be transmitted by facsimile directly to the UFT District Representative, the Superintendent(s), the UFT Grievance/Arbitration Department and the Board's Office of Labor Relations and Collective Bargaining. The award shall include the following information:

(1) Sustained or denied.

(2) If sustained, the guidelines for compliance (e.g., equalization, new class or monetary penalty).

(3) If denied, the basis for the denial.

Arbitrators shall not issue written opinions unless jointly requested by the parties. The award is non-precedential unless the parties jointly request a formal written Opinion.

h. All sustained awards shall be implemented within five (5) school days of issuance. No class that ultimately complies with the contractual maximum class size limitations shall constitute an Article 7M3 class size exception, except that said awards can be used for grievance history background.

i.   The arbitrator shall retain jurisdiction over his or her decision.  If a sustained award is not implemented within five (5) school days, the arbitrator shall convene a conference between the Board's Office of Labor Relations and Collective Bargaining and the UFT's Grievance/Arbitration Department within five (5) school days, but no earlier than October 1st in the case of class size grievances.

j.   If the Board asserts that it cannot comply with the arbitrator's award, it must set forth a plan of action to remedy the class size or group size violation.  If the Board has acted in good faith, and the plan of action is not unreasonable, it will be accepted by the arbitrator.

k.   If the arbitrator concludes that the Board's plan of action is not appropriate, he or she shall be empowered, on a non-precedential basis, to issue a supplemental award within five (5) school days, as follows: For elementary schools, the school may be directed to add one additional paraprofessional for every two oversized classes in a grade, or at the school's option, one teacher for every four classes, with a minimum of one hour teacher coverage per oversize class.  For all other school organizations, the school may be directed to implement a comparable remedy appropriate to the level.  In the case of group size awards, the arbitrator may impose a monetary penalty.

## H.  Arbitration of APPR Complaints

1.  Nothing in this section H shall constitute a waiver or modification of any provision of the Commissioner of Education's June 1, 2013 Determination and Order ("Order") or of any collective bargaining agreement, letter, other agreement between the DOE and the UFT, or applicable DOE by-laws, policies, and regulations of the Chancellor, or past practice unless expressly modified by the parties herein. Further, notwithstanding anything to the contrary, nothing in the Memorandum of Agreement entered into between the Board and the UFT in May 2014 modifying the collective bargaining agreements that expired on October 31, 2009 (or the 2009-2018 collective bargaining agreement covering teachers) shall be construed as altering or eliminating the APPR complaint process referenced herein and the Streamlined Process to Resolve APPR Compliance Issues described in the Order.

2. For the purposes of this section H, any alleged violation of the Order which might be arbitrated shall be referred to as an "APPR Complaint," except for Union-Initiated grievances pertaining to the Order which shall be heard pursuant to the procedures provided for in this Agreement.

3. Nothing herein shall constitute a waiver of, modification of, or addition to any right that either party or a UFT-represented employee has to raise any issue which, by the terms of the Order, may be the subject of an APPR Complaint.

4. Beginning on October 26, 2013, APPR Complaints shall be processed between the parties in accordance with the procedures set forth herein.

a. A teacher may present an APPR Complaint in writing to the head of school within five (5) school days after the teacher has knowledge of the act or condition which is the basis of the APPR Complaint.

b.  If an APPR Complaint is not resolved within twenty (20) school days of the presentation of the APPR Complaint to the head of school, within twenty (20) school days of that date, the UFT may file an Intent to Arbitrate the APPR Complaint with the DOE's Office of Labor Relations. The UFT may schedule an arbitration of any APPR Complaint for which it has filed an Intent to Arbitrate with the DOE's Office of Labor

Relations upon fifteen (15) school days' notice to the DOE's Office of Labor Relations, by filing a demand for arbitration which shall include a brief description of the specific facts of the underlying grievance and the provision of the Order that is alleged to have been violated, in order to allow the DOE to sufficiently understand and defend the grievance in the arbitration. The determination to proceed to arbitration of an APPR Complaint is within the sole discretion of the UFT. The parties agree to work in good faith to develop a system to be used generally for filing Intents to Arbitrate and demands for arbitration electronically.

   c.  At least five (5) school days prior to an arbitration of an APPR Complaint, the DOE shall provide the UFT with a brief written statement concerning the APPR Complaint, which shall set forth the DOE's position concerning the APPR Complaint with sufficient particularity for the UFT to understand and address it in the arbitration.

   5.  As per the Order, the UFT may arbitrate up to one hundred fifty (150) APPR Complaints per school year. Each shall be considered one "slot" of arbitration and the parties agree that APPR Resolution Complaints shall be scheduled as slots.

   6.  Notwithstanding the Order, for the 2013-14 school year there will be no prescribed number of slots per day scheduled. At the conclusion of the school year the parties will discuss whether to continue or modify this arrangement. Should the parties fail to come to an agreement on the scheduling of slots, they will follow the procedures set forth in the Order for scheduling APPR Complaints for arbitration.

   7.  The parties agree to jointly select arbitrators from the parties' panel of arbitrators (Article 22C of this Agreement) to hear and decide APPR Complaint arbitrations. Absent an agreement and subject to consent by individual arbitrators, APPR Complaints will be assigned to arbitrators in the same manner as grievances are pursuant to Article 22 of this Agreement.

   8.  Arbitration of APPR Complaint arbitration hearings shall be limited to one hour with each side allotted up to thirty (30) minutes to present their respective cases (including any cross-examination and breaks), except that the arbitrator hearing the APPR Resolution Assistance Requests may, under extraordinary circumstances, where the nature of the case demands it, extend the time of the arbitration hearing. The arbitrator shall issue a decision on the APPR Complaint within five (5) school days of the conclusion of the hearing. The arbitrator's decision shall be final and binding upon the parties and shall include a brief explanation of the basis for the decision. Decisions resulting from arbitrations of APPR Complaints shall not be precedential, admissible, or citable in any other proceeding except by mutual agreement of the parties, and to enforce the terms of the Decision.

   9.  Either party, upon written notice to the other party (and the assigned arbitrator, if there is one) prior to the issuance of the decision may require that an APPR Complaint be scheduled for arbitration pursuant to the grievance procedure contained in Article 22 of this Agreement. However, if the DOE requires that an APPR Complaint be heard as an arbitration pursuant to this Agreement, the APPR Complaint arbitration shall not count towards the UFT's contractual number of arbitration dates. Should the UFT require that an APPR Complaint arbitration be heard as an arbitration pursuant to the CBA, all hearing dates shall count towards the UFT's contractual number of arbitration dates. An APPR Complaint arbitration heard pursuant to the parties' grievance procedure contained in the CBA shall have precedential weight in future APPR Grievance arbitrations. The

parties recognize the importance of these cases in helping to guide the evaluation process and are committed to having these cases adjudicated in an expeditious manner. Toward that end, cases heard under the grievance procedure contained in Article 22 shall be completed as soon as possible but no later than two (2) months from the date the Union initiates the scheduling of the case. Further the parties shall jointly request that the arbitrator issue an award within five (5) school days of the last hearing date, with an opinion to follow if necessary. Notwithstanding the above, nothing herein shall be interpreted to limit either party's ability to fully present its case. In unique circumstances, the arbitrator shall have the right, upon application by either party, to extend the two (2) month time frame.

10. The parties agree that this MOU shall not be construed or interpreted as a waiver or modification in any way of either party's rights, claims, and defenses regarding the arbitrability of any dispute arising pursuant to the Order. Nothing contained herein prohibits the UFT from filing a UI grievance which shall be processed in accordance with the procedures set forth in paragraph 2.

## ARTICLE TWENTY-THREE
## SPECIAL COMPLAINTS

It is the declared objective of the parties to encourage the prompt and informal resolution of special complaints not covered by the grievance procedure and to dispose of such complaints as they arise and to provide recourse to orderly procedures for their adjustment.

### A. Definition

A "special complaint" is a complaint by an employee in the bargaining unit that persons or groups are engaging in a course of harassing conduct, or in acts of intimidation, which are being directed against him/her in the course of his/her employment and that the school principal or community or assistant superintendent has not afforded the employee adequate relief against such course of conduct or acts of intimidation.

### B. Filing and Priority Handling

A special complaint shall be promptly filed with the Chancellor by the Union. Such complaint shall receive expedited handling pursuant to this Article.

### C. Joint Investigation and Informal Resolution

Within twenty-four (24) hours after the special complaint is filed with the Chancellor, the Board ("Department") must notify the Union of the management member assigned to the joint investigating committee ("JIC"). The JIC shall consist of one representative designated by the Chancellor and one representative designated by the Union shall investigate the complaint at the school level to ascertain the facts and bring about a prompt resolution of the problem without resort to formal procedures. In the course of its investigation, the joint committee shall confer with the principal of the school, the community or assistant superintendent and other persons involved in the controversy. In view of the expedited nature of Special Complaint proceedings, the JIC shall complete its investigation in no more than one (1) school day, and as soon as possible but no later than seven (7) school days from the filing date. The Union shall notify the Department member of the of the JIC, the Chancellor's designee or the Office of Labor Relations advocate assigned to the case at the fact finding stage, in writing as soon as possible,

should new allegations of harassment arise after the Committee has completed its investigation.

**D.  Administrative Hearing and Continued Attempt at Informal Resolution**

If the complaint is not resolved by the joint investigating committee the Union shall request a hearing before the Chancellor.  Within forty-eight (48) hours after receipt of the request for hearing, the Chancellor, or a representative designated by him/her, shall hold a hearing at which the joint investigating committee shall report its findings and all persons involved, including the affected employee, shall have an opportunity to be heard. The complaining employee shall be represented by the Union.

At the hearing the Chancellor or his/her representative shall make every effort to resolve the complaint informally and all persons involved shall cooperate toward this end.  The Chancellor's hearing shall be completed in no more than one (1) school day.

**E.  Decision of the Chancellor**

Within seventy-two (72) hours following the close of the hearing, the Chancellor shall notify all parties of his/her decision and the manner in which it shall be effectuated.

Should the Department fail to process a complaint or issue a timely decision at any step, the Union shall be permitted to proceed to the next step in the Special Complaint process.  The Union will not be prejudiced in any way by the Department's failure to adhere to the Special Complaint procedure and the timelines therein.  When the Department fails to issue a Chancellor's decision within 72 hours following the close of the hearing, the case shall not count toward the annual cap of arbitration dates set forth in Article 22 if the Union decides to bring the complaint to fact finding.

If within ten (10) school days after the close of a Chancellor's level hearing the Department fails to issue a decision or position statement similar to the kind the parties utilize in expedited arbitration, the one day hearing cap for fact finding will be increased to two days for that particular case.  None of the hearing dates will count toward the annual cap of arbitration dates set forth in Article 22.  The fact finder shall manage the case with the two day cap as he or she deems appropriate.  Rebuttal time shall be set aside for the Union to utilize if it so chooses.

If within ten (10) school days prior to the date a special complaint is scheduled for fact finding the Department fails to issue a Chancellor's level decision or a position statement similar to the kind the parties utilize in expedited arbitration, the one day hearing cap for fact finding will be increased to three days.  None of the hearing days will count toward the annual cap of arbitration dates set forth in Article 22. The fact finder shall manage the case with the three day cap as he or she deems appropriate.  Rebuttal time shall be set aside for the Union to utilize if it so chooses.  The fact-finding hearing shall be completed in no more than one (1) school day.

**F.  Fact Finding and Recommendations**

If the complaint is not resolved by the Chancellor, the Union shall submit it for hearing and fact finding before an arbitrator selected in accordance with Article 22C of this Agreement.  The submission shall be made within ten (10) school days after the issuance of the Chancellor's decision.  The fact-finding hearing shall be completed in no more than one (1) school day.

The voluntary labor arbitration rules of the American Arbitration Association shall apply to the proceeding insofar as they relate to the hearing, fees and expenses.

The fact finder shall render findings not later than seventy-two (72) hours from the date of the close of the hearings or, if oral hearings have been waived, then from the date of transmitting the final statements and proofs to the fact finder.  The findings of fact shall be in writing.  The fact finder shall limit his/her findings strictly to the question whether the employee's complaint has been substantiated by the evidence.  If the fact finder finds the complaint to be substantiated and unremedied, he/she shall recommend an appropriate remedy.

The fact finder shall not interpret or apply the provisions of this Agreement or exercise any of the other functions specified in Article 22 of this contract, nor shall he/she exercise any of the powers conferred pursuant to Section 3020-a of the Education Law.

**G. Board Consideration**

Within ten (10) days after receipt of the fact finder's report, the Board shall make a determination.

**H. Expansion of Special Complaint Procedure to Include Supervisors**

Complaints against supervisors may be considered in an expeditious manner in accordance with the provisions of this Article.

### ARTICLE TWENTY-FOUR
### PROFESSIONAL CONCILIATION

The Board and the Union agree that professional involvement of teachers in educational issues should be encouraged.  However, it is recognized that there may be differences in professional judgment.

**A. School Level**

1.  Where differences related to school-based decisions in one of the following areas cannot be resolved, a conciliation process will be available to facilitate the resolution of these differences:

   a.  Curriculum mandates
   b.  Textbook selection
   c.  Program offerings and scheduling
   d.  Student testing procedures and appraisal methodology
   e.  Pedagogical and instructional strategy, technique and methodology.

In order to utilize the conciliation process, the UFT chapter may request, through the Union, the service of (a) person(s) identified as expert in conciliation.  Selections of such person(s) will be made by the Board and the Union from a list of conciliators mutually agreed upon by the Board and the Union.

2.  Within five school days, the Board Coordinator will contact the appropriate superintendent who will promptly advise the Board Coordinator as to whether he/she will directly address the issue.

   a.  If the issue is addressed by the superintendent, he/she should resolve it within ten school days.  If not resolved, the Board Coordinator will assign a conciliator at the end of that period.

   b.  If the superintendent does not respond to the Board Coordinator or advises that he/she is not addressing the issue, the Board Coordinator will assign a Conciliator within five school days.

3.   The Conciliator will initiate the conciliation process within ten days.  This stage of the process is expected to be completed within a month unless the participants, including the Conciliator, believe it beneficial to continue the process.

4.   At the conclusion of the conciliation:

a.   If a resolution is reached, the Conciliator will prepare an agreement for both parties to confirm and sign.  It is expected that both parties will adhere in good faith to the agreement.  Where one of the parties believes that a good faith effort is not being made to adhere to the agreement, the party will contact the superintendent and district representative who will assess the situation and take actions as necessary to assure implementation of the agreement.  If the superintendent and district representative cannot resolve it, the issue will be forwarded to the Chancellor and Union President for resolution.

b.   If there is no resolution, the Conciliator will send letters to the parties confirming termination of the conciliation process.  In addition, the Conciliator will send letters to the Board and Union Coordinators advising them of the same.

**B.  District Level**

1.   A teacher(s) who wishes to conciliate a professional difference regarding a community school district, high school or Citywide special education superintendency policy/procedure shall forward it to the UFT school chapter for review.  If appropriate, the chapter will forward it to the district representative who will present the issue to the superintendent.

a.   If the issue is addressed by the superintendent, he/she should resolve it within ten school days.

b.   If the issue is not addressed at the end of that period, or, if the superintendent elects not to address the issue in this fashion, the district representative may refer the issue for conciliation to the UFT Coordinator.

2.   After a decision to proceed with conciliation has been made the Board Coordinator will assign a Conciliator within five school days.  The Conciliator will initiate the conciliation process within ten school days with the district representative and the superintendent.  This stage of the conciliation process is expected to be completed within a month unless the participants, including the Conciliator, believe it beneficial to continue the process.

3.   At the conclusion of the conciliation:

a.   If a resolution is reached, the Conciliator will prepare an agreement for both parties to confirm and sign.  It is understood that for any agreement that requires a waiver of a policy adopted by a community school board, the superintendent would be expected to seek the waiver.  It is expected that both parties will adhere in good faith to the agreement.

b.   If there is no resolution, the Conciliator will send letters to the parties and the Board and Union Coordinators confirming termination of the conciliation process.

**ARTICLE TWENTY-FIVE**
**CHARTER SCHOOLS**

**A.  Conversion Charter Schools**

Pursuant to Article 56 of the New York State Education Law (the "Charter Schools Law") an existing public school may be converted to a charter school.  As modified

below, teachers of a Conversion Charter School shall be subject to this Collective Bargaining Agreement, in accordance with the Charter Schools Law, including but not limited to salary, medical, pension and welfare benefits and applicable due process procedures. The provisions regarding the right of return which follow apply to teachers in such Board schools that are converted to charter schools ("Conversion Charter Schools").

1. At the point of conversion of a Board school to a Conversion Charter School, incumbent employees who choose not to remain as employees in the school as a charter school will have the placement rights contained in Articles 17 and 18 of this Agreement.

2. The Board agrees to extend leaves beyond the statutory two year period to the full term of their employment in the charter school for Board employees who become Conversion Charter School employees. Such employees shall have a right to return to their former geographic district or superintendency in accordance with their seniority. For such employees, service in a Conversion Charter School and Board service shall be combined for all contractual purposes where length of service is a factor.

3. Conversion Charter School pedagogical employees placed at the Board shall be eligible for up to a total of two years credit toward tenure based upon satisfactory service at a Conversion Charter School and any applicable prior Board service.

4. The contractual salary limitations for Conversion Charter School employees placed at the Board shall not apply to certified pedagogical employees.

5. If a Conversion Charter School closes or if the employee is laid off due to economic necessity beyond their control, certified pedagogical Conversion Charter School employees who were not Board employees when hired by the Conversion Charter School shall have placement rights in the Board equal to a certified provisional teacher with no seniority.

6. If a Conversion Charter School closes or if the employee is laid off due to economic necessity beyond their control, uncertified pedagogical Conversion Charter School employees shall have no placement rights in the Board, but the Board will use its best efforts to place such employees in available vacancies.

7. Conversion Charter Schools shall be required to maintain the same medical, pension and welfare benefits as apply to Board employees covered by these agreements.

Except as otherwise set forth herein, pursuant to and in accordance with the Charter Schools Law, the terms and conditions of this Collective Bargaining Agreement apply to teachers serving in the Converted Charter Schools. However, nothing shall limit the Board of Trustees of the converted Charter School from exercising their rights to modify the Collective Bargaining Agreement for the purposes of employment in the charter school, in accordance with and pursuant to the provisions of Section 2854(3)(b) of the Charter Schools Law.

While the Charter Schools Law, as written, provides that the decision to apply for conversion of an existing school resides in the parents of the student body, the Board believes the participation of the UFT and its members is critical in this process. The successful conversion of schools to the Charter model necessitates the involvement of the faculty at these schools. Because of this, the Board fully intends to consult with the UFT in the conversion process, and will seek a collaborative atmosphere in moving forward. Towards that end, in Board schools that are under consideration for conversion to Charter School status, if 50% or more of the staff chooses to stay at the Board of Education, the

Board and the Union shall undertake a joint review of the impact of conferring charter status on the school.

Also, for Board schools that convert to charter status, the Memorandum of Understanding between the Board and the Charter School shall provide that the grievance procedure for UFT employees, unless and until modified in accordance with the Charter School Law, shall be the contractual grievance procedure modified to provide that Step 1 shall be at the level of the head of the school, Step 2 shall be to the Board of Directors of the school and Step 3 shall be to binding arbitration.

**B.  New Charter Schools**

It is agreed that UFT-represented employees who leave the Board to serve in a new charter school shall have the following rights:

1.  Employees shall be granted a two year leave of absence;

2.  Employees returning from a leave of absence shall be credited for time served at the charter school toward their placement on the salary schedule; and

3.  Employees shall have a right to return to their former geographic district or superintendency in accordance with their seniority.

# ARTICLE TWENTY-SIX
# PROGRESSIVE REDESIGN OPPORTUNITY SCHOOLS FOR EXCELLENCE (PROSE)

**A.  Mission**

1.  To achieve success and outstanding results through a truly collaborative environment for all schools at all levels among the key stakeholders responsible for educating New York City's schoolchildren – teachers and other school-based staff, principals, and parents.

2.  To build this partnership on a basis of collaboration and mutual respect that empowers school-based staff (including administrators) and enables students to learn, thrive, and achieve mastery.

3.  To treat instructional staff as professionals by empowering them and holding them responsible for providing the highest quality of teaching.

4.  To foster continuous innovation in the way that labor and management, principals, supervisors, and teachers and other school-based staff share information, share decision-making, and share accountability for student achievement and sound educational outcomes.

5.  To empower school-based staff to embrace new ways of teaching children, even if this means modifying certain existing regulations and work rules.  This includes reexamining current instructional practice, such as the school day and school year, student assessment, evaluation, and class size.

6.  To leverage technology in instruction to engage students and improve professional development.  This partnership will use technology to improve the assessment of student learning, workforce engagement, and parent satisfaction.

7.  To use joint training and labor-management facilitators.

8.  To give existing schools the opportunity and flexibility to change certain rules and challenge the traditional way of doing things – provided they meet specific, measurable performance targets.

9.  To demonstrate creativity and innovation in the pursuit of educational excellence.

**B.  Joint PROSE Panel.**

    1.   Upon ratification of the successor collective bargaining agreements  to the 2007-2009 collective bargaining agreements, a collaborative, decision-making Panel made up of an equal number of members selected by the UFT President and the Chancellor will invite school teams of UFT-represented employees and CSA-represented administrators to submit proposals for five years long for participation in the PROSE program where schools with real educator voice and decision making input and/or authority are permitted to design schools that work best for the students and communities they serve.

    2.   The program will begin as soon as practicable, consisting of a mix of high- and low achieving schools, and a mix of elementary, middle, and high schools.

    3.   The Panel will set a goal of implementing two hundred (200) PROSE Program schools over the next five years that will be overseen and report into the office of the Senior Deputy Chancellor.

    4.   Proposals will be for a maximum of five (5) years.  The Panel may end a school's participation in the program only if the school is not succeeding.

**C.  How the Joint Panel screens and evaluates proposals.**

    **1.   Proposals will be screened based on the extent to which they demonstrate:**

    a.  Partnership between UFT-represented employees and CSA-represented administrators in decision-making;

    b.  A proven record of previous collaboration and success (which includes, but is not limited to, academic success on assessments);

    c.  Creativity and flexibility in modifying DOE-regulations and CBA provisions as specified in section C(1)(j);

    d.  A school community where many voices are listened to;

    e.  Strong buy-in from both UFT-represented employees and CSA-represented administration;

    f.  A commitment to capacity-building and sustainability from the Board (DOE), UFT and CSA;

    g.  Jointly-designed and job-embedded professional development and training;

    h.  A five (5) year commitment to the proposal;

    i.  Measurable, reportable performance targets (defined more broadly than academic success on assessments).  If any school does not meet its targets, the panel may take away its PROSE status at the end of five years or sooner;

    j.  Proposals may (but do not have to) include changes to this Agreement that relate to (i) configuration of the existing work hours and/or work year (Article 6), including extending the school day and/or year, provided there is no diminution of annual salary; (ii) programs, assignments and teaching conditions in schools and programs (Article 7); professional support for new teachers (Article 8G); (iii) evaluation; (iv) professional development assignments and positions (Article 11 IV); (v) working conditions of per session teachers (Articles 15C2 and 15C4); (vi) Step 1 of the grievance process (Article 22B1a); and (vii) transfers to the school (Article 18A, paragraph 1, sentence 2). The Chancellor and UFT President may agree to other articles of this Agreement that schools may propose to change. Proposals may (but do not have to) include modifications to Chancellor's Regulations except those affecting student safety or implementing state and federal laws and regulations.

**2. Proposals must include:**

a.  Evidence of the school's current success, or if a group, at least one (1) school in the group's success in providing a quality education to students.  The Panel will consider multiple measures of success, not only academic measures.  Schools that serve high-need students and schools without screened or selective admissions are especially encouraged to apply.

b.  A list of the types of innovative, teacher-led practices that the school currently uses or is planning to use to promote student success.  Examples could include: school-based staff selection procedures, UFT-represented employee representation on and powers of current school committees that positively influence the quality of instruction delivered to students, School-Based options for scheduling or other policies;

c.  A specific description of how the school intends to use the contractual and regulatory flexibility of the PROSE program to provide employees with decision-making input and authority in the school and build on its successes during the duration of the plan.  As part of their proposals, schools may choose to establish committees consisting of key school-based stakeholders to examine resource allocation, schedules, curriculum, technology, professional development, hiring, and parent engagement.

d.  A proposed budget for the initial year, including both current budgetary resources and any requested supplementary funds.  No such supplemental funds are guaranteed.  The UFT and DOE will commit to pursuing additional outside funding to support innovative school plans, where feasible.  The PROSE program is not contingent on securing additional outside funding.

e.  A mechanism for PROSE Program schools to regularly report their progress to the Panel including, but not limited to, annual goals and budgets.

**D.  How a school becomes a PROSE Program School.**

1.  Applying schools must submit a proposal which has been approved by the School Leadership Team of their school.

2.  To be accepted, the UFT and DOE Panel members must agree to accept the proposal and allow a school's participation in the PROSE program.  Once approved by the Panel (including any required revisions), a proposal is submitted to the school for adoption.

3.  The proposal may be implemented only upon ratification by sixty-five percent (65%) of all those UFT-represented employees voting and acceptance by the school's principal. Proposals may also be modified by the same ratification and approval process set forth in this subsection D.

4.  UFT-represented employees who wish to transfer out of a school that has been approved to participate in the PROSE program may do so on the same basis as similarly situated employees, with the exception that teachers who wish to transfer out of the school for the 2014-15 school year may do so by October 15th without Principal release if they find another position in accordance with the applicable CBA.

5.  If accepted and approved as provided herein, the UFT, DOE and the applying school will implement the proposal as approved.

6.  Individual schools or groups of schools may apply; however, preference will be given to groups of schools which demonstrate a mix of types of schools.  Where a group of schools apply, each school in the group must ratify the proposal by sixty-five percent (65%), as provided herein, in order to participate.

7.   Participation in the PROSE program can be renewed at the expiration of the initial proposal term, in accordance with the Panel's approval, and with ratification by sixty-five percent (65%) of school's staff, and approval by the school's principal, and a vote of the school leadership team.

8.   The Panel shall, as soon as practicable, implement the PROSE program, adopt application procedures, and accept proposals from schools.

9.   The DOE and UFT will collaborate in developing pre-application and post-application workshops to be delivered during the 2014-15 school year for applications which will be implemented after the 2014-15 school year.

**E.  New Schools.**

1.   The DOE and the UFT will develop an alternative process for the creation of new schools that are proposed by either teachers and parents.

2.   These schools can be proposed in addition to the two hundred (200) PROSE Program Schools and if approved in accordance with the agreed upon procedures will have the same flexibility with regard to Chancellor's regulations and work rules as PROSE Program Schools.

**ARTICLE TWENTY-SEVEN**
**CONFORMITY TO LAW-SAVING CLAUSE**

A.  If any provision of this Agreement is or shall at any time be contrary to law, then such provision shall not be applicable or performed or enforced, except to the extent permitted by law and any substitute action shall be subject to appropriate consultation and negotiation with the Union.

B.  In the event that any provision of this Agreement is or shall at any time be contrary to law, all other provisions of this Agreement shall continue in effect.

**ARTICLE TWENTY-EIGHT**
**NO-STRIKE PLEDGE**

The Union and the Board recognize that strikes and other forms of work stoppages by teachers are contrary to law and public policy.  The Union and the Board subscribe to the principle that differences shall be resolved by peaceful and appropriate means without interruption of the school program.  The Union therefore agrees that there shall be no strikes, work stoppages, or other concerted refusal to perform work, by the employees covered by this Agreement, nor any instigation thereof.

**ARTICLE TWENTY-NINE**
**DEFINITIONS**

A.  Wherever the term "Board" is used in the Agreement it shall mean the City Board, it being understood, nevertheless, that this contract is binding on all community school districts in accordance with Section 2590 of the Education Law.

B.  Wherever the term "community school board" or "community board" is used in the Agreement it shall mean the Board of Education of a community district.

C.  Where applicable herein "seniority in the school" shall be determined by the number of years of continuous service in the school as a regularly appointed teacher and as a regular substitute teacher.  In the case of teachers who were excessed into the school, continuous service in the school shall include in addition the number of years of

continuous regular and regular substitute service in the previous school. Continuity of service shall not be deemed to be interrupted by absence determined to be due to illness, accident or injury suffered in line of duty or by time spent in military service, the Peace Corps or VISTA, or by layoff or leave without pay.

### ARTICLE THIRTY
### NOTICE-LEGISLATIVE ACTION

The following Article is required by the Public Employee's Fair Employment Act, as amended by Section 204a, approved March 10, 1969.

It is agreed by and between the parties that any provision of this Agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefor, shall not become effective until the appropriate legislative body has given approval.

### ARTICLE THIRTY-ONE
### COPY OF AGREEMENT

The parties will have available copies of this Agreement upon request.

### ARTICLE THIRTY-TWO
### INCORPORATION OF DETERMINATION
### AND AWARD

The determination and award of the arbitration panel in Case No. IA-1-85 is incorporated into this Agreement and made a part hereof.

### ARTICLE THIRTY-THREE
### DURATION

This Agreement and each of its provisions shall be effective as of November 1, 2009, and shall continue in full force and effect through November 30, 2018. Negotiations for a subsequent Agreement will commence no sooner than April 30, 2018 upon request of either party filed two weeks in advance or as otherwise mutually agreed.

### APPENDIX A
### SALARY SCHEDULES OF
### DAY SCHOOL TEACHERS

### I

In any and all schedules hereinafter set forth advancement by increments shall be conditioned upon regulations adopted by the Board of Education upon recommendation of the Chancellor.

Whenever, in the schedules which follow, provision is made for the payment of a salary differential based upon the completion of additional approved study, the certificate issued by the Chancellor shall provide that the effective date thereof shall be determined in accordance with appropriate regulations issued by the Chancellor with the approval of the Board of Education.

# II

## A. Salaries and Differentials

### 1. Salary Schedules and Differential Eligibility

The specified increases in salaries and rates of pay set forth in Appendix A (or elsewhere in this Agreement or in any Appendix) for day school teachers or for any other employees covered by this Agreement shall apply in accordance with their terms to employees covered by this Agreement.

### 2. Special Education Differential

All special education teachers currently receiving the additional compensation set forth in Appendix A 11 F c or g of the 1975-78 Agreement shall continue to receive such additional compensation at the rate in effect on September 8, 1978 so long as they serve in any special education assignment. A teacher serving in a high school who is receiving the additional compensation hereunder and who is involuntarily assigned to a program which would disqualify him/her from continuing to receive such additional compensation shall have the opportunity to transfer to a vacancy for which he/she is qualified and which would enable him/her to continue to receive the additional compensation. Teachers newly assigned or employed in special education assignments after September 8, 1978 shall not be eligible for the additional compensation set forth therein.

## B. Salary Schedules

The approximate qualifications which appear at the head of each column marked "Descriptive Designation" are for general descriptive purposes only. In order to be placed on a particular schedule, the teacher must meet, in full, the qualifications hereinafter described.

All regularly appointed teachers will advance to the next step in the salary schedule on the anniversary date of their appointment and on March 1 of each year until they have advanced to the last step of the salary schedule.

Regular substitute teachers will advance to the next step in the salary schedule upon completion of each full year of regular substitute service and on March 1 of each such year but not beyond Step 4A of the salary schedule.

Full-term and other-than-occasional per diem substitutes serving in full-time vacancies shall be compensated at the first salary step in Schedule C1, or at such salary step and rate as may be payable pursuant to a certificate of salary fixation issued by the Chancellor. Such per diem substitute teachers will advance to the next step in the salary schedule upon completion of 170 school days of service and on March 1, following the completion of each such unit of 170 school days of service but not beyond Step 4A of the salary schedule.

Full-term and other-than-occasional per diem substitutes serving in regularly scheduled part time positions shall be compensated for each full day of service at the rate of one two-hundredth of the first salary step of Schedule C1, or at the rate of one two-hundredth of such salary step and rate as may be payable pursuant to a certificate of salary fixation issued by the Chancellor. Such per diem substitute teachers will advance to the next step in the salary schedule upon completion of 170 school days of service and on March 1, following the completion of each such unit of 170 school days of service but not beyond Step 4A of the salary schedule.

## TEACHER SALARY SCHEDULE
## MAY 19, 2008

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $45,530 | $49,831 | $47,124 | $50,071 | $51,425 | $54,372 | $53,019 | $57,320 |
| 1B | $45,530 | $49,831 | $47,124 | $50,071 | $51,425 | $54,372 | $53,019 | $57,320 |
| 2A | $48,434 | $52,735 | $50,028 | $52,975 | $54,329 | $57,276 | $55,923 | $60,224 |
| 2B | $48,434 | $52,735 | $50,028 | $52,975 | $54,329 | $57,276 | $55,923 | $60,224 |
| 3A | $48,836 | $53,137 | $50,430 | $53,377 | $54,731 | $57,678 | $56,325 | $60,626 |
| 3B | $48,836 | $53,137 | $50,430 | $53,377 | $54,731 | $57,678 | $56,325 | $60,626 |
| 4A | $49,543 | $53,844 | $51,137 | $54,084 | $55,438 | $58,385 | $57,032 | $61,333 |
| 4B | $49,543 | $53,844 | $51,137 | $54,084 | $55,438 | $58,385 | $57,032 | $61,333 |
| 5A | $50,153 | $54,454 | $51,747 | $54,694 | $56,048 | $58,995 | $57,642 | $61,943 |
| 5B | $50,153 | $54,454 | $51,747 | $54,694 | $56,048 | $58,995 | $57,642 | $61,943 |
| 6A | $50,812 | $55,113 | $52,406 | $55,353 | $56,707 | $59,654 | $58,301 | $62,602 |
| 6A+L5 | $51,812 | $56,113 | $53,406 | $56,353 | $57,707 | $60,654 | $59,301 | $63,602 |
| 6B | $51,744 | $56,045 | $53,338 | $56,285 | $57,639 | $60,586 | $59,233 | $63,534 |
| 6B+L5 | $52,744 | $57,045 | $54,338 | $57,285 | $58,639 | $61,586 | $60,233 | $64,534 |
| 7A | $53,128 | $57,429 | $54,722 | $57,669 | $59,023 | $61,970 | $60,617 | $64,918 |
| 7A+L5 | $54,128 | $58,429 | $55,722 | $58,669 | $60,023 | $62,970 | $61,617 | $65,918 |
| 7B | $56,370 | $60,671 | $57,964 | $60,911 | $62,265 | $65,212 | $63,859 | $68,160 |
| 7B+L5 | $57,370 | $61,671 | $58,964 | $61,911 | $63,265 | $66,212 | $64,859 | $69,160 |
| 8A | $59,404 | $63,705 | $60,998 | $63,945 | $65,299 | $68,246 | $66,893 | $71,194 |
| 8A+L5 | $60,404 | $64,705 | $61,998 | $64,945 | $66,299 | $69,246 | $67,893 | $72,194 |
| 8B | $63,006 | $67,307 | $64,600 | $67,547 | $68,901 | $71,848 | $70,495 | $74,796 |
| 8B+L5 | $64,006 | $68,307 | $65,600 | $68,547 | $69,901 | $72,848 | $71,495 | $75,796 |
| 8B+L10 | $67,095 | $71,396 | $68,689 | $71,636 | $72,990 | $75,937 | $74,584 | $78,885 |
| 8B+L13 | $69,197 | $73,498 | $70,791 | $73,738 | $75,092 | $78,039 | $76,686 | $80,987 |
| 8B+L15 | $73,636 | $77,937 | $75,230 | $78,177 | $79,531 | $82,478 | $81,125 | $85,426 |
| 8B+L18 | $74,800 | $79,101 | $76,394 | $79,341 | $80,695 | $83,642 | $82,289 | $86,590 |
| 8B+L20 | $83,412 | $87,713 | $85,006 | $87,953 | $89,307 | $92,254 | $90,901 | $95,202 |
| 8B+L22 | $88,259 | $92,560 | $89,853 | $92,800 | $94,154 | $97,101 | $95,748 | $100,049 |
| L5 | $1,000 | | | | | | | |
| L10 | $4,089 | | | | | | | |
| L13 | $6,191 | | | | | | | |
| L15 | $10,630 | | | | | | | |
| L18 | $11,794 | | | | | | | |
| L20 | $20,406 | | | | | | | |
| L22 | $25,253 | | | | | | | |

**MAY 1, 2013**

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $45,985 | $50,329 | $47,595 | $50,571 | $51,939 | $54,915 | $53,549 | $57,893 |
| 1B | $45,985 | $50,329 | $47,595 | $50,571 | $51,939 | $54,915 | $53,549 | $57,893 |
| 2A | $48,918 | $53,262 | $50,528 | $53,504 | $54,872 | $57,848 | $56,482 | $60,826 |
| 2B | $48,918 | $53,262 | $50,528 | $53,504 | $54,872 | $57,848 | $56,482 | $60,826 |
| 3A | $49,324 | $53,668 | $50,934 | $53,910 | $55,278 | $58,254 | $56,888 | $61,232 |
| 3B | $49,324 | $53,668 | $50,934 | $53,910 | $55,278 | $58,254 | $56,888 | $61,232 |
| 4A | $50,038 | $54,382 | $51,648 | $54,624 | $55,992 | $58,968 | $57,602 | $61,946 |
| 4B | $50,038 | $54,382 | $51,648 | $54,624 | $55,992 | $58,968 | $57,602 | $61,946 |
| 5A | $50,655 | $54,999 | $52,265 | $55,241 | $56,609 | $59,585 | $58,219 | $62,563 |
| 5B | $50,655 | $54,999 | $52,265 | $55,241 | $56,609 | $59,585 | $58,219 | $62,563 |
| 6A | $51,320 | $55,664 | $52,930 | $55,906 | $57,274 | $60,250 | $58,884 | $63,228 |
| 6A+L5 | $52,330 | $56,674 | $53,940 | $56,916 | $58,284 | $61,260 | $59,894 | $64,238 |
| 6B | $52,261 | $56,605 | $53,871 | $56,847 | $58,215 | $61,191 | $59,825 | $64,169 |
| 6B+L5 | $53,271 | $57,615 | $54,881 | $57,857 | $59,225 | $62,201 | $60,835 | $65,179 |
| 7A | $53,659 | $58,003 | $55,269 | $58,245 | $59,613 | $62,589 | $61,223 | $65,567 |
| 7A+L5 | $54,669 | $59,013 | $56,279 | $59,255 | $60,623 | $63,599 | $62,233 | $66,577 |
| 7B | $56,934 | $61,278 | $58,544 | $61,520 | $62,888 | $65,864 | $64,498 | $68,842 |
| 7B+L5 | $57,944 | $62,288 | $59,554 | $62,530 | $63,898 | $66,874 | $65,508 | $69,852 |
| 8A | $59,998 | $64,342 | $61,608 | $64,584 | $65,952 | $68,928 | $67,562 | $71,906 |
| 8A+L5 | $61,008 | $65,352 | $62,618 | $65,594 | $66,962 | $69,938 | $68,572 | $72,916 |
| 8B | $63,636 | $67,980 | $65,246 | $68,222 | $69,590 | $72,566 | $71,200 | $75,544 |
| 8B+L5 | $64,646 | $68,990 | $66,256 | $69,232 | $70,600 | $73,576 | $72,210 | $76,554 |
| 8B+L10 | $67,766 | $72,110 | $69,376 | $72,352 | $73,720 | $76,696 | $75,330 | $79,674 |
| 8B+L13 | $69,889 | $74,233 | $71,499 | $74,475 | $75,843 | $78,819 | $77,453 | $81,797 |
| 8B+L15 | $74,372 | $78,716 | $75,982 | $78,958 | $80,326 | $83,302 | $81,936 | $86,280 |
| 8B+L18 | $75,548 | $79,892 | $77,158 | $80,134 | $81,502 | $84,478 | $83,112 | $87,456 |
| 8B+L20 | $84,246 | $88,590 | $85,856 | $88,832 | $90,200 | $93,176 | $91,810 | $96,154 |
| 8B+L22 | $89,142 | $93,486 | $90,752 | $93,728 | $95,096 | $98,072 | $96,706 | $101,050 |
| L5 | $1,010 | | | | | | | |
| L10 | $4,130 | | | | | | | |
| L13 | $6,253 | | | | | | | |
| L15 | $10,736 | | | | | | | |
| L18 | $11,912 | | | | | | | |
| L20 | $20,610 | | | | | | | |
| L22 | $25,506 | | | | | | | |

**MAY 1, 2014**

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $46,445 | $50,832 | $48,071 | $51,077 | $52,459 | $55,464 | $54,085 | $58,472 |
| 1B | $46,445 | $50,832 | $48,071 | $51,077 | $52,459 | $55,464 | $54,085 | $58,472 |
| 2A | $49,407 | $53,794 | $51,033 | $54,039 | $55,421 | $58,426 | $57,047 | $61,434 |
| 2B | $49,407 | $53,794 | $51,033 | $54,039 | $55,421 | $58,426 | $57,047 | $61,434 |
| 3A | $49,817 | $54,204 | $51,443 | $54,449 | $55,831 | $58,836 | $57,457 | $61,844 |
| 3B | $49,817 | $54,204 | $51,443 | $54,449 | $55,831 | $58,836 | $57,457 | $61,844 |
| 4A | $50,538 | $54,925 | $52,164 | $55,170 | $56,552 | $59,557 | $58,178 | $62,565 |
| 4B | $50,538 | $54,925 | $52,164 | $55,170 | $56,552 | $59,557 | $58,178 | $62,565 |
| 5A | $51,162 | $55,549 | $52,788 | $55,794 | $57,176 | $60,181 | $58,802 | $63,189 |
| 5B | $51,162 | $55,549 | $52,788 | $55,794 | $57,176 | $60,181 | $58,802 | $63,189 |
| 6A | $51,833 | $56,220 | $53,459 | $56,465 | $57,847 | $60,852 | $59,473 | $63,860 |
| 6A+L5 | $52,853 | $57,240 | $54,479 | $57,485 | $58,867 | $61,872 | $60,493 | $64,880 |
| 6B | $52,784 | $57,171 | $54,410 | $57,416 | $58,798 | $61,803 | $60,424 | $64,811 |
| 6B+L5 | $53,804 | $58,191 | $55,430 | $58,436 | $59,818 | $62,823 | $61,444 | $65,831 |
| 7A | $54,196 | $58,583 | $55,822 | $58,828 | $60,210 | $63,215 | $61,836 | $66,223 |
| 7A+L5 | $55,216 | $59,603 | $56,842 | $59,848 | $61,230 | $64,235 | $62,856 | $67,243 |
| 7B | $57,503 | $61,890 | $59,129 | $62,135 | $63,517 | $66,522 | $65,143 | $69,530 |
| 7B+L5 | $58,523 | $62,910 | $60,149 | $63,155 | $64,537 | $67,542 | $66,163 | $70,550 |
| 8A | $60,598 | $64,985 | $62,224 | $65,230 | $66,612 | $69,617 | $68,238 | $72,625 |
| 8A+L5 | $61,618 | $66,005 | $63,244 | $66,250 | $67,632 | $70,637 | $69,258 | $73,645 |
| 8B | $64,272 | $68,659 | $65,898 | $68,904 | $70,286 | $73,291 | $71,912 | $76,299 |
| 8B+L5 | $65,292 | $69,679 | $66,918 | $69,924 | $71,306 | $74,311 | $72,932 | $77,319 |
| 8B+L10 | $68,443 | $72,830 | $70,069 | $73,075 | $74,457 | $77,462 | $76,083 | $80,470 |
| 8B+L13 | $70,588 | $74,975 | $72,214 | $75,220 | $76,602 | $79,607 | $78,228 | $82,615 |
| 8B+L15 | $75,115 | $79,502 | $76,741 | $79,747 | $81,129 | $84,134 | $82,755 | $87,142 |
| 8B+L18 | $76,303 | $80,690 | $77,929 | $80,935 | $82,317 | $85,322 | $83,943 | $88,330 |
| 8B+L20 | $85,088 | $89,475 | $86,714 | $89,720 | $91,102 | $94,107 | $92,728 | $97,115 |
| 8B+L22 | $90,033 | $94,420 | $91,659 | $94,665 | $96,047 | $99,052 | $97,673 | $102,060 |
| L5 | $1,020 | | | | | | | |
| L10 | $4,171 | | | | | | | |
| L13 | $6,316 | | | | | | | |
| L15 | $10,843 | | | | | | | |
| L18 | $12,031 | | | | | | | |
| L20 | $20,816 | | | | | | | |
| L22 | $25,761 | | | | | | | |

**SEPTEMBER 1, 2014**

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $48,445 | $52,832 | $50,071 | $53,077 | $54,459 | $57,464 | $56,085 | $60,472 |
| 1B | $48,445 | $52,832 | $50,071 | $53,077 | $54,459 | $57,464 | $56,085 | $60,472 |
| 2A | $49,407 | $53,794 | $51,033 | $54,039 | $55,421 | $58,426 | $57,047 | $61,434 |
| 2B | $49,407 | $53,794 | $51,033 | $54,039 | $55,421 | $58,426 | $57,047 | $61,434 |
| 3A | $49,817 | $54,204 | $51,443 | $54,449 | $55,831 | $58,836 | $57,457 | $61,844 |
| 3B | $49,817 | $54,204 | $51,443 | $54,449 | $55,831 | $58,836 | $57,457 | $61,844 |
| 4A | $50,538 | $54,925 | $52,164 | $55,170 | $56,552 | $59,557 | $58,178 | $62,565 |
| 4B | $50,538 | $54,925 | $52,164 | $55,170 | $56,552 | $59,557 | $58,178 | $62,565 |
| 5A | $51,162 | $55,549 | $52,788 | $55,794 | $57,176 | $60,181 | $58,802 | $63,189 |
| 5B | $51,162 | $55,549 | $52,788 | $55,794 | $57,176 | $60,181 | $58,802 | $63,189 |
| 6A | $51,833 | $56,220 | $53,459 | $56,465 | $57,847 | $60,852 | $59,473 | $63,860 |
| 6A+L5 | $52,853 | $57,240 | $54,479 | $57,485 | $58,867 | $61,872 | $60,493 | $64,880 |
| 6B | $52,784 | $57,171 | $54,410 | $57,416 | $58,798 | $61,803 | $60,424 | $64,811 |
| 6B+L5 | $53,804 | $58,191 | $55,430 | $58,436 | $59,818 | $62,823 | $61,444 | $65,831 |
| 7A | $54,196 | $58,583 | $55,822 | $58,828 | $60,210 | $63,215 | $61,836 | $66,223 |
| 7A+L5 | $55,216 | $59,603 | $56,842 | $59,848 | $61,230 | $64,235 | $62,856 | $67,243 |
| 7B | $57,503 | $61,890 | $59,129 | $62,135 | $63,517 | $66,522 | $65,143 | $69,530 |
| 7B+L5 | $58,523 | $62,910 | $60,149 | $63,155 | $64,537 | $67,542 | $66,163 | $70,550 |
| 8A | $60,598 | $64,985 | $62,224 | $65,230 | $66,612 | $69,617 | $68,238 | $72,625 |
| 8A+L5 | $61,618 | $66,005 | $63,244 | $66,250 | $67,632 | $70,637 | $69,258 | $73,645 |
| 8B | $64,272 | $68,659 | $65,898 | $68,904 | $70,286 | $73,291 | $71,912 | $76,299 |
| 8B+L5 | $65,292 | $69,679 | $66,918 | $69,924 | $71,306 | $74,311 | $72,932 | $77,319 |
| 8B+L10 | $68,443 | $72,830 | $70,069 | $73,075 | $74,457 | $77,462 | $76,083 | $80,470 |
| 8B+L13 | $70,588 | $74,975 | $72,214 | $75,220 | $76,602 | $79,607 | $78,228 | $82,615 |
| 8B+L15 | $75,115 | $79,502 | $76,741 | $79,747 | $81,129 | $84,134 | $82,755 | $87,142 |
| 8B+L18 | $76,303 | $80,690 | $77,929 | $80,935 | $82,317 | $85,322 | $83,943 | $88,330 |
| 8B+L20 | $85,088 | $89,475 | $86,714 | $89,720 | $91,102 | $94,107 | $92,728 | $97,115 |
| 8B+L22 | $90,033 | $94,420 | $91,659 | $94,665 | $96,047 | $99,052 | $97,673 | $102,060 |
| L5 | $1,020 | | | | | | | |
| L10 | $4,171 | | | | | | | |
| L13 | $6,316 | | | | | | | |
| L15 | $10,843 | | | | | | | |
| L18 | $12,031 | | | | | | | |
| L20 | $20,816 | | | | | | | |
| L22 | $25,761 | | | | | | | |

**MAY 1, 2015**

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $49,908 | $54,427 | $51,583 | $54,680 | $56,104 | $59,199 | $57,779 | $62,298 |
| 1B | $49,908 | $54,427 | $51,583 | $54,680 | $56,104 | $59,199 | $57,779 | $62,298 |
| 2A | $50,899 | $55,418 | $52,574 | $55,671 | $57,095 | $60,190 | $58,770 | $63,289 |
| 2B | $50,899 | $55,418 | $52,574 | $55,671 | $57,095 | $60,190 | $58,770 | $63,289 |
| 3A | $51,321 | $55,840 | $52,996 | $56,093 | $57,517 | $60,612 | $59,192 | $63,711 |
| 3B | $51,321 | $55,840 | $52,996 | $56,093 | $57,517 | $60,612 | $59,192 | $63,711 |
| 4A | $52,064 | $56,583 | $53,739 | $56,836 | $58,260 | $61,355 | $59,935 | $64,454 |
| 4B | $52,064 | $56,583 | $53,739 | $56,836 | $58,260 | $61,355 | $59,935 | $64,454 |
| 5A | $52,707 | $57,226 | $54,382 | $57,479 | $58,903 | $61,998 | $60,578 | $65,097 |
| 5B | $52,707 | $57,226 | $54,382 | $57,479 | $58,903 | $61,998 | $60,578 | $65,097 |
| 6A | $53,398 | $57,917 | $55,073 | $58,170 | $59,594 | $62,689 | $61,269 | $65,788 |
| 6A+L5 | $54,449 | $58,968 | $56,124 | $59,221 | $60,645 | $63,740 | $62,320 | $66,839 |
| 6B | $54,378 | $58,897 | $56,053 | $59,150 | $60,574 | $63,669 | $62,249 | $66,768 |
| 6B+L5 | $55,429 | $59,948 | $57,104 | $60,201 | $61,625 | $64,720 | $63,300 | $67,819 |
| 7A | $55,833 | $60,352 | $57,508 | $60,605 | $62,029 | $65,124 | $63,704 | $68,223 |
| 7A+L5 | $56,884 | $61,403 | $58,559 | $61,656 | $63,080 | $66,175 | $64,755 | $69,274 |
| 7B | $59,240 | $63,759 | $60,915 | $64,012 | $65,436 | $68,531 | $67,111 | $71,630 |
| 7B+L5 | $60,291 | $64,810 | $61,966 | $65,063 | $66,487 | $69,582 | $68,162 | $72,681 |
| 8A | $62,428 | $66,947 | $64,103 | $67,200 | $68,624 | $71,719 | $70,299 | $74,818 |
| 8A+L5 | $63,479 | $67,998 | $65,154 | $68,251 | $69,675 | $72,770 | $71,350 | $75,869 |
| 8B | $66,213 | $70,732 | $67,888 | $70,985 | $72,409 | $75,504 | $74,084 | $78,603 |
| 8B+L5 | $67,264 | $71,783 | $68,939 | $72,036 | $73,460 | $76,555 | $75,135 | $79,654 |
| 8B+L10 | $70,510 | $75,029 | $72,185 | $75,282 | $76,706 | $79,801 | $78,381 | $82,900 |
| 8B+L13 | $72,720 | $77,239 | $74,395 | $77,492 | $78,916 | $82,011 | $80,591 | $85,110 |
| 8B+L15 | $77,383 | $81,902 | $79,058 | $82,155 | $83,579 | $86,674 | $85,254 | $89,773 |
| 8B+L18 | $78,607 | $83,126 | $80,282 | $83,379 | $84,803 | $87,898 | $86,478 | $90,997 |
| 8B+L20 | $87,658 | $92,177 | $89,333 | $92,430 | $93,854 | $96,949 | $95,529 | $100,048 |
| 8B+L22 | $92,752 | $97,271 | $94,427 | $97,524 | $98,948 | $102,043 | $100,623 | $105,142 |
| L5 | $1,051 | | | | | | | |
| L10 | $4,297 | | | | | | | |
| L13 | $6,507 | | | | | | | |
| L15 | $11,170 | | | | | | | |
| L18 | $12,394 | | | | | | | |
| L20 | $21,445 | | | | | | | |
| L22 | $26,539 | | | | | | | |

**MAY 1, 2016**

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $51,650 | $56,327 | $53,383 | $56,589 | $58,062 | $61,265 | $59,796 | $64,472 |
| 1B | $51,650 | $56,327 | $53,383 | $56,589 | $58,062 | $61,265 | $59,796 | $64,472 |
| 2A | $52,676 | $57,353 | $54,409 | $57,615 | $59,088 | $62,291 | $60,822 | $65,498 |
| 2B | $52,676 | $57,353 | $54,409 | $57,615 | $59,088 | $62,291 | $60,822 | $65,498 |
| 3A | $53,112 | $57,789 | $54,845 | $58,051 | $59,524 | $62,727 | $61,258 | $65,934 |
| 3B | $53,112 | $57,789 | $54,845 | $58,051 | $59,524 | $62,727 | $61,258 | $65,934 |
| 4A | $53,881 | $58,558 | $55,614 | $58,820 | $60,293 | $63,496 | $62,027 | $66,703 |
| 4B | $53,881 | $58,558 | $55,614 | $58,820 | $60,293 | $63,496 | $62,027 | $66,703 |
| 5A | $54,547 | $59,224 | $56,280 | $59,486 | $60,959 | $64,162 | $62,693 | $67,369 |
| 5B | $54,547 | $59,224 | $56,280 | $59,486 | $60,959 | $64,162 | $62,693 | $67,369 |
| 6A | $55,262 | $59,939 | $56,995 | $60,201 | $61,674 | $64,877 | $63,408 | $68,084 |
| 6A+L5 | $56,350 | $61,027 | $58,083 | $61,289 | $62,762 | $65,965 | $64,496 | $69,172 |
| 6B | $56,276 | $60,953 | $58,009 | $61,215 | $62,688 | $65,891 | $64,422 | $69,098 |
| 6B+L5 | $57,364 | $62,041 | $59,097 | $62,303 | $63,776 | $66,979 | $65,510 | $70,186 |
| 7A | $57,782 | $62,459 | $59,515 | $62,721 | $64,194 | $67,397 | $65,928 | $70,604 |
| 7A+L5 | $58,870 | $63,547 | $60,603 | $63,809 | $65,282 | $68,485 | $67,016 | $71,692 |
| 7B | $61,308 | $65,985 | $63,041 | $66,247 | $67,720 | $70,923 | $69,454 | $74,130 |
| 7B+L5 | $62,396 | $67,073 | $64,129 | $67,335 | $68,808 | $72,011 | $70,542 | $75,218 |
| 8A | $64,607 | $69,284 | $66,340 | $69,546 | $71,019 | $74,222 | $72,753 | $77,429 |
| 8A+L5 | $65,695 | $70,372 | $67,428 | $70,634 | $72,107 | $75,310 | $73,841 | $78,517 |
| 8B | $68,524 | $73,201 | $70,257 | $73,463 | $74,936 | $78,139 | $76,670 | $81,346 |
| 8B+L5 | $69,612 | $74,289 | $71,345 | $74,551 | $76,024 | $79,227 | $77,758 | $82,434 |
| 8B+L10 | $72,971 | $77,648 | $74,704 | $77,910 | $79,383 | $82,586 | $81,117 | $85,793 |
| 8B+L13 | $75,258 | $79,935 | $76,991 | $80,197 | $81,670 | $84,873 | $83,404 | $88,080 |
| 8B+L15 | $80,084 | $84,761 | $81,817 | $85,023 | $86,496 | $89,699 | $88,230 | $92,906 |
| 8B+L18 | $81,351 | $86,028 | $83,084 | $86,290 | $87,763 | $90,966 | $89,497 | $94,173 |
| 8B+L20 | $90,718 | $95,395 | $92,451 | $95,657 | $97,130 | $100,333 | $98,864 | $103,540 |
| 8B+L22 | $95,989 | $100,666 | $97,722 | $100,928 | $102,401 | $105,604 | $104,135 | $108,811 |
| L5 | $1,088 | | | | | | | |
| L10 | $4,447 | | | | | | | |
| L13 | $6,734 | | | | | | | |
| L15 | $11,560 | | | | | | | |
| L18 | $12,827 | | | | | | | |
| L20 | $22,194 | | | | | | | |
| L22 | $27,465 | | | | | | | |

**MAY 1, 2017**

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $54,000 | $58,890 | $55,812 | $59,164 | $60,704 | $64,052 | $62,517 | $67,405 |
| 1B | $54,000 | $58,890 | $55,812 | $59,164 | $60,704 | $64,052 | $62,517 | $67,405 |
| 2A | $55,073 | $59,963 | $56,885 | $60,237 | $61,777 | $65,125 | $63,590 | $68,478 |
| 2B | $55,073 | $59,963 | $56,885 | $60,237 | $61,777 | $65,125 | $63,590 | $68,478 |
| 3A | $55,529 | $60,419 | $57,341 | $60,693 | $62,233 | $65,581 | $64,046 | $68,934 |
| 3B | $55,529 | $60,419 | $57,341 | $60,693 | $62,233 | $65,581 | $64,046 | $68,934 |
| 4A | $56,333 | $61,223 | $58,145 | $61,497 | $63,037 | $66,385 | $64,850 | $69,738 |
| 4B | $56,333 | $61,223 | $58,145 | $61,497 | $63,037 | $66,385 | $64,850 | $69,738 |
| 5A | $57,029 | $61,919 | $58,841 | $62,193 | $63,733 | $67,081 | $65,546 | $70,434 |
| 5B | $57,029 | $61,919 | $58,841 | $62,193 | $63,733 | $67,081 | $65,546 | $70,434 |
| 6A | $57,776 | $62,666 | $59,588 | $62,940 | $64,480 | $67,828 | $66,293 | $71,181 |
| 6A+L5 | $58,914 | $63,804 | $60,726 | $64,078 | $65,618 | $68,966 | $67,431 | $72,319 |
| 6B | $58,837 | $63,727 | $60,649 | $64,001 | $65,541 | $68,889 | $67,354 | $72,242 |
| 6B+L5 | $59,975 | $64,865 | $61,787 | $65,139 | $66,679 | $70,027 | $68,492 | $73,380 |
| 7A | $60,411 | $65,301 | $62,223 | $65,575 | $67,115 | $70,463 | $68,928 | $73,816 |
| 7A+L5 | $61,549 | $66,439 | $63,361 | $66,713 | $68,253 | $71,601 | $70,066 | $74,954 |
| 7B | $64,098 | $68,988 | $65,910 | $69,262 | $70,802 | $74,150 | $72,615 | $77,503 |
| 7B+L5 | $65,236 | $70,126 | $67,048 | $70,400 | $71,940 | $75,288 | $73,753 | $78,641 |
| 8A | $67,547 | $72,437 | $69,359 | $72,711 | $74,251 | $77,599 | $76,064 | $80,952 |
| 8A+L5 | $68,685 | $73,575 | $70,497 | $73,849 | $75,389 | $78,737 | $77,202 | $82,090 |
| 8B | $71,642 | $76,532 | $73,454 | $76,806 | $78,346 | $81,694 | $80,159 | $85,047 |
| 8B+L5 | $72,780 | $77,670 | $74,592 | $77,944 | $79,484 | $82,832 | $81,297 | $86,185 |
| 8B+L10 | $76,291 | $81,181 | $78,103 | $81,455 | $82,995 | $86,343 | $84,808 | $89,696 |
| 8B+L13 | $78,682 | $83,572 | $80,494 | $83,846 | $85,386 | $88,734 | $87,199 | $92,087 |
| 8B+L15 | $83,728 | $88,618 | $85,540 | $88,892 | $90,432 | $93,780 | $92,245 | $97,133 |
| 8B+L18 | $85,053 | $89,943 | $86,865 | $90,217 | $91,757 | $95,105 | $93,570 | $98,458 |
| 8B+L20 | $94,846 | $99,736 | $96,658 | $100,010 | $101,550 | $104,898 | $103,363 | $108,251 |
| 8B+L22 | $100,357 | $105,247 | $102,169 | $105,521 | $107,061 | $110,409 | $108,874 | $113,762 |
| L5 | $1,138 | | | | | | | |
| L10 | $4,649 | | | | | | | |
| L13 | $7,040 | | | | | | | |
| L15 | $12,086 | | | | | | | |
| L18 | $13,411 | | | | | | | |
| L20 | $23,204 | | | | | | | |
| L22 | $28,715 | | | | | | | |

**MAY 1, 2018**

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $55,059 | $60,045 | $56,907 | $60,324 | $61,894 | $65,308 | $63,743 | $68,727 |
| 1B | $55,059 | $60,045 | $56,907 | $60,324 | $61,894 | $65,308 | $63,743 | $68,727 |
| 2A | $56,153 | $61,139 | $58,001 | $61,418 | $62,988 | $66,402 | $64,837 | $69,821 |
| 2B | $56,153 | $61,139 | $58,001 | $61,418 | $62,988 | $66,402 | $64,837 | $69,821 |
| 3A | $56,618 | $61,604 | $58,466 | $61,883 | $63,453 | $66,867 | $65,302 | $70,286 |
| 3B | $56,618 | $61,604 | $58,466 | $61,883 | $63,453 | $66,867 | $65,302 | $70,286 |
| 4A | $57,437 | $62,423 | $59,285 | $62,702 | $64,272 | $67,686 | $66,121 | $71,105 |
| 4B | $57,437 | $62,423 | $59,285 | $62,702 | $64,272 | $67,686 | $66,121 | $71,105 |
| 5A | $58,147 | $63,133 | $59,995 | $63,412 | $64,982 | $68,396 | $66,831 | $71,815 |
| 5B | $58,147 | $63,133 | $59,995 | $63,412 | $64,982 | $68,396 | $66,831 | $71,815 |
| 6A | $58,909 | $63,895 | $60,757 | $64,174 | $65,744 | $69,158 | $67,593 | $72,577 |
| 6A+L5 | $60,069 | $65,055 | $61,917 | $65,334 | $66,904 | $70,318 | $68,753 | $73,737 |
| 6B | $59,990 | $64,976 | $61,838 | $65,255 | $66,825 | $70,239 | $68,674 | $73,658 |
| 6B+L5 | $61,150 | $66,136 | $62,998 | $66,415 | $67,985 | $71,399 | $69,834 | $74,818 |
| 7A | $61,595 | $66,581 | $63,443 | $66,860 | $68,430 | $71,844 | $70,279 | $75,263 |
| 7A+L5 | $62,755 | $67,741 | $64,603 | $68,020 | $69,590 | $73,004 | $71,439 | $76,423 |
| 7B | $65,355 | $70,341 | $67,203 | $70,620 | $72,190 | $75,604 | $74,039 | $79,023 |
| 7B+L5 | $66,515 | $71,501 | $68,363 | $71,780 | $73,350 | $76,764 | $75,199 | $80,183 |
| 8A | $68,871 | $73,857 | $70,719 | $74,136 | $75,706 | $79,120 | $77,555 | $82,539 |
| 8A+L5 | $70,031 | $75,017 | $71,879 | $75,296 | $76,866 | $80,280 | $78,715 | $83,699 |
| 8B | $73,047 | $78,033 | $74,895 | $78,312 | $79,882 | $83,296 | $81,731 | $86,715 |
| 8B+L5 | $74,207 | $79,193 | $76,055 | $79,472 | $81,042 | $84,456 | $82,891 | $87,875 |
| 8B+L10 | $77,787 | $82,773 | $79,635 | $83,052 | $84,622 | $88,036 | $86,471 | $91,455 |
| 8B+L13 | $80,225 | $85,211 | $82,073 | $85,490 | $87,060 | $90,474 | $88,909 | $93,893 |
| 8B+L15 | $85,370 | $90,356 | $87,218 | $90,635 | $92,205 | $95,619 | $94,054 | $99,038 |
| 8B+L18 | $86,721 | $91,707 | $88,569 | $91,986 | $93,556 | $96,970 | $95,405 | $100,389 |
| 8B+L20 | $96,706 | $101,692 | $98,554 | $101,971 | $103,541 | $106,955 | $105,390 | $110,374 |
| 8B+L22 | $102,325 | $107,311 | $104,173 | $107,590 | $109,160 | $112,574 | $111,009 | $115,993 |
| L5 | $1,160 | | | | | | | |
| L10 | $4,740 | | | | | | | |
| L13 | $7,178 | | | | | | | |
| L15 | $12,323 | | | | | | | |
| L18 | $13,674 | | | | | | | |
| L20 | $23,659 | | | | | | | |
| L22 | $29,278 | | | | | | | |

**JUNE 16, 2018**

| | BA | | BA+30 | | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|---|---|---|
| | C1 | C1+PD | C2 | C2+ID | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $56,711 | $61,847 | $58,614 | $62,134 | $63,751 | $67,267 | $65,656 | $70,789 |
| 1B | $56,711 | $61,847 | $58,614 | $62,134 | $63,751 | $67,267 | $65,656 | $70,789 |
| 2A | $57,838 | $62,974 | $59,741 | $63,261 | $64,878 | $68,394 | $66,783 | $71,916 |
| 2B | $57,838 | $62,974 | $59,741 | $63,261 | $64,878 | $68,394 | $66,783 | $71,916 |
| 3A | $58,317 | $63,453 | $60,220 | $63,740 | $65,357 | $68,873 | $67,262 | $72,395 |
| 3B | $58,317 | $63,453 | $60,220 | $63,740 | $65,357 | $68,873 | $67,262 | $72,395 |
| 4A | $59,160 | $64,296 | $61,063 | $64,583 | $66,200 | $69,716 | $68,105 | $73,238 |
| 4B | $59,160 | $64,296 | $61,063 | $64,583 | $66,200 | $69,716 | $68,105 | $73,238 |
| 5A | $59,891 | $65,027 | $61,794 | $65,314 | $66,931 | $70,447 | $68,836 | $73,969 |
| 5B | $59,891 | $65,027 | $61,794 | $65,314 | $66,931 | $70,447 | $68,836 | $73,969 |
| 6A | $60,676 | $65,812 | $62,579 | $66,099 | $67,716 | $71,232 | $69,621 | $74,754 |
| 6A+L5 | $61,871 | $67,007 | $63,774 | $67,294 | $68,911 | $72,427 | $70,816 | $75,949 |
| 6B | $61,790 | $66,926 | $63,693 | $67,213 | $68,830 | $72,346 | $70,735 | $75,868 |
| 6B+L5 | $62,985 | $68,121 | $64,888 | $68,408 | $70,025 | $73,541 | $71,930 | $77,063 |
| 7A | $63,443 | $68,579 | $65,346 | $68,866 | $70,483 | $73,999 | $72,388 | $77,521 |
| 7A+L5 | $64,638 | $69,774 | $66,541 | $70,061 | $71,678 | $75,194 | $73,583 | $78,716 |
| 7B | $67,316 | $72,452 | $69,219 | $72,739 | $74,356 | $77,872 | $76,261 | $81,394 |
| 7B+L5 | $68,511 | $73,647 | $70,414 | $73,934 | $75,551 | $79,067 | $77,456 | $82,589 |
| 8A | $70,937 | $76,073 | $72,840 | $76,360 | $77,977 | $81,493 | $79,882 | $85,015 |
| 8A+L5 | $72,132 | $77,268 | $74,035 | $77,555 | $79,172 | $82,688 | $81,077 | $86,210 |
| 8B | $75,238 | $80,374 | $77,141 | $80,661 | $82,278 | $85,794 | $84,183 | $89,316 |
| 8B+L5 | $76,433 | $81,569 | $78,336 | $81,856 | $83,473 | $86,989 | $85,378 | $90,511 |
| 8B+L10 | $80,120 | $85,256 | $82,023 | $85,543 | $87,160 | $90,676 | $89,065 | $94,198 |
| 8B+L13 | $82,631 | $87,767 | $84,534 | $88,054 | $89,671 | $93,187 | $91,576 | $96,709 |
| 8B+L15 | $87,931 | $93,067 | $89,834 | $93,354 | $94,971 | $98,487 | $96,876 | $102,009 |
| 8B+L18 | $89,322 | $94,458 | $91,225 | $94,745 | $96,362 | $99,878 | $98,267 | $103,400 |
| 8B+L20 | $99,607 | $104,743 | $101,510 | $105,030 | $106,647 | $110,163 | $108,552 | $113,685 |
| 8B+L22 | $105,394 | $110,530 | $107,297 | $110,817 | $112,434 | $115,950 | $114,339 | $119,472 |
| L5 | $1,195 | | | | | | | |
| L10 | $4,882 | | | | | | | |
| L13 | $7,393 | | | | | | | |
| L15 | $12,693 | | | | | | | |
| L18 | $14,084 | | | | | | | |
| L20 | $24,369 | | | | | | | |
| L22 | $30,156 | | | | | | | |

**C. Longevity Increments**

1. Effective September 16, 1998 (May 19, 2008 for the five year longevity increment) or on such date thereafter as the requirements shall be met, additional compensation shall be paid to those teachers eligible therefor pursuant to the conditions and at the rates set forth below.  Such additional compensation shall be known as the "longevity increment" and the gross annual salary rates of teachers to whom said longevity increment is payable shall be computed by adding the sum provided per annum to the rates ascertained without consideration of said longevity increment.  Longevity increments shall be payable as follows to appointed teachers with the requisite years of pedagogical service in the New York City public schools:

## LONGEVITY INCREMENTS

| Years of NYC Public School Service | Effective Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **May 19, 2008** | **May 1, 2013** | **May 1, 2014** | **May 1, 2015** | **May 1, 2016** | **May 1, 2017** | **May 1, 2018** | **June 16, 2018** |
| 5 but less than 10 | $1,000 | $1,010 | $1,020 | $1,051 | $1,088 | $1,138 | $1,160 | $1,195 |
| 10 but less than 13 | $4,089 | $4,130 | $4,171 | $4,297 | $4,447 | $4,649 | $4,740 | $4,882 |
| 13 but less than 15 | $6,191 | $6,253 | $6,316 | $6,507 | $6,734 | $7,040 | $7,178 | $7,393 |
| 15 but less than 18 | $10,630 | $10,736 | $10,843 | $11,170 | $11,560 | $12,086 | $12,323 | $12,693 |
| 18 but less than 20 | $11,794 | $11,912 | $12,031 | $12,394 | $12,827 | $13,411 | $13,674 | $14,084 |
| 20 but less than 22 | $20,406 | $20,610 | $20,816 | $21,445 | $22,194 | $23,204 | $23,659 | $24,369 |
| 22 or more | $25,253 | $25,506 | $25,761 | $26,539 | $27,465 | $28,715 | $29,278 | $30,156 |

2. Pursuant to law, the service required for these longevity increments shall include teaching service outside the New York City public school system and/or related non-teaching experience for which salary credit was granted by the Board prior to April 12, 1971.

**D. Payment Under Schedule C1**

Rates under Schedule C1 shall be paid to teachers who do not qualify as provided hereinafter in this Section for payment under any other Schedule.

**E. Qualification for Schedule C2-First Differential**

1. Rates under Schedule C2 shall be paid to teachers covered by this Agreement when they qualify for a salary differential by reason of having completed (1) 30 semester hours of approved study beyond the baccalaureate or (2) 30 semester hours of approved study beyond such courses offered for and accepted by the Board as the equivalent of a baccalaureate for eligibility for the license under which the teacher is serving at the time of filing application for the salary differential or (3) holding an approved master's degree

issued by a recognized college or university.  In any of the above cases, qualification for the differential shall be evidenced by a certificate issued by the Chancellor.

2.   Effective January 1, 1958, rates under Schedule C2 shall be paid to teachers covered by this Agreement who, at the time of licensing, were not required to be holders of a baccalaureate or its equivalent as an exclusive prerequisite to said licensing; with the proviso that such teachers qualify for a salary differential, as evidenced by a certificate issued by the Chancellor, by reason of having completed 30 semester hours of approved study beyond the academic qualifications submitted and accepted for said licensing; except that the additional 30 semester hours of approved study shall be waived (for purposes of placement under this paragraph only) in the case of any teacher holding a baccalaureate or who was graduated from an approved four year normal school course, if such teacher was licensed as a result of an examination wherein the academic qualifications for the license were not restricted to holders of a baccalaureate or its equivalent.

3.   Effective July l, 1964, any teacher who was graduated from an approved three-year normal or teacher training school course and has completed 15 semester hours of approved study beyond such graduation shall qualify for salary placement under Schedule C2 if such a teacher, at the time of licensing, was not required to be a holder of a baccalaureate or its equivalent as an exclusive prerequisite to such licensing.

4.   Effective July l, 1962, teachers of shop subjects (trades) shall qualify for the salary differential payable pursuant to the terms and conditions of this paragraph upon completion of the required 32 semester hours of approved teacher training courses set forth in Section 389 of the Board of Education by-laws.

Effective February 1, 1985, teachers of shop subjects (trades) shall qualify for the salary differential payable pursuant to the terms and conditions of this paragraph upon completion of the required 30 semester hours of approved teacher training courses set forth in Chancellor's Regulation C389.  Years of experience beyond those required for the license may be substituted for the required 30 semester hours of approved teacher training courses at the rate of 15 credits for each year of such experience, provided that experience used for this purpose is not used to qualify for any other differential.

5.   Effective July 1, 1965, teachers of business subjects shall qualify for the salary differential payable pursuant to the terms and conditions of this paragraph upon submitting evidence of meeting in full the requirements of such license which were in effect as of July 1, 1963 through June 30, 1965, as then set forth in Section 347b of the Board of Education by-laws.

6.   Effective July l, 1963, teachers of related technical subjects shall qualify for the salary differential payable pursuant to the terms and conditions of this paragraph upon submitting evidence of meeting in full, the requirements for such license as set forth in Section 387 of the Board of Education by-laws.

**F.  Qualification for Schedule C6-Second Differential**

1.   Commencing September 1, 1969, eligibility for the second differential (Schedule C6) shall be acquired by a teacher who:

a.   holds an approved doctorate issued by a recognized college or university; or

b.   holds an approved master's degree issued by a recognized college or university and who, after having earned the baccalaureate has satisfactorily completed 30 semester hours of approved credits in college or university study in addition to those required for

the master's degree; and/or effective September 1996, professional development courses and /or activities approved by the Chancellor; or

c.   effective September 1996, achieves full National Board for Professional Teaching Standards (NBPTS) certification.

Provided, however, that a teacher regularly employed by the Board of Education on June 30, 1967, who had satisfied the conditions of eligibility then existing or who satisfied those conditions not later than June 30, 1970, shall not be affected by this alteration of the conditions of entitlement;

Provided, further, that teachers of shop subjects (trades), teachers of industrial arts, teachers of business subjects and teachers of related technical subjects may continue to qualify by meeting the requirements existing on June 30, 1967, as listed in sub-paragraphs (1) through (12), below.

2.a.  Teachers who were regularly employed on June 30, 1967, may qualify for the second differential by meeting any of the following requirements not later than June 30, 1970:

(1) Teachers who hold an approved doctorate issued by a recognized college or university.

(2) Teachers who hold an approved master's degree issued by a recognized college or university and who, after having earned the baccalaureate, have completed 30 semester hours of approved study.

(3) Teachers who hold an approved baccalaureate issued by a recognized college or university and who, beyond such degree, have completed 60 semester hours of approved study.

(4) Effective July l, 1964, teachers who, at the time of appointment, were not required to hold a baccalaureate as an exclusive prerequisite to qualify for the teaching license, provided:

(a) graduates of an approved four year normal or teacher training school, or holders of a baccalaureate, have completed 30 semester hours of approved study beyond such graduation or degree, or

(b) graduates of an approved three-year normal or teacher training school have completed 45 semester hours of approved study beyond such graduation, or

(c) graduates of an approved two-year normal or teacher training school have completed 60 semester hours of approved study beyond such graduation.

(5) Teachers who have completed 60 semester hours of approved study beyond such courses offered for and accepted by the Board of Examiners as the equivalent of a baccalaureate for eligibility for the license under which the teacher is serving at the time of filing application for salary differential.

(6) Teachers of shop subjects (trades) who hold a baccalaureate and in addition have had five years of journeyman trade experience.

(7) Teachers of shop subjects (trades) who have established eligibility for the first differential and who in addition thereto (1) have successfully completed a program of 30 semester hours of courses formulated by the State Commissioner of Education for extension of license to permit teaching of related technical material in the trade areas; and (2) hold a certificate of competency in related technical subjects issued on the basis of a recommendation of the Board of Examiners following the passing of a suitable examination.

SUBSTITUTION: An in-service course or courses marked "C" or "D" or a course or courses taken at a recognized college or university may be substituted for a course or courses of the same number of semester hours to be offered under paragraph (7) above, provided such course or courses were completed prior to September 1, 1959.

(8) Teachers of shop subjects (trades) who have established eligibility for the first differential, and who in addition thereto have completed 30 semester hours of approved study; with the proviso that each year of journeyman experience beyond the number required for the license may be submitted as the equivalent of 15 semester hours of approved study. Effective February 1, 1985, journeyman experience submitted to establish eligibility for the first differential may not be submitted to establish eligibility for the second differential.

(9) Effective July 1, 1962, teachers of shop subjects (trades) appointed prior to July 1, 1947, to serve in junior high schools whose licenses qualified them for appointment to service in academic or vocational high schools at that time in the same manner as teachers of shop subjects (trades) who were appointed prior to July 1, 1947, to academic or vocational high schools.

(10) Effective July 1, 1963, teachers of industrial arts appointed prior to July 1, 1947, to serve in junior high schools.

(11) Effective July 1, 1965, teachers of business subjects who have established eligibility for the first differential and who, in addition thereto, have completed 30 semester hours of approved study. All approved courses, beyond those needed to meet license requirements in effect as of July 1, 1963, through June 30, 1965, as then set forth in Section 347b of the Board of Education by-laws, shall be credited toward the second differential.

(12) Effective July 1, 1963, teachers of related technical subjects who have established eligibility for the first differential and who in addition thereto have completed 30 semester hours of approved study, with the proviso that a maximum of 15 semester hours of study shall be granted for approved and appropriate experience of not less than one year above the three years required by Section 387 of the Board of Education by-laws.

b. For teachers who were regularly employed on June 30, 1967, service as a cooperating teacher for a full term in an approved teacher training program may be submitted as the equivalent of two semester hours of approved study in meeting requirements for the second differential under paragraph a, above. A maximum of four semester hours of approved study may be granted for such service.

## G. Footnotes to Schedules

1. A teacher appointed prior to July 1, 1947, who returns to active service following a leave of absence without pay or upon withdrawal of resignation or upon restoration to service by the Chancellor shall be compensated under the appropriate schedule at a salary step computed in accordance with the revised equated date of appointment, by reference to all salary schedules, charts and conditions operative between July 1, 1947, and the date of resumption of active service.

2. Teachers of agriculture shall be paid under the appropriate schedule with the addition of 10% to their rates.

**H. Promotional Differential**

On such date as the requirements shall be met, as evidenced by a certificate issued by the Chancellor, additional compensation, known as the "Promotional Differential," shall be paid to teachers eligible therefor pursuant to the conditions set forth below. The promotional differential shall be at the rate of $4,301 per annum ($4,344 effective May 1, 2013; $4,387 effective May 1, 2014; $4,519 effective May 1, 2015; $4,677 effective May 1, 2016; $4,890 effective May 1, 2017; $4,986 effective May 1, 2018; and $5,136 effective June 16, 2018). The gross annual salary rates of teachers to whom said promotional differential is payable shall be computed by adding the applicable sum per annum to the annual rates ascertained without consideration of said promotional differential.

Promotional differentials shall be payable to:

l. Regularly appointed teachers serving under junior or senior high school licenses in day academic or day vocational high schools, junior high schools and, effective July 1, 1963, in "400" schools, "600" schools or "K-8" schools or as teachers of homebound children, who have met requirements, in full, for such licenses.

2. Teachers who hold an approved master's degree issued by a recognized college or university.

3. Teachers who hold an approved baccalaureate issued by a recognized college or university and who beyond such degree have satisfactorily completed 30 semester hours of approved credits in college or university study, provided however, that teachers seeking eligibility under this subdivision shall have completed not less than 36 semester hours of study in an approved subject matter area, which may be in combination of graduate and undergraduate study.

4. All teachers compensated under Salary Schedule C6 as of June 30, 1962, provided said teachers shall have completed 24 hours of study in an approved subject matter area which may be in combination of graduate and undergraduate study. The differential herein provided shall become payable only when the study requirements have been met.

5. Teachers of shop subjects (trades) appointed after July l, 1947, who are compensated under Salary Schedule C2, and who have completed the required 32 semester hours of approved teacher training courses set forth in Section 389 of the Board of Education by-laws.

6. Teachers assigned to service in special education areas in accordance with Footnote "g" of Section 513 of the Board's by-laws and who do not otherwise qualify for the promotional differential shall be permitted to qualify for such promotional differential by offering the appropriate special education courses to the extent described in Footnote "g" of Section 513 as part of the subject matter area courses described in paragraphs 3 and 4, above. Teachers who qualify in this manner shall be eligible for the promotional differential upon submitting, with their applications, a waiver of the additional compensation of $200 per annum currently payable. However, if and when teachers in special education areas shall qualify for the promotional differential, upon filing separate applications therefor under paragraph 2, 3, 4 or 5 above, such additional compensation of $200 per annum shall nevertheless be paid to those teachers during assignment to special education areas if they otherwise are eligible to receive the additional compensation under the terms of this Agreement.

7. Effective July 1, 1965, teachers of special classes as covered by Section 312 of these by-laws, teachers of speech improvement, and teachers of homebound children who were licensed to teach in such special education areas and were appointed to serve in such license prior to July 1, 1947.

8. Effective July 1, 1965, teachers who, at the time of appointment, were not required to hold a baccalaureate or its equivalent to qualify for the teaching license under which the teacher is serving and who are graduates of a recognized two, three or four year normal school or training school for teachers, provided that such teachers have completed (a) 120 semester hours of approved study accepted by the Board as the equivalent of a baccalaureate, and (b) 30 semester hours of approved credits in college or university study beyond such baccalaureate equivalent, and (c) not less than 36 semester hours of study in an approved subject matter area, which may be in combination of graduate and undergraduate study.

9. Substitute teachers may qualify for the promotional differential by meeting the eligibility requirements set forth in paragraphs 2, 3, 4 and 5, above. Substitute teachers shall qualify also if they are compensated under Salary Schedule C6 by virtue of a license issued as a result of prior service as a regular teacher compensated under Salary Schedule IIa.

10. Effective September 9, 1975, the "approved subject matter areas" referred to above shall include every subject in which a subject matter license exists or may be established.

**I. Intermediate Differential**

On such date as the requirements shall be met, as evidenced by a certificate issued by the Chancellor, additional compensation at the rate of $2,947 ($2,976 effective May 1, 2013; $3,006 effective May 1, 2014; $3,097 effective May 1, 2015; $3,206 effective May 1, 2016; $3,352 effective May 1, 2017; $3,417 effective May 1, 2018; and $3,520 effective June 16, 2018) per annum shall be paid to those teachers eligible therefor pursuant to the conditions set forth below. Such additional compensation shall be known as the "Intermediate Differential," and the gross annual salary rates of teachers to whom said intermediate differential is payable, shall be computed by adding the applicable sum to the rates ascertained without consideration of said intermediate differential.

Intermediate differentials shall be payable to teachers who hold an approved baccalaureate issued by a recognized college or university and who beyond such degree have satisfactorily completed 60 semester hours of approved credits in college or university study.

The intermediate differential is not payable to anyone receiving the second differential.

# APPENDIX B
# SPECIAL CIRCULAR

1. A child who threatens or engages in physical violence to himself, his/her fellow students, or a teacher may be directed by the teacher to report immediately to the principal or other designated supervisor under such escort as is prescribed by the school. Such pupil shall not be returned to the classroom without consultation between the principal and the teacher.

2.  Pupils who so seriously disrupt the classroom work as to impede effective instruction may be reported by the teacher to the principal or other designated supervisor. Such report shall be in writing and shall contain substantiating data on the behavior of the child.

3.  Upon receiving a report of violent or disruptive behavior the principal or his/her designated representative shall make a suitable investigation and shall promptly initiate a course of action that will best serve the needs of the school and the child.

4.  If the problem is not solved in this manner after available courses of action have been taken and the decision has been reached by the principal that the child still so seriously disrupts the classroom work as to impede effective instruction, the child should be referred to other facilities within the school.  If no such facilities exist within the school the principal shall refer the case to the community or assistant superintendent under existing procedures.

5.  Each plan of action should involve the parent, the teacher, the child and other appropriate personnel.  No final decision on placement or care should be arrived at without such participation.

6.  If action by the principal is unduly delayed or if the child is repeatedly returned to the same teacher's classroom or if a series of actions by the principal does not resolve the issue, the teacher may appeal to the community or assistant superintendent.  The community or assistant superintendent shall set up an appropriate procedure for review and disposition of such cases.  If the community or assistant superintendent finds that the continued presence of that child in a regular classroom so interferes with instruction as to be seriously detrimental to the interests of all the children (including the particular child), he/she shall, if consistent with applicable law, direct that the child not be returned to a regular class and follow appropriate procedures for the proper placement of the child.

7.  There shall be established in each district a panel to hear appeals from the decision of the community or assistant superintendent.  The panel shall consist of a teacher selected by the Union, a parent selected by the local school board from a list of three names submitted to it by the district parents' council, and a third member selected by the community or assistant superintendent who shall be employed by the school system in the field of psychology or social work or guidance.  The panel shall have the power to make recommendations in writing to the Chancellor who shall make the final decision on the appeal in accordance with applicable law.  During the first year of this circular the Chancellor will render his/her decision within 30 days following receipt of the panel recommendations and thereafter within 15 days.

## APPENDIX C
## GRIEVANCE FORMS
## STEP 1 GRIEVANCE

School:_____District:_____

Name of Grievant:_____

Title (teacher, guidance counselor, etc.):_____

File Number:_____

Date Grievance Occurred:_____

Set forth specifically the act or condition and the grounds on which the grievance is based:
Specific contractual article and section alleged to be violated:
Specific remedy sought:

_____

(Signature of Grievant)

Date filed:

**GRIEVANCE CONFERENCE**

Date:

                  Attendees:

*Name*                *Title*

*Decision including supporting reason:*

_____

(Signature)

**APPENDIX D**
**MENTOR TEACHER INTERNSHIP**

On June 10, 2002, the following understanding was reached regarding the Mentor Teacher Internship Program:

The Mentor Advisory Selection Committee, subject to selection criteria, recommends teachers and retirees to Superintendents for approval to act as mentors.  Under existing guidelines, applicants who are current teachers have a preference for referral to Superintendents before retirees or teachers on unpaid leave.

The parties agree that the Board's memo to the field on the Mentor Teacher Internship Program will be amended to establish preferences for referrals to Superintendents in the following order of priority from among applicants who are recommended by the committee: school based staff developers, teachers in the school, district based staff developers, full time mentors, retirees and teachers on unpaid leave. During the school year, staff developers will not be assigned to mentor more than two teachers.  It is understood that participation in the Mentor Teacher Intern Program will continue to be voluntary.

## APPENDIX E
## HEALTH INSURANCE

In accordance with the LOBA determination and award in Case No. IA-1-85 and subsequent agreements, the following shall apply:

1. Effective July 1, 1983 and thereafter, the Employer's cost for each contract for each Employee under age 65 and for each retiree under age 65 who selects either HIP/HMO or Blue Cross/GHI-CBP coverage (or a replacement plan) shall be equalized at the community rated basic HIP/HMO plan payment rate as approved by the State Department of Insurance on a category basis of individual or family, e.g. the Blue Cross/GHI-CBP payment for family coverage shall be equal to the HIP/HMO payment for family coverage.

2. If a replacement plan is offered to employees and retirees under age 65 which exceeds the cost of the HIP/HMO equalization provided for in Section 1, the City shall not bear the additional costs.

3. The Employers shall contribute on a City employee benefits program-wide basis the additional annual amount of $30 million to provide a health insurance stabilization reserve fund which shall be used to continue equalization and protect the integrity of health insurance benefits.

4. The health insurance stabilization reserve fund shall be used: to provide a sufficient reserve; to maintain to the extent possible the current level of health insurance benefits provided under the Blue Cross/GHI-CBP plan; and, if sufficient funds are available, to fund new benefits.

5. The health insurance stabilization reserve fund shall be credited with the dividends or reduced by the losses attributable to the Blue Cross/GHI-CBP plan.

## APPENDIX F
## SALARY SCHEDULES OF
## ADULT EDUCATION TEACHERS

Adult Education teachers will be paid in accordance with the following salary schedules:

## ADULT EDUCATION TEACHER SALARY SCHEDULE
## MAY 19, 2008

|  | BA | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|
|  | C1 | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $45,530 | $51,425 | $54,372 | $53,019 | $57,320 |
| 1B | $45,530 | $51,425 | $54,372 | $53,019 | $57,320 |
| 2A | $48,434 | $54,329 | $57,276 | $55,923 | $60,224 |
| 2B | $48,434 | $54,329 | $57,276 | $55,923 | $60,224 |
| 3A | $48,836 | $54,731 | $57,678 | $56,325 | $60,626 |
| 3B | $48,836 | $54,731 | $57,678 | $56,325 | $60,626 |
| 4A | $49,543 | $55,438 | $58,385 | $57,032 | $61,333 |
| 4B | $49,543 | $55,438 | $58,385 | $57,032 | $61,333 |

| | | | | | |
|---|---|---|---|---|---|
| 5A | $50,153 | $56,048 | $58,995 | $57,642 | $61,943 |
| 5B | $50,153 | $56,048 | $58,995 | $57,642 | $61,943 |
| 6A | $50,812 | $56,707 | $59,654 | $58,301 | $62,602 |
| 6A+L5 | $51,821 | $57,707 | $60,654 | $59,301 | $63,602 |
| 6B | $51,744 | $57,639 | $60,586 | $59,233 | $63,534 |
| 6B+L5 | $52,744 | $58,639 | $61,586 | $60,233 | $64,534 |
| 7A | $53,128 | $59,023 | $61,970 | $60,617 | $64,918 |
| 7A+L5 | $54,128 | $60,023 | $62,970 | $61,617 | $65,918 |
| 7B | $56,370 | $62,265 | $65,212 | $63,859 | $68,160 |
| 7B+L5 | $57,370 | $63,265 | $66,212 | $64,859 | $69,160 |
| 8A | $59,404 | $65,299 | $68,246 | $66,893 | $71,194 |
| 8A+L5 | $60,404 | $66,299 | $69,246 | $67,893 | $72,194 |
| 8B | $63,006 | $68,901 | $71,848 | $70,495 | $74,796 |
| 8B+L5 | $64,006 | $69,901 | $72,848 | $71,495 | $75,796 |
| 8B+L10 | $67,095 | $72,990 | $75,937 | $74,584 | $78,885 |
| 8B+L13 | $69,197 | $75,092 | $78,039 | $76,686 | $80,987 |
| 8B+L15 | $73,636 | $79,531 | $82,478 | $81,125 | $85,426 |
| 8B+L18 | $74,800 | $80,695 | $83,642 | $82,289 | $86,590 |
| 8B+L20 | $83,412 | $89,307 | $92,254 | $90,901 | $95,202 |
| 8B+L22 | $88,259 | $94,154 | $97,101 | $95,748 | $100,049 |
| L5 | $1,000 | | | | |
| L10 | $4,089 | | | | |
| L13 | $6,191 | | | | |
| L15 | $10,630 | | | | |
| L18 | $11,794 | | | | |
| L20 | $20,406 | | | | |
| L22 | $25,253 | | | | |

**MAY 1, 2013**

| | BA | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|
| | C1 | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $45,985 | $51,939 | $54,915 | $53,549 | $57,893 |
| 1B | $45,985 | $51,939 | $54,915 | $53,549 | $57,893 |
| 2A | $48,918 | $54,872 | $57,848 | $56,482 | $60,826 |
| 2B | $48,918 | $54,872 | $57,848 | $56,482 | $60,826 |
| 3A | $49,324 | $55,278 | $58,254 | $56,888 | $61,232 |
| 3B | $49,324 | $55,278 | $58,254 | $56,888 | $61,232 |
| 4A | $50,038 | $55,992 | $58,968 | $57,602 | $61,946 |
| 4B | $50,038 | $55,992 | $58,968 | $57,602 | $61,946 |
| 5A | $50,655 | $56,609 | $59,585 | $58,219 | $62,563 |
| 5B | $50,655 | $56,609 | $59,585 | $58,219 | $62,563 |
| 6A | $51,320 | $57,274 | $60,250 | $58,884 | $63,228 |

| | | | | | |
|---|---|---|---|---|---|
| 6A+L5 | $52,330 | $58,284 | $61,260 | $59,894 | $64,238 |
| 6B | $52,261 | $58,215 | $61,191 | $59,825 | $64,169 |
| 6B+L5 | $53,271 | $59,225 | $62,201 | $60,835 | $65,179 |
| 7A | $53,659 | $59,613 | $62,589 | $61,223 | $65,567 |
| 7A+L5 | $54,669 | $60,623 | $63,599 | $62,233 | $66,577 |
| 7B | $56,934 | $62,888 | $65,864 | $64,498 | $68,842 |
| 7B+L5 | $57,944 | $63,898 | $66,874 | $65,508 | $69,852 |
| 8A | $59,998 | $65,952 | $68,928 | $67,562 | $71,906 |
| 8A+L5 | $61,008 | $66,962 | $69,938 | $68,572 | $72,916 |
| 8B | $63,636 | $69,590 | $72,566 | $71,200 | $75,544 |
| 8B+L5 | $64,646 | $70,600 | $73,576 | $72,210 | $76,554 |
| 8B+L10 | $67,766 | $73,720 | $76,696 | $75,330 | $79,674 |
| 8B+L13 | $69,889 | $75,843 | $78,819 | $77,453 | $81,797 |
| 8B+L15 | $74,372 | $80,326 | $83,302 | $81,936 | $86,280 |
| 8B+L18 | $75,548 | $81,502 | $84,478 | $83,112 | $87,456 |
| 8B+L20 | $84,246 | $90,200 | $93,176 | $91,810 | $96,154 |
| 8B+L22 | $89,142 | $95,096 | $98,072 | $96,706 | $101,050 |
| L5 | $1,010 | | | | |
| L10 | $4,130 | | | | |
| L13 | $6,253 | | | | |
| L15 | $10,736 | | | | |
| L18 | $11,912 | | | | |
| L20 | $20,610 | | | | |
| L22 | $25,506 | | | | |

**MAY 1, 2014**

| | BA | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|
| | C1 | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $46,445 | $52,459 | $55,464 | $54,085 | $58,472 |
| 1B | $46,445 | $52,459 | $55,464 | $54,085 | $58,472 |
| 2A | $49,407 | $55,421 | $58,426 | $57,047 | $61,434 |
| 2B | $49,407 | $55,421 | $58,426 | $57,047 | $61,434 |
| 3A | $49,817 | $55,831 | $58,836 | $57,457 | $61,844 |
| 3B | $49,817 | $55,831 | $58,836 | $57,457 | $61,844 |
| 4A | $50,538 | $56,552 | $59,557 | $58,178 | $62,565 |
| 4B | $50,538 | $56,552 | $59,557 | $58,178 | $62,565 |
| 5A | $51,162 | $57,176 | $60,181 | $58,802 | $63,189 |
| 5B | $51,162 | $57,176 | $60,181 | $58,802 | $63,189 |
| 6A | $51,833 | $57,847 | $60,852 | $59,473 | $63,860 |
| 6A+L5 | $52,853 | $58,867 | $61,872 | $60,493 | $64,880 |
| 6B | $52,784 | $58,798 | $61,803 | $60,424 | $64,811 |

| | | | | |
|---|---|---|---|---|
| 6B+L5 | $53,804 | $59,818 | $62,823 | $61,444 | $65,831 |
| 7A | $54,196 | $60,210 | $63,215 | $61,836 | $66,223 |
| 7A+L5 | $55,216 | $61,230 | $64,235 | $62,856 | $67,243 |
| 7B | $57,503 | $63,517 | $66,522 | $65,143 | $69,530 |
| 7B+L5 | $58,523 | $64,537 | $67,542 | $66,163 | $70,550 |
| 8A | $60,598 | $66,612 | $69,617 | $68,238 | $72,625 |
| 8A+L5 | $61,618 | $67,632 | $70,637 | $69,258 | $73,645 |
| 8B | $64,272 | $70,286 | $73,291 | $71,912 | $76,299 |
| 8B+L5 | $65,292 | $71,306 | $74,311 | $72,932 | $77,319 |
| 8B+L10 | $68,443 | $74,457 | $77,462 | $76,083 | $80,470 |
| 8B+L13 | $70,588 | $76,602 | $79,607 | $78,228 | $82,615 |
| 8B+L15 | $75,115 | $81,129 | $84,134 | $82,755 | $87,142 |
| 8B+L18 | $76,303 | $82,317 | $85,322 | $83,943 | $88,330 |
| 8B+L20 | $85,088 | $91,102 | $94,107 | $92,728 | $97,115 |
| 8B+L22 | $90,033 | $96,047 | $99,052 | $97,673 | $102,060 |
| L5 | $1,020 | | | | |
| L10 | $4,171 | | | | |
| L13 | $6,316 | | | | |
| L15 | $10,843 | | | | |
| L18 | $12,031 | | | | |
| L20 | $20,816 | | | | |
| L22 | $25,761 | | | | |

**SEPTEMBER 1, 2014**

| | BA | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|
| | C1 | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $48,445 | $54,459 | $57,464 | $56,085 | $60,472 |
| 1B | $48,445 | $54,459 | $57,464 | $56,085 | $60,472 |
| 2A | $49,407 | $55,421 | $58,426 | $57,047 | $61,434 |
| 2B | $49,407 | $55,421 | $58,426 | $57,047 | $61,434 |
| 3A | $49,817 | $55,831 | $58,836 | $57,457 | $61,844 |
| 3B | $49,817 | $55,831 | $58,836 | $57,457 | $61,844 |
| 4A | $50,538 | $56,552 | $59,557 | $58,178 | $62,565 |
| 4B | $50,538 | $56,552 | $59,557 | $58,178 | $62,565 |
| 5A | $51,162 | $57,176 | $60,181 | $58,802 | $63,189 |
| 5B | $51,162 | $57,176 | $60,181 | $58,802 | $63,189 |
| 6A | $51,833 | $57,847 | $60,852 | $59,473 | $63,860 |
| 6A+L5 | $52,853 | $58,867 | $61,872 | $60,493 | $64,880 |
| 6B | $52,784 | $58,798 | $61,803 | $60,424 | $64,811 |
| 6B+L5 | $53,804 | $59,818 | $62,823 | $61,444 | $65,831 |
| 7A | $54,196 | $60,210 | $63,215 | $61,836 | $66,223 |

| | | | | |
|---|---|---|---|---|
| 7A+L5 | $55,216 | $61,230 | $64,235 | $62,856 | $67,243 |
| 7B | $57,503 | $63,517 | $66,522 | $65,143 | $69,530 |
| 7B+L5 | $58,523 | $64,537 | $67,542 | $66,163 | $70,550 |
| 8A | $60,598 | $66,612 | $69,617 | $68,238 | $72,625 |
| 8A+L5 | $61,618 | $67,632 | $70,637 | $69,258 | $73,645 |
| 8B | $64,272 | $70,286 | $73,291 | $71,912 | $76,299 |
| 8B+L5 | $65,292 | $71,306 | $74,311 | $72,932 | $77,319 |
| 8B+L10 | $68,443 | $74,457 | $77,462 | $76,083 | $80,470 |
| 8B+L13 | $70,588 | $76,602 | $79,607 | $78,228 | $82,615 |
| 8B+L15 | $75,115 | $81,129 | $84,134 | $82,755 | $87,142 |
| 8B+L18 | $76,303 | $82,317 | $85,322 | $83,943 | $88,330 |
| 8B+L20 | $85,088 | $91,102 | $94,107 | $92,728 | $97,115 |
| 8B+L22 | $90,033 | $96,047 | $99,052 | $97,673 | $102,060 |
| L5 | $1,020 | | | | |
| L10 | $4,171 | | | | |
| L13 | $6,316 | | | | |
| L15 | $10,843 | | | | |
| L18 | $12,031 | | | | |
| L20 | $20,816 | | | | |
| L22 | $25,761 | | | | |

**MAY 1, 2015**

| | BA | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|
| | C1 | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $49,908 | $56,104 | $59,199 | $57,779 | $62,298 |
| 1B | $49,908 | $56,104 | $59,199 | $57,779 | $62,298 |
| 2A | $50,899 | $57,095 | $60,190 | $58,770 | $63,289 |
| 2B | $50,899 | $57,095 | $60,190 | $58,770 | $63,289 |
| 3A | $51,321 | $57,517 | $60,612 | $59,192 | $63,711 |
| 3B | $51,321 | $57,517 | $60,612 | $59,192 | $63,711 |
| 4A | $52,064 | $58,260 | $61,355 | $59,935 | $64,454 |
| 4B | $52,064 | $58,260 | $61,355 | $59,935 | $64,454 |
| 5A | $52,707 | $58,903 | $61,998 | $60,578 | $65,097 |
| 5B | $52,707 | $58,903 | $61,998 | $60,578 | $65,097 |
| 6A | $53,398 | $59,594 | $62,689 | $61,269 | $65,788 |
| 6A+L5 | $54,449 | $60,645 | $63,740 | $62,320 | $66,839 |
| 6B | $54,378 | $60,574 | $63,669 | $62,249 | $66,768 |
| 6B+L5 | $55,429 | $61,625 | $64,720 | $63,300 | $67,819 |
| 7A | $55,833 | $62,029 | $65,124 | $63,704 | $68,223 |
| 7A+L5 | $56,884 | $63,080 | $66,175 | $64,755 | $69,274 |
| 7B | $59,240 | $65,436 | $68,531 | $67,111 | $71,630 |

| | | | | | |
|---|---|---|---|---|---|
| 7B+L5 | $60,291 | $66,487 | $69,582 | $68,162 | $72,681 |
| 8A | $62,428 | $68,624 | $71,719 | $70,299 | $74,818 |
| 8A+L5 | $63,479 | $69,675 | $72,770 | $71,350 | $75,869 |
| 8B | $66,213 | $72,409 | $75,504 | $74,084 | $78,603 |
| 8B+L5 | $67,264 | $73,460 | $76,555 | $75,135 | $79,654 |
| 8B+L10 | $70,510 | $76,706 | $79,801 | $78,381 | $82,900 |
| 8B+L13 | $72,720 | $78,916 | $82,011 | $80,591 | $85,110 |
| 8B+L15 | $77,383 | $83,579 | $86,674 | $85,254 | $89,773 |
| 8B+L18 | $78,607 | $84,803 | $87,898 | $86,478 | $90,997 |
| 8B+L20 | $87,658 | $93,854 | $96,949 | $95,529 | $100,048 |
| 8B+L22 | $92,752 | $98,948 | $102,043 | $100,623 | $105,142 |
| L5 | $1,051 | | | | |
| L10 | $4,297 | | | | |
| L13 | $6,507 | | | | |
| L15 | $11,170 | | | | |
| L18 | $12,394 | | | | |
| L20 | $21,445 | | | | |
| L22 | $26,539 | | | | |

**MAY 1, 2016**

| | BA | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|
| | C1 | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $51,650 | $58,062 | $61,265 | $59,796 | $64,472 |
| 1B | $51,650 | $58,062 | $61,265 | $59,796 | $64,472 |
| 2A | $52,676 | $59,088 | $62,291 | $60,822 | $65,498 |
| 2B | $52,676 | $59,088 | $62,291 | $60,822 | $65,498 |
| 3A | $53,112 | $59,524 | $62,727 | $61,258 | $65,934 |
| 3B | $53,112 | $59,524 | $62,727 | $61,258 | $65,934 |
| 4A | $53,881 | $60,293 | $63,496 | $62,027 | $66,703 |
| 4B | $53,881 | $60,293 | $63,496 | $62,027 | $66,703 |
| 5A | $54,547 | $60,959 | $64,162 | $62,693 | $67,369 |
| 5B | $54,547 | $60,959 | $64,162 | $62,693 | $67,369 |
| 6A | $55,262 | $61,674 | $64,877 | $63,408 | $68,084 |
| 6A+L5 | $56,350 | $62,762 | $65,965 | $64,496 | $69,172 |
| 6B | $56,276 | $62,688 | $65,891 | $64,422 | $69,098 |
| 6B+L5 | $57,364 | $63,776 | $66,979 | $65,510 | $70,186 |
| 7A | $57,782 | $64,194 | $67,397 | $65,928 | $70,604 |
| 7A+L5 | $58,870 | $65,282 | $68,485 | $67,016 | $71,692 |
| 7B | $61,308 | $67,720 | $70,923 | $69,454 | $74,130 |
| 7B+L5 | $62,396 | $68,808 | $72,011 | $70,542 | $75,218 |
| 8A | $64,607 | $71,019 | $74,222 | $72,753 | $77,429 |

| | | | | | |
|---|---|---|---|---|---|
| 8A+L5 | $65,695 | $72,107 | $75,310 | $73,841 | $78,517 |
| 8B | $68,524 | $74,936 | $78,139 | $76,670 | $81,346 |
| 8B+L5 | $69,612 | $76,024 | $79,227 | $77,758 | $82,434 |
| 8B+L10 | $72,971 | $79,383 | $82,586 | $81,117 | $85,793 |
| 8B+L13 | $75,258 | $81,670 | $84,873 | $83,404 | $88,080 |
| 8B+L15 | $80,084 | $86,496 | $89,699 | $88,230 | $92,906 |
| 8B+L18 | $81,351 | $87,763 | $90,966 | $89,497 | $94,173 |
| 8B+L20 | $90,718 | $97,130 | $100,333 | $98,864 | $103,540 |
| 8B+L22 | $95,989 | $102,401 | $105,604 | $104,135 | $108,811 |
| L5 | $1,088 | | | | |
| L10 | $4,447 | | | | |
| L13 | $6,734 | | | | |
| L15 | $11,560 | | | | |
| L18 | $12,827 | | | | |
| L20 | $22,194 | | | | |
| L22 | $27,465 | | | | |

**MAY 1, 2017**

| | BA | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|
| | C1 | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $54,000 | 60,704 | $64,052 | $62,517 | $67,405 |
| 1B | $54,000 | $60,704 | $64,052 | $62,517 | $67,405 |
| 2A | $55,073 | $61,777 | $65,125 | $63,590 | $68,478 |
| 2B | $55,073 | $61,777 | $65,125 | $63,590 | $68,478 |
| 3A | $55,529 | $62,233 | $65,581 | $64,046 | $68,934 |
| 3B | $55,529 | $62,233 | $65,581 | $64,046 | $68,934 |
| 4A | $56,333 | $63,037 | $66,385 | $64,850 | $69,738 |
| 4B | $56,333 | $63,037 | $66,385 | $64,850 | $69,738 |
| 5A | $57,029 | $63,733 | $67,081 | $65,546 | $70,434 |
| 5B | $57,029 | $63,733 | $67,081 | $65,546 | $70,434 |
| 6A | $57,776 | $64,480 | $67,828 | $66,293 | $71,181 |
| 6A+L5 | $58,914 | $65,618 | $68,966 | $67,431 | $72,319 |
| 6B | $58,837 | $65,541 | $68,889 | $67,354 | $72,242 |
| 6B+L5 | $59,975 | $66,679 | $70,027 | $68,492 | $73,380 |
| 7A | $60,411 | $67,115 | $70,463 | $68,928 | $73,816 |
| 7A+L5 | $61,549 | $68,253 | $71,601 | $70,066 | $74,954 |
| 7B | $64,098 | $70,802 | $74,150 | $72,615 | $77,503 |
| 7B+L5 | $65,236 | $71,940 | $75,288 | $73,753 | $78,641 |
| 8A | $67,547 | $74,251 | $77,599 | $76,064 | $80,952 |
| 8A+L5 | $68,685 | $75,389 | $78,737 | $77,202 | $82,090 |
| 8B | $71,642 | $78,346 | $81,694 | $80,159 | $85,047 |

| | | | | | |
|---|---|---|---|---|---|
| 8B+L5 | $72,780 | $79,484 | $82,832 | $81,297 | $86,185 |
| 8B+L10 | $76,291 | $82,995 | $86,343 | $84,808 | $89,696 |
| 8B+L13 | $78,682 | $85,386 | $88,734 | $87,199 | $92,087 |
| 8B+L15 | $83,728 | $90,432 | $93,780 | $92,245 | $97,133 |
| 8B+L18 | $85,053 | $91,757 | $95,105 | $93,570 | $98,458 |
| 8B+L20 | $94,846 | $101,550 | $104,898 | $103,363 | $108,251 |
| 8B+L22 | $100,357 | $107,061 | $110,409 | $108,874 | $113,762 |
| L5 | $1,138 | | | | |
| L10 | $4,649 | | | | |
| L13 | $7,040 | | | | |
| L15 | $12,086 | | | | |
| L18 | $13,411 | | | | |
| L20 | $23,204 | | | | |
| L22 | $28,715 | | | | |

**MAY 1, 2018**

| | BA | EARNED MA OR EQUIV | | MA+30 | EARNED MA OR EQUIV+30 |
|---|---|---|---|---|---|
| | C1 | C2+PD | C2+ID+PD | C6 | C6+PD |
| 1A | $55,059 | $61,894 | $65,308 | $63,743 | $68,727 |
| 1B | $55,059 | $61,894 | $65,308 | $63,743 | $68,727 |
| 2A | $56,153 | $62,988 | $66,402 | $64,837 | $69,821 |
| 2B | $56,153 | $62,988 | $66,402 | $64,837 | $69,821 |
| 3A | $56,618 | $63,453 | $66,867 | $65,302 | $70,286 |
| 3B | $56,618 | $63,453 | $66,867 | $65,302 | $70,286 |
| 4A | $57,437 | $64,272 | $67,686 | $66,121 | $71,105 |
| 4B | $57,437 | $64,272 | $67,686 | $66,121 | $71,105 |
| 5A | $58,147 | $64,982 | $68,396 | $66,831 | $71,815 |
| 5B | $58,147 | $64,982 | $68,396 | $66,831 | $71,815 |
| 6A | $58,909 | $65,744 | $69,158 | $67,593 | $72,577 |
| 6A+L5 | $60,069 | $66,904 | $70,318 | $68,753 | $73,737 |
| 6B | $59,990 | $66,825 | $70,239 | $68,674 | $73,658 |
| 6B+L5 | $61,150 | $67,985 | $71,399 | $69,834 | $74,818 |
| 7A | $61,595 | $68,430 | $71,844 | $70,279 | $75,263 |
| 7A+L5 | $62,755 | $69,590 | $73,004 | $71,439 | $76,423 |
| 7B | $65,355 | $72,190 | $75,604 | $74,039 | $79,023 |
| 7B+L5 | $66,515 | $73,350 | $76,764 | $75,199 | $80,183 |
| 8A | $68,871 | $75,706 | $79,120 | $77,555 | $82,539 |
| 8A+L5 | $70,031 | $76,866 | $80,280 | $78,715 | $83,699 |
| 8B | $73,047 | $79,882 | $83,296 | $81,731 | $86,715 |
| 8B+L5 | $74,207 | $81,042 | $84,456 | $82,891 | $87,875 |
| 8B+L10 | $77,787 | $84,622 | $88,036 | $86,471 | $91,455 |

|        |           |           |           |           |           |
|--------|-----------|-----------|-----------|-----------|-----------|
| 8B+L13 | $80,225   | $87,060   | $90,474   | $88,909   | $93,893   |
| 8B+L15 | $85,370   | $92,205   | $95,619   | $94,054   | $99,038   |
| 8B+L18 | $86,721   | $93,556   | $96,970   | $95,405   | $100,389  |
| 8B+L20 | $96,706   | $103,541  | $106,955  | $105,390  | $110,374  |
| 8B+L22 | $102,325  | $109,160  | $112,574  | $111,009  | $115,993  |
| L5     | $1,160    |           |           |           |           |
| L10    | $4,740    |           |           |           |           |
| L13    | $7,178    |           |           |           |           |
| L15    | $12,323   |           |           |           |           |
| L18    | $13,674   |           |           |           |           |
| L20    | $23,659   |           |           |           |           |
| L22    | $29,278   |           |           |           |           |

**JUNE 16, 2018**

|        | BA       | EARNED MA OR EQUIV |           | MA+30    | EARNED MA OR EQUIV+30 |
|--------|----------|----------|-----------|----------|-----------|
|        | C1       | C2+PD    | C2+ID+PD  | C6       | C6+PD     |
| 1A     | $56,711  | $63,751  | $67,267   | $65,656  | $70,789   |
| 1B     | $56,711  | $63,751  | $67,267   | $65,656  | $70,789   |
| 2A     | $57,838  | $64,878  | $68,394   | $66,783  | $71,916   |
| 2B     | $57,838  | $64,878  | $68,394   | $66,783  | $71,916   |
| 3A     | $58,317  | $65,357  | $68,873   | $67,262  | $72,395   |
| 3B     | $58,317  | $65,357  | $68,873   | $67,262  | $72,395   |
| 4A     | $59,160  | $66,200  | $69,716   | $68,105  | $73,238   |
| 4B     | $59,160  | $66,200  | $69,716   | $68,105  | $73,238   |
| 5A     | $59,891  | $66,931  | $70,447   | $68,836  | $73,969   |
| 5B     | $59,891  | $66,931  | $70,447   | $68,836  | $73,969   |
| 6A     | $60,676  | $67,716  | $71,232   | $69,621  | $74,754   |
| 6A+L5  | $61,871  | $68,911  | $72,427   | $70,816  | $75,949   |
| 6B     | $61,790  | $68,830  | $72,346   | $70,735  | $75,868   |
| 6B+L5  | $62,985  | $70,025  | $73,541   | $71,930  | $77,063   |
| 7A     | $63,443  | $70,483  | $73,999   | $72,388  | $77,521   |
| 7A+L5  | $64,638  | $71,678  | $75,194   | $73,583  | $78,716   |
| 7B     | $67,316  | $74,356  | $77,872   | $76,261  | $81,394   |
| 7B+L5  | 468,511  | $75,551  | $79,067   | $77,456  | $82,589   |
| 8A     | $70,937  | $77,977  | $81,493   | $79,882  | $85,015   |
| 8A+L5  | $72,132  | $79,172  | $82,688   | $81,077  | $86,210   |
| 8B     | $75,238  | $82,278  | $85,794   | $84,183  | $89,316   |
| 8B+L5  | $76,433  | $83,473  | $86,989   | $85,378  | $90,511   |
| 8B+L10 | $80,120  | $87,160  | $90,676   | $89,065  | $94,198   |
| 8B+L13 | $82,631  | $89,671  | $93,187   | $91,576  | $96,709   |
| 8B+L15 | $87,931  | $94,971  | $98,487   | $96,876  | $102,009  |
| 8B+L18 | $89,322  | $96,362  | $99,878   | $98,267  | $103,400  |

| | | | | | |
|---|---|---|---|---|---|
| 8B+L20 | $99,607 | $106,647 | $110,163 | $108,552 | $113,685 |
| 8B+L22 | $105,394 | $112,434 | $115,950 | $114,339 | $119,472 |
| L5 | $1,195 | | | | |
| L10 | $4,882 | | | | |
| L13 | $7,393 | | | | |
| L15 | $12,693 | | | | |
| L18 | $14,084 | | | | |
| L20 | $24,369 | | | | |
| L22 | $30,156 | | | | |

Adult Education teachers shall be placed on the salary schedules above in accordance with the following:

1.  Teachers who meet the requirements for the salary differentials set forth above pursuant to applicable Board regulations, shall be placed on the appropriate salary lane.

2.  Teachers who do not qualify for salary differentials shall be placed on the base salary schedule.

3.  All teachers shall be placed on a salary step in accordance with their years of adult education service except as otherwise set forth in 4 and 5 below.

4.  Only teachers who are both appointed and are also assigned to work full-time, and those appointed pursuant to Chapter 201 of the Laws of 1979, may be paid a salary greater than Step 4a except as provided in paragraph 5 below.  Teachers appointed pursuant to the closed exam mandated by Chapter 201 of the Laws of 1979 may be paid a salary greater than Step 4A provided that they continue to meet the requirements for appointment under that license exam.

5.  Non-appointed incumbents whose adult education service exceeds three years on April 1, 1995 will be paid the greater of either (a) the salary on Step 4a of the appropriate salary lane; or (b) the base (B.A. lane) salary reflecting their years of adult education service on April 1, 1995.

Teachers paid pursuant to (b) shall thereafter receive only the general increases received by teachers on Step 4a, and they shall not advance further on the steps of the base (BA) salary schedule.  However, should such a teacher later become eligible for a salary differential, he or she will be paid the greater of either the April 1, 1995 base salary as adjusted in accordance with this provision, or the Step 4a salary of the then appropriate salary lane.

6.  Appointed teachers who are assigned to work full-time and who have at least an earned MA or equivalent shall advance on the salary schedule on their anniversary date and on March 1 of each year. All other teachers shall advance on the salary schedule only from one "A" step to the next higher "A" step (for example from Step 1A to Step 2A, etc.) on their anniversary date.

7.  Longevity increments are based on years of adult education service and are effective on the applicable anniversary date.

8.  The salary of individual teachers is pro-rated up or down depending on their regular assignment relative to 1,181 hours per year.

9.  "Full-time" assignment for adult education teachers shall mean regular assignment to work thirty hours and fifty minutes per week for a total of 1,181 hours

during the workyear. Teachers may be in full-time status for all or part of the workyear. The typical workyear is 191½ 6-hour and 10 minute days. Nothing herein shall be construed to alter the contractual workyear of 191 ½ workdays set forth in Article 14B2.

## APPENDIX G
## PROCEDURES FOR PROBABLE CAUSE HEARINGS

On October 2, 2005 the following understanding was reached regarding probable cause hearings:

The UFT will conduct a meeting of lawyers who represent UFT members at Education Law §3020-a proceedings to inform them about the new procedures regarding offenses involving sexual misconduct with a student or a minor not a student. During that meeting there will be a discussion of what could constitute probable cause, including that we agree that in a probable cause hearing the hearing officer may accept hearsay as evidence of probable cause, and that a criminal complaint and corroborating affidavit or the SCI report is sufficient evidence to create a rebuttable presumption of probable cause.

## APPENDIX H
## HOUSING SUPPORT PROGRAM FOR
## SHORTAGE AREA TEACHERS

### Program Overview

The Housing Support Program for shortage area teachers - which would be offered to certified, experienced teachers in middle and high school level math and science, and special education at all levels - is aimed at attracting the top talent in critical nationwide shortage areas to New York City. This program recognizes the challenges of relocating to or living in the metropolitan area and encourages both teachers formerly employed by the BOE and current teachers in other districts to consider New York City as an alternative to other career choices or other competitive school districts.

The program is an exciting - and new - opportunity to bring high quality, experienced teachers to our nation's highest need schools at the middle and high school levels in math and science, and special education at all levels. Fully certified teachers in these shortage areas who have taught a minimum of two years – either in their previous careers or currently, will be eligible (the BOE may elect to reduce the eligibility standard to one year's teaching experience). All applicants will have to pass a rigorous selection process. Successful applicants will receive housing support in return for a three-year service commitment.

### Target Teacher Population

This program will target NY certified (or eligible through reciprocity) experienced teachers with two or more years' full-time teaching in the local tri-state area and nationally (the BOE may elect to reduce the eligibility standard to one year's teaching experience). Those certified teachers who formerly taught in New York City are also eligible as long as they have been out of the system for at least 2 years. During upcoming recruitment trips to California, the northwest and the mid-southeast regions, recruiters

will encounter experienced teachers in critical shortage fields for whom a housing support program will definitely be an incentive to relocate. Advertising is done in advance of these trips, along with pre-screening of candidates' resumes. In addition, this program will be an incentive for teachers who may have left the profession to care for families or to be employed in non-teaching careers to strongly consider returning to active teaching. To be eligible for the housing support program, teachers may not have been employed as an appointed teacher by the Board of Education in the immediate past two years.

## Details of Housing Support

Applicants selected for the Program will be eligible for payment of housing-related expenses up to $5,000 which would be used for the following:
- Relocation expenses
- Down-payment on a mortgage
- Initial fees associated with rentals (broker fees, security deposits, first-month's rent)
- Current mortgage or rental payments

Teachers must commit to teach in New York City for a minimum of three years, and during the first two years of that commitment period, would receive a monthly housing stipend of $400 per month. Should the teacher resign or retire during the commitment period, the housing stipend would immediately cease and the teacher would repay a portion of the $5,000 upfront payment dependent upon years of service commitment remaining (participants whose circumstances during the service commitment change may apply for a release from the 3-year commitment based on medical or other severe hardship).

## Teacher Selection and Deployment Details

*Selection*

The Housing Support Program will focus on recruiting math and science teachers at the middle and high school level and special education teachers at all levels. All teachers in this program will be expected to teach in a high-needs school as identified through the Teachers of Tomorrow list of schools.

Overall, those eligible for Housing Support program will possess the following:
- Demonstrated ability to improve student achievement in their subject area.
- Strong instructional knowledge and content-expertise.
- Commitment to supporting the academic achievement of all students.
- Commitment to continuous learning and improvement of instructional practice.
- Strong communication skills.

DHR will determine an eligible candidate's suitability for the Housing Support program by:
- Interviewing applicants to assess whether they meet the qualifications listed above.

222

- Judging applicants against a hiring rubric.
- Checking references and validating full time teaching experience in the shortage area from prior schools/ school districts.
- Verifying certification in the shortage area.

*Deployment*

Once Housing Support program participants are selected, we must ensure that the schools with the strongest need for these experienced teachers receive them.  Therefore, we plan to target the following types of schools to receive these teachers:

Teachers of Tomorrow (TOT) schools which include all SURR schools, Impact schools and most SINI schools, in addition to schools which are located in traditionally more difficult to staff areas. The current list is comprised of 506 schools at all grade levels, but our focus would be at the middle and high schools levels.

Teachers selected to fill vacancies at TOT schools would also be eligible for the TOT stipend of $3,400 per year for up to four years, separate and apart from the Housing Support Program. DHR expects to have teachers available for selection in early summer and will source these candidates to specific high and middle schools with math, science and special education vacancies posted in Galaxy.

## Service Commitment

Teachers will receive the housing support detailed above in exchange for a service commitment of three years of teaching in the critical shortage field in a BOE school (participants whose circumstances during the service commitment period change may apply for a release from the 3-year commitment based on medical or other severe hardship).

A teacher who fails to satisfy the full term of the service agreement will agree in advance to repay a pro-rata portion of the value of the support provided as a penalty. This penalty will only be imposed on those individuals who voluntarily terminate their employment, or who do not provide satisfactory service or meet all NY certification requirements.

This and all other program requirements will be detailed in a supplemental contract to be signed by the participant and a representative from the Office of Recruitment.  The contract will be modeled on the current scholarship contract and will be approved by the Legal Department and discussed with the UFT prior to distribution.

## Project Management

The Office of Teacher Recruitment will execute all parts of the housing support program and follow up tracking and information required.

## Program Evaluation

We expect the Housing Support program teachers to bring us experienced teachers able to assist in significantly improving student achievement.   Therefore, we are proposing to work with research professors Jim Wyckoff and Tom Kane, who are

currently studying the comparative effectiveness of BOE teachers hired from different pathways, to measure the effectiveness of teachers hired through this pathway.

**Housing Assistance Program**

BOE and UFT will partner with the Department of Housing Preservation and Development (HPD) and partner non-profit organization(s) to provide home ownership assistance to UFT members which will include home ownership counseling and access to down-payment assistance for eligible members and their families. In addition, BOE and UFT will work with HPD to disseminate information and provide technical assistance regarding current lotteries for affordable rental and homeownership housing across the City.

**APPENDIX I**
**DISTRICT 79 REORGANIZATION**

Memorandum of Agreement entered into this 29th day of June 2007, by and between the Board of Education of the City School District of the City of New York (hereinafter referred to as the "BOE") and the United Federation of Teachers, Local 2, AFT, AFL-CIO (hereinafter the "UFT") amending the collective bargaining agreements for 2003-07 and 2007-09 between the UFT and the BOE governing Teachers and the corresponding provisions of the other collective bargaining agreements for 2003-07 and 2007-09 that govern other UFT-represented employees assigned to District 79 (hereinafter collectively the "Contract") to the extent set forth below.

**IN WITNESS WHEREOF**, it is mutually agreed to as follows:

1. The UFT will withdraw with prejudice any currently pending grievances related to the reorganization of District 79. The UFT will withdraw with prejudice any currently pending grievances related to (i) the closure of the current GED program (ASHS, CEC, OES, and VTC), (ii) New Beginnings, (iii) Schools for Pregnant Teens, (iv) Second Opportunity Schools and (v) Off-site Suspension Centers (hereinafter collectively, the "Closing Programs") and the creation of (i) a new GED program known as GED Plus (hereinafter "GED Plus"); (ii)a new school known as Restart; (iii) two new ACCESS schools (hereinafter, collectively, "GED Plus/Restart/ACCESS") and (iv) a new program for students suspended for one year (hereinafter "the New Suspension Program") (GED Plus/Restart/ACCESS and the New Suspension Program hereinafter collectively the "New Programs"). The UFT waives any claims under the Contract or under law not yet asserted as to (i) whether the Closing Programs are substantially the same as the New Programs; (ii) whether the BOE complied with its obligation to bargain with the UFT with respect to the BOE's decision to end the Closing Programs and create the New Programs; and (iii) whether the closure of the Closing Programs, the creation of the New Programs or the resulting personnel actions violate the Contract or any applicable law. The UFT does not waive any claims other

224

than those set forth in this paragraph 1 nor any claim that the BOE violated this Memorandum of Agreement.

2.  Section 18D of the Contract will apply to the staffing of the New Programs listed above except that section 18D(3) will apply to one-hundred percent of the bargaining unit positions (not fifty percent of the bargaining unit positions).   There will be one personnel committee established for each of the New Programs, but, for GED Plus/Restart/ACCESS, there will be five subcommittees, one for each borough.   Grievances challenging whether the personnel committee's decision regarding the qualifications of individual applicants will be granted if the arbitrator finds that there was no "reasonable basis" for the determination.  If one subcommittee finds an applicant qualified for GED Plus/Restart/ACCESS, that applicant shall be deemed qualified for employment in any borough.  The GED Plus/Restart/ACCESS personnel committee may require applicants to submit a cover letter or resume explaining how they meet the posted qualifications.  The BOE shall make every effort to have applications, including cover letters, submitted on-line.   The subcommittees shall do phone interviews for applicants that have prior commitments that prevent them from coming to in-person interviews.   The subcommittees will work according to a single hiring rubric created by the GED Plus/Restart/ACCESS personnel committee. The UFT and BOE will jointly conduct training sessions for members of the five subcommittees on the rubric.  The GED Plus/Restart/ACCESS personnel committee and the subcommittees shall consider applicants from all employees in all license areas.

3.  Employees excessed from the Closing Programs shall assert a preference as to where they will be deployed in the Absent Teacher Reserve (should they not secure a regular position) as follows: high school employees will list five individual high schools and then a borough; elementary and middle school employees will list five districts and then a borough. Preferences will be granted in seniority order up to a limit of one assignment per fully phased- in school (except in District 79, which is covered by paragraph 4 and not this paragraph 3).   Should these employees still be in ATR status in subsequent school years they will be deployed in the same district or borough as the school they were deployed to under the preference system provided for in this paragraph 3.

4.  Any actual vacancies in the New Programs that exist as of September 17, 2007 will be filled with excessed employees from the Closing Programs, in license (for GED Plus/Restart/ACCESS, all teaching licenses are appropriate) and in seniority order, under the following conditions: employees placed in these vacancies will serve for the balance of the 2007-2008 school year unless they are removed for disciplinary reasons. At the end of the 2007-2008 school year, if both the principal and

employee agree, the employee will be appointed to fill the vacancy in the school.  If either the employee or principal do not wish the assignment to continue, the employee will be placed back in ATR status and will be deployed according to the process set forth in paragraph 3 above.

5. The Second Opportunity Schools (hereinafter "SOS") and Off-Site Suspension Centers ("OSC") will close effective August 29, 2007. Employees currently working in SOS who wish to work in the New Suspension Program will be selected for the New Suspension Program. The second sentence of paragraph 6, the first sentence of paragraph 10 and the entire paragraph 12 of the Stipulation of Settlement executed November 17, 2006 with respect to SOS (the "Stipulation") shall apply to the New Suspension Program (the provisions in Paragraph 12 shall apply only to alleged violations of the second sentence of paragraph 6 and the first sentence of Paragraph 10 of the Stipulation).  Those employees having rights under the first sentence of paragraph 10 of the Stipulation may, alternatively, choose to be deployed as an ATR according to the process set forth in paragraph 3 of this Agreement above.  Nothing contained herein shall be construed as a waiver of any provision of the Stipulation until SOS and OSC are closed.  Placement in the New Suspension Program shall continue to be voluntary.  Staff presently assigned to SOS will have the right to remain in the New Suspension Program.  Current SOS and OSC employees will notify the BOE by June 30, 2007 whether they will choose to work the SOS summer 2007 session. SOS employees will be given the opportunity to indicate by July 13, 2007 whether they will choose to work in the New Suspension Program or, alternatively, whether they will choose to be deployed as an ATR according to the process set forth in paragraph 3 of this Agreement above.

6. The New Suspension Program's summer school program (hereinafter the "Suspension Summer Program") will be governed in all respects by the provisions of the Contract and Chancellor's Regulations governing per session programs, except that the pay for such summer service for UFT-represented employees will be pro-rata.  Employees working in the New Suspension Program shall have preference for the Suspension Summer Program.

7. Current SOS employees will be rated on their performance during the summer of 2007.  Those who receive a satisfactory rating and who worked in SOS during the summer of 2006 and received a satisfactory rating for the 2005-2006 school year will have retention rights under Section 15c2(a) of the Contract for work in 2008 Suspension Summer Program.

8. The BOE will post teaching positions that will support pregnant and parenting teens across the system.  100% of the teachers currently serving in the School for Pregnant Teens who apply and meet the posted

qualifications will be hired for these positions.  The BOE will consult with the UFT regarding the posting for these positions.  These teachers will be deployed out of the BOE's LYFE centers and referral centers ("hubs") where appropriate and the BOE will consult with the UFT regarding such deployment decisions.  No LYFE Center shall be closed through at least the 2008-2009 school year.

9.  The UFT will serve on a committee to be established by the BOE, which may also include advocates, community representatives and experts, to examine and make recommendations regarding best practices in supporting students across the system who are pregnant or parenting teens.

10. District 79 staff who are excessed from the Closing Programs will have the right of return to a vacancy in New Programs in seniority order if they were found qualified by an 18D committee but did not secure the position because more senior qualified applicants were selected.  For the programs in which multiple licenses are appropriate, all license areas will be grouped together for purposes of determining seniority with respect to the previous sentence.

11. All other terms of the Contract shall remain in full force and effect unless it is otherwise amended by or are inconsistent with the terms of this Memorandum of Agreement.

Agreed to this _____ day of June 2007:

Department of Education

/s/ Joel Klein

_____


United Federation of Teachers

/s/ Randi Weingarten

_____

**APPENDIX J**
**FALSE ACCUSATIONS**

Joel I Klein
Chancellor
Department of Education
52 Chambers Street
New York, NY  10007

December 17, 2007

Randi Weingarten
President
United Federation of Teachers
52 Broadway
New York, NY 10002

Dear Ms Weingarten,

Notwithstanding any provision of the Teacher CBA (and corresponding provisions in other UFT contracts) to the contrary, the parties agree that grievances may be initiated under Article 21H (False Accusations) of the Teacher agreement (and corresponding provisions in other UFT contracts) for the purpose of securing implementation of its specific provisions, including removal of material from the employee's personnel file.

Sincerely,

Joel I Klein

228

**APPENDIX K**
**PENSION LEGISLATION**

October 17, 2007


Randi Weingarten
President
United Federation of Teachers
52 Broadway – 14th Floor
New York, NY 10004

Dear Ms. Weingarten:

This letter will confirm certain mutual understandings and agreements of the parties.

The parties agree to jointly support legislation to amend current pension provisions that will contain the following elements in order to implement an optional "25/55" retirement program for current employees in the Teachers Retirement System (TRS) and the below listed UFT-represented members in the Board of Education Retirement Systems (BERS) and to provide a revised retirement paradigm for newly-hired employees in TRS and newly-hired UFT-represented members in BERS listed below.  The UFT-represented BERS titles to be included are:  all nurse and therapists titles, substitute vocational assistants, all non-annualized adult education titles, directors and assistant directors of drug and alcohol programs, sign language interpreters, all military science instructor titles, and all education officer and analyst titles.

The legislation will incorporate the following:

    (1)    An "opt-in period" of six months in which any incumbent employee who wishes to participate in this optional program must affirmatively submit a written election to participate.

    (2)    Additional Member Contributions (AMC) – in addition to all currently required statutory contributions, an Additional Member Contribution (AMC) of 1.85% shall be paid by those employees electing to participate in this optional program as well as by all newly-hired employees participating in the TRS and newly-hired UFT-represented above listed members participating in BERS retirement systems.  These additional member contributions shall become effective on the first business day after the enactment of this enabling legislation.

    (3)    Current incumbent employees including those on leave who elect to participate in this optional program and who pay the requisite AMC shall be eligible to retire at age 55 with 25 years of credited service with immediate

payability of pension benefits without any reduction.    Assuming the legislation is effectuated in the 2007-08 school year, those who elect this pension will be eligible to retire 6/30/2008 or later.

(4)    Employees hired after enactment of this enabling legislation shall be eligible to retire at age 55 with 27 years of service and receive immediate payability of pension benefits without any reduction.  This will not be construed to change the eligibility for retiree health insurance benefits (i.e., ten years of credited service and pension payability) as determined by the City and Municipal Labor Committee and in accordance with the Administrative Code.

(5)    To the extent the parties have not captured all of the necessary elements required to be enacted with enabling legislation (e.g., loan provisions, refund rules, etc.), the intent is that those elements shall be analogous to those comparable provisions contained in Chapter 96 of the Laws of 1995.  Should the parties be unable to agree on those specific terms in a timely fashion, they agree that the City Actuary, in consultation with the Law Department's Pension Division and the UFT, shall determine the final language for the proposed legislation consistent with the parties' mutual understandings.

If the above accords to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

Agreed and Accepted By:

_____                     October 17, 2007_____
Randi Weingarten                            Date
President
United Federation of Teachers

230

## APPENDIX L
## CONSULTANTS

Joel I Klein
Chancellor
Department of Education
52 Chambers Street
New York, NY  10007

December 17, 2007

Randi Weingarten
President
United Federation of Teachers
52 Broadway
New York, NY 10002

Dear Ms Weingarten,

The parties have agreed to the following clarifications of the 2007-09 Collective Bargaining Agreement covering Teachers (the "CBA"):

The UFT has reserved its rights to take any appropriate legal action with respect to consultants being used as mentors.

The parties agree that Article 8G2 and Appendix D of the CBA do not apply to the school-based mentoring program set forth in Article 11(IV)B or the Lead Instructional Mentor Position set forth in Article 11(IV)(D).

Sincerely,


Joel I. Klein

# APPENDIX M
# PARKING



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EDWARD SKYLER
DEPUTY MAYOR FOR OPERATIONS

August 26, 2008

Ms. Randi Weingarten
President
United Federation of Teachers
52 Broadway
New York, NY 10004

Dear Ms. Weingarten

As you know, Mayor Bloomberg announced earlier this year that the City of New York is implementing a comprehensive program to reduce the number and abuse of government parking placards. This program is part of our efforts to reduce traffic congestion, decrease the City's carbon footprint, and encourage the use of public transportation. Accordingly, the City has designated the Department of Transportation (DOT) and the Police Department as the sole issuing agencies of placards for on-street parking. No other agencies, including the Department of Education (DOE), are now permitted to issue on-street parking placards. With respect to DOE, the transition to the new system will be implemented over the coming weeks as follows:

1. DOE currently has 10,007 on-street parking spots allocated by DOT. These spots have been assigned to individual schools by DOE based on the location of the on-street spots and schools. All of these spots will continue to be available for school parking. In addition, DOE has 15,060 off-street parking spots, each of which will also continue to be available for school parking.

2. DOT will produce and DOE will issue 10,007 Agency Authorized On-Street Parking Placards which allow an individual to park in the on-street spaces designated for a specific school. DOE will continue to issue separate placards valid only for access to the 15,060 off-street parking spots.

3. With respect to the recipients of the on-street and off-street placards, principals and the United Federation of Teachers (UFT) Chapter Leaders will decide on one of the following distribution methods: (1) assignment to individual staff; (2) pooling of placards for use each day; or (3) some combination of these two options. If a principal and the UFT Chapter Leader cannot agree, then the UFT

♻ Printed on paper containing 30% post-consumer material.

President and Commissioner of the Office of Labor Relations, or their respective designees, will make a final decision.

4. If a principal or UFT Chapter Leader believes: (1) a school deserves additional curb-space allocated for school parking; (2) the number of current on-street spaces was incorrectly counted; or (3) there is additional off-street space that is underutilized, they can appeal to DOT and DOE through the Mayor's Office of Operations.

5. DOT will produce and DOE will issue at least 1,000 additional placards to teachers and staff whose work requires them to visit multiple sites during the course of their workdays, and will also consider requests for placards for teachers that travel between assigned schools. Specific offices and groups for whom these placards are intended include, but are not limited to, the following: Adult and Continuing Education, Citywide Speech Services, Educational Vision Services, Hearing Education Services, Home Instruction, Hospital Instruction, Non-Public Schools, UFT, and some administrative offices. The majority of these placards will be Agency Business Parking Placards which allow an individual to park citywide for three hours at a time (parking meters, etc). The distribution of these placards will be determined by the Chancellor or his designee.

6. The issuance of new placards will start with the beginning of the school year so that the system can be fully in place by October 1. Once the new system has been implemented, violators will be subject to enforcement by the Police Department.

7. The UFT will hold the grievance in abeyance.

Note that with respect to Transit Check, we are already in the process of implementing a program and the RFP that has been put out is due back to the City in September.

Please feel free to contact me at (212) 788-3191 with any questions or additional concerns regarding the transition to the new system.

Sincerely,

Edward Skyler

cc: Joel I. Klein, Chancellor, Department of Education
    Raymond W. Kelly, Commissioner, Police Department
    James F. Hanley, Commissioner, Office of Labor Relations
    Janette Sadik-Khan, Commissioner, Department of Transportation

# APPENDIX N
# CLOSING OF ISLAND AND HORIZON ACADEMIES

CLOSING OF ISLAND AND HORIZON ACADEMIES
MEMORANDUM OF AGREEMENT
Between
THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK
And
UNITED FEDERATION OF TEACHERS, LOCAL 2, AFT, AFL-CIO

This Memorandum of Agreement ("MOA"), effective as of July 16, 2010, is made by and between the Board of Education of the City School District of the City of New York ("DOE") and the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") regarding the closing of Island and Horizon Academies ("Closing Programs") on Rikers Island and the opening of a single program ("Rikers Island Academy" or "New Program") for the 2010-2011 school year and beyond.

WHEREAS, the mission of District 79: Alternative Schools and Programs ("District 79") is to re-engage and empower students through rigorous instruction and quality support services, and to serve as a model for innovative and replicable strategies of alternative schools and programs and in connection therewith District 79 operates the educational programs on Rikers Island, public school programs that seek to educate and provide social/emotional and other supports to students who are incarcerated therein;

IN WITNESS WHEREOF, it is mutually agreed to as follows:

1.  The UFT waives any claims under any of the collective bargaining agreements (the "CBAs") between the UFT and the DOE or under law as to:
    (i)   Whether the Closing Programs are substantially the same as the New Program;
    (ii)  Whether the DOE complied with its obligation to bargain with the UFT with respect to the DOE's decision to end the Closing Programs and create the New Program; and
    (iii) Whether the closure of the Closing Programs, the creation of the New Program or the resulting personnel actions violate the CBAs or any applicable law.

    The UFT does not waive any claims of any type other than those specifically set forth in this paragraph 1, nor any claim that the DOE violated this MOA.

2.  The Closing Programs will close effective August 27, 2010 and the New Program will open as of that same date.

3.  All UFT-represented employees ("Employees") excessed from the Closing Programs will have three options:
    (i)   apply for positions in the New Program and have the opportunity to be selected for a position in the New Program in accordance with the procedures set forth herein;
    (ii)  seek a position outside of District 79 through the Open Market Hiring System, the Excessed Staff Selection System, and any other applicable resources; or
    (iii) be placed as an Absent Teacher Reserve ("ATR") in a District 79 program pursuant to the procedures set forth herein.

Employees currently assigned to the Closing Programs shall have until July 26, 2010 to apply to work in the New Program.

4.  Section 18D of the collective bargaining agreement covering teachers (the "Teachers' CBA") will apply to the staffing of all positions for all Employees in the New Program with the following changes: Section 18D4 of the Teachers CBA will apply to one-hundred percent of the positions (not fifty percent of the positions). Notwithstanding Section 18D1 of the Teachers' CBA, there will be three (3) personnel committees established for the New Program and each committee shall consist

Page 1

of two (2) UFT representatives, two (2) DOE representatives, and either the principal of the New Program or District79 representative. These committees:

(i)    May require applicants only to submit a cover letter or resume explaining how they meet the posted qualifications. The cover letters and resumes shall be submitted online to an address designated by the DOE in the postings.

(ii)    Shall conduct interviews for all qualified applicants from July 20, 2010 through August 31, 2010.

(iii)    Shall conduct phone interviews for applicants that have prior commitments that prevent them from coming to in-person interviews.

(iv)    Shall work according to a single hiring rubric created by the personnel committee.

(iv)    Shall consider qualified applicants from all Employees in all license areas.

The UFT and DOE will jointly conduct a training session for the members of the personnel committees on the rubric on July 19, 2010.

Grievances challenging whether the personnel committees' decision regarding the qualifications of individual applicants will be granted if the arbitrator finds that there was no "reasonable basis" for the determination.

Teachers who are selected to work in the New Program may assert a program preference in accordance with the procedures set forth in the CBAs for the term beginning September 2010. To the extent any such preference process exists regarding programs or assignments in other applicable CBAs, this paragraph shall not be construed as a waiver of any such provisions. School seniority, where applicable, will include all prior service in either or both of the closing programs. The DOE agrees to implement any reorganization grievance decisions arising from the process no later than February 1, 2011.

5.    The UFT and DOE shall agree on the number of Absent Teacher Reserve ("ATR") positions that there may be at each school/program (and, where applicable, particular site) in District 79 given space limitations. All Employees excessed from the Closing Programs shall be given a complete list of these positions. The DOE shall place all Employees excessed from the Closing Programs (who are not selected by the personnel committees for the New Program and who do not secure another regular position) into an ATR position in District 79, in seniority order, at the school/program (and, where applicable, particular site) of the Employee's preference. In addition to any other rights the Employee may have, an Employee who believes that the particular location he/she is assigned to in an ATR position is an undue burden because of the travel time from the Employee's home to the site, he/she may request that representatives of the DOE and UFT jointly review the assignment. If the UFT and DOE representatives agree the assignment presents an undue burden, the Employee shall be reassigned to a location jointly determined by the UFT and DOE representatives. Should any Employee excessed from the Closing Programs be in ATR status in subsequent school years, they will not be assigned outside of the borough they were assigned to pursuant to the preference system provided for in this paragraph 5.

6.    By September 21, 2010, Employees excessed from Closing Programs serving in ATR positions pursuant to paragraph 5 shall, in license and in seniority order, be placed, if they choose, in any vacancies that exist in District 79 programs, under the following conditions: Employees placed in the vacancies shall serve for the balance of the 2010-2011 school year. At the end of the 2010-2011 school year, if both the principal and Employee agree, the Employee will be appointed to fill the vacancy in the school. If either the Employee or principal do not wish the assignment to continue, the Employee will be placed back in ATR status and will return to ATR status in District 79 in the same borough as they were assigned as an ATR pursuant to paragraph 5.

Page 2

7.     The summer school programs on Rikers Island will continue for the summer of 2010 and retentions rights to that program shall continue to be governed in all respects by the provisions of the applicable CBAs and existing regulations, precedents, policies and practices.  District 79 reserves the right to modify the size of its summer program for the summer of 2010 and beyond and also reserves the right to change the existing summer program at Rikers Island in the future.  This MOA shall not be construed as a waiver by the UFT or any Employee of any rights (under any CBA or otherwise) regarding summer school programs at Rikers Island, including, but not limited to, should District 79 change the summer programs in the future.

8.     The DOE shall maintain a Teacher Center in the New Program for the 2010-11 school year.

9.     District 79 shall request a "Gate 1" pass from the New York City Department of Corrections ("DOC") for use by a UFT-designated representative. The UFT acknowledges the DOC is not a party to this MOA and has the final authority as to whether the District 79 request is granted.

10.    Given the consolidation of programs and the unique setup at Rikers Island, to the DOE shall program the 5 release periods per week for the chapter leader pursuant to Article 19B1b of the Teachers' CBA either consecutively on one day or in two blocks on two days.

11.    Any settlement of, decision in or order in Public Employment Relations Board cases U-27415 and U-27692 shall apply fully to the New Program in the same manner as it would apply to the Closing Programs.

12.    Nothing in this Agreement shall constitute a waiver or modification of any provision of the CBA, other agreement between the Department and the UFT, applicable Department by-laws, policies, and regulations of the Chancellor, or past practice except as specifically set forth herein.

13.    This MOA may be executed in counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same instrument.

14.    This MOA represents the entire understanding and agreement of the parties with respect to the subject matter hereof and any other purported written and/or verbal agreement shall be null and void.

THE FOREGOING IS UNDERSTOOD, ACCEPTED AND AGREED TO BY:

UNITED FEDERATION OF TEACHERS, LOCAL 2, AFT, AFL-CIO

BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK

Signature

Signature

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

Page 3

# APPENDIX O
# PEER VALIDATORS



**Department of
Education**
Carmen Fariña, Chancellor

Adam Ross
United Federation of Teachers
52 Broadway
New York, New York 10007

Dear Adam:

In the event a Peer Validator concurs with a principal's assessment of a teacher's performance and the Department files charges against the teacher under Education Law §3012-c, this letter shall acknowledge the Parties' agreement.  Peer Validators are not permitted to assess teacher's preparation and professionalism on components 1a, 1e and/or 4e outside of a teacher's classroom observation (pursuant to the MOA).

However, notwithstanding the Parties' agreement regarding components 1a, 1e and 4e, teachers  shall not be precluded from specifically contesting the validity of the ratings of components 1a, 1e and/or 4e regardless of whether or not they have been reviewed by Peer Validators.

Please sign and return to me at your earliest convenience.

Sincerely,

David Brodsky

Adam Ross

**APPENDIX P**
**UNIT**
**PLAN**

| | |
|---|---|
| Topic/Theme/Duration | |
| Essential Question(s) | |
| Standard(s) | |
| Key Student Learning Objectives | |
| Sequence of Key Learning Activities | |
| Text(s) and Materials to be Used | |
| Assessment(s) | |